**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP, | : |
| *Plaintiff*, | : |
| v. | : |
| THE FRIARS NATIONAL ASSOCIATION, INC.; CITY OF NEW YORK DEPARTMENT OF ENVIRONMENTAL CONTROL; COMMISSIONER OF LABOR STATE OF NEW YORK DEPARTMENT OF LABOR; NEW YORK STATE TAX DEPARTMENT LEGAL DEPARTMENT; NEW YORK CITY FINANCE ADMINISTRATION BUREAU OF COMPLIANCE AND COLLECTION; HOTEL RESTAURANT & CLUB EMPLOYEES AND BARTENDERS UNION LOCAL 6 AND CLUB EMPLOYEES PENSION FUND; and "JOHN DOE #1" through "JOHN DOE #20," the twenty names being fictitious and unknown to the Plaintiffs, the person or partiees intended being the tenants, occupants, persons or corporations, if any, having or claiming an interest in lien upon the premises, | : Civil Action No. |
| *Defendants*. | : |

## DECLARATION OF RAYMOND HU A/K/A ZILONG HU IN SUPPORT OF PLAINTIFF'S MOTION FOR THE APPOINTMENT OF A RECEIVER

RAYMOND HU A/K/A ZILONG HU, pursuant to 28 U.S.C. § 1746, hereby declares as follows

1.      My name is Raymond Hu, also known as Zilong Hu. I am over 21 years of age and am competent to give testimony.

2.      I am Head of Real Estate Credit for Kairos Investment Management Company, an affiliate of Kairos Credit Strategies REIT, Inc., a partner of Kairos Credit Strategies Operating Partnership, LP ("Plaintiff"), which is the lender of the subject loan under that certain Consolidated, Extended, Amended and Restated Term Loan and Security Agreement dated as of

June 25, 2021. I submit this declaration in support of Plaintiff's motion for appointment of a temporary receiver of, *inter alia*, the property that is the subject of this action.

3.      I make this Declaration based upon my personal knowledge and upon review of the books and records of Plaintiff kept in the ordinary course of Plaintiff's business and in the Plaintiff's possession and control. I am personally familiar with the asset management practice and procedures of Plaintiff with regard to servicing of mortgage loans, including record keeping as it pertains to custody of notes, mortgages, and other loan documents with respect to mortgage loans held by Plaintiff. In connection with performing its duties as lender, Plaintiff creates, receives, and maintains records, including the documents attached as exhibits to the Complaint (as defined below) and this declaration, in the regular course of Plaintiff's business activities. All of the documents were received, created, or otherwise generated at or near the dates reflected on such documents.

4.      I submit this Declaration in support of the Plaintiff's application for an order: (i) appointing Trigild, LLC, with offices at 24 Church Street, Montclair, New Jersey 07042 Telephone No. (973) 226-1950, as receiver for the real property and improvements located at 57 East 55th Street, New York, New York 10022 (Block: 1291, Lot: 127) (the "Mortgaged Premises"), as well as the personal property related thereto (the "Mortgaged Property"), both as more particularly described in Exhibit H to the Complaint,[1] which are owned by defendant The Friars National Association, Inc. ("Borrower"); and (ii) for such other and further relief as the Court deems just and proper in these circumstances (the "Application").

---

[1] Upon information and belief, the Mortgaged Premises is a building known as the "Martin Erdmann House," a designated a New York City Landmark, which at one time housed the venerable New York Friars Club, a historic comedy club founded in 1904, famous for its comedy roasts, and led by the likes of Larry King, Jerry Lewis, Frank Sinatra, and Ed Sullivan. Recently, and as evidenced in this Complaint, the New York Friars Club has fallen on hard times financially.

2

5.    Plaintiff commenced this action by filing the Summons and Complaint (the "Complaint") seeking, among other things, foreclosure of its Mortgage (defined below).

## I.    THE LOAN AND LOAN DOCUMENTS

### A.    The Prior Loan

6.    On or about February 21, 2020, Borrower became indebted to Titan Capital ID, LLC ("Original Lender") in the principal sum of NINE MILLION AND NO/100 dollars ($9,000,000) (the "Original Loan") in connection with the assignment of pre-existing mortgage debt to Original Lender and additional loan advances to Borrower made by Original Lender.

7.    In connection with the Original Loan, Borrower executed that certain Consolidated, Extended, Amended and Restated Mortgage Note dated February 21, 2020, in the principal sum of NINE MILLION AND NO/100 dollars ($9,000,000) (as amended, extended, restated, and/or assigned, the "Original Note").

8.    Repayment of the Original Note is secured by, among other things, that certain Consolidation, Modification and Extension of Mortgage, Assignment of Leases and Rents and Security Agreement (as amended, extended, restated, and/or assigned, the "Original Mortgage"), dated as of February 21, 2020, executed by Borrower as borrower and mortgagor, in favor of Original Lender, as lender and mortgagee.

9.    The Original Mortgage was recorded on March 4, 2020 with the Office of the City Register of the City of New York (the "City Register") as City Register File No. ("CRFN") 202000082528. A true and correct copy of the Original Mortgage is annexed to the Complaint as Exhibit A.

10.     The Original Note and the Original Mortgage, together with all other documents or agreements executed and delivered in connection with the Original Loan are collectively referred to herein as the "Original Loan Documents."

**B.      Assignment of Loan Documents to Plaintiff**

11.     On or about June 25, 2021, Original Lender assigned the Original Loan Documents, including the Original Note and the Original Mortgage, to Plaintiff (the "Assignment").

12.     In connection with the Assignment, Original Lender executed and delivered the following documents to Plaintiff:

      a.    That certain Allonge to the Original Note by Original Lender in favor of Plaintiff, a true and correct copy of which is annexed to the Complaint as Exhibit B and

      b.    That certain Assignment of Mortgage, effective as of June 25, 2021, which was properly recorded with the City Register on July 7, 2021 as CRFN 2021000256894, a true and correct copy of which is annexed to the Complaint as Exhibit C.

**C.      The Loan from Plaintiff**

13.     On or about June 25, 2021, Borrower became indebted to Plaintiff in the principal sum of THIRTEEN MILLION AND NO/100 Dollars ($13,000,000.00) (the "Loan") in connection with the Assignment and additional loan advances to Borrower made by Plaintiff.

14.     The Loan is evidenced by that certain Consolidated, Extended, Amended and Restated Term Loan and Security Agreement dated June 25, 2021 executed by and between Borrower, as borrower, and Plaintiff, as lender (as amended, extended, restated, and/or assigned, the "Loan Agreement"). A true and correct copy of the Loan Agreement is annexed to the Complaint as Exhibit D.

69777181;3

15.     In connection with the Loan, Borrower executed that certain Gap Promissory Note made by Borrower to Plaintiff dated June 21, 2021 in the principal sum of FOUR MILLION AND NO/100 dollars ($4,000,000.00) (the "Gap Note"). A true and correct copy of the Gap Note is annexed to the Complaint as Exhibit E.

16.     Repayment of the Gap Note is secured by, among other things, that certain Gap Mortgage (the "Gap Mortgage"), which is dated as of June 25, 2021, and was executed by Borrower, as mortgagor, in favor of Plaintiff, as mortgagee.

17.     The Gap Mortgage was recorded on July 7, 2021 with the City Register as CRFN 2021000256896. A true and correct copy of the Gap Mortgage is annexed to the Complaint as Exhibit F.

18.     In connection with the Loan, Borrower executed that certain Consolidated, Extended, Amended and Restated Promissory Note dated June 25, 2021 in the principal sum of THIRTEEN MILLION AND NO/100 Dollars ($13,000,000.00) (as amended, extended, restated, and/or assigned, the "Note"). A true and correct copy of the Note is annexed to the Complaint as Exhibit G.

19.     The Note consolidated, extended, amended, and restated (i) the Original Note and (ii) the Gap Note, as set forth therein.

20.     Repayment of the Note is secured by, among other things, the Mortgage, which is dated as of June 25, 2021, and was executed by Borrower, as mortgagor, in favor of Plaintiff, as mortgagee. The Mortgage consolidated, extended, amended and restated the (i) Original Mortgage and (ii) the Gap Mortgage.

69777181;3

21.     The Mortgage was recorded on July 7, 2021 with the City Register as CRFN 2021000256897. A true and correct copy of the Mortgage is annexed to the Complaint as Exhibit H.

22.     The Loan is further secured by an Assignment of Leases and Rents dated as of June 25, 2021, executed by Borrower, as assignor, in favor of Plaintiff, as assignee (the "Assignment of Leases").

23.     The Assignment of Leases was recorded on July 7, 2021 with the City Register as CRFN 2021000256898. A true and correct copy of the Assignment of Leases is annexed to the Complaint as Exhibit I.

24.     In connection with the Loan, Borrower also executed that certain Cash Management Agreement (the "Cash Management Agreement") dated as of June 25, 2021, pursuant to which, Borrower agreed, among other things, that upon the occurrence of an Event of Default, as defined therein, Plaintiff had the right, and Borrower agreed to cooperate, to implement cash management in accordance with the Cash Management Agreement and other Loan Documents. A true copy of the Cash Management Agreement is annexed to the Complaint as Exhibit J.

25.     On June 29, 2021, a UCC Financing Statement was filed with the New York Department of State as Filing Number 202106290234558 (the "State UCC"). A true copy of the State UCC is annexed to the Complaint as Exhibit K.

26.     On July 7, 2021, a UCC Financing Statement was filed with the Office of the City Register of the City of New York as CFRN 2021000256899 (the "City UCC"). A true and correct copy of the City UCC is annexed to the Complaint as Exhibit L.

27.     The Loan Agreement, the Gap Note, the Gap Mortgage, the Note, the Mortgage, the Assignment of Leases, the Cash Management Agreement, the County UCC, and the City UCC

69777181;3

together with all other documents or agreements executed and delivered in connection with the Loan, are collectively referred to as the "Loan Documents."

28.     As of the date hereof, as a result of the facts described above, evidenced by each of the written assignments, Plaintiff is the owner and holder of the Loan Documents, including, but not limited to, the Note and the Mortgage.

## II.     BORROWER'S EVENTS OF DEFAULT

29.     Pursuant to section 19 of the Mortgage, "[Borrower] shall be in default under this Mortgage upon the occurrence of any default or breach by [Borrower] of the terms, conditions, representations, warranties, and covenants of this Mortgage and upon the occurrence of an Event of Default in accordance with the terms of the Loan Agreement or any of the other Loan Documents …."

30.     Pursuant to section 2 of the Mortgage, "[Borrower] shall comply with all provisions hereof, of the Note, and of all of the other Loan Documents…."

31.     Pursuant to section 8.1 of the Loan Agreement, "Any one or more of the following events, following any applicable notice requirements and/or cure period, if any, shall constitute an event of default … under this Agreement: … (o) If any event of default as defined in any of the other Loan Documents occurs and is not cured within the applicable notice and/or cure period, if any[.]"

### A.     Payment Defaults

32.     Pursuant to Section 2.4 of the Loan Agreement, Borrower was required to make a payment to Plaintiff of interest in arrears on the principal balance of the Loan at a per annum rate equal to the Interest Rate, as defined therein, on each Payment Date (each a "Monthly Debt Service

Payment"), as defined therein, occurring in August 2021 on each payment date thereafter to and including the Maturity Date, as defined therein.

33.     Pursuant to section 8.1 of the Loan Agreement, an Event of Default occurs "If Borrower fails to pay when due and payable, or when declared due and payable in accordance with this Agreement, all or any portion of the Obligations (whether principal, interest (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts), fees and charges due Lender, reimbursement of Lender Expenses, or other amounts constituting Obligations) within ten (10) days that such payment is due without need for further Lender notice …."

34.     Pursuant to section 2 of the Mortgage, Borrower was obligated to "promptly pay to [Plaintiff] the principal with interest thereon and all other sums required to be paid by [Borrower] under the Note, this Mortgage, and of all of the other Loan Documents."

35.     Borrower failed to timely make the Monthly Debt Service Payment due on March 1, 2023, and each Monthly Debt Service Payment thereafter (the "Payment Defaults").

36.     On March 13, 2023, Plaintiff sent Borrower a written Notice of Default (the "First Notice of Default"), which set forth the Payment Defaults and demanded Borrower cure the Payment Defaults immediately. On March 30, 2023, Plaintiff sent Borrower another written Notice of Default demanding Borrower pay the entire outstanding balance under the Loan (the "Second Notice of Default" and, collectively with the First Notice of Default, the "Notices of Default"). Borrower failed to cure the Payment Defaults despite its receipt of the Notices of Default. True and correct copies of the Notices of Default are annexed to the Complaint as Exhibit M.

37.     Accordingly, the Payment Defaults constitute Events of Default under the Loan Documents, which exist and have existed as of the date hereof.

### B.    <u>Insurance Defaults</u>

38.     Pursuant to Section 4 of the Mortgage, "[Borrower] shall obtain, maintain and keep in full force and effect during the term of this Mortgage, or cause Mortgagor's lessees to obtain, maintain and keep adequate insurance coverage, with all premiums paid thereon and without notice or demand, with respect to its properties and business against loss or damage of the kinds and in the amounts as set forth in the Loan Agreement."

39.     Section 5.1 of the Loan Agreement provides that "Borrower will maintain, or cause to be maintained, with respect to the Property, fire and extended coverage insurance policies … Borrower shall also furnish to Lender, promptly following Borrower's receipt thereof (i) copies of all insurance policies (or certificates thereof), including title insurance, affecting the Property and (ii) the original or copy of all recorded documents affecting the Property."

40.     Section 5.14 of the Loan Agreement provides "Borrower shall furnish to Lender and maintain at all times, at Borrower's sole cost and expense, such policies of insurance in such amounts and in accordance with the standards set forth on Exhibit D attached hereto." Exhibit D to the Loan Agreement requires Borrower "to maintain … insurance cover[age] with respect to the property at all times during the term of the loan[.]" Such insurance coverage includes, without limitation, umbrella liability, general liability, flood, and property insurance. *See* Exhibit D to Loan Agreement.

41.     Borrower failed to maintain adequate insurance coverage during the term of the Mortgage; specifically, although an insurance policy is in place on the Mortgaged Premises, due Borrower's abandonment of the Mortgaged Premises and the vacancy provisions contained in the applicable insurance policy, the amount of coverage has been compromised, resulting in a lack of

coverage of a number of otherwise covered events, beneath the requirements of the Loan Agreement (the "Insurance Defaults").

42.     As a result of the Insurance Defaults, Borrower caused Events of Default to occur under the Loan Documents, which exist and have existed as of the date hereof.

**C.    Care and Use Defaults**

43.     On or about March 23, 2023, pursuant to its rights under section 15 of the Mortgage and Section 7.6 of the Loan Agreement, Plaintiff performed an inspection of the Mortgaged Premises (the "Inspection"). A true and correct copy of the report summarizing the observations made during the Inspection (the "Inspection Report") is annexed to the Complaint as Exhibit N.

44.     Pursuant to Section 6 of the Mortgage, "Mortgagor shall not permit, commit or suffer any waste, impairment or deterioration of the Mortgaged Property or any part thereof, and shall keep the same and improvements thereon in good condition and repair. Mortgagor shall notify Lender in writing within five (5) days of any damage or impairment of the Mortgaged Property."

45.     During the Inspection, Plaintiff observed that the Mortgaged Premises: (i) appeared to be completely abandoned; (ii) had exposed electrical wiring and breaker boxes with missing electrical panel covers, (iii) had extensive water and mold damage, (iv) was littered with mounds of trash, (v) showed signs of the presence of rodents and roaches, (vi) had a standing pool of water about one inch deep in the sub-basement, (vii) had broken furniture, (viii) had damage to many of the ceilings, (ix) was littered with soiled towels and other laundry, (x) appeared to be missing several items of valuable memorabilia and Mortgaged Property once present in the Mortgaged Premises based upon picture hooks and hardware with evidence of missing photographs and artwork, and (xi) had legal documents, including certain demand letters as well as possible confidential information strewn about haphazardly.

69777181;3

46.    Upon information and belief, the Mortgaged Premises are not managed by any Property Manager, as that term is defined in the Loan Agreement, subject to any Management Agreement, as that term is defined in the Loan Agreement.

47.    Upon information and belief, Borrower is unable to afford to hire a Property Manager, as that term is defined in the Loan Agreement.

48.    The above facts establish that the Mortgaged Premises are subject to "waste, impairment or deterioration" and are not kept "in good condition and repair."

49.    Moreover, Borrower failed to notify Plaintiff in writing within five (5) days of such damage and impairment to the Mortgaged Premises and Mortgaged Property (collectively, the "Care and Use Defaults").

50.    As a result of the Care and Use Defaults, Borrower caused Events of Default to occur under the Loan Documents, which exist and have existed as of the date hereof.

###    D.    Negative Covenant Defaults

51.    Pursuant to section 6.4 of the Loan Agreement, "Borrower shall not convey, sell, lease, license, assign, transfer, or otherwise dispose of any of Borrower's assets without the prior written consent of [Plaintiff], to be granted or withheld in [Plaintiff]'s sole discretion."

52.    During the Inspection, Plaintiff observed that wall décor had been removed from more than one wall. Plaintiff did not provide any consent to sale, removal, transfer, or disposition of any of the wall décor, which is part of the Mortgaged property, nor did Borrower provide any notice of such sale, removal, transfer or disposition (the "Asset Disposal Defaults"). *See generally* Ex. N.

53.    As a result of the Asset Disposal Defaults, Borrower caused Events of Default to occur under the Loan Documents, which exist and have existed as of the date hereof.

54.     Pursuant to Section 6.13 of the Loan Agreement, "Borrower shall not suspend or change a substantial portion or its or their business."

55.     Borrower appears to have abandoned the Mortgaged Premises no longer operates the business it once operated in the Mortgaged Premises. Borrower has suspended a substantial portion of its business (the "Change of Business Default").

56.     As a result of the Change of Business Default, Borrower caused an Event of Default to occur under the Loan Documents, which exists and has existed as of the date hereof.

57.     Pursuant to Section 6.22 of the Loan Agreement, "Borrower shall not enter into, modify, amend, terminate or cancel any management contracts for the Property or agreements with agents or brokers, without the prior written approval of [Plaintiff] not to be unreasonably withheld or delayed."

58.     The Mortgaged Premises are not managed by any Property Manager, as that term is defined in the Loan Agreement, and Borrower cannot afford to hire a Property Manager, as that term is defined in the Loan Agreement, or otherwise protect the Mortgaged Premises or Mortgaged Property (the "Management Default").

59.     As a result of the Management Default, Borrower caused an Event of Default to occur under the Loan Documents, which exists and has existed as of the date hereof.

### E.    <u>The Judgment Defaults</u>[2]

60.     Pursuant to Section 8.1(i) of the Loan Agreement, the following constitutes an Event of Default under the Loan Agreement: "Judgment or other claim in an amount in excess of $50,000.00 becomes a Lien or encumbrance upon any material portion of any Loan Party's assets or any Borrower Collateral[.]"

---

[2] The defined terms used in this section shall have the meanings ascribed in the Complaint.

61.    Pursuant to Section 3.4 of the Loan Agreement, Borrower represented and warranted that "No Loan Party is a party to any agreement or instrument or subject to any judgment, order, writ, injunction, decree or regulation materially and adversely affecting its business, properties or assets, operations, or condition (financial or otherwise)."

62.    Pursuant to Section 3.3 of the Loan Agreement, Borrower represented and warranted that "There are no actions, suits or proceedings pending in which service of process has been directly effectuated or, to the best knowledge of Borrower, threatened against or affecting any Loan Party, at law or in equity or before or by any Governmental Authority or third party payor which are undisclosed and involve any of the transactions contemplated herein and which, if adversely determined against any Loan Party could reasonably be expected to have a Material Adverse Effect."

63.    Pursuant to Section 3.29 of the Loan Agreement, "Borrower agrees that all of the representations and warranties set forth in this Article III and elsewhere in this Agreement are true as of the date hereof, will be true at the Loan Opening and, except for matters which have been disclosed by Borrower and approved by Lender in writing, at all times thereafter."

64.    Upon information and belief, Borrower is subject to the NYCDEC Judgment, the NYSDOL Judgment, and the Union Judgment (collectively, the "Judgments"). Copies of the relevant pages of the title report reflecting the Judgments are annexed to the Complaint as Exhibit O. The Judgments constitute a lien or encumbrance upon a material portion of any Borrower's assets and the Mortgaged Premises. The Judgments are materially and adversely affecting Borrower's business, properties or assets, operations, or condition (financial or otherwise). The Judgments could reasonably be expected to have a Material Adverse Effect, as that term is defined in the Loan Agreement. The Judgments evidence that an action, suit or proceeding occurred, which

69777181;3

affected the Mortgaged Premises, and which have a Materially Adverse Effect, as that term is defined in the Loan Agreement. The Union Judgment is in excess of $50,000. Borrower did not inform Plaintiff of the Judgments as of the date hereof (the "Judgment Defaults").

65.    As a result of the Judgment Defaults, Borrower caused an Event of Default to occur under the Loan Documents, which exists and has existed as of the date hereof.

66.    The Payment Defaults, the Insurance Defaults, the Care and Use Defaults, the Asset Disposal Defaults, the Change of Business Default, the Management Default, and the Judgment Defaults are hereinafter collectively referred to as the "Events of Default."

III.    **PLAINTIFF IS ENTITLED TO THE APPOINTMENT OF A RECEIVER**

67.    Upon an Event of Default, Borrower has consented to the appointment of receiver. Specifically, section 21(a)(ii) of the Mortgage provides:

> To the extent permitted by applicable law, Lender may, as attorney-in-fact or agent of Mortgagor, or in its own name as Lender or by the appointment of a receiver in accordance with applicable law, hold, lease, manage, operate or otherwise use or permit the use of all or any portion of the Mortgaged Property and conduct the business, if any, thereof, either by itself or by other persons, firms, entities or agents, in such manner, for such time and upon such other terms as Lender may deem to be prudent and reasonable under the circumstances (making such repairs, alterations, additions and improvements thereto and taking any and all other action with reference thereto, from time to time, as Lender shall deem necessary or desirable) and to exercise the powers described herein. Lender may apply all Rents and other amounts collected by Lender in connection therewith in accordance with the provisions hereof. Such remedies may be exercised cumulatively and concurrently, and in this respect each of Lender shall be entitled to avail itself of the benefits and rights stated herein.

Mortgage § 21(a)(ii) (annexed as Ex. I to the Complaint, which is Ex. I to the Hu Decl.).

68.    Section 21(b) also provides for the appointment of a receiver:

> Prior to, upon or at any time after, commencement of foreclosure of the lien, security title and security interest provided for herein or any legal proceedings pursuant hereto, Lender may make application to a court of competent jurisdiction for appointment of a receiver of the Mortgaged Property. Such application may be made as a matter of strict right and without notice to Mortgagor (unless notice is

required by applicable law and such right of notice may not be waived) or regard to the adequacy of the Mortgaged Property or insolvency of Mortgagor or any person who may be legally or equitably liable to pay the Obligations and without giving bond to Mortgagor (unless bond is required by applicable law and such right of bond may not be waived, in which case, such bond shall be in the minimum amount required by applicable law), and Mortgagor does hereby irrevocably consent to such appointment. Any such receiver shall have all the usual powers and duties of receivers in similar cases, including the full power to rent, maintain and otherwise operate the Mortgaged Property all upon such terms as may be approved by the court, and shall apply the Rents in accordance with the provisions of this Mortgage.

Mortgage § 21(b).

69.    Page 3 of the Assignment of Leases also provides for the appointment of a receiver:

[Plaintiff] shall have the right and authority, without further notice whatsoever to Assignor and without regard to the adequacy of the security therefor, to: (a) make application to a court of competent jurisdiction for appointment of a receiver for all or any part of the [Mortgaged Premises], as particularly set forth in the Security Instrument, (b) manage and operate the [Mortgaged Premises], with full power to employ agents to manage the same; (c) demand, collect, receive and sue for the Rents, including without limitation those past due and unpaid; and (d) do all acts relating to such management of the [Mortgaged Premises], including, but not limited to, negotiation of new Leases, making adjustments of existing Leases, contracting and paying for repairs and replacements to the Improvements and to the fixtures, equipment and personal property located in the Improvements or used in any way in the operation, use and occupancy of the [Mortgaged Premises] as in the reasonable judgment and discretion of [Plaintiff] may be necessary to maintain the same in a tenantable condition, purchasing and paying for such additional furniture and equipment as in the sole judgment of [Plaintiff] may be necessary to maintain a proper employees, purchasing rental income from the [Mortgaged Premises], employing necessary managers and other fuel, providing utilities and paying for all other expenses incurred in the operation of the [Mortgaged Premises], maintaining adequate insurance coverage over hazards customarily insured against and paying the premiums therefor.

Assignment of Leases p.3 (annexed as Ex. I to the Complaint, which is Ex. I to the Hu Decl.).

70.    Section 18(a) of the Mortgage also provides for Borrower's absolute assignment of the Rents, evidences a revocable license to Borrower to collect the Rents (among other amounts), and Borrower's obligation to hold in trust sufficient Rents and other amounts to pay sums due under the Loan Documents:

69777181;3

Mortgagor does hereby absolutely and unconditionally assign to Lender, all of Mortgagor's right, title and interest in all current and future Leases and Rents, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only … subject to the terms of the Cash Management Agreement and this paragraph, Lender grants to Mortgagor a revocable license to operate and manage the Mortgaged Property and to collect the Rents subject to the requirements of this Mortgage. Upon and during an Event of Default, with required notice, if any, and right to cure, if any, each as provided in the Assignment of Leases and Rents (as defined in the Loan Agreement), the license granted to Mortgagor herein shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents, whether or not Lender enters upon or takes control of the Mortgaged Property. Mortgagor hereby grants and assigns to Lender the right, at Lender's option, upon revocation of the license granted herein, to enter upon the Mortgaged Property in person, by agent or by court appointed receiver to collect the Rents. Any Rents collected after the revocation of such license may be applied toward payment of the Obligations in such priority and proportions as Lender in its sole discretion shall deem proper … If Mortgagor collects or receives any such Rents after the occurrence of any Event of Default, then: (i) Mortgagor shall hold such funds in trust for Lender; (ii) Mortgagor shall not commingle such funds with any other funds or assets; and (iii) Mortgagor shall remit such funds to Lender not later than one (1) business day after Mortgagor's receipt of the same.

71.    Furthermore,

Lender may enter upon all or any part of the Mortgaged Property and take exclusive possession thereof and of all books, records and accounts relating thereto. If Mortgagor remains in possession of all or any part of the Mortgaged Property after an Event of Default and without Lender's prior written consent thereto, Lender may invoke any and all legal remedies to dispossess Mortgagor, including without limitation one or more actions for forcible entry and detainer, trespass to try title and writ of restitution. Nothing contained in the foregoing sentence shall, however, be construed to impose any greater obligation or any prerequisites to acquiring possession of the Mortgaged Property after an Event of Default than would have existed in the absence of such sentence.

Mortgage § 21(a)(i).

72.    Even if the Court were to find that Borrower's express consent to the appointment

of a temporary receiver provides an insufficient basis for the appointment of a temporary receiver,

the receiver should be appointed because the Mortgaged Premises and Mortgaged Property are at

69777181;3

imminent risk of loss, Plaintiff's legal remedies are insufficient to protect its interests, and Plaintiff would be severely harmed if a receiver is not appointed.

73.    First, the Mortgaged Premises are without adequate insurance coverage. Specifically, although an insurance policy is in place on the Mortgaged Premises, due Borrower's abandonment of the Mortgaged Premises and the vacancy provisions contained in the applicable insurance policy, the amount of coverage has been compromised, resulting in a lack of coverage of a number of otherwise covered events, beneath the requirements of the Loan Agreement

74.    Second, the Mortgaged Premises and Mortgaged Property are abandoned and in a state of disrepair, as evidenced by the basement flooding, exposed wiring, presence of roaches and rodents, piles of trash and soiled laundry, failing ceiling tiles, and other issues outlined in the Investigation.

75.    Third, the Mortgaged Premises are without any Property Manager, as that term is defined in the Loan Agreement. Absent some kind of management of the Mortgaged Premises, the Mortgages Premises and Mortgaged Property will continue to deteriorate and lose value.

76.    Fourth, the Mortgaged Premises contain valuable items of the Mortgaged Property, which is of potential significant value. Absent a Property Manager, as that term is defined in the Loan Agreement, the Mortgaged Property, will continue to fall into a state of disrepair or be lost permanently.

77.    As such, there is imminent risk of loss to Plaintiff which needs to be protected against by having a receiver appointed to protect the Mortgaged Premises from potential loss. For example, a receiver could procure adequate insurance for the Mortgaged Premises, make sure that the structural integrity of the Mortgaged Premises is not affected due to the flooding and decay of the building, clean up the trash and soiled laundry, eliminate the presence of rodents and roaches,

ensure the valuable Mortgaged Property is not lost, and could continue to maintain the Mortgaged Premises and Mortgaged Property such that they do not lose value during this foreclosure action.

78.     While this foreclosure action is pending, absent a receiver, Borrower may continue to mismanage the Mortgaged Premises and Mortgaged Property, causing Plaintiff's collateral to diminish in value. As such, a receiver is necessary to take immediate possession of the Mortgaged Premises and Mortgaged Property and ensure that all necessary and critical operation expenses are being paid for the purpose of preserving Plaintiff's collateral until this action is resolved.

79.     Moreover, Plaintiff has made the necessary showing that (i) Plaintiff has an interest in the Mortgaged Premises and Mortgaged Property by virtue of the Loan Documents, (ii) Plaintiff's only recourse to secure what the Plaintiff is owed is through this foreclosure action, and (iii) any further dissipation of or loss to the assets securing the Debt would irreparably harm the Plaintiff by reducing the assets from which it can recover.

80.     As such, a receiver is necessary to protect Plaintiff's collateral, including, without limitation, the valuable personal property collateral pledged in the Loan Agreement and the Mortgage and prevent dissipation of assets. *See* Ex. H pp.2-5; Ex. D §§ 1.1, 7.1.

## IV.    TRIGILD, LLC IS WELL-QUALIFIED TO SERVE AS RECEIVER

81.     Trigild, LLC was chosen for its experience as a receiver of commercial properties and its particular skillset in dealing with properties like the Mortgaged Premises.

82.     Annexed hereto as **Exhibit 1** are materials outlining an overview of Trigild, LLC, its client base, a scope of work of its receivership and management services, and proposed compensation for its receivership and property management services. As set forth in the proposal, Trigild, LLC proposes that it receive the sum of $300 per hour for monthly receivership services with a minimum of $2,000 and $1,500 per month for oversight management.  Plaintiff respectfully

69777181;3

submits that Trigild, LLC has the appropriate experience in connection with receivership and management of buildings like the Mortgaged Premises and respectfully requests that Trigild, LLC be appointed receiver for the Mortgaged Premises.

83.     Plaintiff has not previously applied for the appointment of a receiver in this action.

*[remainder of page intentionally left blank; signature page to follow]*

19

69777181;3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6___ day of April, 2023.

DocuSigned by:

*Raymond Hu*

A1B7C72F2B6F45B...

Raymond Hu a/k/a Zilong Hu

# EXHIBIT 1 – TRIGILD PROPOSAL



# TRIGILD
— EST 1976 —

A PROPOSAL FOR
# Friars Club

57 E. 55th Street
New York, NY 10022

**Presented to:**

Mark Lichtenstein
Partner
Akerman LLP
Mark.lichtenstein@akerman.com
(219) 259-8707

**trigild.com**

**TRIGILD**

# TRIGILD IVL OVERVIEW

Trigild IVL has successfully handled over 2,000 court-appointed fiduciary assignments throughout the country, operated multimillion dollar businesses, and liquidated billions of dollars of business, real estate, FF&E, and related assets. We have served in multiple roles under the auspices of numerous courts – including as Receiver, Bankruptcy Trustee and Chief Restructuring Officer. Equipped with decades of experience, Trigild IVL is an expert at devising long-term solutions and sound strategies that maximize recovery.

**Fiduciary Team Experience**
- Since 1988, Trigild IVL has handled over 2,000 receivership appointments for over 3,500 real estate and business assets.
- Receiver professionals include Attorneys at Law who are admitted to the California and Texas bars, Licensed Real Estate Brokers, Paralegals, MBAs, and CPAs who are supported by in-house accounting, operations, marketing, HR, and IT professionals.
- Serving as federal equity receiver on a filing by the Securities and Exchange Commission (SEC) for an alleged Ponzi scheme.
- Served as receiver in 41 different states and Puerto Rico and the Virgin Islands with an aggregate value of nearly $50 billion.
- State and federal receiverships for hotels, restaurants, convenience stores, multifamily, office, industrial, retail, gas stations, truck stops, apartments, office buildings, assisted care facilities, retail centers, mobile home parks, residential subdivisions, marinas, self-storage units, senior care, and a water park.
- Approved as Receiver by the State of New York Unified Court System
- As receiver, has directed the sale of over 300 properties.
- General Counsel has extensive legal, financial, and real estate experience with significant transactional and litigation knowledge, including contract drafting and negotiation, processing of entitlements, alternative dispute resolution and trial work.
- 40-year-old property management firm specializing in distressed properties and operating businesses located throughout the United States.
- Extensive construction management experience on all asset types
- Trigild's staff has done expert witness work in matters concerning hotel liability, security, feasibility studies, "slip and fall", wrongful termination, value of leased premises, safety standards and operating performance.
- Bondable for virtually any dollar amount required.
- Frequent speakers to professional financial and legal groups on foreclosure and uses of receiverships.
- Host of the Trigild Lender Conference and Trigild Spring Conference - annual educational conferences on the latest trends for handling non-performing commercial loans.
- Publisher of the *Trigild Deskbook*, a state-by-state guide to Receivership and Foreclosure laws-by-state guide to Receivership and Foreclosure laws.

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222

# TRIGILD

## PROPOSED FEE SCHEDULE

**Receivership:**

Monthly:                                             $300 per hour
                                                     Minimum of $2,000

                                                     Reimbursement of all out-of-pocket
                                                     expenses

**Oversight Management:**                            $1,500 per month



**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222

**TRIGILD**

# SCOPE OF WORK & TERMS

## Receivership Services

**Receiver/Paralegal Documents & Communication**

- Provide a proposed Order Appointing Receiver to lender's legal counsel.
- As requested, appear telephonically in court
- Obtain and file Receiver's Oath and Bond.
- Prepare, serve parties of record and file Receiver's Opening Report.
- If required by the Court prepares, serve parties of record, and file all Receiver's Interim Reports.
- Prepare, serve parties of record and file Receiver's Final Account and Report.
- Prepare and file Receiver's Certificate(s) if applicable.
- As appropriate, file motions to close out Receivership.
- Upon discharge of Receiver, cancel Receiver's bond.

**Receivership Start-Up**

- Secure control of all property operations in coordination with a qualified property management firm.
- Secure control of property related bank account(s).
- Manage funds in property bank account(s), open new bank account(s) in the name of the Receivership Estate and transfer all funds to Receivership account(s).
- Change merchant account numbers, if any.
- Assess and oversee cash handling procedure.
- Manage operating income, if any.
- Review and audit accounts receivable/accounts payables.
- Evaluate and address status of bad debts and rental delinquencies.
- Review known pre-receivership operating expenses to assess validity of outstanding invoice(s) / claim(s) and facilitate payment to claimant(s).
- Examine State / City Tax Systems to determine need for Tax ID number.
- Acquire Employer Identification Number from Internal Revenue Service.
- Transfer or apply for new business and tax licenses as applicable.
- Determine status of property tax payments.
- Evaluate existing insurance coverage and secure additional coverage, as necessary.
- Secure sales and marketing materials.
- Notify utility companies of receivership.
- Transfer existing utility accounts or open new accounts for the Receivership Estate.
- Notify licensors of receivership.
- Transfer existing or apply for new licenses to ensure property compliance.
- Analyze property's security threat level to determine whether or not onsite security is needed.
- Audit property's life safety emergency protocols.
- Review key control and inventory administration keys; change locks where necessary.

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222

**TRIGILD**

- Evaluate payments of common area maintenance charges, if any, between property and adjacent properties and implement changes as appropriate.
- Identify and secure contracts and leases.
- Review, evaluate and consider renewal or replacement of relevant of property-related agreements.
- Perform other reviews as necessary, leasing documentation, leasing process, and cost segregation.
- Notify vendors of receivership.
- Conduct audit of current vendors to determine necessity of each.
- Hire / terminate vendors
- Complete and submit opening report that details the following to the court:
  - o Property inspection and property condition report
  - o Property and unit inventory
  - o Inspection Photographs

**Receivership Closing**

- Notify vendors that Receivership is closing.
- Request final invoices.
- Send out accounts receivable notification.
- Send notification letter to the necessary license, permit, and tax agencies.
- Cancel insurance policies in name of Receivership.
- Coordinate transition of service and maintenance contracts from receiver to Plaintiff upon foreclosure.
- Contact utility companies to perform final meter reading.
- As appropriate, prepare and submit closing inventories.
- Notify tenants that Receivership is closing.
- Prepare or oversee final accounting.
- Close accounts and disburse funds.
- Prepare Receiver's final report for the court.
- Close out Receivership with court.

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222

**TRIGILD**

# Management Services

## Management Startup Services

- Open new bank accounts and reconcile revenue and expenses as of the sale date. As applicable, transfer or apply for business licenses, health, and sales tax licenses.
- Identify all contracts and leases.
- Review key control and inventory all administration keys; change locks where necessary.
- Review security procedures.
- Identify and address any immediate potential liability risk.
- Determine and secure insurance coverage.
- Determine state of Property Taxes and analyze appropriateness for appeal.
- Determine State's Tax System/ Need for Tax ID Number.
- Review and audit accounts receivable and payables and accounting procedures.
- Notify all vendors, utilities, and licensors of change of management and change mailing address.
- Set up a full set up books. Trigild has a centralized accounting department that utilizes state-of-the-art hardware and software. We host our own ASP that provides secure access to our corporate employees and the onsite employees.
- Determine capital improvement needs and submit recommendations to the lender.
- Perform and report the following:
  - Property inspection and property condition report.
  - Perform a property and unit inventory.
  - Review and document any obvious liability & environmental needs.
  - Take photographs.
  - Document major repair issues.

## Ongoing Management Services

Our management team develops an action plan that guides the basic framework within which the property will be operated. This includes:

- Develop operating budgets and financial projections.
- Oversee daily operations, management, marketing, controls, forecasting and all other matters that pertain to the overall operation and success of the project.
- Oversee the leasing rates.
- Maintain the facility and grounds.
- Utilizing Trigild's centralized accounting department and its state-of-the-art hardware and software, provide the following accounting functions: verify cash deposits and weekly forecasting, rent rolls, accounts payable, accounts receivable, bank reconciliation, monthly and year-end income & expense statements, balance sheet, month-end statistics, statement of cash flow, statement of changes in financial position, variance report and monthly narrative report providing information on what has transpired during the past month.
- As appropriate and if capital improvements are required and approved, Trigild will act as project managers and will plan, solicit bids, and supervise the work.

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222

**TRIGILD**

## Management Closing

- Obtain copies of all service agreements/contracts/leases.
- Deposit petty cash & house banks in operating account.
- Cancel insurance policies.
- Prepare & send vendor letters - service agreements/contracts/leases.
- Accounts receivable notification.
- Notification letter to license/permit/tax agencies.
- Closing date to read meters for final billing -gas/water/sewer/waste/electricity.
- Notify telephone company, long distance carrier, and IT carrier.
- Process accounts payable.
- Proration of service agreements/contracts.
- Notify escrow of closing inventory numbers.
- Prepare final accounting.
- Close accounts and disburse funds.

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222

**TRIGILD**

# PROPOSED PROJECT TEAM



**CHRIS NEILSON,** *Managing Partner*

Chris Neilson, J.D., Managing Partner, oversees Trigild's business operations and serves as one of the firm's principal receivers. Federal and state courts throughout the United States have appointed Neilson as receiver over all types of commercial properties, including offices, malls, shopping centers, apartments, hotels, and golf courses. Neilson is also an approved fiduciary in the State of New York.

In addition to his receivership work, Neilson has handled the resolution of millions of dollars of unsecured judgments against debtors throughout the U.S. and has sourced and secured debtor-in-possession financing for fiduciaries through bankruptcy. Neilson was also a founding partner of P.D. Capital, a commercial real estate investment company focused on acquiring value-add retail projects.

Neilson began his legal career as an attorney practicing in the real estate and capital markets groups of an AmLaw 100 law firm where he focused on complex loan workouts for securitized business trusts (REMICs) through their special servicers.

Neilson received his J.D. from the Southern Methodist University Dedman School of Law where he was a member of the SMU Law Review and received a B.B.A. from Baylor University where he was the Outstanding Graduating Senior of the Hankamer School of Business.



**IAN LAGOWITZ,** *Managing Partner*

Ian Lagowitz founded IVL Group, where he has been involved in nearly one thousand receivership, fiduciary, and trustee appointments over the course of his 25-year real estate career. He is well versed in bankruptcy recovery, having been involved in disposing hundreds of retained assets from bankruptcy sales, reviewing approximately 10,500 proof of claims, and handling cures and assumptions for the transfer of operating leases.

In addition to his specialization in asset management and distressed assets, he is highly experienced in property evaluation, leasing, sales, redevelopment, brownfield redevelopment, mergers and acquisitions, institutional work-outs, asset recovery and property management.

Ian Lagowitz joined Onyx Equities in 2010. As Director of Receivership and REO Management, his responsibilities included serving as a court appointed receiver and managing agent, client relations, and oversight of the receivership and REO portfolio. Ian also led operations for 12 states. He was responsible for facilitating the opening of Onyx's regional offices in Atlanta, GA, Annapolis, MD, Charlotte, NC and Memphis, TN.

Prior to joining Onyx, Ian held key roles at a variety of notable organizations including DiLeo Associates and The Alman Group. Ian is a graduate of the University of Maryland. He is a licensed broker in the state of New Jersey. He is a board member of Prodigal Sons and Daughters, and he is currently the Associate Coach for the Seton Hall University Men's Golf Team.

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222

# TRIGILD



**DAVID WALLACE,** *Chief Operating Officer and General Counsel*

David Wallace oversees Trigild's team in court-ordered receiverships for assets across the nation, successfully resolving distressed loans and preserving assets as a court-appointed fiduciary.

Mr. Wallace led a team of real estate asset managers, property managers, property accountants, accounting firms, and law firms in a bankruptcy liquidation of interests in a real estate portfolio that included more than 100 companies with equity and other management entities. The portfolio, valued at over $1.6 billion, included assets in the multifamily, student housing, and retail asset classes, and creditors recouped more than 60% of their claims.

Mr. Wallace also leads the legal team on a number of other fiduciary assignments, in bankruptcy, state, and federal courts. He has extensive experience in workouts related to CMBS and balance sheet loans, as well as transactions involving private equity, REITs, and sovereign wealth funds. Further, Mr. Wallace has overseen and served as lead counsel in a number of fraudulent transfer actions with ultimate recoveries in the tens of millions of dollars. Wallace also serves as a Ch. 11 trustee for a large real estate holding company with assets across multiple property types.

Wallace holds a B.B.A in Finance from Texas Christian University and a J.D. from Southern Methodist University. Prior to joining Trigild, Mr. Wallace worked as a financial analyst and also as an attorney with Fulbright & Jaworski, LLP. At Fulbright, Mr. Wallace represented a broad range of clients in both litigation and transactional matters. Mr. Wallace also represented a number of master and special servicers in connection with CMBS loan transactions and workouts. Clients included pharmaceutical and device manufacturers, banks, oil and gas companies, and other Fortune 500 companies across an array of industries.

Mr. Wallace lives in Keller, TX with his wife and two daughters, and enjoys playing golf in his free time.



**MAEGAN KALBERMATTEN,** *Director of Operations & Receiverships*

Maegan is a detail-oriented manager with over seven years of operational and receivership experience across multiple asset classes. She applies strong communication and leadership skills, process improvement tactics, and workflow optimization methods to elevate operational efficiencies.

Prior to joining Trigild IVL, Maegan served as Director of Asset Management and Receiverships at IVL Group. At IVL, Maegan was responsible for monthly reporting, bonds, bank account setup, operational and transitional takeovers, coordinating monthly calls with bond holders and special servicers, and managing client relations.

Prior to IVL, Maegan also served as Property Transition Manager and Asset Manager for Onyx Management Group. During her tenure with Onyx, Maegan was responsible for and implemented the operation of regional offices in Atlanta, Charlotte, Philadelphia, Memphis, and Annapolis. In addition, she transitioned over 75,000,000 SF in Receivership and REO Management assets.

Maegan is a graduate of Pennsylvania State University, with a bachelor's degree in Hotel, Restaurant, and Institutional Management

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222

# THANK YOU

**We appreciate your consideration.**

Proposal Submitted by:

| **Chris Neilson** | **Ian Lagowitz** | **Maegan Kalbermatten** |
|---|---|---|
| chris.neilson@trigild.com | ian.lagowitz@trigild.com | maegan.kalbermatten@trigild.com |
| 214/766/9272 | 973/226/1950 | 973/226/1950 |

Please visit our website at ***www.trigild.com.***

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222