# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP, <br><br>               *Plaintiff*, <br><br>   v. <br><br> THE FRIARS NATIONAL ASSOCIATION, INC.; CITY OF NEW YORK DEPARTMENT OF ENVIRONMENTAL CONTROL; COMMISSIONER OF LABOR STATE OF NEW YORK DEPARTMENT OF LABOR; NEW YORK STATE TAX DEPARTMENT LEGAL DEPARTMENT; NEW YORK CITY FINANCE ADMINISTRATION BUREAU OF COMPLIANCE AND COLLECTION; HOTEL RESTAURANT & CLUB EMPLOYEES AND BARTENDERS UNION LOCAL 6 AND CLUB EMPLOYEES PENSION FUND; and "JOHN DOE #1" through "JOHN DOE #20," the twenty names being fictitious and unknown to the Plaintiffs, the person or parties intended being the tenants, occupants, persons or corporations, if any, having or claiming an interest in lien upon the premises, <br><br>               *Defendants*. | Civil Action No. <br><br> **COMPLAINT** |

Plaintiff Kairos Credit Strategies Operating Partnership, LP ("Plaintiff"), by its attorneys,

Akerman LLP, as and for its Complaint (the "Complaint") respectfully alleges as follows:

**NATURE OF ACTION**

1.    Plaintiff brings this action to foreclose that certain Consolidated, Extended,

Amended and Restated Mortgage, Assignment of Rents, Security Agreement and Financing

Statement dated as of June 25, 2021 in the original principal amount of THIRTEEN MILLION

AND NO/100 Dollars ($13,000,000.00) (the "Mortgage"), which encumbers certain real property

located at 57 East 55th Street, New York, New York 10022 (Block 1291, Lot 127), as more

69777207;3

particularly described in the Mortgage, the buildings, structures, fixtures, and other improvements thereon, in addition to the Land, Improvements, Equipment, Rents, Leases, Personal Property, Licenses and Permits, and other collateral granted by the Mortgage (the "Mortgaged Premises").

## I.     **THE PARTIES**

2.      Plaintiff Kairos Credit Strategies Operating Partnership, LP ("Plaintiff") is the lender of the loan at issue in this action and the mortgagee of the Mortgage being foreclosed upon in this action. Plaintiff is a limited partnership organized and existing under the laws of the State of Delaware. Because Plaintiff is a limited partnership, Plaintiff's citizenship is determined by that of its partners. Plaintiff's partners are Kairos Credit Strategies REIT, Inc. ("KCRI") and Kairos Incentive Company, LLC ("KICL"). KCRI is incorporated and existing under the laws of the State of Delaware and maintains a principal place of business at 30242 Esperanza Rancho Santa Margarita, CA 92688 and KICL is a Delaware limited liability company that maintains a principal place of business at 30242 Esperanza Rancho Santa Margarita, CA 92688 and all of its members are exclusively California citizens. Plaintiff is thus a citizen of the State of Delaware and the State of California. Therefore, for purposes of 28 U.S.C. § 1332, Plaintiff is a citizen of the State of Delaware and the State of California.

3.      Upon information and belief and at all times mentioned herein, The Friars National Association, Inc. ("Borrower"), is a non-charitable not-for-profit corporation organized and existing under the laws of the State of New York, with its principal place of business at 57 E. 55th St., New York, NY 10022. Because Borrower is incorporated under the laws of the State of New York and has its principal place of business in the State of New York, for purposes of 28 U.S.C. § 1332, Borrower is a citizen of the State of New York. Borrower is made a defendant in this action

69777207;3

because it is an obligor under the Note, as defined below, and is the mortgagor of the Mortgage being foreclosed upon in this action.

4.     Upon information and belief and at all times mentioned herein, the City of New York Department of Environmental Control (the "NYCDEC") is a city department maintaining a principal place of business at 66 John Street, New York, New York 10038 and a citizen of the State of New York. The NYCDEC is made a defendant in this action as an environmental control board judgment creditor of Borrower as a result of that certain judgment in the original principal amount of $1,000.00 and stemming from Environmental Control Board Violation No. 12114141M, concerning the Mortgaged Premises (the "NYCDEC Judgment"). The NYCDEC is a citizen of the State of New York for purposes of 28 U.S.C. § 1332.

5.     Upon information and belief and at all times mentioned herein, Commissioner of Labor State of New York Department of Labor (the "NYSDOL") is a Department of the State of New York maintaining a principal place of business at Building 12, W.A. Harriman Campus, Albany, New York 12226. The NYSDOL is made a defendant in this action as a result of that certain judgment in the original principal amount of $2,390.27 ctrl no: 004140048-01 against Borrower (the "NYSDOL Judgment"). The NYSDOL is a citizen of the State of New York for purposes of 28 U.S.C. § 1332.

6.     Upon information and belief and at all times mentioned herein, the New York State Tax Department Legal Department (the "NYSTD") is a Department of the State of New York maintaining a principal place of business at Building 9, W.A. Harriman Campus, Albany, New York 12227. The NYSTD is made a defendant in this action as a possible franchise tax creditor of Borrower. The NYSTD is a citizen of the State of New York for purposes of 28 U.S.C. § 1332.

7.     Upon information and belief and at all times mentioned herein, the New York City Finance Administration Bureau of Compliance and Collection (the "NYCFAB") is a Department of the City of New York maintaining a principal place of business at 1 Centre Street New York, New York 10007 and/or 66 John Street, Room 104, New York, New York 10038. The NYCFAB is made a defendant in this action as a possible New York City Corporate Business Tax Creditor of Borrower. The NYCFAB is a citizen of the State of New York for purposes of 28 U.S.C. § 1332.

8.     Upon information and belief and at all times mentioned herein, the Hotel, Restaurant & Club Employees and Bartenders Union, Local 6 and Club Employees Pension Fund (the "Union") is a labor union whose members are citizens of the State of New York, maintaining a principal place of business at 709 Eighth Avenue New York, NY 10036. The Union is made a defendant in this action as a result of that certain judgment in the original principal amount of $153,430.64, Index No. 654668-2022, from the New York Supreme Court (Manhattan) dated February 27, 2023 against Borrower (the "Union Judgment"). The Union is a citizen of the State of New York for purposes of 28 U.S.C. § 1332 because, upon information and belief, its members are citizens of the State of New York.

9.     Upon information and belief, "John Doe #1" through "John Doe #20" are fictitious names and unknown to the Plaintiff, and have been made defendants to this action because of possible claims or interests in possession or liens against the Mortgaged Premises.

## II.    <u>JURISDICTION AND VENUE</u>

10.    This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 because the Mortgaged Premises is located in this judicial district, at least one defendant resides in this judicial district, and a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district.

12.     Further, venue is proper in the United States District Court for the Southern District of New York because, pursuant to Section 10.7 of the Loan Agreement, Borrower consented to the jurisdiction and venue of this Court. Specifically, Section 10.7 of the Loan Agreement provides in pertinent part

> WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A "PROCEEDING"), BORROWER IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE CITY OF NEW YORK, COUNTY OF NEW YORK AND STATE OF NEW YORK, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.

## III.    THE LOAN AND LOAN DOCUMENTS

### A.    The Prior Loan

13.     On or about February 21, 2020, Borrower became indebted to Titan Capital ID, LLC ("Original Lender") in the principal sum of NINE MILLION AND NO/100 dollars ($9,000,000) (the "Original Loan") in connection with the assignment of pre-existing mortgage debt to Original Lender and additional loan advances to Borrower made by Original Lender.

14.     In connection with the Original Loan, Borrower executed that certain Consolidated, Extended, Amended and Restated Mortgage Note dated February 21, 2020, in the principal sum

5

of NINE MILLION AND NO/100 dollars ($9,000,000) (as amended, extended, restated, and/or assigned, the "Original Note").

15.     Repayment of the Original Note is secured by, among other things, that certain Consolidation, Modification and Extension of Mortgage, Assignment of Leases and Rents and Security Agreement (as amended, extended, restated, and/or assigned, the "Original Mortgage"), dated as of February 21, 2020, executed by Borrower as borrower and mortgagor, in favor of Original Lender, as lender and mortgagee.

16.     The Original Mortgage was recorded on March 4, 2020 with the Office of the City Register of the City of New York (the "City Register") as City Register File No. ("CRFN") 202000082528. A true and correct copy of the Original Mortgage is annexed hereto as **Exhibit A**.

17.     The Original Note and the Original Mortgage, together with all other documents or agreements executed and delivered in connection with the Original Loan are collectively referred to herein as the "Original Loan Documents."

**B.     Assignment of Loan Documents to Plaintiff**

18.     On or about June 25, 2021, Original Lender assigned the Original Loan Documents, including the Original Note and the Original Mortgage, to Plaintiff (the "Assignment").

19.     In connection with the Assignment, Original Lender executed and delivered the following documents to Plaintiff:

a.     That certain Allonge to the Original Note by Original Lender in favor of Plaintiff, a true and correct copy of which is annexed as **Exhibit B** hereto and

b.     That certain Assignment of Mortgage, effective as of June 25, 2021, which was properly recorded with the City Register on July 7, 2021 as CRFN 2021000256894, a true and correct copy of which is annexed hereto as **Exhibit C**.

C.     **The Loan from Plaintiff**

20.     On or about June 25, 2021, Borrower became indebted Plaintiff in the principal sum of THIRTEEN MILLION AND NO/100 Dollars ($13,000,000.00) (the "Loan") in connection with the Assignment and additional loan advances to Borrower made by Plaintiff.

21.     The Loan is evidenced by that certain Consolidated, Extended, Amended and Restated Term Loan and Security Agreement dated June 25, 2021 executed by and between Borrower, as borrower, and Plaintiff, as lender (as amended, extended, restated, and/or assigned, the "Loan Agreement"). A true and correct copy of the Loan Agreement is annexed hereto as **Exhibit D**.

22.     In connection with the Loan, Borrower executed that certain Gap Promissory Note made by Borrower to Plaintiff dated June 21, 2021 in the principal sum of FOUR MILLION AND NO/100 dollars ($4,000,000.00) (the "Gap Note"). A true and correct copy of the Gap Note is annexed hereto as **Exhibit E**.

23.     Repayment of the Gap Note is secured by, among other things, that certain Gap Mortgage (the "Gap Mortgage"), which is dated as of June 25, 2021, and was executed by Borrower, as mortgagor, in favor of Plaintiff, as mortgagee.

24.     The Gap Mortgage was recorded on July 7, 2021 with the City Register as CRFN 2021000256896. A true and correct copy of the Gap Mortgage is annexed hereto as **Exhibit F**.

25.     In connection with the Loan, Borrower executed that certain Consolidated, Extended, Amended and Restated Promissory Note dated June 25, 2021 in the principal sum of THIRTEEN MILLION AND NO/100 Dollars ($13,000,000.00) (as amended, extended, restated, and/or assigned, the "Note"). A true and correct copy of the Note is annexed hereto as **Exhibit G**.

69777207;3

26.     The Note consolidated, extended, amended, and restated (i) the Original Note and (ii) the Gap Note, as set forth therein.

27.     Repayment of the Note is secured by, among other things, the Mortgage, which is dated as of June 25, 2021, and was executed by Borrower, as mortgagor, in favor of Plaintiff, as mortgagee. The Mortgage consolidated, extended, amended and restated the (i) Original Mortgage and (ii) the Gap Mortgage.

28.     The Mortgage was recorded on July 7, 2021 with the City Register as CRFN 2021000256897. A true and correct copy of the Mortgage is annexed hereto as **Exhibit H**.

29.     The Loan is further secured by an Assignment of Leases and Rents dated as of June 25, 2021, executed by Borrower, as assignor, in favor of Plaintiff, as assignee (the "Assignment of Leases").

30.     The Assignment of Leases was recorded on July 7, 2021 with the City Register as CRFN 2021000256898. A true and correct copy of the Assignment of Leases is annexed hereto as **Exhibit I**.

31.     In connection with the Loan, Borrower also executed that certain Cash Management Agreement (the "Cash Management Agreement") dated as of June 25, 2021, pursuant to which, Borrower agreed, among other things, that upon the occurrence of an Event of Default, as defined therein, Plaintiff had the right, and Borrower agreed to cooperate, to implement cash management in accordance with the Cash Management Agreement and other Loan Documents. A true copy of the Cash Management Agreement is annexed hereto as **Exhibit J**.

32.     On June 29, 2021, a UCC Financing Statement was filed with the New York Department of State as Filing Number 202106290234558 (the "State UCC"). A true copy of the State UCC is annexed hereto as **Exhibit K**.

33.     On July 7, 2021, a UCC Financing Statement was filed with the Office of the City Register of the City of New York as CFRN 2021000256899 (the "City UCC"). A true and correct copy of the City UCC is annexed hereto as **Exhibit L**.

34.     The Loan Agreement, the Gap Note, the Gap Mortgage, the Note, the Mortgage, the Assignment of Leases, the Cash Management Agreement, the County UCC, and the City UCC together with all other documents or agreements executed and delivered in connection with the Loan, are collectively referred to as the "Loan Documents."

35.     As of the date hereof, as a result of the facts described above, evidenced by each of the written assignments, Plaintiff is the owner and holder of the Loan Documents, including, but not limited to, the Note and the Mortgage.

## IV.    <u>**BORROWER'S EVENTS OF DEFAULT**</u>

36.     Pursuant to section 19 of the Mortgage, "[Borrower] shall be in default under this Mortgage upon the occurrence of any default or breach by [Borrower] of the terms, conditions, representations, warranties, and covenants of this Mortgage and upon the occurrence of an Event of Default in accordance with the terms of the Loan Agreement or any of the other Loan Documents …."

37.     Pursuant to section 2 of the Mortgage, "[Borrower] shall comply with all provisions hereof, of the Note, and of all of the other Loan Documents…."

38.     Pursuant to section 8.1 of the Loan Agreement, "Any one or more of the following events, following any applicable notice requirements and/or cure period, if any, shall constitute an event of default … under this Agreement: … (o) If any event of default as defined in any of the other Loan Documents occurs and is not cured within the applicable notice and/or cure period, if any[.]"

A.    **Payment Defaults**

39.    Pursuant to Section 2.4 of the Loan Agreement, Borrower was required to make a payment to Plaintiff of interest in arrears on the principal balance of the Loan at a per annum rate equal to the Interest Rate, as defined therein, on each Payment Date (each a "Monthly Debt Service Payment"), as defined therein, occurring in August 2021 on each payment date thereafter to and including the Maturity Date, as defined therein.

40.    Pursuant to section 8.1 of the Loan Agreement, an Event of Default occurs "If Borrower fails to pay when due and payable, or when declared due and payable in accordance with this Agreement, all or any portion of the Obligations (whether principal, interest (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts), fees and charges due Lender, reimbursement of Lender Expenses, or other amounts constituting Obligations) within ten (10) days that such payment is due without need for further Lender notice …."

41.    Pursuant to section 2 of the Mortgage, Borrower was obligated to "promptly pay to [Plaintiff] the principal with interest thereon and all other sums required to be paid by [Borrower] under the Note, this Mortgage, and of all of the other Loan Documents."

42.    Borrower failed to timely make the Monthly Debt Service Payment due on March 1, 2023, and each Monthly Debt Service Payment thereafter (the "Payment Defaults").

43.    On March 13, 2023, Plaintiff sent Borrower a written Notice of Default (the "First Notice of Default"), which set forth the Payment Defaults and demanded Borrower cure the Payment Defaults immediately. On March 30, 2023, Plaintiff sent Borrower another written Notice of Default accelerating the indebtedness and demanding that Borrower pay the entire outstanding balance under the Loan (the "Second Notice of Default" and, collectively with the First Notice of

Default, the "Notices of Default"). Borrower failed to cure the Payment Defaults despite its receipt of the Notices of Default. True and correct copies of the Notices of Default are annexed hereto collectively as **Exhibit M**.

44.     Accordingly, the Payment Defaults constitute Events of Default under the Loan Documents, which exist and have existed as of the date hereof.

      **B.**    **<u>Insurance Defaults</u>**

45.     Pursuant to Section 4 of the Mortgage, "[Borrower] shall obtain, maintain and keep in full force and effect during the term of this Mortgage, or cause Mortgagor's lessees to obtain, maintain and keep adequate insurance coverage, with all premiums paid thereon and without notice or demand, with respect to its properties and business against loss or damage of the kinds and in the amounts as set forth in the Loan Agreement."

46.     Section 5.1 of the Loan Agreement provides that "Borrower will maintain, or cause to be maintained, with respect to the Property, fire and extended coverage insurance policies … Borrower shall also furnish to Lender, promptly following Borrower's receipt thereof (i) copies of all insurance policies (or certificates thereof), including title insurance, affecting the Property and (ii) the original or copy of all recorded documents affecting the Property."

47.     Section 5.14 of the Loan Agreement provides "Borrower shall furnish to Lender and maintain at all times, at Borrower's sole cost and expense, such policies of insurance in such amounts and in accordance with the standards set forth on Exhibit D attached hereto." Exhibit D to the Loan Agreement requires Borrower "to maintain … insurance cover[age] with respect to the property at all times during the term of the loan[.]" Such insurance coverage includes, without limitation, umbrella liability, general liability, flood, and property insurance. *See* Loan Agreement, Ex. D.

48. Borrower failed to maintain adequate insurance coverage during the term of the Mortgage; specifically, although an insurance policy is in place on the Mortgaged Premises, due Borrower's abandonment of the Mortgaged Premises and the vacancy provisions contained in the applicable insurance policy, the amount of coverage has been compromised, resulting in a lack of coverage of a number of otherwise covered events, beneath the requirements of the Loan Agreement (the "Insurance Defaults").

49. As a result of the Insurance Defaults, Borrower caused Events of Default to occur under the Loan Documents, which exist and have existed as of the date hereof.

### C.  Care and Use Defaults

50. On or about March 23, 2023, pursuant to its rights under section 15 of the Mortgage and Section 7.6 of the Loan Agreement, Plaintiff performed an inspection of the Mortgaged Premises (the "Inspection"). A true and correct copy of the report summarizing the observations made during the Inspection (the "Inspection Report") is annexed hereto as **Exhibit N**.

51. Pursuant to Section 6 of the Mortgage, "Mortgagor shall not permit, commit or suffer any waste, impairment or deterioration of the Mortgaged Property or any part thereof, and shall keep the same and improvements thereon in good condition and repair. Mortgagor shall notify Lender in writing within five (5) days of any damage or impairment of the Mortgaged Property."

52. During the Inspection, Plaintiff observed that the Mortgaged Premises: (i) appeared to be completely abandoned; (ii) had exposed electrical wiring and breaker boxes with missing electrical panel covers, (iii) had extensive water and mold damage, (iv) was littered with mounds of trash, (v) showed signs of the presence of rodents and roaches, (vi) had a standing pool of water about one inch deep in the sub-basement, (vii) had broken furniture, (viii) had damage to many of the ceilings, (ix) was littered with soiled towels and other laundry, (x) appeared to be missing

several items of valuable memorabilia and Mortgaged Property once present in the Mortgaged Premises based upon picture hooks and hardware with evidence of missing photographs and artwork, and (xi) had legal documents, including certain demand letters as well as possible confidential information strewn about haphazardly.

53.     Upon information and belief, the Mortgaged Premises are not managed by any Property Manager, as that term is defined in the Loan Agreement, subject to any Management Agreement, as that term is defined in the Loan Agreement.

54.     Upon information and belief, Borrower is unable to afford to hire a Property Manager, as that term is defined in the Loan Agreement.

55.     The above facts establish that the Mortgaged Premises are subject to "waste, impairment or deterioration" and are not kept "in good condition and repair."

56.     Moreover, Borrower failed to notify Plaintiff in writing within five (5) days of such damage and impairment to the Mortgaged Premises and Mortgaged Property (collectively, the "Care and Use Defaults").

57.     As a result of the Care and Use Defaults, Borrower caused Events of Default to occur under the Loan Documents, which exist and have existed as of the date hereof.

**D.      Negative Covenant Defaults**

58.     Pursuant to section 6.4 of the Loan Agreement, "Borrower shall not convey, sell, lease, license, assign, transfer, or otherwise dispose of any of Borrower's assets without the prior written consent of [Plaintiff], to be granted or withheld in [Plaintiff]'s sole discretion."

59.     During the Inspection, Plaintiff observed that wall décor had been removed from more than one wall. Plaintiff did not provide any consent to sale, removal, transfer, or disposition of any of the wall décor, which is part of the Mortgaged property, nor did Borrower provide any

notice of such sale, removal, transfer or disposition (the "Asset Disposal Defaults"). *See generally* Ex. N.

60.     As a result of the Asset Disposal Defaults, Borrower caused Events of Default to occur under the Loan Documents, which exist and have existed as of the date hereof.

61.     Pursuant to Section 6.13 of the Loan Agreement, "Borrower shall not suspend or change a substantial portion or its or their business."

62.     Borrower appears to have abandoned the Mortgaged Premises no longer operates the business it once operated in the Mortgaged Premises. Borrower has suspended a substantial portion of its business (the "Change of Business Default").

63.     As a result of the Change of Business Default, Borrower caused an Event of Default to occur under the Loan Documents, which exists and has existed as of the date hereof.

64.     Pursuant to Section 6.22 of the Loan Agreement, "Borrower shall not enter into, modify, amend, terminate or cancel any management contracts for the Property or agreements with agents or brokers, without the prior written approval of [Plaintiff] not to be unreasonably withheld or delayed."

65.     The Mortgaged Premises are not managed by any Property Manager, as that term is defined in the Loan Agreement, and Borrower cannot afford to hire a Property Manager, as that term is defined in the Loan Agreement, or otherwise protect the Mortgaged Premises or Mortgaged Property (the "Management Default").

66.     As a result of the Management Default, Borrower caused an Event of Default to occur under the Loan Documents, which exists and has existed as of the date hereof.

E. __The Judgment and Lien Defaults__

67.     Pursuant to Section 8.1(i) of the Loan Agreement, the following constitutes an Event of Default under the Loan Agreement: "Judgment or other claim in an amount in excess of $50,000.00 becomes a Lien or encumbrance upon any material portion of any Loan Party's assets or any Borrower Collateral[.]"

68.     Pursuant to Section 3.4 of the Loan Agreement, Borrower represented and warranted that "No Loan Party is a party to any agreement or instrument or subject to any judgment, order, writ, injunction, decree or regulation materially and adversely affecting its business, properties or assets, operations, or condition (financial or otherwise)."

69.     Pursuant to Section 3.3 of the Loan Agreement, Borrower represented and warranted that "There are no actions, suits or proceedings pending in which service of process has been directly effectuated or, to the best knowledge of Borrower, threatened against or affecting any Loan Party, at law or in equity or before or by any Governmental Authority or third party payor which are undisclosed and involve any of the transactions contemplated herein and which, if adversely determined against any Loan Party could reasonably be expected to have a Material Adverse Effect."

70.     Pursuant to Section 3.29 of the Loan Agreement, "Borrower agrees that all of the representations and warranties set forth in this Article III and elsewhere in this Agreement are true as of the date hereof, will be true at the Loan Opening and, except for matters which have been disclosed by Borrower and approved by Lender in writing, at all times thereafter."

71.     Borrower is subject to the NYCDEC Judgment, the NYSDOL Judgment, and the Union Judgment (collectively, the "Judgments"). Copies of the relevant pages of the title report reflecting the Judgments are annexed hereto as **Exhibit O**. The Judgments constitute a lien or

encumbrance upon a material portion of any Borrower's assets and the Mortgaged Premises. The Judgments are materially and adversely affecting Borrower's business, properties or assets, operations, or condition (financial or otherwise). The Judgments could reasonably be expected to have a Material Adverse Effect, as that term is defined in the Loan Agreement. The Judgments evidence that an action, suit or proceeding occurred, which affected the Mortgaged Premises, and which have a Materially Adverse Effect, as that term is defined in the Loan Agreement. The Union Judgment is in excess of $50,000. Borrower did not inform Plaintiff of the Judgments as of the date hereof (the "Judgment Defaults").

72.     As a result of the Judgment Defaults, Borrower caused an Event of Default to occur under the Loan Documents, which exists and has existed as of the date hereof.

73.     The Payment Defaults, the Insurance Defaults, the Care and Use Defaults, the Asset Disposal Defaults, the Change of Business Default, the Management Default and the Judgment Defaults are hereinafter collectively referred to as the "Events of Default."

### FIRST CAUSE OF ACTION
#### (Foreclosure of Mortgage)

74.     Plaintiff incorporates herein by reference the paragraphs set forth above as if fully set forth herein.

75.     By reason of, among other things, the Events of Default, Borrower is in default under the Loan Documents.

76.     Borrower has failed to cure its defaults despite due demand in writing through the Notices of Default. *See* Ex. I.

77.     By reason of the Defaults, the Debt has become full recourse to Borrower under the Loan Documents, pursuant to, *inter alia*, Section 21 of the Loan Agreement.

78.     Plaintiff, by reason of the Events of Default, declares that the Maturity Date is accelerated and elects that the whole unpaid principal sums due on the Note and Mortgage, together with all unpaid interest, late charges, default interest, special servicing fees, loan collections costs, legal or any other costs associated with curing the default, shall now be due.

79.     Further, by reasons of the Events of Default, Plaintiff is entitled to foreclose the Mortgage.

80.     As of March 30, 2023, the amount owed to Plaintiff is $13,490,389.51 (the "Debt") comprised of $13,000,000.00 principal and $237,898.00 interest, $1,840.00 Servicing Fees, and $79,450.84 Tax and Insurance Reserve. The Debt includes late fees of $6,708.66 as a result of failure to make timely payment in accordance with the Loan Documents, along with $23,610.15 in attorneys' fees and costs incurred in negotiating and drafting unexecuted amendments to the Loan Documents, but excludes other attorneys' fees and costs of collection, and other costs and expenses previously incurred by, or which may be in the future incurred by Plaintiff, including, but not limited to taxes and other costs and expenses as set forth in the Loan Documents.

81.     Any interest in or lien upon the Mortgaged Premises or Mortgaged Property held or claimed by any defendant is subject to and junior in priority to the lien of Plaintiff's Mortgage.

82.     Pursuant to the terms of the Mortgage, the mortgagee reserves the right to pay taxes and other liens affecting the Mortgaged Premises or Mortgaged Property, which liens, if any, would be and/or are superior to the lien of the Mortgage, and which, when paid by the mortgagee, together with interest thereon as provided in said Mortgage, are to be added to the amounts due under the Mortgage. Plaintiff may be required to pay such liens during the pendency of this action and will demand that such payments so made by it be added to the Mortgage debt as aforesaid.

69777207;3

83.     Pursuant to the Loan Documents, Borrower must pay Plaintiff's reasonable attorneys' fees expended to foreclose the Mortgaged Premises and the Mortgaged Property.

84.     Plaintiff has complied with all the terms and provisions of the Loan Documents.

85.     In order to protect its security interest in the Mortgaged Premises and Mortgaged Property, Plaintiff, as it is entitled to do under the Loan Documents, may be compelled to pay, during the pendency of this action, local taxes, assessments, water rates, insurance premiums, and other charges affecting the Mortgaged Premises and Mortgaged Property, and any sums thus paid by Plaintiff for such purposes, together with late payments due thereon, should be added to the sums otherwise due and deemed secured by the Mortgage and adjudged a lien.

86.     No proceeding other than this action has been commenced to recover the debt secured by the Mortgage owed to Plaintiff.

87.     Upon information and belief, each and all of the defendants herein have or claim to have some interest in, or lien upon, the Mortgaged Premises or Mortgaged Property or some part thereof, which interest or lien, if any, has accrued after the lien of the Mortgage and is subordinate thereto.

88.     In the event that Plaintiff possesses any other lien(s) against said Mortgaged Premises or Mortgaged Property, Plaintiff requests that such other lien(s) shall not be merged in Plaintiff's causes of action set forth in the Complaint, but that Plaintiff shall be permitted to enforce said other lien(s) and/or seek or proceeding(s), including, without limitation, any surplus money proceedings.

89.     Plaintiff shall not be deemed to have waived, altered, released or changed the election hereinafter made by reason of the payment after the date of the commencement of this action of any or all of the defaults mentioned herein, and such election shall continue and remain

effective until the costs and disbursements of this action, and any and all future defaults under the Loan Documents, and occurring prior to the discontinuance of this action, are fully paid.

90.     Plaintiff seeks to foreclose upon the Mortgage and recover the Debt, together with accrued interest, late charges, default interest, and any other amounts to be added pursuant to the terms of the Loan Documents, including costs and attorneys' fees and that Borrower be adjudged to pay the whole residue or so much thereof as the Court may determine to be just and equitable, of the debt remaining unsatisfied after the sale of the Mortgaged Premises and Mortgaged Property and the application of the proceeds pursuant to the provisions contained in such judgment, the amount thereof to be determined by the court as provided in Section 1371 of the Real Property Action and Proceedings Law.

**SECOND CAUSE OF ACTION**
**(Foreclosure of Security Interest in Personal Property)**

91.     Plaintiff incorporates herein by reference the paragraphs set forth above as if fully set forth herein.

92.     Through the Loan Documents, including, without limitation, the Loan Agreement and the Mortgage, Borrower granted Plaintiff a security interest in all present and after-acquired property of Borrower, including the Mortgaged Property (the "Collateral"). *See* Ex. D at §§ 1.1, 7.1; Ex. H at p. 2-5.

93.     The Collateral includes, among other things, all of Borrower's right, title, and interest in all currently existing and hereafter acquired or arising in accounts, books, commercial tort claims, deposit accounts, equipment, general intangibles, inventory, investment property (including all of its securities and securities accounts), negotiable collateral, supporting obligations, licenses and permits, money or other assets, media rights, memorabilia, collectibles, art, furnishings, furniture, and proceeds of the foregoing or tangible or intangible property resulting

19

from the sale, exchange, or other disposition of the foregoing.  Ex. D at §§ 7.1, 1.1; Ex. H at p. 2-5.

94.     The Collateral is now owned by Borrower, which holds possession thereof.

95.     Due to the Events of Default, as alleged above, Plaintiff is entitled to foreclose on its security interest in the Collateral.

96.     The Loan Agreement and the Mortgage provide that, upon the occurrence of an Event of Default, as that term is defined in the Loan Agreement and the Mortgage, Plaintiff may exercise the following remedies, among others:

    a.  Entry of premises where the Collateral may be located;

    b.  Possession of the Collateral by any method permitted by law;

    c.  The sale or lease of the Collateral; and

    d.  The collection of any rents, income, and profits received in connection with the Collateral.

*See* Ex. H at §§ 21(a)(i), 21(a)(iv), 21(a)(v), 21(c), 21(d); Ex. D at §§ 9.1(c), 9.1(g), 9.1.

97.     Defendants may claim some interest or interests in the Collateral, but any such interest or interests are junior, inferior, and subordinate to Plaintiff's security interest therein.

### THIRD CAUSE OF ACTION
### (Court Appointment of Receiver)

98.     Plaintiff incorporates herein by reference the paragraphs set forth above as if fully set forth herein.

99.     Through the Mortgage, Borrower agreed in writing that, following an Event of Default, as that term is defined therein, under the Loan Documents, Plaintiff is entitled to appoint a receiver with broad powers to take over, manage, and/or sell the Mortgaged Premises and Mortgaged Property. *See* Ex. H at § 21(b).

69777207;3

100.    The Loan Documents provide that, following an Event of Default, Plaintiff "Lender may make application to a court of competent jurisdiction for appointment of a receiver of the Mortgaged Property." Ex. H at § 21(b); *see also* Ex. I at p.3 ("[Plaintiff] shall have the right and authority, without further notice whatsoever to [Borrower] and without regard to the adequacy of the security therefore, to: (a) make application to a court of competent jurisdiction for appointment of a receiver for all or any part of the [Mortgaged Property], as particularly set forth in the [Mortgage]….").

101.    The Loan Documents state that a receiver "shall have the usual powers and duties of receivers in similar cases," including to hold, maintain, lease, rent, manage, operate or otherwise use the Mortgaged Premises and Mortgaged Property. Ex. H at §§ 21(a)(ii), 21(b); *see also* Ex. I at p.3.

102.    By executing the Loan Documents, Borrower agreed that Plaintiff has the immediate right to the appointment of a receiver.

103.    By the above allegations, Plaintiff has demonstrated a likelihood of success on the merits on its claim that Borrower defaulted on its obligations under the Loan Documents and, therefore, Plaintiff is entitled to an order appointing a receiver.

104.    By reason of, the Events of Default, among other things, all as alleged above, there is an imminent danger that Plaintiff's security interests created and perfected by the Loan Documents will be concealed, lost, or diminished in value.

105.    Absent an order appointing a receiver having the powers set forth in the Loan Documents (as referenced in paragraph 100 above) and under applicable law, Plaintiff will be irreparably harmed by, among other things, a reduction or elimination of the value of the

Mortgaged Premises in which it maintains a security interest and that is the main source of recovery under the Loan Documents.

106.    The harm to Plaintiff would far outweigh any injury to Borrower.

**WHEREFORE**, Plaintiff demands judgment as follows:

a.  That all defendants, and all persons claiming under them be barred and forever foreclosed of all tight, title, lien, claim and equity of redemption in and to the Mortgaged Premises and Mortgaged Property, except for the right of the United States of America and its political divisions, to be redeemed as provided by applicable law;

b.  That the Mortgaged Premises and Mortgaged Property be sold as to obtain the greatest return of sale, whether sold jointly as a single parcel or sold separately as two or more parcels;

c.  That the money raised from the sale of the Mortgaged Premises and Mortgaged Property be paid into Court and Plaintiff be paid first (i) the sum of $13,490,389.51 due and owing under the Loan Documents, with interest to the time of payment; (ii) late charges; (iii) all sums, including payment of taxes and other charges, which may be expended by plaintiff to protect its security interest in the Mortgage, and (iv) reasonable costs and attorneys' fees incurred by Plaintiff in enforcing this action;

d.  That defendant Borrower be adjudged liable under the Loan Documents for all amounts of the debt remaining unsatisfied after the application of the proceeds of such sale pursuant to a judgment of foreclosure in accordance with RPAPL §1371;

e.   That defendant Borrower be adjudged liable under the Loan Documents for reasonable costs and attorneys' fees incurred by Plaintiff in enforcing this action;

f.   That upon a separate application, Plaintiff shall be entitled to the appointment of a receiver with respect to the Mortgaged Premises and Mortgaged Property, having the powers stated in the Loan Documents and such other powers as appropriate and necessary for the receiver to perform his or her services and duties;

g.   That the purchaser(s) of the Mortgaged Premises at such foreclosure sale be awarded a writ of possession and all other persons in possession of the premises be evicted; and

h.   That Plaintiff be awarded such other and further relief as the Court may deem just and proper.

Dated: New York, New York
        April 7, 2023

AKERMAN LLP

By:  /s/ Mark S. Lichtenstein
     Mark S. Lichtenstein, Esq.
     1251 Avenue of the Americas, 37th Floor
     New York, NY 10020
     Tel. No.: (212) 880-3800
     mark.lichtenstein@akerman.com

     *Attorney for Plaintiff Kairos Credit Strategies Operating Partnership, LP*

# EXHIBIT A – ORIGINAL MORTGAGE



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of this instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2020003030124400700 1E5CBF

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 53 |
|---|---|---|

Document ID: 2020030301244007
Document Type: AGREEMENT
Document Page Count: 51

Document Date: 02-21-2020

Preparation Date: 03-03-2020

**PRESENTER:**
TITLETRAK AGENCY LLC
130 EAST 40TH STREET
SUITE 400
NEW YORK, NY 10016
212-922-9000
TTA-366863

**RETURN TO:**
PRYOR CASHMAN LLP
7 TIMES SQUARE
NEW YORK, NY 10036-6569
Attn: Joseph L. Beasic

| PROPERTY DATA | | | | |
|---|---|---|---|---|
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 1291 | 127 | Entire Lot | 57 EAST 55TH STREET |

Property Type: COMMERCIAL REAL ESTATE

**CROSS REFERENCE DATA**

CRFN: 2018000294567
☒ Additional Cross References on Continuation Page

| PARTIES | |
|---|---|
| **PARTY 1:** | **PARTY 2:** |
| THE FRIARS NATIONAL ASSOCIATION, INC. | TITAN CAPITAL ID, LLC |
| 57 EAST 55TH STREET | 100 EAST 45TH STREET, 40TH FLOOR |
| NEW YORK, NY 10022 | NEW YORK, NY 10017 |

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 9,000,000.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax | | |
| Exemption: | | 255 | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 292.00 | | | |
| Affidavit Fee: | $ | 8.00 | | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**
Recorded/Filed          03-04-2020 09:20
City Register File No.(CRFN):
2020000082528

City Register Official Signature



**NYC DEPARTMENT OF FINANCE
OFFICE OF THE CITY REGISTER**

2020030301244007001C5E3F

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | | PAGE 2 OF 53 |
|---|---|---|
| **Document ID: 2020030301244007** | Document Date: 02-21-2020 | Preparation Date: 03-03-2020 |
| Document Type: AGREEMENT | | |

**CROSS REFERENCE DATA**
**CRFN:** 2018000340879
**CRFN:** 2019000016736
**CRFN:** 2019000198078
**CRFN:** 2019000330235
**Document ID:** 2020030301244006

Prepared by, and after recording
return to:

Pryor Cashman LLP
7 Times Square
New York, New York 10036
Attn: Joseph L. Brasile, Esq.

**Consolidation, Modification
and Extension of Mortgage,
Assignment of Leases and
Rents and Security Agreement**

**LOCATION OF PREMISES:**

| | |
|---|---|
| **ADDRESS:** | **57 EAST 55ᵀᴴ STREET** |
| | **NEW YORK, NEW YORK 10022** |
| **STATE:** | **NEW YORK** |
| **COUNTY:** | **NEW YORK** |
| **BLOCK:** | **1291** |
| **LOT:** | **127** |

Dated: February 21, 2020

4327940

## CONSOLIDATION, MODIFICATION AND EXTENSION
## OF MORTGAGE, ASSIGNMENT OF LEASES
## AND RENTS AND SECURITY AGREEMENT

THIS CONSOLIDATION, MODIFICATION AND EXTENSION OF MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT is made as of the 21st day of February 2020 (this "Agreement") between THE FRIARS NATIONAL ASSOCIATION, INC., a New York not-for-profit corporation, having an address at 57 East 55th Street, New York, New York 10022 ("Borrower") and TITAN CAPITAL ID, LLC, a Delaware limited liability company, having an address at 140 East 45th Street, 40th Floor, New York, New York 10017 ("Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of NINE MILLION AND 00/100 DOLLARS ($9,000,000.00) and Borrower and Lender desire to secure (a) the repayment of that indebtedness, with interest, and all renewals, extensions and modifications thereof, (b) the repayment of any future advances, with interest thereon made by Lender to Borrower and (c) the performance of all of Borrower's obligations, covenants and agreements stated herein and consolidated herewith; and

WHEREAS, Borrower has a fee interest in the real property located at 57 East 55th Street, New York, New York 10022, having the legal description and as more particularly set forth on **Exhibit A** attached hereto and made a part hereof (the "Property").

Borrower hereby covenants and agrees with Lender as follows:

## 1.   BORROWER'S ASSUMPTION OF OBLIGATIONS UNDER NOTES AND MORTGAGES.

Borrower assumes all of the obligations and agreements of the notes (herein, collectively, the "Notes") secured by the mortgages or other security instruments (herein, the "Mortgages") listed on **Exhibit B** attached hereto. Borrower also assumes all of the obligations in all agreements, whether or not listed in **Exhibit B**, which consolidate, modify or extend such Notes and Mortgages.

## 2.   AGREEMENT TO CONSOLIDATE AND MODIFY THE NOTES.

The Borrower agrees that the obligations under the Notes (and under all other agreements which consolidated, modified or extended the obligations under the Notes) shall be and are hereby consolidated. To that end, Borrower has concurrently herewith executed and delivered to Lender a Consolidated, Extended, Amended and Restated Mortgage Note (herein, "Consolidated Note") which consolidates, amends and restates in their entirety the terms and provisions of the Notes.

## 3.   AGREEMENT TO CONSOLIDATE AND MODIFY THE MORTGAGES.

Borrower agrees that the rights and obligations under the Mortgages (and under all other agreements which consolidated, modified or extended rights and obligations under the

Mortgages) shall be and are hereby consolidated and that Lender's rights in the Property shall be and are hereby combined so that Lender has one real estate security interest (herein, "Consolidated Mortgage") securing the Consolidated Note evidencing Borrower's indebtedness to Lender in the amount of $9,000,000.00, (together with interest thereon. Borrower and Lender agree that the terms of the Consolidated Mortgage are hereby amended and restated in their entirety to be the terms which are set out in Exhibit C hereto. As consolidated and restated hereby, the terms and provisions of the Mortgages shall remain in full force and effect and are hereby ratified and confirmed by Borrower in all respects. For purposes of the Consolidated Mortgage, Borrower's address stated above and Lender's address stated above shall be the addresses of Borrower and Lender, respectively, unless and until modified in accordance with the terms of the Consolidated Mortgage.

## 4.    BORROWER'S WARRANTIES.

Borrower covenants that Borrower is lawfully seized of a fee estate in the property and has the right to consolidate, modify and extend the Notes and Mortgages and that Borrower will defend generally the title to the Property against all claims and demands, subject to any easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy insuring Lender's interest in the Property. Borrower also covenants and warrants that there are no offsets, counterclaims or defenses against the indebtedness now unpaid or against the Consolidated Note or the Consolidated Mortgage.

## 5.    TERMINATION; CHANGE; AMENDMENTS.

This Agreement may not be terminated, changed or amended except by a written agreement signed by the party whose rights or obligations are being changed by that Agreement.

## 6.    LOST NOTE(S).

In the event that any of the notes secured by mortgages set forth in Exhibit B (the "Lost Notes"), were lost or misplaced by the current owner or its predecessor in interest and have not been delivered to the Lender with the assignment of the mortgages hereinabove set forth, the Borrower hereby agrees that, notwithstanding the fact that the Lost Notes have not been delivered to the Lender, the Borrower remains indebted to the Lender in the full amount of NINE MILLION AND 00/100 DOLLARS ($9,000,000.00) as set forth hereinabove and as set forth in and evidenced by the Consolidated Note executed by the Borrower of even date herewith, which amount includes the principal balance now remaining unpaid on the Lost Notes. The Borrower further agrees and hereby waives any and all claims and/or rights in any way relating to or arising from the Lost Notes whether as a defense in any action brought by the Lender to enforce any of the terms of this Instrument or collect the full amount due and owing under this Instrument or the Consolidated Note or otherwise.

**IN WITNESS WHEREOF**, Borrower and Lender have executed this Agreement or caused the same to be executed by their representatives thereunto duly authorized.

**LENDER**:

**TITAN CAPITAL ID, LLC**,
a Delaware limited liability company

By: _____

    Name:  Joseph Brasile
    Title:  Authorized Signatory

**BORROWER**:

**THE FRIARS NATIONAL ASSOCIATION, INC.**,
a New York not-for-profit corporation

By: _____

    Name: Warren Handelman
    Title: Bard

[Signature Page to Consolidation,
Modification and Extension of
Mortgage, Assignment of Leases
and Rents and Security Agreement]

4327940

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

On the 21 day of February in the year 2020 before me, the undersigned, personally appeared Joseph Brasile, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

BEAU CORDOVA
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CO6128489
Qualified in New York County
Commission Expires June 13, 2021

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

On the 2l day of February in the year 2020 before me, the undersigned, personally appeared Warren Handelman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

BEAU CORDOVA
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CO6128489
Qualified in New York County
Commission Expires June 13, 2021

4327940

## EXHIBIT "A"

### LEGAL DESCRIPTION

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, CITY OF NEW YORK AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF 55TH STREET DISTANT 156 FEET 6 INCHES EASTERLY FROM THE NORTHEASTERLY CORNER OF SAID STREET AND MADISON AVENUE;

RUNNING THENCE NORTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK;

THENCE EASTERLY ALONG THE CENTER LINE OF THE BLOCK 33 FEET;

THENCE SOUTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH ANOTHER PARTY WALL 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF 55TH STREET;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF 55TH STREET, 33 FEET TO THE POINT OR PLACE OF BEGINNING.

## **EXHIBIT "B" (Mortgages)**

Mortgage Number 1 of 6:

| | |
|---|---|
| Mortgagor: | Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street Funding Associates |
| Amount: | $2,000,000.00 |
| Dated: | 08/28/2018 |
| Recorded: | 09/06/2018 |
| CRFN: | 2018000298267. |

with Assignment of Mortgage from Mortgagor in favor of Titan Capital ID, LLC, to be recorded in the Office of the Register of the City of New York, New York County.

Mortgage Number 2 of 6:

| | |
|---|---|
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street 2nd Funding Associates |
| Amount: | $1,000,000.00 |
| Dated: | 10/03/2018 |
| Recorded: | 10/15/2018 |
| CRFN: | 2018000340879, |

with Assignment of Mortgage from Mortgagor in favor of Titan Capital ID, LLC, to be recorded in the Office of the Register of the City of New York, New York County.

Mortgage Number 3 of 6:

| | |
|---|---|
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street 3rd Funding Associates |
| Amount: | $1,000,000.00 |
| Dated: | 01/08/2019 |
| Recorded: | 01/15/2019 |
| CRFN: | 2019000016736, |

with Assignment of Mortgage from Mortgagor in favor of Titan Capital ID, LLC, to be recorded in the Office of the Register of the City of New York, New York County.

Mortgage Number 4 of 6:

| | |
|---|---|
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street 4th Funding Associates |
| Amount: | $1,000,000.00 |
| Dated: | 06/06/2019 |
| Recorded: | 06/24/2019 |
| CRFN: | 2019000198078, |

with Assignment of Mortgage from Mortgagor in favor of Titan Capital ID, LLC, to be recorded in the Office of the Register of the City of New York, New York County.

Agreement:
#4a
Type:          Omnibus Modification
Mortgagor:     The Friars National Association, Inc.
Mortgagees:    57 East 55th Street Funding Associates,
               57 East 55th Street 2nd Funding Associates,
               57 East 55th Street 3rd Funding Associates
               and 57 East 55th Street 4th Funding Associates
Dated:         09/25/2019
Recorded:      10/10/2019
CRFN:          2019000330237
(Note: The above mortgage #s 1 - 4 were consolidated, extended and modified to form a single lien in the amount of $5,000,000.00)

Mortgage Number 5 of 6:
Mortgagor:     The Friars National Association, Inc.
Mortgagee:     57 East 55th Street 5th Funding Associates
Amount:        $1,000,000.00
Dated:         09/25/2019
Recorded:      10/10/2019
CRFN:          2019000330235

Assignment:
#5a
Type:          Assignment of Mortgage
Assignors:     57 East 55th Street 5th Funding Associates
Assignee:      Titan Capital ID, LLC
Dated:         02/21/2020
Recorded:      To Be Recorded in the Office of the Register
               of the City of New York, New York County

(Note: Assigns the above mortgage # 5)

Mortgage Number 6 of 6:
Mortgagor:     The Friars National Association, Inc.
Mortgagee:     Titan Capital ID, LLC
Amount:        $3,000,000.00
Dated:         02/21/2020
Recorded:      To Be Recorded in the Office of the Register
               of the City of New York, New York County

**EXHIBIT "C"**

4327940

## MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT

between

## THE FRIARS NATIONAL ASSOCIATION, INC. AS MORTGAGOR,

and

## TITAN CAPITAL ID, LLC AS MORTGAGEE,

### LOCATION OF PREMISES:

| | |
|---|---|
| **ADDRESS:** | **57 EAST 55TH STREET** |
| | **NEW YORK, NEW YORK 10022** |
| **STATE:** | **NEW YORK** |
| **COUNTY:** | **NEW YORK** |
| **BLOCK:** | **1291** |
| **LOT:** | **127** |

### MORTGAGE AMOUNT: $9,000,000.00

Dated:  February 21, 2020

Record and return to:

Pryor Cashman LLP
7 Times Square
New York, New York 10036
Attention: Joseph L. Brasile, Esq.

4327985

## MORTGAGE, ASSIGNMENT OF LEASES
## AND RENTS AND SECURITY AGREEMENT

**MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT** is dated and made effective as of February 21, 2020 (as the same may be amended, restated, supplemented, consolidated or otherwise modified from time to time, this "<u>Mortgage</u>") between **THE FRIARS NATIONAL ASSOCIATION, INC.**, a New York not-for-profit corporation, having an address at 57 East 55th Street, New York, New York 10022 (the "<u>Mortgagor</u>") in favor of **TITAN CAPITAL ID, LLC**, a Delaware limited liability company, having an address at 140 East 45th Street, 40th Floor, New York, New York 10017 (the "<u>Mortgagee</u>").

### WITNESSETH:

**WHEREAS,** the Mortgagor is the fee owner of the real property described in <u>Schedule A</u> attached hereto and made a part hereof;

**WHEREAS,** to secure the payment of an indebtedness in the total principal sum of NINE MILLION AND 00/100 DOLLARS ($9,000,000.00), lawful money of the United States to be paid with interest thereon according to (i) that certain Consolidated, Extended, Amended and Restated Mortgage Note in the principal amount of NINE MILLION AND 00/100 DOLLARS ($9,000,000.00), lawful money of the United States (as the same may be amended, restated, supplemented, consolidated, replaced or otherwise modified from time to time, the "<u>Note</u>") to be paid with interest thereon (said aggregate principal sum, interest and all other sums which may or shall become due under this Mortgage or under any Loan Document (as defined below), being hereinafter, collectively, the "<u>Secured Obligations</u>"), the Mortgagor hereby mortgages to the Mortgagee that certain real property more particularly described in <u>Schedule A</u> attached hereto and incorporated herein by reference, **SAID PROPERTY BEING commonly known as and by 57 East 55th Street, New York, New York 10022**; and

**WHEREAS,** this Mortgage shall be a valid and enforceable first lien on the Property (as hereinafter defined)

**NOW, THEREFORE,** to secure to the Mortgagee: (a) the repayment of the Secured Obligations, and all renewals, modifications and extensions thereof, (b) the payment of all other sums advanced in accordance with the terms of the Note or this Mortgage in order to protect the security hereof, together with interest thereon; and (c) the performance of the agreements of the Mortgagor contained herein, it is agreed as follows:

The Mortgagor does hereby mortgage, grant, convey and assign unto the Mortgagee all of the rights, titles, interests and estate of the Mortgagor, now owned, or hereafter acquired, in and to the following property, rights, interests and estates (such property, rights and interests being hereinbefore and hereinafter, collectively, the "<u>Premises</u>").

(a)     the land located in the City, County and State of New York, and known as and by 57 East 55th Street, New York, New York 10022, Block 1291 and Lot 127 on the Official Tax Map of the City of New York, New York County;

(b)     all the right, title and interest of the Mortgagor in and to all streets, roads and public places, opened or proposed, adjoining the above-mentioned real property and all improvements now or hereafter on the above-mentioned real property (the improvements and the real property are hereinafter collectively referred to as the "Property"), and all easements and rights-of-way, public or private, all sidewalks and alleys, sewer rights, water, water courses, water rights and powers, air rights and development rights and/or credits, licenses and permits relating to the Property, including, but not limited to, the floor area development rights and the bulk and density rights accruing to Mortgagor and/or the Property, and all strips and gores of land now or hereafter used in connection with the Property;

(c)     all structures now or hereafter constructed on the Property;

(d)     all and singular the tenements, hereditaments, and appurtenances thereunto belonging to, or in any wise appertaining, and the reversion or reversions, remainder and remainders; and also all the estate, right, title, interest, property, possession, claim and demand whatsoever, in law and in equity, of the Mortgagor, of, in and to the same and every part and parcel thereof, with appurtenances, including all fixtures affixed to the same or intended so to be, and also, all machinery, equipment, improvements and personal property now in or upon or which may hereinafter be installed in, constructed on or affixed to the same, to the extent the foregoing relate to or are necessary for the complete and comfortable use, enjoyment, maintenance, operation or occupancy thereof, including, but not limited to, buildings, furnaces, boilers, oil burners, radiators and piping, heating system, electrical system, panel boards, plumbing and bathroom fixtures, air conditioning, sprinkler systems, wash tubs, sinks, gas and electric fixtures, stoves, ranges, awnings, screens, window shades, refrigerators, kitchen cabinets, plants and shrubbery as to which this Mortgage constitutes a security agreement;

(e)     all current and future leases, rental agreements, occupancy agreements and other agreements of whatever form now or hereafter affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, all or any part of the Property and the improvements heretofore now or hereafter entered into (as the same may be amended from time to time, hereinafter, collectively, the "Leases") and all rents, income, issues and profits arising from the Leases and renewals thereof, together with all security deposits made by tenants in connection with such Leases and together with all rents, income, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the use, enjoyment and occupancy of the Property and the improvements (hereinafter, collectively, the "Rents"), and the Mortgagor grants to the Mortgagee the right to enter upon and to possession of the Property for the purpose of collecting the same and to let the Property or any part thereof, and to apply the rents, issues and profits, after payment of all necessary charges and expenses, on account of the Secured Obligations as hereinafter provided, and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Note;

(f)     any and all awards, damages, payments, judgments, settlements and other compensation, including without limitation, insurance proceeds, and any and all causes of action,

claims therefor and rights thereto, which may result from (i) taking or injury by virtue of the exercise of the power of eminent domain, (ii) a lawsuit or other legal proceeding, or (iii) any damage, injury or destruction in any manner caused to the Property, or any part thereof;

(g)     all the estate, right, title, interest, property, possession, claim and demand whatsoever of the Mortgagor, in law as well as in equity, of, in and to the same and every part and parcel thereof with the appurtenances;

(h)     all other assets and personal property of the Mortgagor relating to, or used in the operation or occupancy of, the Property, including without limitation, all accounts, goods, fixtures, inventory, equipment, chattel paper, documents instruments and general intangibles (as such terms are defined in the Uniform Commercial Code (the "UCC")), whether now owned or hereafter acquired; and

(i)     all proceeds, replacements and additions of any of the foregoing.

The listing of specific rights or property herein shall not be interpreted as a limit of general terms.

**TO HAVE AND TO HOLD**, the above granted and described Premises unto the Mortgagee, its successors and assigns, to its and their own proper use, benefit and behoove forever.

The Note, this Mortgage and any other documents, agreements and/or instruments previously, now or hereafter executed or delivered by the Mortgagor with or in favor of the Mortgagee relating to the "Loan" (as hereinafter defined), all as the same may be amended, restated, supplemented or otherwise modified from time to time, are hereinafter collectively referred to as the "Loan Documents". This Mortgage further creates a security interest in the fixtures included in the Premises and constitutes a security agreement and financing statement under the UCC. The Mortgagor shall execute, file and refile such financing statements or other security agreements as the Mortgagee shall require from time to time with respect to such fixtures and other personal property and assets included in the Premises. The Mortgagor hereby authorizes the Mortgagee to file such financing statement or statements and any amendments thereto pursuant to the UCC, as the Mortgagee may deem necessary to perfect such interests or rights in its favor.

**PROVIDED ALWAYS**, and these presents are made upon this express condition, that if all of the Secured Obligations shall be duly paid and performed as and when the same shall become due and payable and shall be required to be performed, then these presents and the estate hereby granted shall cease, terminate and be void. All now existing and hereafter arising obligations of the Mortgagor to the Mortgagee under any of the Loan Documents are hereinafter included in the definition of "Secured Obligations". Notwithstanding anything to the contrary contained herein, this Mortgage and the liens granted herein shall remain valid and effective until all Secured Obligations of the Mortgagor have been fully and indefeasibly paid to the Mortgagee.

1.     **REPRESENTATIONS AND WARRANTIES OF THE MORTGAGOR.**

The Mortgagor hereby represents and warrants to the Mortgagee as follows:

### A. ORGANIZATION, POWER AND QUALIFICATION; AUTHORIZATION OF AGREEMENT

1. The Mortgagor (i) is a not-for-profit corporation existing and in good standing under the laws of the State of New York and (ii) has all requisite authority to own and operate its properties and assets and to carry on its business as now conducted.

2. The execution of this Mortgage has been duly consented to by the Board of Governors of the Mortgagor as required by applicable law.

3. The Mortgagor has full power and authority to execute, deliver and perform any action or step which may be necessary to carry out the terms of this Mortgage and each of the other Loan Documents to which it is a party and the same have been duly executed and delivered by the Mortgagor having the full, complete and unrestricted power to do so, and are the legal, valid and binding obligations of the Mortgagor enforceable in accordance with their terms, subject to any applicable bankruptcy, insolvency, general equity principles or other similar laws affecting the enforcement of creditors' rights generally.

**B. NO LEGAL BAR.** The execution, delivery and performance of the Loan Documents will not (i) violate any provision of any existing law, statute, rule, regulation or ordinance, (ii) conflict with, result in a breach of or constitute a default under (a) the articles of organization or the operating agreement of the Mortgagor, (b) any order, judgment, award or decree of any court, arbitrator, or governmental authority, bureau or agency, or (c) any mortgage, indenture, lease, contract or other agreement or undertaking to which either the Mortgagor is a party or by which the Mortgagor or any of its properties or assets may be bound, or (iii) result in the creation or imposition of any mortgage, security interest, restriction, lien or other encumbrance upon or with respect to any property or assets now owned or hereafter acquired by the Mortgagor, other than in favor of the Mortgagee.

**C. CONSENT.** No consent, license, permit, approval or authorization of, exemption by, notice to, report to, or registration, filing or declaration with any person or governmental authority, bureau or agency is required in connection with the execution, delivery, performance or validity of the Loan Documents or the transactions contemplated thereby.

**D. COMPLIANCE WITH LAW.** Except only as shown in the results of the searches as disclosed in the title report issued by Title Trak Agency, LLC as agent for First American Title Insurance Company (bearing title no. TTA-566862, effective date of January 17, 2020; the "Title Report"), the Mortgagor is not in violation of any applicable law, rule, regulation, statute, ordinance, or any order, judgment, award or decree of any court, arbitrator, or governmental authority, bureau or agency, the violation of which would have a materially adverse effect on the business, assets, liabilities or financial condition of the Mortgagor.

**E. NO DEFAULT.** The Mortgagor is not in default in any material respect in the payment or performance of any of its obligations or in the performance of any mortgage, indenture, lease, contract or other agreement or undertaking to which it is a party or by which it or any of its properties or assets may be bound, and no default or event of default has occurred and is continuing. The Mortgagor is not in default under any order, award or decree of any court,

arbitrator or governmental authority, bureau or agency binding upon or affecting it or by which any of its properties or assets may be bound or affected, and no such order, award or decree, if any, materially adversely affects the ability of the Mortgagor to carry on its business as presently conducted or to perform its obligations hereunder.

    F.    **NO LITIGATION**. No litigation, investigation or proceeding of or before any court, arbitrator or governmental authority, bureau or agency is currently pending, nor, to the knowledge of the Mortgagor, threatened, against the Mortgagor or any of the Mortgagor's properties and revenues which, if adversely determined, would materially adversely affect the ability of the Mortgagor to carry on its business as presently conducted or to perform its obligations hereunder, and the Mortgagor has not received notice from the insurer with respect to the "Pending Claim" (as hereinafter defined) or anyone acting on its behalf, that: (i) coverage with respect to the Pending Claim is excluded under the policy or has been denied or (ii) no insurance proceeds are available under the policy.

    G.    **NO BURDENSOME RESTRICTIONS**. The Mortgagor is not a party to nor is bound by any contract or agreement or instrument nor subject to any restriction materially and adversely affecting the business or financial condition of the Mortgagor.

    H.    **TAX RETURNS AND PAYMENTS; FINANCIAL STATEMENTS**.

    1    Excepting only with respect to the non-payment of Franchise Taxes as disclosed in the results of the searches as disclosed in the Title Report, all federal, state and other tax returns of the Mortgagor required by law to be filed have been duly filed or extensions obtained, and all federal, state and other taxes, assessments and governmental charges or levies upon the Mortgagor or any of its properties, income, profits or assets which are due and payable have been paid, except such tax returns the non-filing of which, and such taxes the non-payment of which, would not have a material adverse effect upon the business, assets, liabilities or financial condition of the Mortgagor and except for such taxes and assessments which the Mortgagor is disputing in good faith and for which the Mortgagor has established adequate reserves on its books for the payment of such disputed taxes or assessments in accordance with generally accepted accounting principles.

    2.    All financial statements and financial information provided to the Mortgagee by or on behalf of the Mortgagor fairly presents the financial position and results of operations of the Mortgagor on the dates and for the periods then ended and show all direct liabilities and all known contingent liabilities of a material nature.

    3.    Since the date of the most recent financial statement provided to the Mortgagee by or on behalf of the Mortgagor, no material adverse change has occurred in the business, assets, liabilities, financial condition, results of operations or business prospects of the Mortgagor, and no event has occurred or failed to occur which has had or is likely to have a material adverse effect on the business, assets, liabilities, financial condition, results of operations or business prospects of the Mortgagor.

I.   **FINANCIAL CONDITION.**

1.   The Mortgagor is now, and after giving effect to the transactions contemplated hereby will be in a financially solvent condition; the execution and delivery of this Mortgage and the other Loan Documents do not constitute a "fraudulent conveyance" or "fraudulent transfer" within the meaning of any applicable federal or state statute; and no bankruptcy or insolvency proceedings are presently pending by or against the Mortgagor.

2.   No fact is known to the Mortgagor which has had or is likely in the future to have (so far as Mortgagor can reasonably foresee) a materially adverse effect upon the Mortgagor's business, assets, liabilities, condition, financial or otherwise, or results of operations that has not been set forth in the financial statements furnished to the Mortgagee or other reports or other papers or data otherwise disclosed in writing to the Mortgagee.

3.   The Mortgagor does not intend to, nor does the Mortgagor believe that it will, incur debts beyond its ability to pay such debts as they mature.

4.   The Mortgagor does not believe that final judgments against it in actions for money damages will be rendered at a time when, or in an amount such that, the Mortgagor will be unable to satisfy any such judgments promptly in accordance with their terms (taking into account the maximum reasonable amount of such judgments in any such actions and the earliest reasonable time at which such judgments might be rendered).

J.   **FEDERAL RESERVE REGULATIONS.** The Mortgagor is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any margin stock (within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System).

K.   **BROKER.** The Mortgagor represents and warrants to the Mortgagee that: (i) the Mortgagor has used no broker in connection with the transactions contemplated by the Loan Documents other than NP Brokerage, Inc. (the "Mortgagor's Broker") and (ii) the Mortgagor shall pay a commission to the Mortgagor's Broker from out of the proceeds of the Loan. The Mortgagor shall, and hereby does, indemnify and hold harmless the Mortgagee from and against any and all losses, costs, damages and claims, including reasonable attorneys' fees, arising out of or relating to any breach by the Mortgagor of the foregoing representations and warrantees. The Mortgagee represents and warrants to the Mortgagor that the only broker it has interacted with in connection with the transactions contemplated by the Loan Documents is the Mortgagor's Broker. The Mortgagee shall, and hereby does, indemnify and hold harmless the Mortgagor from and against any and all losses, costs, damages and claims, including reasonable attorneys' fees, arising out of or relating to any breach by the Mortgagee of the foregoing representation and warranty. The foregoing provisions shall survive the payment and satisfaction in full of the Secured Obligations.

L.   **WARRANTY OF TITLE.** The Mortgagor is lawfully seized of an indefeasible estate in fee simple in the Premises, subject only to those exceptions (the "Permitted Encumbrances") set forth in that certain Loan Title Insurance Policy No. 5011336-0308435e issued by Title Trak Agency, LLC as agent for First American Title Insurance Company, as delivered to the Mortgagee and endorsed on the date hereof, which is incorporated herein by

reference, and the Mortgagor will warrant and forever defend the title thereof unto the Mortgagee against all lawful claims whatsoever. The Mortgagor warrants that this Mortgage is and shall be maintained as a valid first lien on the Premises subject only to the above-mentioned Permitted Encumbrances, and shall defend the same against the claims of all persons or entities whomsoever. At the Mortgagor's sole cost and expense, the Mortgagor forthwith upon the execution and delivery of this Mortgage, and thereafter from time to time, shall cause this Mortgage, and any security instrument creating or evidencing the lien or security interest hereof upon the Premises and each instrument of further assurance, to be filed, registered or recorded in such manner and in such places as may be required by any present or future law to publish notice of and fully to protect the lien hereof upon, and the lien of the Mortgagee in, the Premises.

M.    **ACCURACY AND COMPLETENESS OF INFORMATION**. All written information, reports and other papers and data furnished to the Mortgagee by the Mortgagor in connection with this Mortgage were, at the time the same were so furnished and remain, as of the date hereof, complete and correct in all material respects and did not and do not contain any untrue statement of fact or omit to state any material fact necessary in order to make the statements and information contained therein not misleading.

### N.    IMPROVEMENT.

l.    ☐    This Mortgage covers real property improved by a one or two family dwelling only.

2.    ☐    This Mortgage covers real property principally improved or to be improved by one or more structures containing in the aggregate not more than six residential dwelling units, each having their own separate cooking facilities.

3.    ☒    This Mortgage does not cover real property improved as described above.

### O.    HAZARDOUS SUBSTANCES.

1.    To the best of the Mortgagor's knowledge, the Premises has never been used by previous owners, operators or occupants or the Mortgagor to generate, manufacture, refine, transport, treat, store, handle or dispose, transfer, produce, process or in any manner deal with any Hazardous Substances (as hereinafter defined).

2.    The Mortgagor shall not, and shall not permit any of its officers, partners, members, employees, agents, contractors, licensees, tenants, subtenants, occupants or others to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, process or in any manner deal with any Hazardous Substances on the Premises except in accordance with all environmental laws applicable thereto.

3.    The Mortgagor has (or will cause its tenants to have), and will continue to have, all necessary licenses, certificates and permits under any applicable environmental laws relating to the Mortgagor and its facilities, property, assets and business, and, to the best of the

Mortgagor's knowledge, the Premises and the foregoing are in compliance with all environmental laws applicable thereto.

F.   **ADDITIONAL WARRANTIES.**

1.   The Mortgagor covenants, warrants and represents, as of the date hereof, that: (a) the Mortgagor has good and marketable title to the Premises, free and clear of all liens and encumbrances, except for the Permitted Encumbrances and liens in favor of the Mortgagee; (b) the information provided in the loan application, credit statement, financial statements, information sheet, if any, correspondence and any and all other materials previously submitted by or on behalf of the Mortgagor to the Mortgagee or the Mortgagee's attorney in connection with the loan made by the Mortgagee to the Mortgagor pursuant to the Note (the "Loan") is true and complete and does not omit or misrepresent any material fact; (c) no material change in the condition of the Premises (whether physical condition or condition of title), the character of the area in which the Premises is situated, the financial condition of the Mortgagor and/or in any other matter considered by the Mortgagee in connection with the Loan has occurred since the date of application for said Loan; (d) there are no writs, injunctions, decrees, orders or judgments outstanding, and no suit, claim, action, proceeding or investigation is pending or is threatened, against the Mortgagor or the Premises which may adversely affect the Loan or the Premises; and (e) no portion of the proceeds of the Loan will be used, directly or indirectly, for the purpose of "purchasing" or "carrying" any "margin stock" in contravention of Federal Reserve Regulation U or Regulation X. The truth and correctness of these covenants, warranties and representations shall be a condition of the Mortgagee's obligation to fund the Loan and shall survive the closing.

2.   All certifications, permits, licenses and approvals required for the legal use, occupancy and operation of the Premises have been obtained and are in full force and effect. The Premises are free of material damage and are in good repair (except for the damages which are the subject of the Mortgagor's pending insurance claims under its Traveler's Property Policy– bearing claim no. FNK0255; date of loss: January 20, 2020; the "Pending Claim"), and there is no proceeding pending or, to the best of the Mortgagor's knowledge, threatened for the total or partial condemnation of, or affecting, the Premises.

3.   The Premises are not subject to any leases, licenses or other use or occupancy agreements.

4.   Notwithstanding anything to the contrary contained in this Mortgage, the maximum amount of the principal indebtedness secured by this Mortgage at execution or which under any contingency may become secured by this Mortgage is NINE MILLION AND 00/100 DOLLARS ($9,000,000.00), plus all interest payable under the Note and all amounts expended by the Mortgagee after an Event of Default by the Mortgagor (a) for the payment of taxes, charges or assessments which may be imposed by legal requirements upon the Premises; (b) to maintain the insurance required hereunder and under the other Loan Documents, (c) for any expenses incurred in maintaining the Premises and upholding the lien of this Mortgage, including, but not limited to, the expense of any litigation to prosecute or defend the rights and lien created by this Mortgage, and (d) for any amount, cost or charge to which the Mortgagee becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority.

## II.    COVENANTS OF THE MORTGAGOR.

The Mortgagor hereby covenants and agrees with the Mortgagee, until the Secured Obligations are performed and paid in full, as follows:

### A.    PAYMENT OF SUMS SECURED.

The Mortgagor will pay to the Mortgagee the amounts set forth in the Loan Documents, when due, until the obligations set forth therein and herein are indefeasibly paid in full.

### B.    INSURANCE.

1.    The Mortgagor shall (a) keep in effect or cause to be kept in effect upon the Premises for the benefit of the Mortgagee insurance against loss or damage by fire, casualty, flood and all other risks embraced within "all risk" and "extended coverage" including, but not limited to, vandalism and malicious mischief endorsements, and terrorism insurance, in such amount, by such insurers, and containing such provisions as the Mortgagee may require, but in no event less than (i) the principal outstanding and other amounts under the Note or (ii) the full repair and replacement value of the Premises without reduction for depreciation or co-insurance, whichever is higher and (b) obtain or cause to be obtained comprehensive general liability insurance, including, without limitation, a contractual liability endorsement, of at least (i) $1,000,000.00 per occurrence, (ii) $2,000,000.00 aggregated coverage and (iii) $10,000,000.00 umbrella general liability coverage. The amounts and form of all insurance must be satisfactory to the Mortgagee, in its sole discretion. Any umbrella or blanket insurance policy shall specifically allocate to the Premises the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate policy insuring only the Premises in compliance with the provisions of this Section II.B, giving the Mortgagee all of the rights set forth in this Section II.B. In addition, the Mortgagee may require the Mortgagor to carry such other insurance on the Premises in such amounts as may, from time to time, be reasonably required by institutional lenders, against insurable casualties which at the time are commonly insured against in the case of premises similarly situated, due regard being given to the site and the type of the building, and the construction, location, utilities and occupancy or any replacements or substitutions thereof, including without limitation, in an amount at least equal to the principal outstanding and other amounts under the Note, builder's risk insurance, insurance against subsidence, and contingent liability insurance coverage against any loss arising from the fact that any building on the Property is deemed to be non-conforming property.  In addition, from time to time, upon the occurrence of any change in the use, operation or value of the Premises or in the availability of insurance in the area in which the Property is located, the Mortgagor shall, within ten (10) days after demand by the Mortgagee, obtain such additional amounts and/or such other kinds of insurance as the Mortgagee may reasonably require.

2.    In addition to the insurance requirements set forth in the preceding paragraph, for so long as any alterations, improvements, renovations or other work is being performed at the Premises ("Renovation Work"), the Mortgagor shall, at its sole cost and expense,

keep in affect and maintain the following insurance:  (a) until the completion of the Renovation Work and during the course thereof, Builder's Risk Insurance in such amount as required by the Mortgagee; and (b) if reasonably available, the "subcontractor warranty" endorsement or similar endorsement, if any, which shall contain "endeavor to" wording and shall not provide that coverage is impaired or barred in the event of non-compliance with the warranty or other conditions listed in the endorsement.  In connection with the foregoing coverages, the "Montrose" exclusion (pre-existing damage, known loss, and the like), if any, must be reasonably satisfactory to the Mortgagee and may not exclude coverage for pre-existing injury or damage, if the injury or damage was unknown to the Mortgagee at the policy's inception.  The policies shall not contain any: (i) exclusions for subsidence/earth movement and there shall be no sublimits on such coverages; (ii) exclusions or restrictions for residential development or construction, or for development or construction of condominiums, townhomes, attached dwellings or multi-family or multi-unit housing; and/or (iii) exclusions or restrictions for blasting or for explosion, collapse or underground (XCU) hazards from and after completion of the Renovation Work.  All property insurance coverage shall include an Ordinance or Law Coverage endorsement (CP 04 05 06 95 or equivalent reasonably satisfactory to Mortgagee), providing coverage A (loss to the undamaged portion of the building), Coverage B (demolition cost) and Coverage C (increased cost of construction) and an Ordinance or Law – Increased Period of Restoration endorsement (CP 15 31, 1988 edition, or equivalent reasonably acceptable to Lender).

3.       Any insurance required pursuant to this Mortgage shall be so written or endorsed as to (a) name the Mortgagee as "mortgagee", "lender loss payee" and as "an additional insured", (b) contain the standard (non-contributing) mortgagee endorsement in favor of the Mortgagee, (c) not contain any "co-insurance provisions", (d) be obtained from insurers which are satisfactory to the Mortgagee, in its sole but reasonable discretion, and (e) with respect to insurance against loss or damage to property, name the Mortgagee as a "lender loss payee" and make losses payable to the Mortgagee. The Mortgagor shall pay the premiums on the policies of all insurance required pursuant to this Mortgage as they become payable and shall deliver to the Mortgagee certificates of insurance and evidence of payment of all premiums, and, if requested by the Mortgagee, the original insurance policies.

4.       All renewal or replacement policies shall be delivered by the Mortgagor, premiums paid, to the Mortgagee at least thirty (30) days before the expiration of the expiring policies. Each insurance policy shall provide that the Mortgagee shall be furnished with not less than thirty (30) days' prior written notice before any termination, cancellation, non-renewal or reduction in scope becomes effective as to the Mortgagee. In the event the Mortgagor fails to maintain any insurance in compliance with this Section II.B or, in the event that a notice of non-renewal, cancellation or material change is given to the Mortgagee with respect to any such insurance policy, if within ten (10) days after the delivery of such notice to the Mortgagee, the Mortgagor shall fail to deliver to the Mortgagee evidence of the purchase of a substitute policy of insurance or a renewal of the existing policy of insurance, the Mortgagee may, but shall not be obligated to, obtain such insurance and pay the premium thereof and the Mortgagor shall, on demand, reimburse the Mortgagee for all sums, advances and expenses incurred in connection therewith, together with interest thereon at the Default Interest Rate (as defined herein) from the date such amounts are advanced or incurred until the same are repaid to the Mortgagee.  If the Mortgagee becomes the owner of the Premises or any part thereof by foreclosure or otherwise, such policies shall become the absolute property of the Mortgagee.

5.     All insurance required under this Mortgage shall be provided by an insurance company with a rating of A- or higher as determined by the prevailing or the latest ratings provided by A.M. Best Company during the duration of this Mortgage.

## C.     DAMAGE, DESTRUCTION AND CONDEMNATION.

1.     If the Property or any part thereof, shall be damaged or either partially or totally destroyed or if title to or the temporary use of the whole or any part of the Property shall be taken, condemned or purchased under threat of condemnation by a competent authority for a public use or purpose the Mortgagee shall be entitled to receive and shall receive any and all insurance proceeds or condemnation awards with respect thereto (hereinafter, the "Proceeds"), up to the amount of the Secured Obligations.  In the event of damage or destruction to the Property or any portion of either thereof, whether insured or uninsured, the Mortgagor promptly shall: (a) give written notice thereof to the Mortgagee and (b) commence and diligently shall continue to repair, restore and rebuild the portion of the Property so damaged or destroyed (hereinafter referred to as the "Work"), to restore the Property in full compliance with all legal requirements so that the Property shall be at least equal in value and quality and general utility as they were prior to the damage or destruction and, if the cost of the Work, as reasonably estimated by the Mortgagee, shall be equal to or exceed the sum of One Million Five Hundred Thousand Dollars ($1,500,000.00) (hereinafter referred to as "Major Work"), then the Mortgagor shall, prior to the commencement of the Work, furnish or cause to be furnished to the Mortgagee (i) complete plans and specifications for the Work (approved by all governmental authorities whose approval is required (each, a "Governmental Authority") for the Mortgagee's approval, which approval inclusive of Mortgagor's choice of architect shall not be unreasonably withheld, conditioned or delayed, which plans and specifications shall bear the signed approval thereof by an A.I.A. licensed architect satisfactory to the Mortgagee (the "Architect") and shall be accompanied by the Architect's signed estimate, bearing the Architect's seal, of the entire cost of completing the Work (the "Architect's Estimate") and (ii) certified or photostatic copies of all permits and approvals required by law in connection with the commencement and conduct of the Work.  In lieu of the Architect's Estimate, the Mortgagor may, provide other proof, reasonably acceptable to the Mortgagee, of the estimate of the entire cost of completing the Work, including a general construction contract and/or a construction management agreement, in each case, accompanied by trade contracts aggregating not less than ninety percent (90%) of the cost of the Work.  Notwithstanding anything to the contrary set forth above or elsewhere in this Mortgage, in the event that there is Major Work, the Mortgagee shall have the absolute right, option and privilege to use all Proceeds to pay down the Secured Obligations, except with respect to the Pending Claim.

2.     The Mortgagor shall not commence any of the Work until the Mortgagor shall have complied with the applicable requirements referred to in Section II.B and, after commencing the Work, the Mortgagor shall perform the Work diligently in a good and workmanlike manner and in good faith in accordance with the plans and specifications referred to in this Section II.C, if applicable, and in compliance with all applicable laws.

3.     The casualty insurance policy carried by Mortgagor shall provide that the Proceeds shall be paid in accordance with the provisions hereof.  The Mortgagor promptly shall deliver to the Mortgagee any and all Proceeds which are paid directly to the Mortgagor by the casualty insurance carrier.  All Proceeds delivered to the Mortgagee as aforesaid, together with all

Proceeds paid directly to the Mortgagee on account of damage or destruction to the Property, less the cost, if any, to the Mortgagee of such recovery and of paying out such Proceeds (including reasonable attorneys' fees and costs, engineers and architect's fees allowable to inspecting the Work and reviewing the plans and specifications therefor), following the written request of the Mortgagor, shall, except as hereinafter provided with respect to Major Work, be applied by the Mortgagee to the payment of the cost of Work and shall be paid out, from time to time (but not more often than once a month), to the Mortgagor and/or, at the Mortgagee's option, exercisable, from time to time, directly to the contractor, subcontractors, materialmen, laborers, engineers, architects and other persons or entities rendering services or materials in connection with the Work, as said Work progresses, and in proportion to the progress of the Work which has been completed (less any retainage), except as otherwise hereinafter provided, but subject to the following conditions, any of which the Mortgagee may waive:

        a.      If the Work to be done is Major Work, as determined by the Mortgagee, the Architect or a reputable and qualified general contractor or a reputable and qualified construction manager, in either case reasonably acceptable to the Mortgagee, shall be in charge of the Work.  If the Mortgagee approves a general contractor or construction manager as aforesaid to be in charge of the Work, then the Architect shall be in charge of inspecting the Work and verifying the percentage of completion as set forth in subsection "b" of this Section II.C.

        b.      Each request for payment shall be made at least ten (10) days prior to the requested date of disbursement and shall be accompanied by a certificate of the Architect, if the work is Major Work, as determined by the Mortgagee, or a certificate of the Mortgagor if the Work is not Major Work, stating that (i) all of the Work completed has been done in a good and workmanlike manner and in compliance with the approved plans and specifications, if any be required under this Section II.C. and in accordance with all provisions of law; (ii) the sum requested is justly required to reimburse the Mortgagor for payments by the Mortgagor to, or is justly due to, the contractor, subcontractors, materialmen, laborers, engineers, architects or other persons or entities rendering services or materials in connection with the work (giving a brief description of such services and materials) and that, when added to all sums previously paid out by the Mortgagee, if any, does not exceed the value of the Work done to the date of such certificate; and (iii) the amount of Proceeds remaining in the hands of the Mortgagee, together with other funds otherwise available to the Mortgagor, will be sufficient on completion of the Work to pay for the same in full (giving, in such reasonable detail as Mortgagee may require, an estimate of the cost of such completion and if such other funds are required, including a certificate from the President of the Mortgagor as to the sources of such funds).

        c.      Each request shall be accompanied by waivers or releases of liens, satisfactory to the Mortgagee, covering that part of the work previously paid for, if any, and by a search prepared by a title company or by other evidence satisfactory to the Mortgagee that there has not been filed with respect to the Premises, or any part of either thereof, any mechanic's lien or other lien or instrument for the retention of title which had not been discharged of record (by bonding or otherwise) with respect to any part of the Work and that there exist no encumbrances on or affecting the Premises or any part of either thereof, other than Permitted Encumbrances and those which may have been expressly approved by the Mortgagee in writing.

d. None of the Leases in effect immediately prior to the damage or destruction shall have been canceled, or contain any still exercisable right to cancel, due to such damage or destruction, except as otherwise expressly provided by written agreement between the Mortgagor and the Mortgagee.

e. There shall be no Event of Default (hereinafter defined) on the part of the Mortgagor under this Mortgage or default on the part of the Mortgagor under any other Loan Document.

f. The request for any payment after the Work has been completed shall be accompanied by a copy of any certificate or certificates required by law, if any, to render occupancy and operation of the Premises legal.

g. If the Proceeds remaining in the Mortgagee's possession are not sufficient to pay for the completion of the Work in full, the Mortgagee shall not be required to make any further advances until the Mortgagor deposits with the Mortgagee the difference between the Proceeds remaining in the Mortgagee's possession and the amount necessary to pay for the completion of the Work in full as estimated by the Architect.

h. The Mortgagor delivers a certificate of the Architect in which the Architect certifies to the Mortgagee that the Proceeds remaining in the Mortgagee's possession are sufficient to pay for the completion of the Work in full and advice from First American Title Insurance Company, Old Republic National Title Insurance Company, Chicago Title Insurance Company, Fidelity National Title Insurance Company or Stewart Title Insurance Company, that no liens have been filed against the Property, or any part thereof, that would be superior to the lien of this Mortgage.

i. Upon the failure on the part of the Mortgagor promptly to commence or diligently to continue the Work, or at any time upon request by the Mortgagor, the Mortgagee may apply the amount of any Proceeds then or thereafter in the hands of the Mortgagee to the principal outstanding and other amounts under the Note; provided, however, that nothing contained in this Mortgage or any other Loan Document shall prevent the Mortgagee from applying at any time the whole or any part of such Proceeds to the curing of any default under this Mortgage, the Note or any other Loan Document. Promptly following the completion of the Work, the payment in full thereof and the delivery of final lien waivers with respect thereto from all contractors, construction managers, material suppliers and subcontractors, any remaining Proceeds with respect thereto shall be remitted to the Mortgagor so long as no Event of Default shall have occurred and be continuing, which applies to all Proceeds received by Mortgagee, including those from the Pending Claim, but other than the Pending Claim, expressly excluding Proceeds in the event that there is Major Work and the Mortgagee has elected to pay down the Secured Obligations.

j. In the event the Work to be done is not Major Work as determined by the Mortgagee, then, subject to the provisions of this Section II.C, the Proceeds shall be paid to the Mortgagee, to be applied toward the cost of the Work, subject to the provisions of the foregoing Section II.B and Subsections II.C(1) and (2), other than those applicable to Major Work.

k.      If, within one hundred fifty (150) days after the occurrence of any damage or destruction to the Premises or any portion thereof requiring Major Work in order to restore the Premises, the Mortgagor shall not have submitted to the Mortgagee and received the Mortgagee's approval (not to be unreasonably withheld or delayed and otherwise subject to the terms and conditions of this Mortgage) of plans and specifications for the repair, restoration and rebuilding of the Premises so damaged or destroyed (approved by all Governmental Authorities whose approval is required), or if, after such plans and specifications are approved by all such Governmental Authorities, other parties and the Mortgagee, the Mortgagor shall fail promptly to commence such repair, restoration and rebuilding, or if, thereafter, the Mortgagor materially fails diligently to continue such repair, restoration and rebuilding or is delinquent in the payment to mechanics, materialmen or others of the costs incurred in connection with such work or, in the case of any damage or destruction to the Premises or any part thereof not Major Work in order to restore the Premises, as determined by the Mortgagee, if the Mortgagor shall fail promptly to repair, restore and rebuild the Premises so damaged or destroyed, or in any other material respect fails to comply with its restoration obligations under this Section II.C, then, in addition to all other rights set forth in this Mortgage and, after giving the Mortgagor ten (10) days' written notice of the nonfulfillment of one or more of the foregoing conditions, the Mortgagee, or any lawfully appointed receiver of the Premises, may, at their respective options, (i) perform or cause to be performed such repair, restoration and rebuilding, and take such other steps as they deem advisable to perform such work or (ii) apply any portion of the Proceeds in accordance with this Section II.C; provided, however, that the Mortgagee shall be permitted to give such shorter notice (and in such other manner) as is reasonably practical in case of emergency or other special circumstances. The Mortgagor hereby waives, for the Mortgagor and all others holding under the Mortgagor, any claim against the Mortgagee and such receiver arising out of anything done by the Mortgagee or such receiver pursuant hereto and the Mortgagee may apply all or a portion of the Proceeds (without the need to fulfill any other requirements of this Section II.C) to reimburse the Mortgagee, and/or such receiver, for all amounts expended or incurred by them, respectively, in connection with the performance of such work, and any excess costs shall be paid by the Mortgagor to the Mortgagee upon demand.

l.      Notwithstanding anything contained herein to the contrary, following the occurrence of an Event of Default, the Mortgagee shall have the option, in its sole discretion, to apply all or a portion of the Proceeds it may receive to the restoration of the Premises or to the payment of the outstanding principal and amounts under the Note: first, to the payment of delinquency or "late" charges, if any; second, to accrued and unpaid interest on the outstanding principal and other amounts under the Note and other charges; and third, to the reduction of the outstanding principal of the Note and other sums due under this Mortgage.

4.      The Mortgagor, immediately upon obtaining knowledge of the institution of any proceedings for the condemnation of the Property or any portion thereof, shall notify the Mortgagee of the pendency of such proceedings. The Mortgagee, at its election and in its discretion, may participate in any such proceedings and the Mortgagor, from time to time, shall deliver to the Mortgagee all instruments requested by it to permit such participation. All awards from a condemnation, or other taking or purchase in lieu thereof, of the Property or any portion thereof ("Awards") shall be paid and applied in accordance with the provisions of this Subsection II.C(4). The Mortgagee shall not be limited to the interest paid on the proceeds of any Award, but shall be entitled to the payment by the Mortgagor of interest at the applicable rate provided for in

this Mortgage or in the Note, as the case may be. All Awards from a condemnation, or other taking or purchase in lieu thereof, of the Premises or any part of any of the foregoing, are hereby assigned to and shall be paid to the Mortgagee. The Mortgagor, upon request by the Mortgagee, shall make, execute and deliver any and all instruments requested for the purposes of confirming the assignment of the aforesaid Awards and compensation to the Mortgagee free and clear of any liens, charges or encumbrances of any kind or nature whatsoever. The Mortgagor hereby authorizes the Mortgagee to collect and receive such Awards, to give proper receipts and acquittances therefor and, in the Mortgagee's sole discretion, to apply the same toward the payment of the outstanding principal and amounts under the Note, notwithstanding the fact that such amounts may not then be due and payable, or to the restoration of the Premises.

5.      In the event that the whole of the Property shall be taken or condemned by any competent authority for any public or quasi public use or purpose, or if any part thereof shall be so taken or condemned and the part thereof not so taken or condemned cannot feasibly be used or reconverted for use as a building or buildings of the type and character existing immediately prior to such taking or condemnation (the foregoing being hereinafter referred to as a "Complete Taking"), then, any Award payable in connection therewith shall be paid to the Mortgagee and applied as follows: first, to the payment of delinquency or "late" charges, if any; second, to accrued and unpaid interest on the outstanding principal and amounts under the Note; and third, to the reduction of the outstanding principal of the Note and other sums due under this Mortgage or any Loan Document. Any portion of any Award remaining after full payment of the Note and satisfaction of this Mortgage, shall be paid to the Mortgagor.

6.      In the event that a portion of the Property is taken or condemned so that there is less than a Complete Taking, then, the Mortgagor promptly shall commence (but in no event later than thirty (30) days after the date of such taking or condemnation) and diligently shall continue to repair, restore, replace or rebuild the Property in accordance with the provisions of this Section II.C, as if such taking or condemnation had resulted in "damage or destruction to the Premises" substantially to its condition immediately prior to such taking or condemnation or, if the foregoing is not possible, so as to constitute the same a distinct and functional architectural unit for use as a building or buildings of the type and character existing immediately prior to such taking, and the proceeds of any Award paid to the Mortgagee in connection therewith, in the Mortgagee's discretion, may be applied as provided in this Section II.C, or may be made available to the Mortgagor for such purposes; provided, however, that in such event such proceeds shall be disbursed to the Mortgagor in accordance with the provisions thereof. Notwithstanding anything to the contrary contained in this Mortgage, the Mortgagee shall have the option, in its sole discretion, to apply all or a portion of any Award it may receive pursuant to the provisions hereof to the payment of the Note or to allow all or a portion of any Award to be used for repair and restoration purposes, as aforesaid. The portion of any Award applied by the Mortgagee to the payment of the Note shall be applied as provided in Subsection II.C(5) above.

7.      Notwithstanding any taking by eminent domain, alteration of the grade of any street or other injury to or decrease in value of the Premises by any Governmental Authority, the Mortgagor shall continue to make all payments due under this Mortgage, under the Note and under any other Loan Document.

8.      The Mortgagor hereby transfers and assigns to the Mortgagee all Proceeds received at any time and from time to time in connection with the Pending Claim, which the Mortgagee will disburse to the Mortgagor for costs and expenses incurred in connection with the remediation and repairs of the damages which are the subject matter of the Pending Claim. The Mortgagor, promptly following the date hereof, shall provide its insurer with written notice of the foregoing transfer and assignment (the "Proceeds Assignment Notice") and that the Mortgagor has hereby authorized and directed the insurer to pay the Proceeds over to the Mortgagee to be disbursed in accordance with the applicable provisions of this this Section II.C.  Within ten (10) days following the date hereof, the Mortgagor shall deliver a copy of the Proceeds Assignment Notice to the Mortgagee.   In furtherance of the foregoing, such remediation and repairs are acknowledged by the Mortgagor to be Major Work and shall be subject to the foregoing terms and provisions of this Section II.C, except that the Mortgagee agrees it will not use the Proceeds towards the payment of the Secured Obligations so long as no Event of Default has occurred or is continuing.  The Mortgagor covenants and agrees to keep the Mortgagee apprised of the status of and all material developments relating to the Pending Claim, and to promptly deliver copies of all material correspondence, notices, estimates, invoices, reports and other materials sent by the Mortgagor or received by it from the insurer with respect to the Pending Claim.  Moreover, the Mortgagor grants Mortgagee the right to participate in negotiations, meetings and/or settlements with respect to the Pending Claim (with the insurer, its agents, attorneys and/or any estimator or adjuster) and the Mortgagor further agrees to notify such parties of the Mortgagee's rights under this Paragraph, For purposes of clarification, to the extent (but not in excess of the extent) that any Proceeds with respect to the Pending Claim include losses under the Mortgagor's business interruption insurance, the same shall not be considered Proceeds for purposes hereof, it being understood and agreed to that, notwithstanding anything express or implied to the contrary set forth in this Mortgage, the Mortgagor shall have the right to receive such business interruption loss proceeds from the insurer.

D      **COMPLIANCE WITH LAWS**. The Mortgagor shall comply in all material respects with all applicable federal, state and local laws, rules, regulations, ordinances, building codes and orders in effect from time to time including, but not limited to, those relating to the environment, the payment of taxes, assessments and other governmental charges, zoning, and the use, occupancy, transfer or encumbrancing of the Premises the failure to comply with which would result in a lien upon the Premises or otherwise impair the value of the Premises. The Mortgagor additionally agrees to pay all costs and expenses required to comply with any of the above conditions, and to indemnify and hold the Mortgagee harmless against any loss, liability, cost or expense (including attorneys' fees) arising out of or relating to any proceeding instituted in connection with any alleged or actual violation of any of the foregoing not caused by the Mortgagee.  The Mortgagor warrants and represents to the Mortgagee that (a) other than with respect to the damage which is the subject matter of the Pending Claim, the Premises is undamaged as of the date hereof and (b) the Premises comply with all legal and insurance underwriters' requirements (including, without limitation, all building and zoning laws, rules and regulations), and all permits, licenses, consents, approvals and other authorizations and policies required to be obtained thereunder have been duly issued and are in force.

E.     **TAXES AND OTHER CHARGES; MECHANICS' LIENS**

1.        Except as otherwise provided in this Section II.E. the Mortgagor shall pay all taxes, water and sewer rents, fines, impositions and other similar claims, liens and encumbrances assessed, or which may be assessed, against the Premises or any part thereof (collectively, "Taxes"), without any deduction or abatement, not later than five (5) days before the same shall become due and payable and shall simultaneously with each such payment, furnish to the Mortgagee receipts for the payment thereof in full. The Mortgagor will pay, from time to time when the same shall become due, all lawful claims and demands of mechanics, materialmen, laborers, and others, which, if unpaid, might result in, or permit the creation of, a lien on the Premises or any part thereof, or on the revenues, rents, issues, income and profits arising therefrom, and will do or cause to be done everything necessary so that the lien of this Mortgage shall be fully preserved, at the cost of the Mortgagor and without expense to the Mortgagee. If the Mortgagor shall in good faith, and by proper legal action, contest any taxes, assessments, fines, impositions, claims, liens, encumbrances or other charges, or the validity thereof, and provided no Event of Default is then existing and continuing, then the Mortgagor shall not be required to pay the same or to produce such receipts as long as such contest operates to prevent collections, and is maintained and prosecuted with diligence and shall not have been terminated or discontinued adversely to the Mortgagee. In addition to the foregoing, the Mortgagor will pay when due and will not suffer to remain outstanding, any charges for utilities, whether public or private, with respect to the Premises.

2.        Pursuant to Section 13 of the Lien Law of the State of New York, the Mortgagor shall receive the advances secured hereby and shall hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of any improvement and shall apply such advances first to the payment of the cost of any such improvement on the Premises before using any part of the total of the same for any other purpose.

3.        The Mortgagor shall make the deposits for Taxes as hereinafter provided in this Subsection II.E(3). In addition, the Mortgagor shall deposit with the Mortgagee a sum of money which (and if applicable, together with the monthly installments if requested by the Mortgagee and to the extent made by the Mortgagor) shall be sufficient to make such payments of Taxes at least thirty (30) days prior to the date such payments are due. Should said charges not be ascertainable at the time any deposit is required to be made with the Mortgagee, the deposit shall be made on the basis of the charges for the prior year and, when the charges are fixed for the then current year, the Mortgagor shall deposit any deficiency with the Mortgagee. All funds so deposited with the Mortgagee may be held by it in a non-interest bearing account, may be commingled by the Mortgagee with its general funds. Provided that the Mortgagee shall not otherwise have used a portion of such funds in accordance with the provisions of this Mortgage, such funds, shall be applied in payment of the aforementioned charges when and as payable, to the extent the Mortgagee shall have such funds on hand. In the event that there shall occur an Event of Default, the funds deposited with the Mortgagee, as aforementioned, may be applied in payment of the charges for which such funds shall have been deposited or the payment of the Secured Obligations or any other charges affecting the security of the Mortgagee, as the Mortgagee determines, in its sole discretion, but no such application shall be deemed to have been made by operation of law or otherwise until actually made by the Mortgagee as provided in this Mortgage. The Mortgagor shall furnish the Mortgagee with bills for the charges for which the aforesaid escrow deposits are required to be made under this Mortgage and/or such other documents necessary for the payment of same, at least thirty (30) days prior to the date on which the charges

first become payable.  Upon receipt of the documents necessary to make payments from the escrows deposited by Mortgagor, Mortgagee may either (i) pay such charges directly to the person or entity issuing the invoice or (ii) deliver a check to Mortgagor in the amount which is the lesser of (a) the amount of the invoice or (b) the amount of funds being held in escrow for said charge. In the event of (b), Mortgagor shall pay the difference between the amount of the check it receives from Mortgagee and the amount of the invoice and shall deliver to Mortgagee an invoice marked "Paid" within ten (10) business days of the date such charge(s) is required to be paid pursuant to this Mortgage.  Upon an assignment of this Mortgage, the Mortgagee shall pay over the balance of any escrowed sums deposited in its possession to the assignee and, thereupon, the Mortgagee shall be completely released from all liability with respect to such sums, and the Mortgagor shall look solely to such assignee with respect thereto.  The initial deposit for Taxes under this Section II.E. shall be made on the date of this Mortgage in the sum of $185,000.00.  In addition to the foregoing, concurrently with and as a condition to the exercise of the "Extension Option" (as defined in the Note) by no later than the date specified in the Note in the event the Extension Option is exercised, the Mortgagor shall deposit with the Mortgagee, the sum which the Mortgagee estimates to equal twelve (12) months of payments of Taxes coming due (which estimates may be inclusive of a buffer amount determined by the Mortgagee to cover any potential increase in Taxes for such period).  Time shall be of the essence as to the Mortgagor's obligation to make the deposits as and when required under this Section II.E.

### F.   FURTHER ASSURANCES; FILING AND RECORDING; COSTS AND EXPENSES.

1.     The Mortgagor will, at its sole cost and expense, perform, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, security agreements, assignments, notices of assignment, financing statements, transfers and assurances as the Mortgagee shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Mortgagee, the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Mortgagor may be or may hereafter become bound to convey or assign to the Mortgagee, for carrying out the intention or facilitating the performance of the terms of this Mortgage or for filing, registering or recording this Mortgage and, on demand, will execute and deliver, and hereby authorizes the Mortgagee and irrevocably appoints the Mortgagee as the agent, attorney-in-fact and/or authorized signatory of the Mortgagor to execute and file in the Mortgagee's name or in the Mortgagor's name, to the extent it may lawfully do so, all such documents, instruments, certificates and financing statements.

2.     The Mortgagor, forthwith upon the execution and delivery of this Mortgage, and thereafter from time to time upon request by the Mortgagee, and as may be required by law, will cause this Mortgage and any security instrument creating a lien or evidencing the lien hereof upon the Premises and the fixtures thereon and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien hereof upon, and the interest of the Mortgagee in, the Premises and the fixtures thereon.

3.     The Mortgagor will pay all filing, registration or recording fees, and all expenses incident to the execution and acknowledgment of this Mortgage, any mortgage

supplemental hereto, any security instrument with respect to the Premises and the fixtures therein, and any instrument of further assurance, and all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the Premises and the fixtures thereon or any instrument of further assurance.

4    The Mortgagor shall pay on demand all costs and expenses in connection with the preparation, execution, delivery, filing, recording, analysis, amending and administration of (a) any of the Loan Documents and/or (b) any other documents, agreements or instruments previously, now or hereafter executed or delivered with or in favor of the Mortgagee, including, without limitation, the reasonable attorney's fees and out-of-pocket expenses of counsel for the Mortgagee, with respect thereto and with respect to advising the Mortgagee as to its rights and responsibilities under any of the Loan Documents, and all costs and expenses, if any, in connection with the enforcement of any of the Loan Documents. In the event that the Mortgagor fails to pay the fees and expenses set forth in the previous sentence within thirty (30) days from Mortgagee's demand therefor, the amounts shall be added to the principal under the Note and shall bear interest thereafter until paid at the Default Interest Rate (as that term is defined hereinbelow) from the date of the Mortgagee's incurrence of the expenditure until reimbursed by the Mortgagor.

5    The Mortgagor covenants and agrees to pay or, if the Mortgagor fails to pay, to reimburse the Mortgagee, immediately upon receipt of written notice from the Mortgagee, all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements and allocated costs of internal legal services and all actual disbursements of internal counsel) incurred by the Mortgagee in connection with (a) the Mortgagor's ongoing performance of and compliance with Mortgagor's agreements and covenants contained in this Mortgage and/or the other Loan Documents on its part to be performed or complied with after the date of this Mortgage, (b) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers and other modifications to this Mortgage and/or other Loan Documents or any other documents or matters requested by the Mortgagor; (c) enforcing or preserving any of the Mortgagee's rights or remedies in response to third party claims, or the prosecuting or defending of any action or proceeding or other litigation, in each case, against, under or affecting the Mortgagor, this Mortgage and/or the other Loan Documents, the Property and/or any other security given for the Loan; (d) enforcing any of the Mortgagor's obligations under the terms of this Mortgage and/or the other Loan Documents; and/or (e) collecting any payments or other amounts due from the Mortgagor under this Mortgage and/or any of the other Loan Documents, including, without limitation, the reasonable attorneys' fees and disbursements and allocated costs of internal legal services and all actual disbursements of internal counsel incurred in connection with (i) any foreclosure commenced in connection with the Property; (ii) any action or other proceeding commenced to collect the Secured Obligations; (iii) any appellate proceedings; (iv) the enforcement of any deficiency judgment entered in connection with any foreclosure commenced in connection with the Property; (v) any case or proceeding under Chapter 7, 11 or 13 of the Bankruptcy Code (11 United States Code Sections 101 et seq.) or any successor statutes, whether commenced by or against the Mortgagor; (vi) the enforcement of any the Mortgagee's rights and/or remedies under the terms of this Mortgage and/or any of the other Loan Documents, including, without limitation, the protection of the Property or any or any other security given for the Loan; and (vii) the workout, restructuring or negotiations with respect to the Loan.  For the avoidance of

doubt, it is expressly understood and agreed to that the Mortgagee has no obligation whatsoever to participation in, or offer to participate in, any workout or restructuring discussions with respect to this Mortgage and/or any of the other Loan Documents.

6.       Any sum referenced in this Section II.F paid by the Mortgagee, and the interest thereon, shall be a lien on the Premises prior to any claim, lien, right, title or interest in, to or on the Premises, attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

G.       **RIGHT TO REMEDY DEFECTS; INDEMNIFICATION.** If the Mortgagor shall at any time fail to pay any amount payable by it hereunder or fails to comply with any provision of this Mortgage, the Mortgagee may, but it is not obligated to, after notice to the Mortgagor, pay such amount or comply with such provision and make such expenditures, including, without limitation, attorney's fees and expenses, in connection therewith and with enforcing this Mortgage and for repairing, maintaining and preserving the Premises, for establishing, preserving, protecting and restoring the validity and priority of the lien hereof, for paying Taxes, for obtaining official tax searches of the Premises, for protecting and preserving any use being made of the Premises now or hereafter and for advances to any trustee or receiver of the Premises, as the Mortgagee deems advisable; each amount so paid or expended, plus eight percent (8%) of such amount so paid or expended (the "Delinquency Charge") shall become part of the Secured Obligations; and the Mortgagor shall pay to the Mortgagee, on demand, the amount of each payment or expenditure, plus the Delinquency Charge, but no such payment or compliance by the Mortgagee shall constitute a waiver of the Mortgagor's failure so to do or affect any right or remedy of the Mortgagee with respect thereto. Upon the occurrence of any Event of Default, the Mortgagor shall pay the Mortgagee interest on the Secured Obligations at the rate which is the lesser of: (y) the maximum rate of interest which may be lawfully charged or collected by the Lender or (z) twenty-four percent (24%) per annum (the "Default Interest Rate") until the Secured Obligations are fully paid, and the Default Interest Rate shall apply prior to and after any court judgment relating thereto. It is expressly understood and agreed to that the Default Interest Rate shall apply and begin to accrue from and after the date any default occurs regardless of the date of acceleration. The Mortgagor agrees that any such Delinquency Charges or payments made at the Default Interest Rate shall not be deemed to be additional interest or a penalty, but shall be deemed to be liquidated damages because of the difficulty in computing the actual amount of damages in advance, provided, however, that if any such Delinquency Charge or payment at the Default Interest Rate hereunder is not recognized as liquidated damages (as contemplated by the Mortgagor and the Mortgagee) and is deemed to be interest in excess of the amount permitted to be charged to the Mortgagor under applicable law, the Mortgagee shall be entitled to collect a delinquency charge only at the highest rate permitted by law, and any interest actually collected by the Mortgagee in excess of such lawful amount shall be deemed a payment in reduction of the principal sum then outstanding and shall be so applied. Such delinquency charges or late charges shall be payable with the next installment of principal and/or interest due under the Note. The Mortgagor agrees to and does hereby indemnify the Mortgagee and holds the Mortgagee harmless from and against any and all losses, claims, damages or liabilities (including all costs, expenses and reasonable counsel fees incurred in investigating or defending such claim) suffered by the Mortgagee, its directors, officers, employees and agents and caused by, relating to, arising out of, resulting from or in any way connected with any of the items enumerated in the immediately

preceding sentence, except to the extent resulting from the gross negligence or willful misconduct of the Mortgagee or its agents.

### H.   PRESERVATION OF THE PREMISES; LIENS AND ENCUMBRANCES.

1.     The Mortgagor shall keep the improvements now or hereafter on the Premises in good repair and condition, ordinary wear and tear excepted, and, with reasonable diligence, shall repair, replace or rebuild any material part of the Premises which may be destroyed by any casualty or become damaged, worn or dilapidated. The Mortgagor shall make any repairs needed to immediately preserve the value of the Premises within thirty (30) days after written notice thereof from the Mortgagee; provided, however, that in the event the Mortgagor is diligently undertaking such repairs but same cannot be completed within said thirty (30) day period, the Mortgagee shall extend said thirty (30) day period for as long as the Mortgagor and the Mortgagee shall agree is reasonably necessary in order to complete such repairs; provided, further, however, that the Mortgagee shall be under no obligation to extend said period beyond ninety (90) days after the aforementioned written notice.

2.     The Mortgagor shall not remove or demolish nor alter the design or structural character of any building now or hereafter erected upon the Premises without the prior written consent of the Mortgagee.

3.     The Mortgagor shall not suffer or permit waste of the Premises and shall cause the Premises to comply with all applicable building codes, ordinances, statutes and regulations of all federal, state and municipal governmental authorities and agencies having jurisdiction thereof, including but not limited to, all fire and safety codes.

I.     **NOTIFICATION.** The Mortgagor shall notify the Mortgagee immediately of (a) the occurrence or existence of any Event of Default, (b) the inception of any action, suit, proceeding, inquiry or investigation at law or in equity before any court, public board or body wherein an unfavorable decision, ruling or finding would, to the extent not covered by insurance, have a material adverse effect upon the Premises, and (c) the occurrence of any substantial loss, substantial damage, destruction, condemnation or taking of the whole or any part of the Premises.

J.     **RIGHT TO INSPECT PREMISES AND BOOKS AND RECORDS; APPRAISAL.** The Mortgagor shall permit the Mortgagee, by its duly authorized officers and agents during normal business hours and upon reasonable written notice, to enter upon and inspect the Premises and, to the extent and with such frequency as is reasonably required by the Mortgagee, the books and records of the Mortgagor. The Mortgagee shall also have the right, from time to time, upon reasonable notice to the Mortgagor, to conduct or cause to be conducted an appraisal or appraisals of the Premises, the cost of which shall be paid by the Mortgagor.

### K.   FINANCIAL STATEMENTS.

The Mortgagor will furnish or cause to be furnished, as applicable, the following information to the Mortgagee:

1.     From time to time, upon request and within fifteen (15) days of such request, such reports and information regarding the business, assets, liabilities, financial condition, balance

sheets, statements of profits and loss, results of operation or business prospects of the Mortgagor as the Mortgagee may reasonably request, all certified by the Prior or Treasurer of the Mortgagor;

2. From time to time, upon request and within ten (10) days of such request, but not more often than once in each calendar month, a written statement of receipts and disbursements in connection with the Mortgagor's operation of the Premises for the twelve (12) months next preceding the first day of the month in which the request is made, and certified as true and correct by the Prior or Treasurer of the Mortgagor;

3. Prompt notice of any material adverse change with respect to the business, assets, liabilities, financial condition or results of operation of the Mortgagor.

4. As soon as available, but not later than ninety (90) days after the end of the Mortgagor's fiscal year, the Mortgagor will furnish (i) the Mortgagor's balance sheet and statement of profit and loss for the Premises for the fiscal year then just ended, certified by the Mortgagor, (ii) operating statements of the Premises for such fiscal year, prepared in accordance with generally accepted accounting principles consistently applied and certified by the Prior or Treasurer of the Mortgagor.

All financial statements of the Mortgagor shall be delivered in duplicate and shall be accompanied by the certificate of the Prior or Treasurer of Mortgagor, dated within fifteen (15) days of the delivery of such statements to the Mortgagee, stating that such officer knows of no Event of Default, nor of any event which, after notice or lapse of time or both, would constitute an Event of Default which has occurred and is continuing, or, if such event or Event of Default has occurred and is continuing, specifying the nature and period of existence thereof and what action the Mortgagor has taken or proposes to take with respect thereto and, except as otherwise specified, stating that the Mortgagor has fulfilled all its obligations under this Mortgage and under the Note which are required to be fulfilled on or prior to the date of such certificate. The Mortgagee shall have the right to request more frequent operating statements from the Mortgagor if a default or an Event of Default has occurred under this Mortgage or any other Loan Document.

## L.   FURTHER INDEBTEDNESS.

1. The Mortgagor shall not create, assume, incur, guarantee or in any manner become liable, contingently or otherwise, in respect of any indebtedness for money borrowed without the prior written consent of the Mortgagee, which consent shall be in the Mortgagee's sole and absolute discretion.

2. The Mortgagor shall not sell, transfer, assign, lease or otherwise dispose of (whether in one transaction or a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired).

3. The Mortgagor shall not guarantee, endorse, become surety for, or otherwise in any way become or be responsible for, the obligations of any other person whether by agreement to purchase the indebtedness of any other person, or agreement for the furnishing of funds, directly or indirectly, for the purpose of payment of indebtedness of any other person, other than endorsements of negotiable instruments for deposit or collection in the ordinary course of its business.

4.    There shall be no junior financing or junior mortgage/liens with respect to the Premises without the prior written consent of the Mortgagee, which consent shall be in the Mortgagee's sole and absolute discretion.

## M.    LEASES AND RENTS.

1.    The Mortgagor hereby assigns, transfers and sets over to the Mortgagee any and all Leases which are now in existence or which may exist at any time or times in the future during the term of this Mortgage, including all of the Mortgagor's right, title and interest in security deposits thereunder, and any renewals or extensions thereof, whether or not recorded, the Mortgagor intending hereby to assign to the Mortgagee all of the landlord's interest in said Leases, and all Rents arising therefrom.

2.    The Mortgagor hereby represents and warrants that, if there are any existing Leases, as to such Leases: (a) each Lease has been duly executed, is and shall at all times remain valid and enforceable and has not been altered, modified or amended in any manner whatsoever; (b) the Mortgagor is and shall at all times remain the sole owner of the entire lessor's interest in the Leases; (c) neither landlord nor tenant are in default thereunder; (d) neither the Leases nor any rents thereunder are or will be subject to any other assignment, lien or encumbrance, other than in favor of the Mortgagee; (e) no rent has been anticipated or prepaid by more than thirty (30) days prior to due date or accrual; (f) the tenant does not have and has not claimed any defense, abatement, deduction, offset, claim or counterclaim affecting the payment of rent or performance of the tenant's other obligations thereunder; (g) the Leases contain no option to buy or right of first refusal of an offer to sell the Premises or any part thereof; (h) the Mortgagor has good right and authority to assign the Lease(s) to the Mortgagee, and the execution and delivery of the assignment hereunder has been duly authorized and does not conflict with or constitute a default under any law, judicial order or other agreement affecting the Mortgagor or the Premises; (i) each Lease is expressly subordinate by its terms to this Mortgage; (j) the premises demised under the Leases have been completed, the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis, and the terms of all such Leases have commenced; (k) the tenants under all existing Leases are currently paying the full rents due under such Leases; and (l) all rents in respect of the Premises and under any Leases may be and are being lawfully collected, free of any offsets credits or claims or any violations of governmental regulations or requirements.

3.    The Mortgagor shall not lease or sublease all or any portion of the Premises or consent to the leasing, subleasing or assignment of any lease by any tenant of all or any portion of the Premises, or consent to the amendment, modification or termination of any lease or sublease with respect to the Premises, without the prior review and express prior written consent, both as to the form and substance thereof, of the Mortgagee, which consent may be granted or withheld in the sole and absolute discretion of the Mortgagee.

4.    All present and future leases and subleases of the Premises, or any part thereof, shall be subordinate in all respects to the lien of this Mortgage and collaterally assigned to the Mortgagee. At the option of the Mortgagee, in its sole and absolute discretion, a subordination agreement shall be executed by all tenants in form and substance satisfactory to the Mortgagee in its sole and absolute discretion.

5.     Within thirty (30) days after the end of each of the Mortgagor's fiscal years and/or upon request (but not more than two (2) times in any period of 180 days), the Mortgagor shall provide to the Mortgagee a current, certified rent roll with respect to all tenants and other occupants of the Premises. In addition, the Mortgagor shall provide to the Mortgagee, promptly upon execution thereof, certified copies of all leases, subleases and all amendments, modifications and supplements to existing leases and subleases, entered into with respect to the Premises from and after the date hereof.

6.     All Leases and subleases executed in the future (i) are subject to the Mortgagee's prior written approval, both as to form and substance, which approval may be granted or withheld in the sole and absolute discretion of the Mortgagee, and (ii) must be subordinated to the Mortgage and assigned to the Mortgagee.  Notwithstanding the foregoing, the Mortgagor shall have the right, without the consent of the Mortgagee, to enter into space license agreements for up to 1000 sf of the Property, provided the same are entered into at arm's length, are on market terms, are for a term not to exceed seven (7) consecutive days and are expressly subordinated to this Mortgage in the manner required under Paragraph 4 above [each, a "Production License" and collectively, "Production Licenses").  The Mortgagee shall promptly deliver a copy of each Production License to the Mortgagee.

7.     The Mortgagor warrants that all Rents under all Leases and subleases may be and are being lawfully collected, free of any offsets, credits or claims, or any violations of governmental requirements.

8.     The Mortgagor covenants with the Mortgagee that the Mortgagor (a) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases as security for the obligations secured by this Mortgage; (b) shall give prompt notice to the Mortgagee of any default by either landlord or tenant under any Lease, with a copy of any notice of default given by either landlord or tenant; (c) shall enforce, at the Mortgagor's expense, all of the terms, covenants and conditions contained in the Leases upon the part of the lessees thereunder to be observed or performed, short of termination thereof; (d) shall not consent to or permit to continue any violation or default under any Lease; (e) shall not collect any rents more than one (1) month in advance; (f) shall not pledge, mortgage, encumber or assign any Lease or rents thereunder or lessor's interest in the Leases or the rent thereunder; (g) shall not alter, modify or change the terms of the Leases without the prior written consent of Mortgagee, or cancel or terminate the Leases or accept a surrender thereof or convey or transfer or suffer or permit a conveyance or transfer of the Premises or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees thereunder; (h) shall not alter, modify or change the terms of any guaranty of any of the Leases or cancel or terminate any such guaranty without the prior written consent of the Mortgagee; (i) shall not consent to any assignment of or subletting under the Leases not in accordance with their terms, without the prior written consent of the Mortgagee; (j) shall execute and deliver at the request of the Mortgagee all such further assurances, confirmations and assignments in connection with the Premises as the Mortgagee shall from time to time require; and (k) shall not enter into any new lease of the Premises without the prior written consent of the Mortgagee.  The Mortgagee shall have all of the rights against lessees of the Premises set forth in Section 291-f of the Real Property Law of New York.

9.     The Mortgagor further covenants with the Mortgagee that (a) all Leases shall be in form and substance satisfactory to the Mortgagee in its sole and absolute discretion, (b) the Mortgagor shall furnish the Mortgagee with executed or conformed copies of all Leases or other instruments affecting the Premises; (c) all renewals of Leases and all proposed Leases shall provide for rental rates comparable to existing local market rates, which, in the case of residential Leases, shall not be in excess of the local registered rent for the apartment to which the Lease relates, and shall be arms-length transactions; and (d) all Leases shall provide that they are subordinate to the Mortgage and that the lessees agree to attorn to the Mortgagee, in each case, on terms and conditions acceptable to the Mortgagee in its sole and absolute discretion.

10.     (a)     Pursuant to Section 291-f of the Real Property Law of the State of New York, the Mortgagor shall not have the right or power, as against the Mortgagee without its prior written consent (which consent shall not be unreasonably withheld or delayed), to cancel, abridge or otherwise modify tenancies, subtenancies, leases or subleases now or hereafter in effect in respect of all or any part of the Premises or the improvements located thereon or to accept or make, as the case may be, prepayments of installments of rent to become due thereunder. The Rents of the Premises are hereby transferred and assigned to the Mortgagee, and upon a default under the Note beyond any applicable notice and cure periods, the Mortgagee shall have the right to enter upon the Premises for the purpose of collecting the same and to let and operate the Premises or any part thereof and to apply the Rents, either in whole or in part, as the Mortgagee elects, to the payment of all charges and expenses of the Premises or in reduction of any part of the Loan or other sums due or to become due under the Note or this Mortgage. This assignment and grant shall continue in effect until the Loan and all other obligations secured by this Mortgage are paid in full. The Mortgagee hereby waives the right to enter upon the Premises for the purpose of collecting the Rent and the Mortgagor shall have a license to collect and receive the Rents until an Event of Default hereunder, but such license of the Mortgagor may be revoked by the Mortgagee upon any such Event of Default. From and after the occurrence of an Event of Default hereunder all Rents collected or received by the Mortgagor shall be accepted and held for the Mortgagee in trust and shall not be commingled with the funds and property of the Mortgagor, but shall be promptly paid over to the Mortgagee. The Mortgagee may apply all Rents or any part thereof so received hereunder, after the payment of all its expenses including costs and attorneys' fees, to the Loan in such manner as it elects or at its option the entire amount of any part thereof so received may be released to the Mortgagor.

(b)     All future Leases entered into after the execution of this Mortgage for the whole or any part of the Premises shall endeavor to include a provision substantially similar to the following:

"Tenant/Lessee hereby agrees not to look to the mortgagee of (i) the fee interest in the premises demised by this Lease or (ii) the lien to which this Lease is subordinate, in such mortgagee's capacity as mortgagee, mortgagee in possession, successor in title to such interest, or otherwise, for accountability for any security deposit required by the landlord hereunder, unless said sums have actually been

received by said mortgagee as security for the tenant's performance of this Lease."

11. The provisions of this Section II.M shall apply in all respects to, without limitation, any Lease entered into with an affiliate of the Mortgagor.

N. **NO DEDUCTION**. The Mortgagor shall claim no deduction upon the assessed value of the Premises on account of the monies owing under the Note.

O. **FINANCIAL COVENANTS AND MISCELLANEOUS**.

1. By no later than May 31, 2020, the Mortgagor shall deliver to the Mortgagee proof that the Mortgagor has filed all outstanding tax returns through the period ending December 31, 2019.

2. After the occurrence and during the continuance of an Event of Default, the Mortgagor shall not pay any dividend, or make any payment, to any of its members or shareholders or repurchase any membership interest or stock without the prior written consent of the Mortgagee, which consent shall be in the Mortgagee's sole and absolute discretion.

P. **LOAN TO VALUE**. The Borrower shall maintain a loan-to-value ratio ("LTV") of not more than fifty percent (50%). For purposes hereof, "LTV" shall mean, at any time, the ratio of the outstanding principal amount of the Loan to the "as is" value of the Property, as long as it is mortgaged to the Lender, based upon the most updated appraisal of the Property prepared by an appraiser approved by the Lender and in form and substance satisfactory to the Lender in its sole and absolute discretion. Should there be a material deterioration in market conditions, as reasonably determined by the Lender, the Lender shall have the right in its reasonable discretion to order, at the sole cost and expense of the Borrower, an updated appraisal on the "as is" and "as completed" value of all or any portion of the Property.

III. **INDEMNIFICATION**.

1. The Mortgagor hereby agrees to indemnify the Mortgagee, its directors, officers, employees and agents from and against any and all liabilities, suits, obligations, fines, damages, penalties, claims, losses, costs, charges and expenses (including, without limitation, all amounts owing pursuant to Section II.F(5) hereof, architect's, engineer's, accountant's, consultant's and attorneys' fees and disbursements) (collectively, the "Losses") which may be imposed upon, incurred or asserted against the Mortgagee, its directors, officers, employees and agents by reason of: (a) any construction relating to the Premises; (b) any capital improvements, other work or thing done in, on or about the Premises; (c) any use, non-use, misuse, possession, occupation, alteration, repair, condition, operation, maintenance or management of the Premises or any street, drive, sidewalk, curb, passageway or space comprising a part thereof or adjacent thereto; (d) any negligence or willful act or omission on the part of the Mortgagor, any lessee, sublessee or any other occupant of the Premises or any agent, contractor, servant, employee, licensee or invitee or any of them; (e) the claims of any lessee, sublessee or any party acting through or under any such lessee, sublessee or otherwise arising under or as a consequence of any lessee or sublessee; (f) any accident, injury (including death) or damage to any person or property occurring in, on or about any sidewalks, drives, curbs, passageways, streets, spaces or alleys

adjacent to or on the Premises; (g) any Event of Default; (h) any lien or claim which may be alleged to have arisen on or against the Premises under any law or any liability asserted against the Mortgagee with respect thereto; (i) any tax or other imposition, including, but not limited to, any imposition attributable to the execution, delivery, filing or recording of this Mortgage or any other documents executed by the Mortgagor in connection herewith; (j) any contest permitted pursuant to the provisions of this Mortgage or the other Loan Documents; (k) any and all violations of law, including, without limitation, any and all federal, state and local laws, rules and regulations relating to the environment, existing at the Premises; (l) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substances, from, or affecting the Premises or any other property; and (m) any claim established or entered as a final judgment in a court of competent jurisdiction for any premium or other charge or any brokerage commission or other compensation of or to any other real estate broker or any person acting as such with respect to (i) the Loan or (ii) any leasing brokerage commission arising from any lease or sublease for all or a portion of the Premises. The foregoing indemnity shall not apply to Losses resulting or arising from the gross negligence or willful misconduct of the Mortgagee.

　　　　　2.　　　The obligations of the Mortgagor under this Section III shall not in any way be affected or limited by the absence of any insurance, by the amount of any insurance policy or by the failure or refusal of any insurance carrier to perform any obligation on its part under any insurance policies. If any claim, action or proceeding is made or brought against the Mortgagee or any of its directors, officers, employees and agents, by reason of any event as to which the Mortgagor is obligated to indemnify the Mortgagee or any of its directors, officers, employees and agents, then, upon demand by the Mortgagee, the Mortgagor, at its sole cost and expense, shall resist or defend such claim, action or proceeding in the Mortgagee's, or any of its directors, officers, employees and agents, name, if necessary, by the attorneys for the Mortgagor's insurance companies or by such attorneys as the Mortgagee shall approve in writing, which approval shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, the Mortgagee or any of its directors, officers, employees and agents may engage his/her/its own attorneys in its reasonable discretion to defend it or to assist in its defense and the Mortgagor shall pay the reasonable fees and expenses of such attorneys.

　　　　　3.　　　For the purposes of this section: (i) "Hazardous Substances" means material defined as a hazardous substance in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sections 9601 et seq., the Hazardous Materials Transportation Act, as amended (49 USC Sections 1801 et seq.) the Federal Resource Conservation And Recovery Act, as amended (42 USC Sections 6901, et seq.), the Federal Water Pollution Control Act (33 USC Section 1317) and all regulations promulgated thereunder and/or any and all other Federal, New York or local governmental law, ordinance rule or regulation (the "Acts"); and (ii) "Release" has the same meaning as given to that term in such Acts. The Mortgagor agrees to indemnify, defend, and hold the Mortgagee harmless from and against any and all liabilities, claims, damages, penalties, liens, removal, restoration or permit acquisition, which may now or in the future be undertaken, suffered, paid, awarded, assessed, or otherwise incurred by the Mortgagee as a result of the presence or suspected presence of, Release of or threatened Release of Hazardous Substances on, in, under or near the Premises. The liability of the Mortgagor to the Mortgagee under the covenants of this Section III.3 is not limited by any exculpatory provisions in any agreement in connection with the Mortgagor or the Premises and shall survive payment of the

Secured Obligations or transfer or termination of any agreement in connection with the Secured Obligations and/or the Premises regardless of the means of such transfer or termination.

IV.    **EVENTS OF DEFAULT**.

The following shall constitute events of default under this Mortgage (each, an "Event of Default"):

A.    If any portion of the Loan is not paid when the same is due and payable.

B.    If any Event of Default or default shall occur under the terms of the Note and/or any of the other Loan Documents.

C.    If the deposits for Taxes made by the Mortgagor pursuant to Section II.(E) hereof shall be insufficient to pay Taxes and any of the Taxes are not paid within fifteen (15) days following the date when the same are due and payable.

D.    If any insurance policies required hereunder or under any other Loan Document are not kept in full force and effect, or if such insurance policies are not assigned and delivered to the Mortgagee upon written request, or if the Mortgagor shall fail to deliver to the Mortgagee proof of substitution, replacement and/or renewal of any insurance policies within the ten (10) day period provided in Section II.B(4) hereof.

E.    If the Mortgagor breaches or defaults in the performance or observance of any covenant, agreement or condition contained in this Mortgage (and not the subject of another clause of this Section IV hereof), and such default, breach and/or failure shall continue for ten (10) days after the earlier of (i) the date the Mortgagor knows or should have known of such failure and (ii) the date notice thereof is given to the Mortgagee.

F.    If any representation or warranty made by the Mortgagor in this Mortgage or in any of the other Loan Documents shall prove to have been false, incorrect or misleading in any material respect on the date as of which made.

G.    If the Premises or any part thereof shall be sold, transferred, assigned or otherwise conveyed, including without limitation, the entering into by the Mortgagor of a long-term lease of the Premises, or if title to the Premises or any part thereof shall be transferred or conveyed to any person, firm, corporation, trust, association or other entity, including without limitation, the passing of title to, or possession of the Premises by, a receiver, trustee or assignee for the benefit of creditors.

H.    The further assignment or encumbrances by the Mortgagor of the Rents arising from the Premises, or any part thereof, without the prior written consent of the Mortgagee in each instance.

I.    The occurrence, in the commercially reasonable judgment of the Mortgagee acting in good faith, of a material adverse change in the financial condition or operation of the Mortgagor or the Premises, except to the extent such change is covered by the Mortgagor's insurance and its insurer has not denied coverage.

J.     If any default shall occur under the terms of any of the Permitted Encumbrances.

K.     If a default or event of default occurs under a mortgage that is prior or subordinate to the lien of this Mortgage, including without limitation, if any mortgagee claims a right to possession or commences a foreclosure action.

L.     (i) The Mortgagor shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for all or any substantial part of its assets, or (ii) the Mortgagor shall make a general assignment for the benefit of creditors; or (iii) the shall commence, or there shall be commenced against the Mortgagor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief of any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iv) there shall be commenced against the Mortgagor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets, which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (v) the Mortgagor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clauses (i), (ii), (iii) or (iv) above; or (vi) the Mortgagor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due.

M.     The Mortgagor shall (i) default in any payment with respect to any indebtedness for money borrowed from the Mortgagee, beyond the period of grace, if any, provided in the instrument or agreement under which such indebtedness was created; or (ii) default in the observance or performance of any other agreement or condition relating to any such indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur, the effect of which default or other event is to cause, or to permit the holder of such indebtedness (or a trustee or agent on behalf of such holder) to cause, with the giving of notice if required, such indebtedness to become due prior to its stated maturity. In addition, any Event of Default hereunder and/or under any other Loan Documents shall be an event of default under and with respect to all indebtedness of any nature whatsoever, whether actual or contingent, of the Mortgagor to the Mortgagee.

N.     A judgment shall be entered against the Mortgagor by any court for the payment of money which, together with all other outstanding judgments against the Mortgagor, exceeds forty thousand dollars ($40,000.00) in the aggregate, which judgment is not fully covered by insurance, or a warrant of attachment or execution or similar process shall be issued or levied against property of the Mortgagor which, together with such other property subject to such process, exceeds in value fifty thousand dollars ($50,000.00) in the aggregate and, if within thirty (30) days after the entry, issue or levy thereof, such judgment, warrant or process shall not have been discharged or stayed pending appeal, or, if after the expiration of any such stay, such judgment, warrant or process shall not have been discharged.

O.      If the Mortgagor shall enter into any junior financing of the Premises without the prior written consent of the Mortgagee, which consent shall be in the sole and absolute discretion of the Mortgagee.

P.      Intentionally Omitted.

Q.      Intentionally Omitted.

R.      Excluding the damage which is the subject matter of the Pending Claim, if any or all of the Premises is materially damaged or destroyed, except to the extent the Mortgagor is in compliance with all of the terms and provisions of Section II.C hereof.

S.      If the Mortgagor ceases to be a not-for-profit corporation under the laws of the State of New York.

## V.      REMEDIES

In case one or more Events of Default shall have occurred, the Mortgagee shall have the following rights and remedies:

A.      The Mortgagee may declare all amounts outstanding (with accrued interest thereon), all of the Secured Obligations and all other amounts owing to it by the Mortgagor to be immediately due and payable, whereupon the same shall become due and payable forthwith without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Mortgagor.

B.      To take any action at law or in equity to collect all of the Secured Obligations and all other amounts owing to the Mortgagee or to enforce the performance and observance of the obligations, agreements and covenants of the Mortgagor contained in this Mortgage and in each of the other Loan Documents.

C.      Enter into possession of the Premises and employ watchmen to protect the Premises from injury.

D.      To institute an action of mortgage foreclosure, or take other action as the law may allow, at law or in equity, for the enforcement of this Mortgage, and proceed therein to final judgment and execution for the entire unpaid balance of the Secured Obligations, including, without limitation, costs of suit, interest and attorneys' fees and other amounts owing pursuant to Section II.F(5) hereof. In case of any sale of the Premises by virtue of judicial proceedings, the Premises may be sold in one parcel and as an entirety or in such parcels, manner or order as the Mortgagee in its sole discretion may elect. The failure to make any tenants parties defendant to a foreclosure proceeding and to foreclose their rights will not be asserted by the Mortgagor as a defense in any proceeding instituted by the Mortgagee to collect the Secured Obligations and/or any deficiency remaining unpaid after the foreclosure sale of the Premises. Notwithstanding anything herein to the contrary, the Mortgagor shall continue to be responsible for the payment of taxes, insurance and all other amounts payable with respect to the Premises until title to the Premises shall be conveyed at a sheriff's sale or other similar proceeding.

E.     If the Event of Default relates to the payment of any tax, assessment, water or sewer rent or governmental charge, or the payment of a premium for insurance, or the obligation to keep the Premises in satisfactory repair and condition, or to otherwise preserve the Premises, then the Mortgagee, in addition to or in lieu of exercising any other rights which it may have hereunder or under any other document executed in connection with any Secured Obligations, may pay the tax, assessment, water or sewer rent, governmental charge, insurance premium, or the cost of placing the Premises in satisfactory repair and condition, or the cost of otherwise preserving the Premises, and the amount so paid shall be added to the monies owing on the Secured Obligations and shall be secured hereby and shall be due and payable on demand with interest at the Default Interest Rate.

F.     Upon the occurrence of any Event of Default, the Mortgagee is hereby empowered and appointed attorney-in-fact and/or authorized signatory of the Mortgagor to enter upon and take possession of the Premises and rent the same, either in its name or in the name of the owner of such property, and to demand, collect and receive from the tenants, lessees or other occupants then in possession of the Premises or any part thereof, the rents, issues and profits as they become due as well as all past due rents, income or profits which have not been collected by the Mortgagor, to endorse the name of the Mortgagor or any subsequent owner of the Premises on any checks, notes or other instruments for the payment of money, to give any and all acquittances or any other instrument in relation thereto in the name of the Mortgagor, and to institute, prosecute, settle or compromise any summary or legal proceedings in the name of the Mortgagor or in the name of the Mortgagee for the recovery of such rents, income or profits, or for the abatement of any nuisance thereon, and to defend, at the Mortgagee's option and sole discretion, any legal proceedings brought against the Mortgagor arising out of the operation of the Premises. All rents, issues and profits collected or received by the Mortgagor after an Event of Default shall be accepted and held for the Mortgagee in trust and shall not be commingled with the funds and property of the Mortgagor, but shall be promptly paid over to the Mortgagee; and the Mortgagor agrees to pay the Mortgagee, if demanded by it, a reasonable rental for the portion of the Premises occupied by the Mortgagor, monthly in advance as a tenant from month to month, and in default of any such payment the Mortgagor may be dispossessed by summary proceedings, such tenancy to expire upon delivery of deed in foreclosure; and the Mortgagee shall apply the rents, issues and profits, after the payment of the necessary charges and expenses, including management fees and commissions, on account of the Secured Obligations, being accountable only for rents, issues and profits as are collected by it while in possession.

G.     Upon the filing of a complaint to collect the amount due on any Secured Obligation, the Mortgagee shall be entitled to the appointment of a receiver of the rents, issues and profits of the Premises without the necessity of proving either inadequacy of the security or insolvency of the Mortgagor or any person who may be legally or equitably liable to pay monies secured hereby, and the Mortgagor and each such person waive such proof and consent to the appointment of a receiver.

H.     Sell the Premises or any part thereof and all estate, claim, demand, right, title and interest of the Mortgagor therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one (1) or more sales, in whole or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law, and in the event of a sale, by

foreclosure or otherwise, of less than all of the Premises, this Mortgage shall continue as a lien on the remaining portion of the Premises.

      I.    Institute an action, suit or proceeding in equity for the specific performance of any covenants, conditions or agreement contained herein or in the Note.

      J.    To exercise any and all rights and remedies conferred upon secured parties by the UCC and other applicable laws; provided, however, the Mortgagee shall not have the right to exercise this remedy unless it has first foreclosed upon the Property and has obtained a deficiency judgment against the Mortgagor.

In addition to the above remedies, if the Mortgagor commits a breach or threatens in writing to commit a breach of this Mortgage, the Mortgagee shall have the right and remedy, without posting bond or other security, to have the provisions of this Mortgage specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause immediate and irreparable injury to the Mortgagee and that the Mortgagee's rights in and to the Premises will not provide an adequate remedy therefor.

All proceeds received from the sale or other disposition of the whole or any part of the Premises shall be applied as follows: (i) first, to the payment of all fees, costs and expenses incurred by the Mortgagee in connection with such sale or disposition; (ii) second, to the payment in full of the balance of the Secured Obligations; and (iii) third, the balance, if any, of such proceeds remaining after indefeasible payment in full of the foregoing, to the Mortgagor or as a court of competent jurisdiction may otherwise direct.

Without limiting the foregoing, in exercising its remedies upon the occurrence of an Event of Default, the Mortgagee (i) shall not be responsible nor liable for any shortage, discrepancy, damage, loss or destruction of any part of the Premises regardless of the cause thereof unless the same shall happen through its gross negligence or willful misconduct; (ii) shall be entitled to the appointment (without notice and without proof of diminution in value of the Premises) of a receiver to take possession of all or any portion of the Premises and to exercise such powers as the court shall confer upon the receiver; and (iii) generally may perform all acts necessary or proper to carry out the intention of this Mortgage, as fully and completely as though the Mortgagee were the absolute owner of the Premises for all purposes, and the Mortgagor hereby ratifies and confirms all that the Mortgagee shall do by virtue of this grant of power.

The rights and remedies of the Mortgagee hereunder shall be in addition to every other right and remedy now and hereafter provided by law; the rights and remedies of the Mortgagee shall be cumulative and not exclusive one of the other; the Mortgagee may exercise the same at such times, in such order, to such extent, and as often as Mortgagee deems advisable, and without regard to whether the exercise of one precedes, concurs with, or succeeds the exercise of another; no delay or omission by the Mortgagee in exercising a right or remedy shall exhaust or impair the same, or constitute a waiver of, or acquiescence in, the Event of Default; and no waiver of an Event of Default by the Mortgagee shall extend to or affect any other Event of Default or impair any right or remedy with respect thereto.

## VI.    SECURITY AGREEMENT.

A.    This Mortgage is both a real property mortgage and a "security agreement" within the meaning of the UCC. The Premises includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of the Mortgagor in the Premises. The Mortgagor, by executing and delivering this Mortgage, has granted and hereby grants to the Mortgagee, as security for the Loan, a security interest in the Premises to the full extent that the Premises may be subject to the UCC (said portion of the Premises so subject to the UCC being called in this Section VI, the "Collateral"). If an Event of Default shall occur, the Mortgagee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the UCC, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as the Mortgagee may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of the Mortgagee, the Mortgagor shall at its expense assemble the Collateral and make it available to the Mortgagee at a convenient place acceptable to the Mortgagee. The Mortgagor shall pay to the Mortgagee on demand any and all expenses, including reasonable legal expenses and attorneys' fees, incurred or paid by the Mortgagee in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by the Mortgagee with respect to the Collateral sent to the Mortgagor in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute commercially reasonable notice to the Mortgagor. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by the Mortgagee to the payment of the Loan and the Secured Obligations in such priority and proportions as the Mortgagee in its discretion shall deem proper.

B.    The Mortgagor hereby gives to the Mortgagee a continuing lien on, security interest in and right of set-off against all monies, securities and other property of the Mortgagor and the proceeds thereof, now on deposit or now or hereafter delivered, remaining with or in transit in any manner to the Mortgagee, its correspondents, participants or its agents from or for the Mortgagor, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into possession of the Mortgagee in any way, and also, any balance of any individual deposit account and credits of the Mortgagor with, and any and all claims of the Mortgagor against the Mortgagee, at any time existing, as collateral security for the payment of the Loan and the Secured Obligations and all of the other obligations of the Mortgagor under this Mortgage, including fees, contracted with or acquired by the Mortgagee, whether joint, several, absolute, contingent, secured, matured or unmatured (for the purposes of this Section VI, collectively, the "Liabilities"), hereby authorizing the Mortgagee at any time or times, without prior notice, to apply such balances, credits or claims, or any part thereof, to the Liabilities in such amounts as it may select, whether contingent, unmatured or otherwise, and whether any collateral security therefore is deemed adequate or not. The collateral security described herein shall be in addition to any collateral security described in any separate agreement executed in connection with this Mortgage.

C.    For this Section VI, the term "Collateral" shall include, without limitation, the following in which the Mortgagor has an interest or right of any kind or in which the Mortgagor hereafter acquires an interest or right of any kind:

1.  All equipment in all of its forms, wherever located, now or hereafter existing, and all parts thereof and all accessions thereto;

2.  All inventory in all of its forms, wherever located, now or hereafter existing, all accessions thereto and products thereof;

3.  All accounts, contract rights, chattel paper, instruments, general intangibles and other obligations of any kind now or hereafter existing arising out of or in connection with the sale or lease of goods or the rendering of services (including shipping documents, warehouse receipts, policies or certificates of insurance), and all rights now or hereafter existing in and to all security agreements, leases, and other contracts securing or otherwise relating to any such accounts, contract rights, chattel paper, instruments, general intangibles or obligations;

4.  All contracts, proprietary rights, trade secrets, licenses, franchise agreements, and other agreements affecting the use, enjoyment or occupancy of the Premises; all building permits, certificates of occupancy and other governmental approvals relating to construction, completion, occupancy, use or operation of the Premises or any part thereof; all drawings, plans, specifications and similar or related items relating to the Premises, and all trade names, trademarks, logos, copyrights, good will and books and records relating to or used in connection with the operation of the Premises or any part thereof; all furniture, furnishings, and other personal property of whatever kind and nature, and general intangibles related to the operation of the Premises now existing or hereafter arising;

5.  All awards, damages, payments, judgments, settlements and other compensation, including without limitation, insurance proceeds, and any and all causes of action, claims therefor and rights thereto, which may result from (i) taking or injury by virtue of the exercise of the power of eminent domain, (ii) a lawsuit or other legal proceeding, or (iii) any damage, injury or destruction in any manner caused to the Premises, or any part thereof;

6.  To the extent not described in Section VI.C(1)-(5) above, all goods, instruments, documents, accounts, chattel paper, deposit accounts, letter-of-credit rights, commercial tort claims, securities and all other investment property, cash, money, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles; and

7.  All products and proceeds of any and all of the foregoing Collateral and, to the extent not otherwise included, all payments under insurance, or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral.

Notwithstanding the foregoing, the Collateral shall not include the goodwill of the Mortgagor's business, the Mortgagor's trademarks or copyrights (whether or not federally registered), and shall not include the goodwill associated with the Mortgagor's trademarks and copyrights, but shall include the all profits, income and proceeds derived therefrom (including, without limitation, license fees, royalties and sales proceeds).

## VII.   MISCELLANEOUS.

A.   **USURY.** Nothing herein or in the Note, and none of the terms, covenants, conditions or obligations hereof or thereof shall impose or shall be deemed to impose upon the Mortgagor an obligation to make any payment, pay any interest or late charges in excess of, or do any act or take any action, or forbear from doing any act or taking any action, in violation of any statute, rule, ordinance or regulation in effect and effective as of the date of such payment, act, action or forbearance. In no event shall the Mortgagor be required to make any such illegal or impermissible payment or to take or do any such illegal or impermissible act or forbear from so doing or so taking nor shall any such failure so to pay or act or such forbearance be deemed a default hereunder. If the provisions of this Mortgage would at any time otherwise require payment by the Mortgagor to the Mortgagee of an amount of interest in excess of the maximum amount then permitted by law, the interest payments to the Mortgagee shall be reduced to the extent necessary so that the Mortgagee shall not receive interest in excess of such maximum amount. The terms, covenants, conditions and obligations hereof or of the Note requiring any such illegal or impermissible payment, act, action or forbearance on the part of the Mortgagor to be made or taken are deemed amended, modified or altered in such a manner as to bring all and each of them into conformity with the applicable statutes, rules, ordinances or regulations in respect of the Mortgagor and the Mortgagor hereby covenants and agrees to abide by, conform to and comply with any and all such terms, covenants, conditions and obligations as so amended, modified or altered.

B.   **NON-JUDICIAL FORECLOSURE.** To the extent allowable under applicable law and judicial foreclosure is not an available remedy, notwithstanding anything to the contrary contained herein, in addition to and without limiting any remedies available to the Mortgagee at law, in equity and pursuant to this Mortgage, the Note and/or the Loan Documents, upon the occurrence of any Event of Default, the Mortgagee, at its option, may pursue the remedy of a non-judicial proceeding for foreclosure by power of sale in the manner prescribed in Article 14 of the Real Property Actions and Proceedings Law of New York. To the extent permitted by law, the Mortgagor waives any right granted pursuant to Section 1421 or any other provision of the Real Property Actions and Proceedings Law of New York to challenge the Mortgagee's election to enforce this Mortgage by means of such non-judicial foreclosure by power of sale. If the Premises consists of two (2) or more distinct parcels, all such parcels shall be sold as one (1) parcel, unless the Mortgagee shall elect otherwise.

C.   **NOTICES.** All notices and other communications given to or made upon any party hereto in connection with this Mortgage shall, except as otherwise expressly herein provided, be in writing and hand delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by reputable overnight commercial courier service providing a receipt against delivery, to the respective parties, as follows:

Mortgagee:   Titan Capital ID, LLC

140 East 45th Street, 40th Floor
New York, New York 10017

– with a copy to –

Pryor Cashman LLP
7 Times Square
New York, New York 10036-6569
Attention: Joseph L. Brasile, Esq.

Mortgagor:   The Friars National Association, Inc.
57 East 55th Street
New York, New York 10022
Attention: Prior

– with a copy to –

Davidoff Hutcher & Citron LLP
605 Third Avenue, 34th Floor
New York, New York 10158
Attention: William P. Walzer, Esq.

or to such changed address as may be fixed by notice. Notices by registered or certified mail shall be effective three (3) Business Days (as that term is defined in the Note) after mailing. Notices by messenger, hand delivery or by reputable overnight commercial courier service shall be effective upon receipt or rejection. The written receipt by any employee of any such party shall constitute sufficient evidence of such receipt.

D.   **INDULGENCES; EXTENSIONS**. The Mortgagee, with respect to the Secured Obligations, the Premises and the Mortgagor's obligations hereunder, may waive compliance with any of the provisions hereof, and may release all or any part of the Premises from any lien hereof, without affecting the priority or validity of the lien hereof upon the remainder of the Premises.

E.   **INVALID PROVISIONS TO AFFECT NO OTHERS**. In case any one or more of the covenants, agreements, terms or provisions contained in this Mortgage shall be invalid, illegal or unenforceable in any respect, the validity of the remaining covenants, agreements, terms or provisions contained herein shall be in no way affected, prejudiced or disturbed thereby.

F.   **JOINT AND SEVERAL LIABILITY**.   The obligations and liabilities of each such person hereunder and of Mortgagor shall be joint and several.

G.   **SUCCESSORS AND ASSIGNS; PLURALS**. All of the grants, covenants, terms, provisions and conditions of this Mortgage shall run with the land and bind the Mortgagor, its legal representatives, heirs, successors and assigns, and shall inure to the benefit of the Mortgagee, the successors and assigns of the Mortgagee and all subsequent holders of this Mortgage. As used herein the singular shall include the plural and vice versa as the context requires. The Mortgagee

shall have the right to assign all or a portion of its rights under this Mortgage and/or procure participation in the Loan.

H.   **PROMOTIONAL ACTIVITIES**.   The Mortgagee shall have the right to reference the closing of the Loan and/or the Mortgagee's financing of the Premises on the Mortgagee's web site.

I.   **WAIVER OF AUTOMATIC STAY, AND CONSENT TO RELIEF FROM THE AUTOMATIC STAY**. AS A MATERIAL INDUCEMENT FOR THE MORTGAGEE'S ENTRY INTO THIS MORTGAGE AND AGREEMENT TO MAKE THE LOAN, IN RECOGNITION OF THE RISKS ASSOCIATED WITH THE MORTGAGOR'S EXECUTION AND PERFORMANCE OF THIS MORTGAGE, IN CONSIDERATION OF THE RECITALS AND MUTUAL COVENANTS CONTAINED HEREIN, AND IN RECOGNITION THAT THIS COVENANT IS A MATERIAL INDUCEMENT FOR THE MORTGAGEE'S AGREEMENT TO MAKE THE LOAN, AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, THE MORTGAGOR HEREBY AGREES AND CONSENTS THAT IF THE MORTGAGOR (1) FILES OR BECOMES THE SUBJECT OF A PETITION IN A CASE UNDER ANY CHAPTER OF TITLE 11 OF THE UNITED STATES CODE, AS THE SAME MAY BE AMENDED FROM TIME TO TIME (THE "BANKRUPTCY CODE"), (2) BECOMES THE SUBJECT OF ANY ORDER FOR RELIEF ISSUED UNDER THE BANKRUPTCY CODE, (3) FILES OR BECOMES THE SUBJECT OF ANY PETITION SEEKING REORGANIZATION, ARRANGEMENT, COMPOSITION, READJUSTMENT, LIQUIDATION, DISSOLUTION, OR SIMILAR RELIEF UNDER ANY CURRENT OR FUTURE FEDERAL OR STATE ACT OR LAW RELATING TO BANKRUPTCY, INSOLVENCY OR OTHER RELIEF FOR DEBTORS (AN "INSOLVENCY PROCEEDING"), (4) SEEKS, CONSENTS TO OR ACQUIESCES IN THE APPOINTMENT OF ANY TRUSTEE, RECEIVER, CONSERVATOR, ASSIGNEE FOR THE BENEFIT OF CREDITORS, OR LIQUIDATOR, OR (5) BECOMES THE SUBJECT OF ANY ORDER, JUDGMENT OR DECREE ENTERED BY ANY COURT OF COMPETENT JURISDICTION APPROVING A PETITION FILED AGAINST THE MORTGAGOR IN ANY INSOLVENCY PROCEEDING, THEN THE MORTGAGEE THEREUPON SHALL BE ENTITLED TO RELIEF FROM THE AUTOMATIC STAY OR ANY INJUNCTION IMPOSED BY OR UNDER SECTIONS 105(A) AND/OR 362 OF THE BANKRUPTCY CODE, OR FROM ANY OTHER STAY, INJUNCTION OR SUSPENSION OF REMEDIES IMPOSED IN ANY OTHER MANNER WITH RESPECT TO THE EXERCISE OF THE MORTGAGEE'S RIGHTS AND REMEDIES UNDER THIS MORTGAGE, AND/OR THE OTHER LOAN DOCUMENTS, AND/OR AS OTHERWISE PROVIDED BY LAW   THE MORTGAGOR EXPRESSLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES THE BENEFIT OF SUCH AUTOMATIC STAY AND CONSENTS AND AGREES TO RAISE NO OBJECTION TO SUCH RELIEF IN FAVOR OF THE MORTGAGEE.

J.   **INTERPRETATION**. Should any provision of this Mortgage require judicial interpretation, it is agreed that the court interpreting or construing the same shall not construe this Mortgage against one party more strictly by reason of the rule of interpretation that a document is to be construed more strictly against the party who itself or through its agent prepared the same, it being agreed that the agents of each party have participated in the preparation of this Mortgage

and that each party hereto consulted with independent legal counsel of its own selection prior to its execution of this Mortgage.

K.    **CAPTIONS**.  The captions herein are inserted only for convenience of reference and in no way define, limit or describe the scope or intent of this Mortgage or any particular paragraph or section hereof, nor the proper construction hereof.

L.    **GOVERNING LAW**.  This Mortgage is to be construed according to the laws of the State of New York, without giving effect to conflict of laws principles.

M.    **MODIFICATION**.  The clauses and covenants contained herein which are construed by Section 254 and Section 271 of the Real Property Law shall be construed as provided in that Section; that the additional clauses and covenants contained herein shall afford rights supplemental to, and not exclusive of, the rights conferred by the clauses and covenants construed by such Section 254 and Section 271 and shall not impair, modify, alter or defeat such rights notwithstanding that such additional clauses and covenants may relate to the same subject matter, or provide for different or additional rights in the same or similar contingencies as the causes and covenants construed by Section 254 and Section 271; that the rights of the Mortgagee shall be separate, distinct and cumulative and none of them shall be in exclusion of the other; that no act of the Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision, anything herein or otherwise to the contrary notwithstanding. This Mortgage cannot be changed orally.

N.    **COUNTERPARTS**.  This Mortgage may be executed in counterparts.

O.    **ASSIGNMENT OF MORTGAGE**.  Provided no Event of Default has occurred at any time, subject to the further terms and provisions hereof and provided also that; (a) the Mortgagor provides the Mortgagee with not less than ten (10) days prior written notice to the Mortgagee, (b) the Mortgagor is not in default under the Loan Documents either at the time of giving its notice or at the time of repayment of the Loan, as applicable, and (c) the Mortgagor pays the Mortgagee's reasonable legal fees and closing attendance fees, the Mortgagee agrees that, in lieu of delivery a satisfaction of this Mortgage, upon the payment in full of the indebtedness by the Mortgagor's new lender which is unaffiliated with the Mortgagor (such a lender, "Mortgagor's New Lender") in connection with its refinancing of the Property, the Mortgagee will assign to the Mortgagor's New Lender this Mortgage and provide an allonge to the Note (or in the loss or absence of the original Note, the Mortgagee will provide a lost note affidavit in the form it utilizes in its discretion), each without any representation, warranty or recourse whatsoever.

P.    **AMENDMENT**  This Mortgage may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties, or, in the case of a waiver, by the party waiving compliance.

Q.    **WAIVER OF JURY TRIAL**.  THE MORTGAGOR IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS MORTGAGE, THE NOTE, THE LOAN DOCUMENTS, ANY OTHER DOCUMENTS EXECUTED IN

CONNECTION WITH THIS MORTGAGE OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE MORTGAGOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

R.    **WAIVER OF COUNTERCLAIMS**.  THE MORTGAGOR HEREBY WAIVES THE RIGHT TO ASSERT ANY COUNTERCLAIMS IN ANY ACTION OR PROCEEDING BROUGHT AGAINST IT BY THE MORTGAGEE UNDER THE NOTE, THIS MORTGAGE OR ANY OF THE OTHER LOAN DOCUMENTS.

S.    **MERGER**. This Mortgage, together with the Loan Documents, collectively, sets forth the entire agreement and understanding of the Mortgagor and the Mortgagee with respect to the matters covered in the Loan Documents, and the undersigned acknowledges that no oral or other agreements, understandings, covenants, representations or warranties exist with respect to this Mortgage and/or the Loan Documents, except those specifically set forth herein and therein, as applicable.

T.    **RECEIPT OF MORTGAGE**. The Mortgagor hereby acknowledges receipt of a true copy of this Mortgage, without charge.

**IN WITNESS WHEREOF**, the Mortgagor has caused this Consolidation, Modification and Extension of Mortgage, Assignment of Leases and Rents and Security Agreement to be executed and delivered effective as of the day and year first above written.

**MORTGAGOR**:

**THE FRIARS NATIONAL ASSOCIATION, INC.**,
a New York not-for-profit corporation

By: _____

Name: Warren Handelman
Title: Bard

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

On the 21 day of February in the year 2020 before me, the undersigned, personally appeared Warren Handelman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

[Signature Page to Consolidation, Modification and
Extension of Mortgage, Assignment of Leases and Rents and Security Agreement]

BEAU CORDOVA
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CO6128489
Qualified in New York County
Commission Expires June 13, 2021

## SCHEDULE A

## LEGAL DESCRIPTION

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, CITY OF NEW YORK AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF 55TH STREET DISTANT 156 FEET 6 INCHES EASTERLY FROM THE NORTHEASTERLY CORNER OF SAID STREET AND MADISON AVENUE;

RUNNING THENCE NORTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK;

THENCE EASTERLY ALONG THE CENTER LINE OF THE BLOCK 33 FEET;

THENCE SOUTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH ANOTHER PARTY WALL 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF 55TH STREET;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF 55TH STREET, 33 FEET TO THE POINT OR PLACE OF BEGINNING.

# EXHIBIT B – ALLONGE

## **ALLONGE**

This is an Allonge which is attached to and made a part of those certain notes referenced on <u>Schedule A</u> attached hereto (collectively, the "Notes").

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, TITAN CAPITAL ID, LLC ("Assignor") hereby endorses, assigns and transfers to KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, maintaining an address at 30242 Esperanza Rancho, Santa Margarita, California 92688, its successors and/or assigns, without recourse, representation or warranty whatsoever, all of Assignor's right, title and interest in and to the Notes.

Dated: June 25, 2021

TITAN CAPITAL ID, LLC

By: _____
    Name: Joseph Brasile
    Title: Authorized Signatory

5612190

Schedule A

1.  Allonge dated 2/21/20, along with promissory note dated 8/28/2018 in the amount of $2,000,000 given by Friar's National Association, Inc. in favor of 57 East 55th Street Funding Associates;

2.  Allonge dated 2/21/20, along with promissory note dated 10/3/2018 in the amount of $1,000,000 given by Friar's National Association, Inc. in favor of 57 East 55th Street 2nd Funding Associates;

3.  Allonge dated 2/21/20, along with promissory note dated 1/8/2019 in the amount of $1,000,000 given by Friar's National Association, Inc. in favor of 57 East 55th Street 3rd Funding Associates;

4.  Allonge dated 2/21/20, along with promissory note dated 6/6/2019 in the amount of $1,000,000 given by Friar's National Association, Inc. in favor of 57 East 55th Street 4th Funding Associates;

5.  Allonge dated 2/21/20, along with promissory note dated 9/25/2019 in the amount of $1,000,000 given by Friar's National Association, Inc. in favor of 57 East 55th Street 5th Funding Associates;

6.  Gap Note dated 2/21/2020 in the amount of $3,000,000 given by Friar's National Association, Inc. in favor of Titan Capital ID, LLC; and

7.  Consolidated, Extended, Amended and Restated Mortgage Note dated 2/21/2020 in the amount of $9,000,000 given by Friar's National Association, Inc. in favor of Titan Capital ID, LLC.

5612190

# EXHIBIT C – ASSIGNMENT OF MORTGAGE

| NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER<br><br>This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document. | <br>2021062900751001004E1462 |
|---|---|

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 11 |
|---|---|---|

**Document ID:** 2021062900751001  **Document Date:** 06-25-2021  **Preparation Date:** 06-29-2021
Document Type: ASSIGNMENT, MORTGAGE
Document Page Count: 9

| PRESENTER: | RETURN TO: |
|---|---|
| FIRST AMERICAN TITLE INSURANCE COMPANY<br>666 THIRD AVENUE<br>1060172B<br>NEW YORK, NY 10017<br>212-850-0675<br>CBLISTEIN@FIRSTAM.COM | AKERMAN LLP<br>ATTENTION: CHRISTOPHER MCCRANIE, ESQ.<br>50 NORTH LAURA STREET, SUITE 3100<br>JACKSONVILLE, FL 32202 |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1291 | 127 | Entire Lot | 57 EAST 55TH STREET |

Property Type: COMMERCIAL REAL ESTATE

### CROSS REFERENCE DATA

**CRFN:**   2018000298267
☒ Additional Cross References on Continuation Page

### PARTIES

| ASSIGNOR/OLD LENDER: | ASSIGNEE/NEW LENDER: |
|---|---|
| TITAN CAPTIAL ID, LLC<br>140 EAST 45TH STREET, 40TH FLOOR<br>NEW YORK, NY 10017 | KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP<br>30242 ESPERANZA<br>RANCHO SANTA MARGARITA, CA 92688 |

### FEES AND TAXES

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES:   County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | | |
| TASF: | $ | 0.00 | **OF THE CITY REGISTER OF THE** | | |
| MTA: | $ | 0.00 | **CITY OF NEW YORK** | | |
| NYCTA: | $ | 0.00 | Recorded/Filed       07-07-2021 10:58 | | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | | |
| TOTAL: | $ | 0.00 | **2021000256894** | | |
| Recording Fee: | $ | 100.00 | | | |
| Affidavit Fee: | $ | 0.00 | *City Register Official Signature* | | |

NYC DEPARTMENT OF FINANCE
OFFICE OF THE CITY REGISTER



2021062900751001004C16E2

**RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION)**     **PAGE 2 OF 11**

**Document ID: 2021062900751001**     Document Date: 06-25-2021     Preparation Date: 06-29-2021
Document Type: ASSIGNMENT, MORTGAGE

**CROSS REFERENCE DATA**
**CRFN:** 2018000340879
**CRFN:** 2019000016736
**CRFN:** 2019000198078
**CRFN:** 2019000330235
**CRFN:** 2020000082527

10601726

First American Title
Insurance Company
606 Third Avenue  5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

## ASSIGNMENT OF MORTGAGE

### TITAN CAPITAL ID, LLC

to

### KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP

Date: June _25_, 2021

| Block: | 1291 |
|---|---|
| Lot: | 127 |
| County: | New York |
| Premises: | 57 East 55th Street, New York, New York |

RECORD AND RETURN TO:

Akerman LLP
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202
Attention: Christopher McCranie, Esq.

5607842

## ASSIGNMENT OF MORTGAGE

**FOR VALUE RECEIVED**, the receipt and sufficiency of which are hereby acknowledged, the undersigned, TITAN CAPITAL ID, LLC, having an address at 140 East 45th Street, 40th Floor, New York, New York 10017 ("Assignor"), hereby grants, bargains, sells assigns, delivers, conveys, transfers and set over unto KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP, having an address at 30242 Esperanza Rancho, Santa Margarita, California 92688, together with its successors and/or assigns ("Assignee") those certain mortgages described in Schedule A attached hereto and made a part hereof (collectively, the "Mortgage"), encumbering certain real property more particularly described in Schedule B attached hereto and made a part hereof, together with the note therein described or referred to, the money due or to become due thereon with interest, and all rights accrued or to accrue under said Mortgage.

This Assignment is made without representation or warranty, either express or implied, by, or recourse to, the undersigned.

This assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

*[END OF TEXT – SIGNATURE AND ACKNOWLEDGMENT PAGES FOLLOW]*

5607842

IN WITNESS WHEREOF, Assignor has executed this Assignment as of the 25th of June, 2021.

Assignor:

TITAN CAPITAL ID, LLC

By: _____

Name: Joseph Brasile
Title: Authorized Signatory

STATE OF NEW YORK            )
                    NEW YORK      )  S.S.:
COUNTY OF ~~WESTCHESTER~~     )

On the 25th day of June, 2021, before me, the undersigned, a notary public in and for said State, personally appeared Joseph Brasile, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

SUZIE A. ALI
Notary Public - State of New York
No. 01AL6098470
Qualified in Kings County
My Commission Expires Sept.15, 2023

5607842

## SCHEDULE A

Mortgage Number 1 of 7:

| | |
|---|---|
| Mortgagor: | Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street Funding Associates |
| Amount: | $2,000,000.00 |
| Dated: | 08/28/2018 |
| Recorded: | 09/06/2018 |
| CRFN: | 2018000298267 |

Mortgage Number 2 of 7:

| | |
|---|---|
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street 2nd Funding Associates |
| Amount: | $1,000,000.00 |
| Dated: | 10/03/2018 |
| Recorded: | 10/15/2018 |
| CRFN: | 2018000340879 |

Mortgage Number 3 of 7:

| | |
|---|---|
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street 3rd Funding Associates |
| Amount: | $1,000,000.00 |
| Dated: | 01/08/2019 |
| Recorded: | 01/15/2019 |
| CRFN: | 2019000016736 |

Mortgage Number 4 of 7:

| | |
|---|---|
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street 4th Funding Associates |
| Amount: | $1,000,000.00 |
| Dated: | 06/06/2019 |
| Recorded: | 06/24/2019 |
| CRFN: | 2019000198078 |

Agreement:

| | |
|---|---|
| #4a | |
| Type: | Omnibus Modification |
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagees: | 57 East 55th Street Funding Associates, |
| | 57 East 55th Street 2nd Funding Associates, |
| | 57 East 55th Street 3rd Funding Associates |
| | and 57 East 55th Street 4th Funding Associates |
| Dated: | 09/25/2019 |
| Recorded: | 10/10/2019 |
| CRFN: | 2019000330237 |

(Note: The above mortgage #s 1 - 4 were consolidated, extended and modified to

form a single lien in the amount of $5,000,000.00)

Assignment:
#4b
Type:           Assignment of Mortgage
Assignors:      57 East 55th Street Funding Associates,
                57 East 55th Street 2nd Funding Associates,
                57 East 55th Street 3rd Funding Associates
                and 57 East 55th Street 4th Funding Associates
Assignee:       Titan Capital ID, LLC
Dated:          02/21/2020
Recorded:       03/04/2020
CRFN:           2020000082523

(Note: Assigns the above mortgages #s 1 - 4, as consolidated by the referenced Omnibus Modification)

Mortgage Number 5 of 7:
Mortgagor:      The Friars National Association, Inc.
Mortgagee:      57 East 55th Street 5th Funding Associates
Amount:         $1,000,000.00
Dated:          09/25/2019
Recorded:       10/10/2019
CRFN:           2019000330235

Assignment:
#5a
Type:           Assignment of Mortgage
Assignors:      57 East 55th Street 5th Funding Associates
Assignee:       Titan Capital ID, LLC
Dated:          02/21/2020
Recorded:       03/04/2020
CRFN:           2020000082526

(Note: Assigns the above mortgage # 5)

Mortgage Number 6 of 7:
Mortgagor:      The Friars National Association, Inc.
Mortgagee:      Titan Capital ID, LLC
Amount:         $3,000,000.00
Dated:          02/21/2020
Recorded:       03/04/2020
CRFN:           2020000082527

~~Mortgage Number 7 of 7~~: Agreement ①

| | |
|---|---|
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagee: | Titan Capital ID, LLC |
| Amount: | $9,000,000.00 |
| Dated: | 02/21/2020 |
| Recorded: | 03/04/2020 |
| CRFN: | 2020000082528 |

Consolidates, Modifies and Extends Mortgage 1-6. ①

5607842

## SCHEDULE B

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, CITY OF NEW YORK AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF 55TH STREET DISTANT 156 FEET 6 INCHES EASTERLY FROM THE NORTHEASTERLY CORNER OF SAID STREET AND MADISON AVENUE;

RUNNING THENCE NORTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK;

THENCE EASTERLY ALONG THE CENTER LINE OF THE BLOCK 33 FEET;

THENCE SOUTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH ANOTHER PARTY WALL 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF 55TH STREET;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF 55TH STREET, 33 FEET TO THE POINT OR PLACE OF BEGINNING.

## AFFIDAVIT UNDER SECTION 275
## OF THE NEW YORK REAL PROPERTY LAW
## ASSIGNMENT OF MORTGAGE

STATE OF NEW YORK    )
                          ) ss
COUNTY OF NEW YORK  )

ARTHUR AIDALA ("**Affiant**") being duly sworn, deposes and says:

       1.     That I am the President of THE FRIARS NATIONAL ASSOCIATION, INC., a New York not-for-profit corporation (the "**Corporation**"), which Corporation is authorized to do business in the State of New York, and is the mortgagor of the mortgages which are the subject of the attached assignment, and as such I am fully familiar with the pertinent facts in connection with the transaction involved in this assignment.

       2.     The assignee is not acting as a nominee of the mortgagor and the mortgages being assigned continue to secure a bona fide obligation.

{Signature Page Follows}

By: _____

**Arthur Aidala**
President of THE FRIARS NATIONAL
ASSOCIATION, INC., a New York not-for-
profit corporation

Sworn to before me this 24th day of June, 2021

By: _____

Notary Public

[NOTARIAL STAMP/SEAL]

WILLIAM R. SANTO
Notary Public, State of New York
No. ▮▮▮▮▮▮▮
Qualified in Kings County
Commission Expires Febuary 8, 2023

275 Affidavit

# EXHIBIT D – LOAN AGREEMENT

**KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP**

**WITH**

**THE FRIARS NATIONAL ASSOCIATION, INC.**

_____

**CONSOLIDATED, EXTENDED, AMENDED AND RESTATED
TERM LOAN AND SECURITY AGREEMENT**

_____

**Dated as of June  25, 2021**

# TABLE OF CONTENTS

**ARTICLE I     DEFINITIONS**                                                      **1**

   1.1   Defined Terms.                                            1
   1.2   Other Definitional Provisions.                           14

**ARTICLE II     THE TERM LOAN**                                                   **14**

   2.1   Term Loan                                                 15
   2.2   The Note                                                  15
   2.3   Maturity Date                                             15
   2.4   Interest Payments on the Term Loan                        16
   2.5   Prepayment of the Term Loan                               17
   2.6   Late Charge                                               17
   2.7   Funds; Manner of Payment.                                 17
   2.8   17
   2.8   Default Rate                                              18
   2.9   Use of the Term Loan Proceeds                             18
   2.10  Fees                                                      18
   2.11  Initial Funding                                           18
   2.12  Interest Reserve.                                         19
   2.13  Tax and Insurance Impound.                                19
   2.14  Tax and Insurance Reserve.                                19
   2.15  RESERVED.                                                 21
   2.16  Excess Cash Flow.                                         21
   2.17  Cash Management.                                          21
   2.18  [Reserved].                                               22
   2.19  [Reserved].                                               22

**ARTICLE III     REPRESENTATIONS AND WARRANTIES**                                 **22**

   3.1   22
   3.1   Organization                                              22
   3.2   Authorization; No Contravention.                          22
   3.3   Litigation.                                               23
   3.4   Agreements.                                               23
   3.5   No Bankruptcy Filing.                                     23
   3.6   Fraudulent Transfer.                                      23
   3.7   No Plan Assets.                                           23
   3.8   Federal Reserve Regulations; Investment Company Act.      24
   3.9   Proceeds of the Term Loan.                                24
   3.10  Purchase Options.                                         24
   3.11  Hazardous Substances.                                     24
   3.12  Governmental Approval; Authorization.                     25
   3.13  Indebtedness.                                             25
   3.14  Full Disclosure.                                          25
   3.15  Binding Effect.                                           25
   3.16  No Defaults.                                              26
   3.17  Financial Statements.                                     26
   3.18  No Brokerage Fees.                                        26
   3.19  Not a Foreign Person.                                     26
   3.20  OFAC.                                                     26
   3.21  Trade Names.                                              26
   3.22  Title.                                                    26
   3.23  No Condemnation.                                          27
   3.24  Legal Requirements.                                       27

| 3.25 | UTILITIES. | 27 |
|---|---|---|
| 3.26 | SEPARATE TAX PARCEL. | 27 |
| 3.27 | LEASES. | 27 |
| 3.28 | NO ENCROACHMENTS. | 27 |
| 3.29 | SURVIVAL OF REPRESENTATIONS AND WARRANTIES. | 27 |

**ARTICLE IV     CONDITIONS OF THE TERM LOAN** — **28**

| 4.1 | REPRESENTATIONS AND WARRANTIES; NO DEFAULT. | 28 |
|---|---|---|
| 4.2 | ORGANIZATIONAL DOCUMENTS. | 28 |
| 4.3 | OPINION OF COUNSEL. | 28 |
| 4.4 | LOAN DOCUMENTS. | 28 |
| 4.5 | TITLE AND OTHER DOCUMENTS. | 29 |
| 4.6 | SURVEY. | 29 |
| 4.7 | [RESERVED]. | 29 |
| 4.8 | NO LITIGATION. | 29 |
| 4.9 | SEARCHES. | 29 |
| 4.10 | FINANCIAL STATEMENTS. | 29 |
| 4.11 | MANAGEMENT AGREEMENTS. | 29 |
| 4.12 | FLOOD HAZARD. | 30 |
| 4.13 | ORGANIZATIONAL DOCUMENTS. | 30 |
| 4.14 | NO DEFAULTS. | 30 |
| 4.15 | EASEMENTS. | 30 |
| 4.16 | ENVIRONMENTAL REPORT. | 30 |
| 4.17 | ADDITIONAL DOCUMENTS. | 30 |
| 4.18 | ZONING. | 31 |
| 4.19 | UTILITIES. | 31 |
| 4.20 | APPRAISAL. | 31 |
| 4.21 | RESERVED. | 31 |
| 4.22 | NO MATERIAL CHANGE. | 31 |
| 4.23 | RESERVED. | 31 |
| 4.24 | OPERATING BUDGET. | 31 |

**ARTICLE V     AFFIRMATIVE COVENANTS** — **31**

| 5.1 | BOOKS AND RECORDS. | 31 |
|---|---|---|
| 5.2 | FINANCIAL STATEMENTS; REPORTS. | 32 |
| 5.3 | TAXES | 32 |
| 5.4 | LOCATION OF BORROWER COLLATERAL. | 33 |
| 5.5 | COMPLIANCE WITH LAWS. | 33 |
| 5.6 | PROPERTY MANAGER. | 33 |
| 5.7 | POST-CLOSING OBLIGATIONS. | 33 |
| 5.8 | PROJECT APPROVALS. | 33 |
| 5.9 | LABORERS, SUBCONTRACTORS, AND MATERIALMEN. | 33 |
| 5.10 | FURTHER ASSURANCES. | 34 |
| 5.11 | LOSS OF PRIORITY. | 34 |
| 5.12 | APPRAISALS. | 34 |
| 5.13 | SIGN AND PUBLICITY. | 34 |
| 5.14 | COVERAGE. | 34 |

**ARTICLE VI     NEGATIVE COVENANTS** — **35**

| 6.1 | INDEBTEDNESS. | 35 |
|---|---|---|
| 6.2 | LIENS. | 35 |
| 6.3 | RESTRICTIONS ON FUNDAMENTAL CHANGES. | 35 |
| 6.4 | DISPOSAL OF ASSETS. | 36 |
| 6.5 | NAME CHANGE. | 36 |
| 6.6 | NATURE OF BUSINESS. | 36 |
| 6.7 | PREPAYMENTS AND AMENDMENTS. | 36 |

| | | |
|---|---|---|
| **6.8** | Change of Control. | 36 |
| **6.9** | Restricted Payments. | 36 |
| **6.10** | Accounting Methods. | 36 |
| **6.11** | Investments. | 36 |
| **6.12** | Transactions with Affiliates. | 37 |
| **6.13** | Change of Business. | 37 |
| **6.14** | Use of Proceeds. | 37 |
| **6.15** | Borrower Collateral with Bailees. | 37 |
| **6.16** | [Removed]. | 37 |
| **6.17** | Organizational Documents. | 37 |
| **6.18** | Prescribed Laws. | 37 |
| **6.19** | RESERVED. | 38 |
| **6.20** | Leasing Restrictions. | 38 |
| **6.21** | Defaults Under Leases. | 38 |
| **6.22** | Management Contracts. | 38 |
| **6.23** | Alterations. | 38 |
| **6.24** | Mechanics' Liens and Contest Thereof. | 38 |

**ARTICLE VII      CREATION OF SECURITY INTEREST                                            38**

| | | |
|---|---|---|
| **7.1** | Grant of Security Interest. | 38 |
| **7.2** | Negotiable Collateral. | 39 |
| **7.3** | Collection of Accounts, General Intangibles, and Negotiable Collateral. | 39 |
| **7.4** | Filing of Financing Statements; Delivery of Additional Documentation Required. | 39 |
| **7.5** | Power of Attorney. | 40 |
| **7.6** | Right to Inspect and Verify. | 40 |
| **7.7** | Control Agreements. | 41 |

**ARTICLE VIII     EVENTS OF DEFAULT                                                         41**

| | | |
|---|---|---|
| **8.1** | Events of Default. | 41 |

**ARTICLE IX     LENDER'S RIGHTS AND REMEDIES.                                             43**

| | | |
|---|---|---|
| **9.1** | Rights and Remedies. | 43 |

**ARTICLE X     MISCELLANEOUS                                                              44**

| | | |
|---|---|---|
| **10.1** | Notices. | 44 |
| **10.2** | Survival of Agreement; Successors and Assigns. | 45 |
| **10.3** | Expenses of Lender; Indemnification. | 45 |
| **10.4** | Applicable Law. | 46 |
| **10.5** | No Waiver of Rights by Lender; Waiver of Jury Trial, etc. | 46 |
| **10.6** | Acknowledgments. | 47 |
| **10.7** | Marshalling of Assets; Jurisdiction. | 47 |
| **10.8** | Modification of Agreement. | 47 |
| **10.9** | Prohibition on Transfers in Violation of ERISA. | 48 |
| **10.10** | Reinstatement; Certain Payments. | 48 |
| **10.11** | Right of Setoff. | 48 |
| **10.12** | Lender's Consent. | 49 |
| **10.13** | Time of the Essence. | 49 |
| **10.14** | Severability. | 49 |
| **10.15** | Counterparts. | 49 |
| **10.16** | Entire Agreement; Cumulative Remedies. | 49 |
| **10.17** | Captions and Headings. | 49 |
| **10.18** | Recitals, Exhibits, and Schedules. | 49 |
| **10.19** | Number and Gender; Definitions Include Amendments. | 49 |
| **10.20** | Waiver of Damages. | 50 |
| **10.21** | Claims Against Lender. | 50 |
| **10.22** | Cross Default and Cross Collateral. | 50 |

**10.23**   Joint and Several.                                    50
**10.24**   NO ORAL AGREEMENTS.                                   50
**10.25**   Sale of Mortgage and Securitization.                 51
**10.26**   Lost Notes.                                          52

EXHIBITS TO LOAN AGREEMENT

Exhibit A              Legal Description of Land
Exhibit B              Post-Closing Obligations
Exhibit C              [RESERVED]
Exhibit D              Insurance Requirements
Exhibit E              Tenant Direction Letter

Schedule 3.13          Permitted Liens
Schedule 5.4(a)        Location of Borrower Collateral
Schedule 5.4(b)        Location of Chief Executive Offices

## TERM LOAN AND SECURITY AGREEMENT

**THIS CONSOLIDATED, EXTENDED, AMENDED AND RESTATED TERM LOAN AND SECURITY AGREEMENT** ("**Agreement**") is made as of June 25, 2021 ("**Closing Date**"), by and among **THE FRIARS NATIONAL ASSOCIATION, INC.**, a New York not-for-profit corporation ("**Borrower**"), and **KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP**, a Delaware limited partnership, its successors and assigns ("**Lender**").

<u>W I T N E S S E T H</u>:

     A.  At the request of Borrower, Lender is making a term loan to Borrower on the date hereof, in the maximum principal amount of **THIRTEEN MILLION AND NO/100 Dollars ($13,000,000.00)**, to provide funds FOR THE PURPOSES SET FORTH IN <u>Section 2.9</u> hereof, which Loan shall mature on the Maturity Date. Lender may advance all or a portion of the maximum principal balance at once or over time in accordance with this Agreement, and Borrower acknowledges that no amount repaid in respect of the Loan may be reborrowed; and

     B.  This Agreement consolidates, extends, amends and restates the Existing Note, Gap Note, Existing Mortgage and Gap Mortgage and all terms, conditions, obligations and liabilities set forth therein.

     C.  Lender is willing to provide Borrower with such credit facility pursuant to the terms, conditions and limitations set forth in this Agreement.

     NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1** Defined Terms.

     The following terms as used herein shall have the following meanings:

     "**Account**" means an account (as that term is defined in the Code).

     "**Account Debtor**" means any Person who is obligated under, with respect to, or on account of, an Account, chattel paper, or a General Intangible.

     "**Additional Documents**" shall have the meaning set forth in <u>Section 7.4</u> hereof.

     "**Affiliate**" shall mean as to any Person, any other Person (i) which directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such Person; or (ii) which, directly or indirectly, beneficially owns or holds ten percent (10%) or more of any class of stock or any other ownership interest in such Person; or (iii) ten percent (10%) or more of the direct or indirect ownership of which is beneficially owned or held by such Person; or (iv) which is a member of the family (as defined in the Code) of such Person or which is a trust or estate, the beneficial owners of which are members of the family (as defined in the Code) of such Person; or (v) which directly or indirectly is a general partner, controlling shareholder, managing member, officer, director, trustee or employee of such Person.

"**Agent**" shall mean KeyBank National Association, a national banking association.

"**Appraisal**" shall mean an MAI certified appraisal of the Property performed in accordance with Lender's appraisal requirements by an appraiser selected and retained by Lender.

"**Assignment of Leases and Rents**" shall mean that certain Assignment of Leases and Rents, dated as of the date hereof, from Borrower in favor of Lender with respect to the Property.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees, to be executed upon approval and execution of a Management Agreement by Borrower, from Borrower for the benefit of Lender and consented and agreed to by Property Manager, as applicable.

"**Bankruptcy Action**" shall mean with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (d) such Person consenting to or acquiescing in or joining in an application for the appointment in a judicial, quasi-judicial or administrative proceeding of a custodian, receiver, trustee, assignee, sequestrator (or similar official), liquidator, or examiner for such Person or any portion of the Property; (e) the filing of a petition against a Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Code or any other applicable law; (f) under the provisions of any other law for the relief or aid of debtors, an action taken by any court of competent jurisdiction that allows such court to assume custody or Control of a Person or of the whole or any substantial part of its property or assets or (g) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy" as now or hereafter in effect, or any successor thereto or any other present or future bankruptcy or insolvency statute.

"**Bankruptcy Proceeding**" has the meaning set forth in <u>Section 3.5</u> hereof.

"**Books**" means all of Borrower's now owned or hereafter acquired books and records (including (i) all of their Records indicating, summarizing, or evidencing their assets (including Borrower Collateral) or liabilities, (ii) all of Borrower's Records relating to their business operations or financial condition, and (iii) all of their goods or General Intangibles related to such information).

"**Borrower Collateral**" means all of Borrower's now owned or hereafter acquired right, title, and interest in and to all property, including, but not limited to the Property and each of the following:

(a)    all of its Accounts;

(b)    all of its Books;

(c)    all of its commercial tort claims;

2

(d)     all of its Deposit Accounts;

(e)     all of its Equipment;

(f)     all of its General Intangibles;

(g)     all of its Inventory;

(h)     all of its Investment Property (including all of its securities and Securities Accounts);

(i)     all of its Negotiable Collateral;

(j)     all of its Supporting Obligations;

(k)     money or other assets of Borrower that now or hereafter come into the possession, custody, or control of Lender;

(l)     all of its media rights, memorabilia, collectibles, art, furnishings, furniture and any other valuables of Borrower, whether or not located at, or relating to, the Property; and

(m)     the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all Accounts, Books, Deposit Accounts, Equipment, General Intangibles, Inventory, Investment Property, Negotiable Collateral, Project Approvals, Property, Real Property, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof.

"**Borrower's Counsel**" shall mean Baratta, Baratta & Aidala LLP, or such other counsel as shall be retained by Borrower.

"**Business Day**" shall mean any day not a Saturday, Sunday or legal holiday, on which commercial banks in New York, New York are authorized or required by law to close.

"**Calculation Date**" shall mean the last day of each calendar quarter during the term of the Loan.

"**Capital Lease**" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"**Cash Equivalents**" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof having at the date of acquisition thereof combined capital and surplus of not less than

3

$250,000,000, (e) demand Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the amount maintained with any such other bank is less than or equal to $250,000 and is insured by the Federal Deposit Insurance Corporation, and (f) Investments in money market funds substantially all of whose assets are invested in one or more of the types of assets described in clauses (a) through (e) above.

"**Cash Management Account**" shall have the meaning set forth in <u>Section 2.17(b)</u> hereof.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, by and among Borrower, Lender and Cash Management Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Management Bank**" shall mean shall mean KeyBank National Association, a national banking association, or another a financial institution reasonably acceptable to Lender.

"**Cash Management Period**" shall mean the period commencing upon the giving by Lender to Borrower of a notice (the "**Trigger Notice**") stating that a Cash Trap Event has occurred.

"**Cash Management Period Termination Event**" shall occur upon the giving by Lender to the Cash Management Bank of a notice stating that a cure of the Cash Trap Event has occurred.

"**Cash Trap Event**" shall mean an Event of Default.

"**Cash Trap Period**" shall mean the period of time commencing upon the occurrence of a Cash Trap Event and ending upon the Cash Management Period Termination Event.

"**Closing Date**" shall mean as such term is defined in the Preamble.

"**Code**" means the laws of the State of New York, as in effect from time to time; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Lender's Lien on any Borrower Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, as applicable, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

"**Collateral Access Agreement**" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in any Borrower Collateral, in each case, in form and substance satisfactory to Lender.

"**Collections**" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"**Commercial Tort Claim Assignment**" has the meaning set forth in <u>Section 7.4</u>.

"**Control**" shall mean with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. "**Controlled by**", "**Controlling**" and "**under common Control with**" shall have the respective correlative meaning thereto.

"**Debt Service**" shall mean, with respect to any particular period, the scheduled principal, if any, and interest payments due under the Note.

"**Debt Service Coverage Ratio**" shall mean, as of any date of determination, a ratio reasonably calculated by Lender in accordance with customary practices, in which: (a) the numerator is the Net Operating Income, and (b) the denominator is the annual Debt Service.   Each determination by Lender of the Debt Service Coverage Ratio shall be conclusive and binding for all purposes, absent manifest error.

"**Default**" means an event, condition or failure the occurrence or existence of which, with notice or lapse of time, or both, would, unless cured or waived, become an Event of Default.

"**Default Rate**" shall mean the lesser of (i) sixteen percent (16%) per annum or (ii) the highest rate of interest permitted under the laws of the state of New York.

"**Deposit Account**" means any deposit account (as that term is defined in the Code) and shall include, without limitation, any operating accounts, including those related to operation of the Property.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is an account or accounts maintained with a federal or state-chartered depository institution or trust company which (a) complies with the definition of Eligible Institution, (b) has a combined capital and surplus of at least $50,000,000.00 and (c) has corporate trust powers and is acting in its fiduciary capacity.  An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean (a) a depository institution or trust company insured by the Federal Deposit Insurance Corporation (i) the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" by S&P, "P-1" by Moody's and "F1" by Fitch (and the long term unsecured debt obligations of such depository institution are rated at least "A" by Fitch) (in the case of accounts in which funds are held for thirty (30) days or less) and (ii) the long term unsecured debt obligations of which are rated at least (i) "A" by S&P, (ii) "A" by Fitch (and the short term deposits or short term unsecured debt obligations or commercial paper of such depository institution are rated no less than "F1" by Fitch) and (iii) "A2" by Moody's (in the case of accounts in which funds are held for more than thirty (30) days); provided, however, for purposes of the Cash Management Bank, the definition of Eligible Institution shall have the meaning set forth in the Cash Management Agreement or (b) such other depository institution otherwise approved by the Rating Agencies from time-to-time.

"**Enforcement Costs**" shall mean the actual and reasonable costs incurred in the enforcement of any of Lender's rights and remedies under any of the Loan Agreement including, without limitation, attorneys' fees and costs, whether or not in-house or external counsel and whether or not suit be brought and on appeal and in bankruptcy, employees costs and experts or consultants.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement dated as of the date hereof, in favor of Lender, from Borrower and each Guarantor whereby Borrower and each Guarantor jointly and severally indemnify Lender with regard to Hazardous Substances and other environmental matters.

"**Environmental Laws**" has the meaning set forth in <u>Section 3.11</u> hereof.

5

"**Environmental Report**" shall mean an environmental report prepared at Borrower's expense by a qualified environmental consultant approved by Lender, dated not more than three months prior to the Loan Opening Date and addressed to Lender (or subject to separate letter agreement permitting Lender to rely on such environmental report).

"**Equipment**" means equipment (as that term is defined in the Code) and includes machinery, machine tools, motors, furniture, furnishings, fixtures, vehicles (including motor vehicles), computer hardware, tools, parts, and goods (other than consumer goods, farm products, or Inventory), wherever located, including all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder from time to time.

"**Event of Default**" has the meaning set forth in <u>Section 8.1</u> hereof.

"**Excused Delay**" shall mean a delay caused by an Act of God,  state of emergency or public health emergency declared by federal, state or local governmental authorities, pandemic (specifically including the COVID-19 pandemic), epidemic, endemic or outbreak, government mandated shutdown, quarantine or travel ban, war, acts of terrorism, order of government or civil or military authorities, impossibility or frustration of purpose.

"**Executive Order**" means Executive Order No. 13,224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism.

"**Existing Mortgage**" has the meaning set forth in the defined term "Security Instrument".

"**Existing Note**" has the meaning set forth in the defined term "Note".

"**Extended Maturity Date**" has the meaning set forth in <u>Section 2.3</u>.

"**Extension Option**" has the meaning set forth in <u>Section 2.3</u>.

"**Extension Term**" shall mean the period of time commencing on the day after the Initial Maturity Date and ending on the Extended Maturity Date.

"**Final Prepayment Date**" shall mean April 1, 2023.

"**GAAP**" shall mean generally accepted accounting principles.

"**Gap Note**" has the meaning set forth in the defined term "Note".

 "**General Intangibles**" means general intangibles (as that term is defined in the Code), including payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, choses or things in action, goodwill, patents, trade names, trade secrets, trademarks, servicemarks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, infringement claims, computer programs, information contained on computer disks or tapes, software, literature, reports, catalogs, insurance premium rebates, tax refunds, and tax refund claims, and any other personal property other than Accounts, commercial tort claims, Deposit Accounts, goods, Investment Property, and Negotiable Collateral.

"**Governmental Authority**" shall mean any federal, state, county or municipal government, or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality, or public body, or any court, administrative tribunal, or public utility, now or hereafter in existence.

"**Hazardous Substances**" shall have the meaning set forth in <u>Section 3.11</u> hereof.

"**Indebtedness**" means (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, interest rate swaps, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of a Person or its Subsidiaries, irrespective of whether such obligation or liability is assumed, (e) all obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all obligations owing under Hedge Agreements, and (g) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of the preceding clauses above.

"**Including**" or "**including**" shall mean including but not limited to.

"**Initial Maturity Date**" shall mean July 1, 2023.

"**Initial Term**" shall mean the period beginning on the date hereof through and including the Initial Maturity Date.

"**Interest Rate**" shall mean nine and a quarter percent (9.25%) per annum, in all cases, to be computed on the basis of the actual days elapsed on the assumption that each month contains thirty (30) days and each year contains three hundred sixty (360) days; <u>provided</u>, <u>however</u>, from the date hereof until June 30, 2021, the calculation shall be computed assuming a three hundred sixty (360) day year, multiplied by the actual number of days elapsed.

"**Internal Revenue Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Inventory**" means inventory (as that term is defined in the Code).

"**Investment**" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guaranties, advances, or capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) bona fide Accounts arising in the ordinary course of business consistent with past practice), purchases or other acquisitions of Indebtedness, Stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"**Investment Property**" means investment property (as that term is defined in the Code).

"**Leases**" or "**Lease**" shall mean any and all leases, subleases, licenses or other agreements, now or hereafter approved by Lender in its sole discretion, relating to the use or occupancy of Borrower Collateral and in effect between Borrower, as lessor or sublessor, and the tenants or subtenants named therein, as the same may be amended or modified with Lender's prior approval.

"**Legal Requirements**" shall mean statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, any member or general partner of Borrower, any Loan Document, all or part of Borrower Collateral, all or part of the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower, at any time in force affecting all or part of the Property.

"**Lender's Counsel**" shall mean Akerman LLP, having an office at 50 N. Laura Street, Suite 3100, Jacksonville, Florida 32202.

"**Lender Expenses**" means all actual and reasonable out-of-pocket (a) costs or expenses (including, without limitation,  taxes, and insurance premiums) required to be paid by Borrower under any of the Loan Documents that are paid, advanced, or incurred by Lender, (b) fees or charges paid or incurred by Lender in connection with Lender's transactions with Borrower and Lender's administration of the Loan Documents, including, without limitation, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including, without limitation, tax lien, litigation, and UCC searches and including, without limitation,  searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, or publication, visits to and evaluations of the Property, (c) fees and charges paid or incurred by Lender in connection with appraisals and collateral valuations (including, without limitation, Lender-prepared appraisal and valuations, third party appraisals and valuations, initial and subsequent periodic collateral appraisals or valuations or business valuations to the extent of the fees and charges therefor (and up to the amount of any limitation contained in this Agreement)), real estate surveys, real estate title policies and endorsements, and environmental audits, (d) costs and expenses incurred by Lender in the disbursement of funds to Borrower (by wire transfer or otherwise), (e) charges paid or incurred by Lender resulting from the dishonor of checks, (f) costs and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell Borrower Collateral, or any portion thereof, irrespective of whether a sale is consummated, (g) audit fees and expenses of Lender related to audit examinations of the Books and Borrower Collateral (including the Property) to the extent of the fees and charges (and up to the amount of any limitation) contained in this Agreement, (h) costs and expenses of third-party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Lender's relationship with Borrower or any Guarantor (including, without limitation, Lender's employees, attorneys (both internal and external), loan servicers, accountants, consultants, and other advisors' fees and expenses), (i) Lender's third-party out-of-pocket costs and expenses (including, without limitation, Lender's employees, attorneys (both internal and external), loan servicers, accountants, consultants, and other advisors' fees and expenses) incurred in advising, structuring, drafting, reviewing, administering, or amending the Loan Documents, (j) Lender's costs and expenses (including, without limitation, employees, attorneys, loan servicers, accountants, consultants, and other advisors' fees and expenses) incurred in terminating, enforcing (including, without limitation,  employees, attorneys, accountants, consultants, loan servicers and other advisors' fees and expenses incurred in connection with a "workout," a "restructuring," or a Bankruptcy Proceeding concerning Borrower or any Guarantor or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any remedial action concerning Borrower Collateral; and (k) Lender's out of pocket costs and expenses (including, without limitation, Lender's employees, attorneys (both internal and external), loan servicers, accountants, consultants, and other advisors' fees and expenses) incurred in connection with Lender's administration of the Loan, including, without limitation, inspections and

travel costs incurred in connection with visits to Borrower Collateral. For purposes of this paragraph, the term Lender shall include, without limitation Lender's affiliates, subsidiaries, successors, assigns, participants and related parties.

"**Lender's Liens**" means the Liens granted by Borrower to Lender under this Agreement or the other Loan Documents.

"**Lien**" means any interest in an asset securing an obligation owed to, or a claim by, any Person other than the owner of the asset, irrespective of whether (a) such interest is based on the common law, statute, or contract, (b) such interest is recorded or perfected, and (c) such interest is contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances. Without limiting the generality of the foregoing, the term "Lien" includes the lien or security interest arising from a mortgage, deed of trust, deed to secure debt, encumbrance, pledge, hypothecation, assignment, deposit arrangement, security agreement, conditional sale or trust receipt, or from a lease, consignment, or bailment for security purposes and also includes reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Real Property and the Pledged Securities.

"**Loan**" shall mean the Term Loan.

"**Loan Amount**" shall mean the maximum amount of the Loan as reduced by principal payments made from time to time.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases and Rents, the Environmental Indemnity, the Assignment of Contracts, the Assignment of Management Agreement (when applicable), the Cash Management Agreement, and all other documents, certificates and instruments executed in connection therewith and delivered to Lender in connection with the Loan and any prior loan documents assigned to Lender in connection with this Loan, as all of the forgoing shall be consolidated, extended, amended or restated from time to time.

"**Loan Opening Date**" shall mean the date of the first disbursement of proceeds of the Loan.

"**Loan Party**" shall mean Borrower.

"**Management Agreement**" shall mean a property management agreement (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time), if applicable, pursuant to which Borrower employs a property manager to rent, lease, operate or manage the Property.

"**Material Action**" shall mean, with respect to Borrower, to consolidate, divide or merge Borrower with or into any Person, or sell all or substantially all of the assets of Borrower (unless such sale results in the repayment, in full, of the Loan), or to institute a Bankruptcy Action or take action in furtherance of any such action, or, to the fullest extent permitted by law, to dissolve or liquidate Borrower.

"**Material Adverse Effect**" shall mean an event, fact, omission, or set of circumstances which would have a material adverse effect on the business, operations, property, condition (financial or otherwise) or prospects of Borrower, in each instance taken as a whole that would materially and adversely affect (i) the ability of Borrower or the Guarantor to perform their respective obligations

under this Agreement or the other Loan Documents; (ii) the validity or enforceability of the rights or remedies of Lender hereunder or under the Loan Documents; (iii) the value of Borrower Collateral; or (iv) Lender's ability to enforce or collect upon Borrower Collateral.

"**Maturity Date**" shall mean the Initial Maturity Date, provided, if Borrower timely satisfies the conditions to extend the term of the Loan pursuant to Section 2.3(b), then the Maturity Date shall be extended to the then applicable Extended Maturity Date.

"**Maximum Lawful Rate**" shall mean as such term in defined in Section 2.4(b).

"**Negotiable Collateral**" means letters of credit, letter of credit rights, instruments, promissory notes, drafts, documents, and chattel paper (including electronic chattel paper and tangible chattel paper).

"**Net Operating Income**" shall mean, for any period, the excess, if any, of Operating Income for such period over Operating Expenses for such period.

"**Note**" shall mean a consolidated, extended, amended and restated promissory note, in the Loan Amount, executed by Borrower and payable to the order of Lender, evidencing the Loan, and which shall consolidate and restate, *inter alia*, that certain [Replacement] Consolidated, Extended, Amended and Restated Mortgage Note executed by Borrower in favor of Titan in the original principal amount of $9,000,000 (the "**Existing Note**") and that certain Gap Promissory Note dated as of the date hereof executed by Borrower in favor of Lender in the original principal amount of $4,000,000 (the "**Gap Note**").

"**Obligations**" means (a) all loans including, without limitation, the Loan, debts, principal, interest, premiums, liabilities, obligations (including indemnification obligations), fees, the Prepayment Fee, charges, costs, Lender Expenses (including any fees or expenses that, but for the commencement of an Insolvency Proceeding, would have accrued), lease payments, guaranties, covenants, and duties of any kind and description owing by Borrower to Lender pursuant to or evidenced by the Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all Lender Expenses that Borrower is required to pay or reimburse by the Loan Documents, by law, or otherwise. Any reference in this Agreement or in the Loan Documents to the Obligations shall include all extensions, modifications, renewals, supplements, restatements or alterations thereof.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**Open Prepayment Date**" shall mean July 1, 2022.

"**Open the Loan**", "**Opening of the Loan**", or "**Loan Opening**" shall mean the first disbursement of Loan proceeds.

"**Operating Expenses**" shall mean for any applicable period, the actual costs and expenses of owning, operating, managing and maintaining the Property during such period incurred by Borrower, determined based on operating expenses and costs as provided in the most recent, Lender-approved Annual Budget.

"**Operating Income**" means, for any period, the gross income from operations of the Property derived from memberships, arm's length leases with unaffiliated third parties, service fees or charges, food and beverage sales, event income and any other income of charges (excluding (a) any income from prepaid membership fees in excess of thirty (30) days and (b) capital gains income derived from the sale of assets and other items of income which Lender reasonably determines are unlikely to occur in any subsequent period) as reasonably determined by Lender.

"**Organizational Documents**" shall mean, as to any Person, the organizational or governing documents of such Person, including the certificate of incorporation and by-laws with respect to a corporation; the certificate of formation or organization and operating agreement with respect to a limited liability company; and the certificate of limited partnership and partnership agreement with respect to a limited partnership.

"**Origination Fee**" means an amount equal to ONE HUNDRED THIRTY THOUSAND and No/100 Dollars ($130,000.00), which amount shall represent an origination fee due to Lender with respect to the Loan.

"**Payment Date**" shall have the meaning set forth in Section 2.4 hereof.

"**Permitted Dispositions**" means (a) sales or other dispositions of Equipment that is substantially worn, damaged, or obsolete in the ordinary course of business, (b) sales of Inventory to buyers in the ordinary course of business, (c) the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents, and (d) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business.

"**Permitted Exceptions**" shall mean those matters listed on Schedule B to the Title Policy to which title to the Property may be subject at the Loan Opening and thereafter such other title exceptions as Lender may reasonably approve in writing.

"**Permitted Liens**" means (a) Liens held by Lender, (b) Liens for unpaid taxes that either (i) are not yet delinquent, or (ii) do not constitute an Event of Default hereunder and are the subject of Permitted Protests, (c) Liens set forth on Schedule 3.13, (d) the interests of lessors under operating leases, (e) Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests, (f) Liens on amounts deposited in connection with obtaining worker's compensation or other unemployment insurance, (g) Liens on amounts deposited in connection with the making or entering into of bids, tenders, or leases in the ordinary course of business and not in connection with the borrowing of money, (h) Liens on amounts deposited as security for surety or appeal bonds in connection with obtaining such bonds in the ordinary course of business, (i) Liens resulting from any judgment or award that is not an Event of Default hereunder, and (j) with respect to any Real Property, easements, rights of way, and zoning restrictions that do not materially interfere with or impair the use or operation thereof as determined by Lender.

"**Permitted Protest**" shall mean the right of Borrower to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on the Books in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by Borrower, as applicable, in good faith, and

(c) Lender is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"**Person**" shall mean any natural person, limited liability company, corporation (including, without limitation, Borrower), business trust, joint venture, association, company, partnership or government, or any agency or political subdivision thereof.

"**Prescribed Laws**" means, collectively, (i) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA Patriot Act of 2001); (ii) Executive Order No. 13,224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order"); (iii) the Trading with the Enemy Act and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V); (iv) the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et seq.; and (v) all other Legal Requirements addressing or in any way relating to acts of war, drug trafficking, anti-money laundering, terrorism, or similar activities that threaten the security of the United States of America.

"**Prepayment Fee**" shall be an amount equal to $130,000.00.

"**Proceeding**" has the meaning set forth in Section 10.7.

"**Prohibited Person**" means any Person (i) listed in the Annex to, or otherwise subject to the provisions of, the Executive Order, (ii) that is owned or controlled by, or acting for or on behalf of, any Person that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order, (iii) with whom Borrowers are prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order, (iv) who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order, (v) that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website, http:// www.ustreas.gov/offices/enforcement/ofac or at any replacement website or other replacement official publication of such list, (vi) who is an Affiliate of or affiliated with a Person listed in subsections (i) through (v) above, (vii) that is Controlled by a Person who does not have experience in the ownership, management and operation of real property similar to the Secured Property, or (viii) that has caused a single purpose entity under its Control to be adjudicated bankrupt or insolvent, or to file any petition for bankruptcy, reorganization or arrangement pursuant to the Bankruptcy Code, or to have such a petition filed by or against it.

"**Project Approvals**" shall mean all approvals, consents, waivers, orders, agreements, acknowledgments, authorizations, permits and licenses required under applicable Legal Requirements or under the terms of any restriction, covenant or easement affecting or otherwise necessary for the ownership of the Property, and the use, occupancy and operation of the Property, whether obtained from a Governmental Authority or any other Person.

"**Property**" shall mean the collective reference to (i) the fee simple interest in the land legally described on **Exhibit A** attached hereto, together with all buildings, structures and improvements located or to be located thereon, (ii) all rights, privileges, easements and hereditaments relating or appertaining thereto, and (iii) all personal property, fixtures and equipment required or beneficial for the operation thereof.

"**Property Manager**" shall mean, as applicable, (a) the third-party person or party entering into the Management Agreement as the manager of the Property, or (b) if managed by the Borrower

or an Affiliate of Borrower, the person or party managing the daily affairs of the Property in a manner as is customary of a third-party property manager in accordance with an arm's length property management agreement.

"**Real Property**" shall mean any estates or interests in real property now owned or hereafter acquired by Borrower and the improvements thereto, including the Property.

"**Record**" shall mean information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

"**Rents**" shall have the meaning set forth in Section 1.1 of the Security Instrument.

"**Required Permits**" shall mean each building permit, environmental permit, utility permit, land use permit, wetland permit and any other permits, approvals or licenses issued by any Governmental Authority which are required in connection with the operation of the Property.

"**Restricted Payments**" means (a) any dividend or other distribution, in cash or other property, direct or indirect, on account of any class of membership interests or other ownership interests in Borrower, now or hereafter outstanding, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any class of membership interests or other ownership interests in Borrower, now or hereafter outstanding, (c) any payment made to retire, or obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of membership interests or other ownership interests in Borrower, now or hereafter outstanding, (d) any payment or prepayment of principal, or redemption, purchase, retirement, defeasance, sinking fund or similar payment with respect to, any Indebtedness owing to a member or general partner in Borrower or an Affiliate of a member or general partner in Borrower, to the extent such payment or repayment does not trigger a default under any of the Loan Documents, or (e) any payment to a member or a general partner in Borrower or an Affiliate of Borrower or any member or general partner in Borrower not expressly authorized herein.

"**Securities Account**" means a securities account (as that term is defined in the Code).

"**Security Deposits**" shall mean any and all monies representing security deposits under the Leases received by Borrower, in accordance with the terms of the respective Lease and Applicable Law.

"**Security Instrument**" shall mean that certain Consolidated, Extended, Amended and Restated Mortgage, Assignment of Rents, Security Agreement and Financing Statement, dated as of the date hereof executed by Borrower in favor of Lender and which Security Instrument shall be recorded in the land records of the city and/or county of the Property, and securing this Agreement, the Note, and all obligations of Borrower in connection with the Loan, granting a first priority lien on Borrower's fee interest in the Property, subject only to the Permitted Exceptions, and such Security Instrument shall consolidate and restate, *inter alia*, that certain Consolidation, Modification and Extension of Mortgage, Assignment of Leases and Rents and Security Agreement, dated February 21, 2020 (the "**Existing Mortgage**"), executed by Borrower in favor of Titan and recorded in the NYC Department of Finance, Office of the City Register with Document ID of 2020030301244007 securing the Existing Note, and that certain Gap Mortgage dated of even date herewith executed by Borrower in favor of Lender securing the Gap Note (the "**Gap Mortgage**").

"**Servicing Fee**" has the meaning set forth in Section 2.10(b).

"**Solvent**" shall mean, with respect to any Person on a particular date, that, at fair valuations, the sum of such Person's assets is greater than all of such Person's debts.

"**Special Servicer**" has the meaning set forth in <u>Section 2.10(c)</u>.

"**Stock**" shall mean all shares, options, warrants, membership interests, units of membership interests, partnership interests, other interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"**Supporting Obligation**" means a letter-of-credit right or secondary obligation that supports the payment or performance of an Account, chattel paper, document, General Intangible, instrument, or Investment Property.

"**Tenant**" shall mean the tenant under a Lease.

"**Term Loan**" shall mean the term loan pursuant to <u>Section 2.1</u> hereof.

"**Titan**" shall mean TITAN CAPITAL ID, LLC.

"**Title Company**" shall mean First American Title Insurance Company, or such other title insurance company licensed in the State of New York, as applicable. as may be approved in writing by Lender.

"**Title Policy**" shall mean an ALTA Mortgagee's Loan Title Insurance Policy committed to be issued at Loan Opening with extended coverage issued by the Title Company insuring the lien of the Security Instrument as a valid first, prior and paramount lien upon the Property and all appurtenant easements, all in form and substance reasonably satisfactory to Lender, and subject to no other exceptions other than the Permitted Exceptions.

"**Toxic Mold**" shall have the meaning set forth in <u>Section 3.11(b)</u> hereof.

"**Transfer**" shall mean any sale, transfer, lease (other than a Lease approved by Lender), conveyance, alienation, pledge, assignment, mortgage, encumbrance hypothecation or other disposition of (a) all or any portion of the Property or any portion of any other security for the Loan, or (b) any interest in Borrower (other than membership interests which are issued and/or renewed on an annual basis in accordance with the Borrower's governing documents as of the Closing Date) or any interest in any entity which directly or indirectly holds an interest in, or directly or indirectly controls, Borrower (other than transfers caused by death or incapacity).

**1.2** Other Definitional Provisions.

All terms defined in this Agreement shall have the same meanings when used in the Note, Security Instrument, any other Loan Documents, or any certificate or other document made or delivered pursuant hereto.   The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement.

**ARTICLE II**
**THE TERM LOAN**

**2.1** Term Loan

(a)      Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, Lender agrees to make a term loan (the "**Term Loan**") to Borrower. The maximum aggregate amount of the Term Loan shall not exceed **THIRTEEN MILLION AND NO/100 Dollars ($13,000,000.00)**.

(b)      Lender agrees, upon Borrower's compliance with and satisfaction of all conditions precedent to the Loan Opening, no Material Adverse Effect has occurred with respect to Borrower or the Property and no Event of Default has occurred and is continuing hereunder, to Open the Loan.

(c)      To the extent that Lender may have acquiesced in noncompliance with any requirements precedent to the Opening of the Loan or precedent to any subsequent disbursement of Loan proceeds, such acquiescence shall not constitute a waiver by Lender, and Lender may at any time after such acquiescence require Borrower to comply with all such requirements. Notwithstanding anything to the contrary, Lender shall afford Borrower any appliable notice and cure period, if any, as provided in this Agreement to comply with any such requirements.

**2.2** The Note

The Term Loan shall be evidenced by the Note, duly executed and delivered on behalf of Borrower. Upon Lender's furnishing to Borrower an affidavit to such effect, Borrower shall, if the Note is mutilated, destroyed, lost or stolen, deliver to Lender, in substitution therefor, a new note containing the same terms and conditions as the Note, but clearly stating that it is such a replacement note and stating the conditions that required the issuance of the replacement note.

**2.3** Maturity Date

(a)      All principal, interest and other sums due under the Loan Documents shall be due and payable in full on the Maturity Date.  All references herein to the Maturity Date shall mean Initial Maturity Date, provided that, subject to clause (b) below, Borrower shall have the right to request the Initial Maturity Date be extended for one, additional twelve (12) month term (the "**Extension Option**"), thereby extending the Maturity Date to the twelve-month anniversary of the Initial Maturity Date (the "**Extended Maturity Date**").

(b)      Borrower may obtain the Extension Option upon satisfying the following conditions:

(i)      Borrower shall have delivered to Lender written notice of such request no earlier than one hundred twenty (120) days and no later than forty-five (45) days prior to the Initial Maturity Date;

(ii)      Borrower shall have submitted the balance sheet and income expense statement for the fiscal quarter most recently ended with respect to Borrower and the Property in such detail as Lender may reasonably require if they have not previously been delivered to Lender;

(iii)      No Event of Default exists nor had an Event of Default occurred during the Initial Term and is continuing;

(iv)      [RESERVED];

(v)     Borrower and Lender have executed an acknowledgement of the extension which includes a reaffirmation of its obligations in form reasonably required by Lender;

(vi)    Borrower has provided Lender with such additional documentation as Lender may reasonably request, including, without limitation, evidence of the priority of the lien of the Security Instrument;

(vii)   Borrower has represented to Lender in writing the accuracy of all submissions supporting the extension request, that Borrower is not in material default under any Loan Document, that the representations made by Borrower in the Loan Documents are materially true on the date of the extension and that there have been no material adverse changes to the financial condition of Borrower that would have a Material Adverse Effect;

(viii)  Borrower shall have paid to Lender an extension fee in an amount equal to one-half of one percent (0.50%) of the outstanding Loan Amount;

(ix)    Borrower shall have paid any reasonable Lender's Expenses incurred in connection with the Extension Option;

(x)     The Property shall have achieved a Debt Service Coverage Ratio of at least 2:00:1.00, as reasonably determined by Lender, for the two consecutive Calculation Dates immediately preceding the Initial Maturity Date. In the event Borrower has not achieved the Debt Service Coverage Ratio, then Borrower shall have the option to pay down a portion of the Loan Amount to meet such Debt Service Coverage Ratio prior to the Initial Maturity Date;

(xi)    The Property shall have a maximum as-is loan to value of sixty-five percent (65%) (based on a MAI/FIRREA appraisal of the Property reasonably satisfactory to Lender) and dated no earlier than ninety (90) days prior to the Initial Maturity Date) based on the then outstanding Loan Amount; and

(xii)   Lender confirmation that all applicable reserves hereunder are in balance.

**2.4** Interest Payments on the Term Loan

(a)     Commencing on August 1, 2021, until and including the Maturity Date, on the first day of each month (each a "**Payment Date**"), Borrower shall pay interest in arrears on the principal balance of the Loan from time to time outstanding at a per annum rate equal to the Interest Rate (or the Default Rate at any time at which an Event of Default shall exist). The outstanding principal balance plus all accrued and unpaid interest shall be due and payable on the Maturity Date. All payments (whether of principal or of interest) shall be deemed credited to Borrower's account only if received by 2:00 p.m. New York time on a Business Day; otherwise, such payment shall be deemed received on the next Business Day. Except as otherwise expressly provided herein, whenever a payment to be made hereunder shall fall due and payable on any day other than a Business Day, such payment may be made on the next succeeding Business Day.

(b)     It is the intent of Borrower and Lender to conform to and contract in strict compliance with applicable usury law from time to time in effect. In no way, nor in any event or

16

contingency (including but not limited to prepayment, default, demand for payment, or acceleration of the maturity of any obligation), shall the rate of interest taken, reserved, contracted for, charged or received under this Agreement and the other Loan Documents exceed the highest lawful interest rate permitted under applicable law (the "**Maximum Lawful Rate**").   If Lender shall ever receive anything of value which is characterized as interest under applicable law and which would apart from this provision be in excess of the Maximum Lawful Rate, an amount equal to the amount which would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the Loan in the inverse order of its maturity and not to the payment of interest, or refunded to Borrower or the other payor thereof if and to the extent such amount which would have been excessive exceeds such unpaid principal.   All interest paid or agreed to be paid to the holder hereof shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term (including any renewal or extension) of the Loan so that the amount of interest on account of such obligation does not exceed the Maximum Lawful Rate.   As used in this Section, the term "applicable law" shall mean the laws of the State of New York or the federal laws of the United States, whichever laws allow the greater interest, as such laws now exist or may be changed or amended or come into effect in the future**.**

**2.5**  Prepayment of the Term Loan

Prior to the Open Prepayment Date, Borrower may not prepay the Term Loan in whole or in part.   On or after the Open Prepayment Date on any Payment Date, Borrower may prepay the Term Loan in whole but not in part together with accrued and unpaid interest thereon, and all other documents due and payable under the Note, this Loan Agreement, and the other Loan Documents, at any time and including upon acceleration in the case of an Event of Default, upon not less than (a) twenty (20) days or (b) five (5) Business Days, in the case of an Event of Default, prior written notice to Lender.   If any such prepayment is made after the Open Prepayment Date but prior to the Final Prepayment Date, Borrower shall also owe and pay Lender the Prepayment Fee at the same time as such prepayment. On or after the Final Prepayment Date on a Payment Date upon not less than (a) twenty (20) days or (b) five (5) Business Days, in the case of an Event of Default, prior written notice to Lender, Borrower may prepay the outstanding principal balance of the Term Loan in whole or in part together with accrued and unpaid interest thereon, and all other amounts due and payable under the Note, this Loan Agreement, and the other Loan Documents without penalty. Lender's acceptance of any prepayment under this Section 2.5 shall not waive any of Lender's rights and remedies under the Loan Documents arising pursuant to an Event of Default.

**2.6**  Late Charge

If any sum payable under the Note or hereunder (other than principal) is not paid within ten (10) days of the date on which it is due, Borrower shall pay, upon demand, an amount equal to five percent (5%) of such unpaid sum as a late payment charge, which payment shall be in addition to all of Lender's other rights and remedies under the Loan Documents. Nothing in this Section shall be deemed a cure period for the purpose of determining the occurrence of an Event of Default.

**2.7**  Funds; Manner of Payment.

Each payment of principal and interest on the Note shall be made in immediately available federal funds without notice, set-off or counterclaim to Lender. Whenever any payment to be made hereunder or under the Note shall be stated to be due, or whenever any Payment Date would otherwise occur on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case not be included in the computation of payment of interest.

**2.8** Default Rate

If an Event of Default exists (including Borrower's failure to pay the outstanding Obligations in full on the Maturity Date) and Lender has notified Borrower of such Event of Default and after the expiration of any applicable grace or cure periods, in addition to the late payment charge set forth at Section 2.6 hereof, Borrower shall pay to Lender, interest at the Default Rate on the entire unpaid principal sum and any other amounts due at such time under this Agreement and the other Loan Documents. The Default Rate will be computed from the date the Event of Default occurs until the earlier of the date the Event of Default is cured or the actual receipt and collection of the Obligations. This charge will be added to the Obligations and will be deemed secured by this Agreement and the other Loan Documents.

**2.9** Use of the Term Loan Proceeds

The proceeds of the Term Loan shall be used by Borrower to refinance the existing loans secured by the Property, to provide funds for certain debt service costs and operating carry and to pay for associated closing costs and the balance if any shall be distributed to Borrower and disbursed as Borrower deems fit.

**2.10** Fees

(a)    Origination Fee.  On or prior to the Closing Date, Lender shall have received the Origination Fee from Borrower.

(b)    Servicing Fee.  Borrower shall also pay Lender along with accrued and payable interest then due a servicing fee equal to $920.00 per month (the "**Servicing Fee**").

(c)    Special Servicing Fee. If there is an Event of Default by Borrower under this Agreement and the Loan is transferred to a special workout person ("**Special Servicer**") for workout, including, without limitation, advising, structuring, drafting, reviewing, administering, or amending Loan documents in any form or fashion, the Special Servicer is entitled to collect a one-time fee for their services equal to $130,000.00 at the time the Loan is transferred in addition to the Servicing Fee payable monthly. Said fees will be due and payable in advance monthly on each Payment Date and will be in addition to any other Loan payment requirements contained in the Loan Documents.

**2.11** Initial Funding

Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, including, without limitation, satisfaction of the conditions precedent set forth in Article IV hereof, on the Closing Date, a portion of the Loan Amount equal to $13,000,000.00 (the "**Initial Funding Amount**") shall be disbursed by Lender to Borrower or to the account of Borrower on the Closing Date from the proceeds of the Loan, which amount shall be used for (A) refinancing of the Property and other customary closing costs, and (B) (i) paying Lender Expenses, (ii) paying the Origination Fee, and (iii) paying the interest in advance due on the Initial Funding Amount at a per annum rate equal to the Interest Rate from the Closing Date through the initial Payment Date (the "**Stub Interest**"), and (iv) funding any reserves, holdbacks or impounds as set forth in this Article II as set forth below (collectively, the "**Reserves**").  Borrower hereby authorizes Lender to disburse on the Closing Date such Loan proceeds directly to Lender as are necessary to pay the Lender Expenses, the Origination Fee, and the Stub Interest and to fund the Reserves.

**2.12**     Interest Reserve.

On the Closing Date, Lender shall deposit $2,440,000.00 (the "**Interest Reserve**") in a Lender controlled account (the "**Interest Reserve Account**"), which amounts shall be used to pay interest payments as required by the Note, to the extent the cash-flow from the Property is insufficient to pay such interest payments (such shortfalls, the "**Debt Service Shortfalls**"), and may be further disbursed pursuant to the terms and conditions of this Section 2.12, in Lender's sole and reasonable discretion.  Funds in the Interest Reserve Account shall be periodically disbursed directly by Lender to Lender for the payment of interest which accrues and becomes due under the Note. The funds in such Interest Reserve shall, for purposes of interest calculation, be deemed disbursed to Borrower as of the Closing Date. Lender is hereby authorized to charge the Loan directly for such interest payments when due by reducing the amount in the Interest Reserve.  If Lender disburses funds to Lender directly from the Interest Reserve Account to pay interest, Lender shall provide Borrower with a monthly interest statement within ten (10) days following such interest disbursement.  Depletion of the Interest Reserve shall not release Borrower from any of Borrower's obligations under the Loan Documents including, without limitation, payment of all accrued and due interest.  Lender shall have no obligation to release any portion of the Interest Reserve during any period that an Event of Default exists.

Lender shall release any remaining funds in the Interest Reserve to Borrower upon written demand (the "**Interest Reserve Release Request**") from Borrower once the Property has achieved a Debt Service Coverage Ratio of at least 2:00:1.00, as reasonably determined by Lender, for the two consecutive Calculation Dates immediately preceding the date of the Interest Reserve Release Request.

At the time the Term Loan is paid in full together with any other sums that are due at such time, the balance of the Interest reserve, if any, shall be paid to the Borrower.

**2.13**     Tax and Insurance Impound.

On the Closing Date, Lender shall fund $472,500.00 (the "**Tax and Insurance Impound**") of the Loan proceeds directly into an account held and controlled by Lender or Lender's agent (the "**Tax and Insurance Impound Account**"). Provided no Event of Default has occurred and is continuing, upon receipt of applicable invoices or statements for real property tax or insurance in accordance with Section 2.14 below, Lender shall disburse the applicable portion of the Tax and Insurance Impound from the Tax and Insurance Impound Account to the Tax and Insurance Reserve for payment in accordance with Section 2.14 below.

**2.14**     Tax and Insurance Reserve.

(a)     To the extent not paid directly by a tenant under a Lease, tax and insurance reserves shall be maintained by a monthly deposit by Borrower of one-twelfth (1/12th) of the annual real property taxes and assessments for the Property and one-twelfth (1/12th) of the annual insurance premiums payable for the Property, each as reasonably determined by Lender (the "**Tax and Insurance Reserve**").  Borrower shall provide to Lender, if available a copy of the applicable invoices at least thirty (30) days prior to when due.  If Lender at any time determines that any amounts paid into the Tax and Insurance Reserve are insufficient for the payment in full of such taxes, assessments, levies and/or insurance premiums, Lender shall notify Borrower of the increased amounts required to pay all amounts due, whereupon Borrower shall pay (or cause to be paid) to Lender within thirty (30) days thereafter the additional amount as stated in Lender's notice.

(b)     All sums in the Tax and Insurance Reserve shall be held by Lender in the Tax and Insurance Reserve to pay annual real property taxes and assessments for the Property when necessary so that the maximum tax discount available may be obtained with regard to the Property and to pay insurance premiums for the Property in one installment before the same becomes delinquent. Borrower shall be responsible for ensuring the receipt by Lender, at least thirty (30) days prior to the respective due date for payment thereof, of all bills, invoices and statements for all real property taxes (if available) and assessments and insurance premiums to be paid from the Tax and Insurance Reserve, and Lender shall pay the applicable Governmental Authority or other party entitled thereto directly, to the extent funds are available for such purpose in the Tax and Insurance Reserve. Notwithstanding the foregoing, should bills, invoices and statements for real property tax or insurance not be available and/or provided to Borrower within thirty (30) days of their respective due date, Borrower shall provide said bills, statements or invoices immediately upon receipt.  In making any payment from the Tax and Insurance Reserve, Lender shall be entitled to rely on any bill, statement or estimate procured from any public office or insurance company or agent without any inquiry into the accuracy of such bill, statement or estimate and without any inquiry into the accuracy, validity, enforceability or contestability of any tax, assessment, valuation, sale, forfeiture, tax lien or title or claim thereof.  Neither the Tax and Insurance Impound nor the Tax and Insurance Reserve shall, unless otherwise explicitly required by applicable law, be or be deemed to be escrow or trust funds, but, at Lender's option and in Lender's discretion, may either be held in a separate account or be commingled by Lender with the general funds of Lender or Lender's loan servicer. Interest (if any) on the funds contained in the Tax and Insurance Impound or Tax and Insurance Reserve shall accrue for the benefit of and belong to Lender and shall be paid immediately to Lender. No interest on funds contained in the Tax and Insurance Impound or the Tax and Insurance Reserve shall be paid by Lender to Borrower.  The Tax and Insurance Impound and Tax and Insurance Reserve are solely for the protection of Lender and entails no responsibility on Lender's part beyond the timely payment of taxes, assessments and insurance premiums following receipt of bills, invoices or statements therefor in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received.  Upon assignment of the Loan by Lender in accordance with the terms hereof, any funds in the Tax and Insurance Impound and Tax and Insurance Reserve shall be turned over to the assignee and any responsibility of Lender with respect thereto shall terminate.

(c)     If the total funds in the Tax and Insurance Reserve (after disbursement of the applicable amounts from the Tax and Insurance Impound to the Tax and Insurance Reserve) shall exceed the amount of payments actually applied by Lender for the purposes of the Tax and Insurance Reserve, such portion of the excess (less two months of the projected Tax and Insurance Reserve as reasonably determined by Lender, which shall remain in the Tax and Insurance Reserve as provided hereunder) shall be refunded to Borrower within thirty (30) days of application of such payments.  If, however, the Tax and Insurance Reserve shall not contain sufficient funds to pay the sums required when the same shall become due and payable, Borrower shall, within ten (10) days after receipt of written notice thereof, deposit with Lender the full amount of any such deficiency.  If Borrower shall fail to deposit with Lender the full amount of such deficiency as provided above, such failure shall constitute an Event of Default and, without limiting Lender's other rights and remedies by reason thereof, Lender shall have the option, but not the obligation, to make such deposit and all amounts so deposited by Lender, together with interest thereon at the Default Rate from the date deposited by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the Indebtedness evidenced by the Note.  If there is an Event of Default that has occurred and is continuing, Lender may, but shall not be obligated to, to the extent permitted by law, apply at any time the balance then remaining in the Tax and Insurance Impound and Tax and Insurance Reserve against the Indebtedness secured by the Security Instrument in whatever order Lender shall reasonably determine.  No such application of the Tax and Insurance Impound or Tax and Insurance

Reserve shall be deemed to cure any Event of Default hereunder.  Upon full payment of the Indebtedness secured hereby in accordance with its terms or at such earlier time as Lender may elect, the balance of the Tax and Insurance Impound and Tax and Insurance Reserve then in Lender's possession shall be paid over to Borrower and no other party shall have any right or claim thereto.

**2.15**   RESERVED.

**2.16**   Excess Cash Flow.

Upon the occurrence and during the continuance of a Cash Management Period, all Excess Cash Flow shall be collected by Lender and all such amounts shall be held by Lender as additional security for the Obligations (the account in which such amounts are held shall hereinafter be referred to as the "**Excess Cash Flow Account**").  At Lender's option, the Excess Cash Flow Account shall be maintained as a subaccount of the Cash Management Account or be an account maintained by Servicer either at Servicer or at an Eligible Institution.

**2.17**   Cash Management.

(a)   [RESERVED].

(b)   Upon receipt of the Trigger Notice, Agent shall establish an Eligible Account with Agent (the "**Cash Management Account**") into which Borrower shall deposit, or cause to be deposited, all funds from the operation of the Property, whether collected prior to or after commencement of the applicable Cash Management Period, which Cash Management Account shall be maintained for the remainder of the term of the Loan.

(c)   Borrower represents, warrants and covenants that upon an Event of Default, Borrower shall send a notice, substantially in the form of **Exhibit E**, to each Tenant, if applicable, each member and the Property Manager or booking agent to pay all Rents and all other sums due under any Lease and all event fees and revenues directly into the Cash Management Account.  Upon an Event of Default, until deposited into the Cash Management Account, any Operating Income, forfeited Security Deposits and other revenue of any kind from the Property shall be deemed to be Borrower Collateral and shall be held in trust by it for the benefit, and as the property, of Lender and shall not be commingled with any other funds or Property of Borrower.  Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 2.17(c) without Lender's prior written consent.

(d)   [RESERVED].

(e)   Upon commencement of a Cash Management Period, and on each Business Date thereafter until a Cash Management Period Termination Event has occurred, Borrower shall direct all funds from the operation of the Property, whether collected prior to or after commencement of such Cash Management Period, to the Cash Management Account.  On each Business Day during the Cash Management Period, Cash Management Bank shall apply all funds on deposit in the Cash Management Account in the following amounts and in the following order of priority:

(i)   First, funds, if any, sufficient to pay the monthly installment of the Tax and Insurance Reserve pursuant to the terms and provisions of Section 2.14 hereof, which amounts shall be deposited into the Tax and Insurance Reserve;

(ii)   [RESERVED];

(iii)      [RESERVED];

(iv)      Second, funds sufficient to pay the fees and expenses of the Cash Management Bank then due and payable, which amount shall be paid to the Cash Management Bank;

(v)      Third, funds sufficient to pay the next required monthly payment of interest and/or principal in accordance with the Note, subject to application of any amounts remaining in the Interest Reserve Account, shall be disbursed to Lender;

(vi)      Fourth, funds sufficient to pay any and all Lender Expenses and Servicing Fee as of the date of disbursement, shall be disbursed to Lender;

(vii)      Fifth, funds sufficient to pay any interest accruing at the Default Rate, late payment charges and any other amounts due under the Loan Documents, if any, shall be disbursed to Lender; and

(viii)      Lastly, provided no Event of Default has occurred and is continuing, any funds remaining in the in the Cash Management Account after deposits for items (i) through (vii) above (the "**Excess Cash Flow**"), if any, shall be disbursed directly into the Excess Cash Flow Account until the earlier of (A) repayment of the Loan or (B) end of any applicable Cash Management Period, after which any such amount remaining in the Excess Cash Flow Account shall be returned to Borrower.

**2.18**    [Reserved].

**2.19**    [Reserved].

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

To induce Lender to execute this Agreement and perform its obligations hereunder, Borrower hereby represents and warrants to Lender as follows as of the date hereof:

**3.1** Organization

Each Loan Party (as applicable) has been duly organized, is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and with all rights, licenses, permits, and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which is now engaged. Each Loan Party (as applicable) is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business, and operations.

**3.2** Authorization; No Contravention.

(a)      The execution, delivery and performance of this Agreement, and the other Loan Documents by Borrower and the borrowings by such Borrower hereunder (a) have been duly authorized, (b) will not violate (i) any provision of law or any governmental rule or regulation applicable to such Borrower or, (ii) any order of any court or other agency of government binding on

Borrower or any indenture, agreement or other instrument to which Borrower is a party, or by which Borrower or any of its properties are bound, and (c) will not be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under, any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its properties or assets other than as contemplated by the Loan Documents. Each person executing the Loan Documents on behalf of Borrower has full authority to execute and deliver the same.

(b)     [Reserved].

**3.3** Litigation.

(a)     There are no actions, suits or proceedings pending in which service of process has been directly effectuated or, to the best knowledge of Borrower, threatened against or affecting any Loan Party, at law or in equity or before or by any Governmental Authority or third party payor which are undisclosed and involve any of the transactions contemplated herein and which, if adversely determined against any Loan Party could reasonably be expected to have a Material Adverse Effect.

(b)     No Loan Party is in default with respect to any judgment, writ, injunction, decree, rule or regulation of any court or Governmental Authority which could reasonably be expected to have a Material Adverse Effect.

**3.4** Agreements.

No Loan Party is a party to any agreement or instrument or subject to any judgment, order, writ, injunction, decree or regulation materially and adversely affecting its business, properties or assets, operations, or condition (financial or otherwise). No Loan Party is in default in any manner which could reasonably be expected to have a Material Adverse Effect or materially and adversely affect the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any other agreement or instrument to which it is a party.

**3.5** No Bankruptcy Filing.

No Loan Party is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of its property (a "**Bankruptcy Proceeding**"), and Borrower has no knowledge of any Person contemplating the filing of any such petition against any Loan Party. In addition, no Loan Party has been a party to, or the subject of, a Bankruptcy Proceeding for the past ten years.

**3.6** Fraudulent Transfer.

Each Loan Party is Solvent. No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of any Loan Party.

**3.7** No Plan Assets.

As of the date hereof and throughout the term of the Loan (i) no Loan Party is or will be an "employee benefit plan," as defined in Section 3(3) of ERISA, (ii) none of the assets of any Loan

Party will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101 or Section 4975 of the Internal Revenue Code, (iii) no Loan Party is or will be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with any Loan Party are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans. As of the date hereof, no Loan Party nor any member of a "controlled group of corporations" (within the meaning of Section 414 of the Code) maintains, sponsors or contributes to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA).

**3.8** Federal Reserve Regulations; Investment Company Act.

No part of the proceeds of the Loan will be used for the purpose of purchasing, acquiring, or carrying any "margin stock" within the meaning of Regulation T, U, or X of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation T, U, or X or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (ii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**3.9** Proceeds of the Term Loan.

The proceeds of the Term Loan shall be applied by Borrower for the purposes described in <u>Section 2.9</u>.

**3.10** Purchase Options.

Neither the Property nor any part thereof is subject to any purchase options or other similar rights in favor of third parties.

**3.11** Hazardous Substances.

Except as may be disclosed in any Environmental Report, Title Policy or other inspection report provided to Lender by Borrower, to Borrower's knowledge after reasonable inquiry:

(a) The Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any state super-lien and environmental clean-up statutes (including with respect to Toxic Mold), any local law requiring related permits and licenses and all amendments to and regulations in respect of the foregoing laws (collectively, "**Environmental Laws**").

(b) The Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic and/or dangerous substances, toxic mold or fungus of a type that may pose a risk to human health or the environment or would negatively impact the value of the Property ("**Toxic Mold**") or any other

substances or materials which are included under or regulated by Environmental Laws (collectively, "**Hazardous Substances**").

(c)      No Hazardous Substances are or have been (including the period prior to Borrower's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws.

(d)      No Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property.

(e)      No Toxic Mold is on or about the Property which requires remediation.

(f)      No underground storage tanks exist on the Property and the Property has never been used as a landfill.

(g)      There have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower and within Borrower's possession which have not been provided to Lender.

**3.12**    Governmental Approval; Authorization.

To Borrower's knowledge, no registration with or consent or approval of, or other action by, any Governmental Authority or nongovernmental person or entity, including any creditor, partner, or member of any Loan Party, is required in connection with the execution, delivery and performance of the Loan Documents or the borrowings hereunder other than the recordation of the Security Instrument, Assignment of Leases and the filing of UCC-1 Financing Statements.

**3.13**    Indebtedness.

No Indebtedness of Borrower shall remain outstanding after the Closing Date other than unsecured trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices and not in connection with the borrowing of money and which amounts are for sums not yet delinquent; provided, however, in no event shall any such trade payables outstanding exceed $250,000.00 in the aggregate at any time.

**3.14**    Full Disclosure.

All written information heretofore furnished by any Loan Party to Lender for purposes of or in connection with this Agreement is, and all such information hereafter to be furnished by any Loan Party to Lender will, to the best of each Loan Party's knowledge, be true and accurate in all material respects on the date as of which such information is stated or certified. Each Loan Party has disclosed to Lender in writing any and all facts which, in the reasonable judgment of such Loan Party, has or would be reasonably likely to cause a Material Adverse Effect.

**3.15**    Binding Effect.

This Agreement and each other Loan Document to which any Loan Party is a party constitutes the legal, valid and binding obligations of such Loan Party, enforceable against such Loan Party in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

**3.16** No Defaults.

To Borrower's knowledge, there is no Event of Default under this Agreement or any of the other Loan Documents.

**3.17** Financial Statements.

All financial statements and other information previously furnished by any Loan Party or any Tenant to Lender in connection with the Loan are true, complete and correct in all material respects and fairly present the financial conditions of the subjects thereof as of the respective dates thereof and do not fail to state any material fact necessary to make such statements or information not misleading, and nothing has occurred that would cause a Material Adverse Effect with respect to any Loan Party or any Tenant since the respective dates of such statements and information. Neither any Loan Party nor any Tenant has any material liability, contingent or otherwise, not disclosed in such financial statements.

**3.18** No Brokerage Fees.

No brokerage fees or commissions are payable by or to any person in connection with this Agreement or the Loan to be disbursed hereunder except as will be paid at Loan Opening to Amherst Real Estate Group.

**3.19** Not a Foreign Person.

Borrower is not a "foreign person" within the meaning of Section 1445 or 7701 of the Internal Revenue Code.

**3.20** OFAC.

No Loan Party is (or will be) a person with whom Lender is restricted from doing business under regulations of OFAC (including, those Persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons. In addition, Borrower hereby agrees to provide to Lender with any additional information that Lender deems necessary from time to time in order to ensure compliance with all applicable Laws concerning money laundering and similar activities.

**3.21** Trade Names.

Borrower uses no trade name other than its actual name set forth herein. The principal place of business of Borrower is as stated in <u>Section 10.1</u>.

**3.22** Title.

Borrower has good and marketable fee simple title to the Property, subject only to the Permitted Exceptions.

**3.23**   No Condemnation.

To the best of Borrower's knowledge, no (i) condemnation of any portion of the Property, (ii) condemnation or relocation of any roadways abutting the Property, or (iii) proceeding to deny access to the Property from any point or planned point of access to the Property, has commenced or is contemplated by any Governmental Authority.

**3.24**   Legal Requirements.

To Borrower's knowledge after reasonable inquiry, and other than as set forth in the Title Commitment issued by the Title Company, the use of the Property will not violate (i) any Legal Requirements (including subdivision, zoning, building, environmental protection and wetland protection laws), or (ii) any building permits, restrictions of record, or agreements affecting the Property or any part thereof.  Neither the zoning authorizations, approvals or variances nor any other right to construct or to use the Property is to any extent dependent upon or related to any real estate other than the Property.

**3.25**   Utilities.

The Property has adequate water, gas and electrical supply, storm and sanitary sewerage facilities, other required public utilities, fire and police protection, and means of access between the Property and public highways; none of the foregoing will be foreseeably delayed or impeded by virtue of any requirements under any applicable Legal Requirements.

**3.26**   Separate Tax Parcel.

The Property is taxed separately without regard to any other property and for all purposes the Property may be mortgaged, conveyed and otherwise dealt with as an independent parcel.

**3.27**   Leases.

As of the Closing Date, no portion of the Property is subject to any Leases.  If the Property becomes subject to any Leases, Borrower shall be the owner and lessor of landlord's interest in such Leases.  No Person shall have any possessory interest in the Property or any portion thereof or right to occupy the same, except under and pursuant to the provisions of a Lease.

**3.28**   No Encroachments.

Except as set forth in the Title Commitment issued by the Title Company, no building or other improvement encroaches upon any property line, building line, setback line, side yard line or any recorded or visible easement (or other easement of which Borrower is aware or has reason to believe may exist) which is likely to result in a Material Adverse Change with respect to any Loan Party, any Tenant, or the Property.

**3.29**   Survival of Representations and Warranties.

Borrower agrees that all of the representations and warranties set forth in this Article III and elsewhere in this Agreement are true as of the date hereof, will be true at the Loan Opening and, except for matters which have been disclosed by Borrower and approved by Lender in writing, at all times thereafter.  Each request for a disbursement under the Loan Documents shall constitute a reaffirmation of such representations and warranties, as deemed modified in accordance with the

disclosures made and approved as aforesaid, as of the date of such request.  It shall be a condition precedent to the Loan Opening and each subsequent disbursement that each of said representations and warranties is true and correct as of the date of such requested disbursement.  Each disbursement of Loan proceeds shall be deemed to be a reaffirmation by Borrower that each of the representations and warranties is true and correct as of the date of such disbursement.  In addition, at Lender's request, Borrower shall reaffirm such representations and warranties in writing prior to each disbursement hereunder.

## ARTICLE IV
## CONDITIONS OF THE TERM LOAN

Borrower agrees that Lender's obligation to open the Loan and thereafter to make further disbursements of proceeds thereof is conditioned upon Borrower's delivery, performance and satisfaction of the following conditions precedent in form and substance satisfactory to Lender in its reasonable discretion:

**4.1** Representations and Warranties; No Default.

As of the Closing Date, the representations and warranties set forth in Article III hereof shall be true and correct in all material respects.

**4.2** Organizational Documents.

On or prior to the Closing Date, Lender shall have received a copy of the filing receipt and articles of organization and bylaws of the Loan Party, together with the consent of the members or partners of Borrower to execute this Agreement and the other Loan Documents.

**4.3** Opinion of Counsel.

On or prior to the Closing Date, Lender shall have received legal opinions of Borrower's Counsel or other counsel in form and substance reasonably acceptable to Lender and Lender's Counsel. Such opinion shall cover due authorization, execution and delivery and enforceability of the Loan Documents, recordability and perfection, authority to file bankruptcy, non-dissolution, and also contain such other legal opinions as Lender shall reasonably require.

**4.4** Loan Documents.

Borrower agrees that it will, on or before the Loan Opening Date, execute and deliver or cause to be executed and delivered to Lender the following documents in form and substance acceptable to Lender:

(a)      This Agreement.

(b)      The Note.

(c)      The Security Instrument.

(d)      The Assignment of Leases and Rents.

(e)      **[Removed]**.

28

(f)     The Environmental Indemnity Agreement.

(g)     The Assignment of Management Agreement, if and when applicable.

(h)     **[Removed]**.

(i)     Such other documents, instruments or certificates as Lender and its counsel may reasonably require, including such documents as Lender in its reasonable discretion deems necessary or appropriate to effectuate the terms and conditions of this Agreement and the Loan Documents, and to comply with all Legal Requirements.

**4.5** Title and Other Documents.

Borrower shall have furnished to Lender the Title Policy together with legible copies of all title exception documents cited in the Title Policy and all other legal documents affecting the Property or the use thereof.

**4.6** Survey.

Borrower shall have furnished to Lender an "as-built" ALTA/NSPS Land Title Survey of the Property.  Said survey shall be dated no earlier than ninety (90) days prior to the Loan Opening, shall be made (and certified to have been made) as required by Lender in its sole and absolute discretion.  Such survey shall be sufficient to permit issuance of the Title Policy in the form required by this Agreement.  Such survey shall include the legal description of the Property.

**4.7** [RESERVED].

**4.8** No Litigation.

No litigation or proceedings shall be pending or to the best of Borrower's knowledge threatened which could or might cause a Material Adverse Change with respect to any Loan Party or the Property.

**4.9** Searches.

Borrower shall have furnished to Lender current (a) bankruptcy, federal tax lien and judgment searches and searches of all Uniform Commercial Code financing statements filed in each place UCC Financing Statements are to be filed hereunder, demonstrating the absence of adverse claims and (b) Patriot Act, OFAC and other applicable anti-money laundering regulation searches on the Borrower.

**4.10** Financial Statements.

Borrower shall have furnished to Lender current annual financial statements of Borrower and such other persons or entities connected with the Loan as Lender may request, each in form and substance and certified by such individual as acceptable to Lender.  Borrower shall provide such other additional financial information Lender reasonably requires.

**4.11** Management Agreements.

Borrower shall obtain prior written approval of Lender of any Management Agreement, if any, not to be unreasonably withheld or delayed.  Borrower shall thereafter deliver to Lender

executed copies of any leasing, management and development agreements entered into by Borrower in connection with the operation of the Property, if and when applicable.

**4.12**   Flood Hazard.

Lender shall have received evidence that the Property is not located in an area designated by the Secretary of Housing and Urban Development as a special flood hazard area, or flood hazard insurance (if applicable) acceptable to Lender in its sole discretion.

**4.13**   Organizational Documents.

Borrower shall have furnished to Lender proof satisfactory to Lender of authority, formation, organization and good standing in the state of its incorporation or formation and, if applicable, qualification as a foreign entity in good standing in the state of its incorporation or formation, of all corporate, partnership, trust and limited liability company entities (including each Loan Party) executing any Loan Documents, whether in their own name or on behalf of another entity.  Borrower shall also provide certified resolutions in form and content satisfactory to Lender, authorizing execution, delivery and performance of the Loan Documents, and such other documentation as Lender may reasonably require to evidence the authority of the persons executing the Loan Documents.

**4.14**   No Defaults.

There shall be no uncured Event of Default by Borrower hereunder.

**4.15**   Easements.

Borrower shall have caused the Title Company to  furnish Lender all easements reasonably required for the construction, maintenance or operation of the Property and such easements shall be insured by the Title Policy.

**4.16**   Environmental Report.

Borrower shall have furnished to Lender the Environmental Report. The Environmental Report shall, at a minimum, (A) demonstrate the absence of any existing or potential Hazardous Substances contamination or violations of Environmental Laws at the Property, except as acceptable to Lender in its sole and absolute discretion, (B) include the results of all sampling or monitoring to confirm the extent of existing or potential Hazardous Substances contamination at the Property, including the results of leak detection tests for each underground storage tank located at the Property, if any, (C) describe response actions appropriate to remedy any existing or potential Hazardous Substances contamination, and report the estimated cost of any such appropriate response, (D) confirm that any prior removal of Hazardous Substances or underground storage tanks from the Property was completed in accordance with applicable Legal Requirements, and (E) confirm whether or not the Property is located in a wetlands district.

**4.17**   Additional Documents.

Borrower shall have furnished to Lender such other materials, documents, papers or requirements regarding the Property, any Loan Party or any Tenant, as Lender shall reasonably request.

**4.18**     Zoning.

If the Title Policy does not include a zoning endorsement, Borrower shall have furnished to Lender a legal opinion or zoning letter as to compliance of the Property with zoning and similar Legal Requirements.

**4.19**     Utilities.

Borrower shall have furnished to Lender (by way of utility letters or otherwise) evidence establishing to the satisfaction of Lender that the Property has adequate water supply, storm and sanitary sewerage facilities, telephone, gas, electricity, fire and police protection, means of ingress and egress to and from the Property and public highways and any other required public utilities and that the Property is benefited by insured easements as may be required for any of the foregoing.

**4.20**     Appraisal.

Lender shall have obtained an Appraisal which is satisfactory to Lender in all respects.

**4.21**     RESERVED.

**4.22**     No Material Change.

There has not been a material adverse change in the financial condition of Borrower that would have a Material Adverse Effect.

**4.23**     RESERVED.

**4.24**     Operating Budget.

Borrower shall have furnished to Lender, and Lender shall have approved, Borrower's operating budget for the Property including, without limitation, a timeline of expected new leases for the Property.

**ARTICLE V**
**AFFIRMATIVE COVENANTS**

Borrower covenants and agrees with Lender that, so long as this Agreement shall remain in effect or any of the principal of or interest on the Note shall remain unpaid, it will comply with the following:

**5.1** Books and Records.

Borrower shall maintain adequate books, accounts and records in accordance with good accounting standards and practice. Lender shall have the right, upon reasonable notice, to examine such books and records. Borrower will maintain, or cause to be maintained, with respect to the Property, fire and extended coverage insurance policies. In the event Borrower shall fail to maintain insurance coverage reasonably satisfactory to Lender and required under this Agreement, Lender may obtain such insurance at Borrower's expense and such expense shall be added to the unpaid principal balance of the Loan. Borrower shall also furnish to Lender, promptly following Borrower's receipt thereof (i) copies of all insurance policies (or certificates thereof), including title insurance, affecting the Property and (ii) the original or copy of all recorded documents affecting the Property.

**5.2** Financial Statements; Reports.

As applicable, Borrower shall furnish or cause to be furnished to Lender the following: (i) on or before April 30th of each year for the fiscal year most recently ended, the annual financial statements with respect to Borrower the Property showing Borrower's balance sheet, income and expense statement, statement of cash flow and the annual rent roll, if applicable, other income, and the detailed operating expenses of the Property, prepared and certified by Borrower's chief financial officer in accordance with GAAP or cash based accounting consistently applied; (ii)  within thirty (30) days after the end of each fiscal quarter of Borrower, the unaudited balance sheet, income and expense statement and statement of cash flow, trailing twelve month income statement, mortgage statement, bank reconciliations, general ledger and rent roll, if applicable, for the fiscal quarter most recently ended with respect to Borrower, Guarantor and the Property, as applicable, in such detail as Lender may reasonably require; (iii) within twenty (20) days after the end of each calendar month, a leasing activity report and rent roll, if applicable, for the Property with respect to the previous month in such detail as Lender may reasonably require; (iv) for the calendar year of the Loan Opening Date and all subsequent years, as soon as available and not later than thirty (30) days after the due date, as may be lawfully extended, copies of all federal, state, and local tax returns of: (1) Borrower if Borrower files its own tax returns or (2) the entity in whose tax returns Borrower is included for tax reporting purposes, in either case together with all supporting schedules; (v) [removed], (vi) such other information as to Borrower and the Property as Lender may reasonably require from time to time, all in such form and detail as Lender may require; (vii) on or before the end of each calendar year, an annual budget (the "**Annual Budget**") for the Property in such detail as Lender may reasonably require and as approved in writing by Lender in Lender's commercially reasonable judgment; and (viii) such financial and other information with respect to tenants and prospective tenants of any part of the Property as Lender may reasonably require from time to time as available to Borrower. Borrower shall provide Lender with copies of all material inspections, reports, test results and other information received by any Borrower, which in any way relate to the Property or any part thereof.  Borrower shall provide Lender with copies of all material notices pertaining to the Property received by Borrower from any Tenant, Governmental Authority or insurance company within seven (7) days after such notice is received.  Borrower shall, upon request from Lender, provide consent, to Lender's direct communication with the Property Manager and any leasing agent, if any, on a monthly basis for any status updates or reports related to the Property or shall cause the Property Manager and any leasing agent, if any, to communicate directly with Lender. Except in the case of Borrower providing notice of material notices pertaining to the Property in the immediately preceding sentence, which shall require no notice from Lender, no default under this Section 5.2 shall constitute an Event of Default until Lender provides written notice thereof to Borrower and Borrower shall thereafter fail to cure such default within twenty (20) days of such written notice.  Upon the foregoing default becoming an Event of Default, interest shall accrue at the Default Rate until said Event of Default is cured.

**5.3** Taxes

Subject to Lender's or Special Servicer's timely payment of the funds from the payment of the Tax and Insurance Reserve, Borrower shall cause all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against Borrower or any of its assets to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest. Subject to Permitted Protests, Borrower will make timely payment or deposit of all tax payments and withholding taxes required of it and them by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will,

upon request, furnish Lender with proof satisfactory to Lender indicating that Borrower has made such payments or deposits.

**5.4** Location of Borrower Collateral.

Borrower shall keep Borrower Collateral only at the Property, the locations identified on Schedule 5.4(a), or at Lender, and maintain the chief executive offices of Borrower only at the locations identified on Schedule 5.4(b); provided, however, that Borrower may amend Schedule 5.4(a) and Schedule 5.4(b) so long as such amendment occurs by written notice to Lender not less than 30 days prior to the date on which such Borrower Collateral is moved to such new location or such chief executive office is relocated, so long as, at the time of such written notification, Borrower provides to Lender a Collateral Access Agreement with respect thereto.

**5.5** Compliance with Laws.

Borrower shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**5.6** Property Manager.

Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right to direct Borrower to terminate any Management Agreement, if applicable, and/or any asset management or leasing agreements and replace the Property Manager and/or the asset manager or leasing agent (as applicable) with a new manager and/or asset manager or leasing agent (as applicable) acceptable to Lender in Lender's reasonable  discretion.

**5.7** Post-Closing Obligations.

Borrower shall cause the conditions set forth on Exhibit B attached hereto to be satisfied in full, on or before the date specified for each such condition, time being of the essence, and each to be satisfactory, in form and substance as applicable, to Lender.

**5.8** Project Approvals.

To the extent applicable, Borrower will promptly obtain and keep, or cause to be obtained and kept, in full force and effect all Project Approvals and will furnish Lender with evidence that such Project Approvals have been obtained promptly upon Lender's request. Borrower will give all such notices to, and take all such other actions with respect to, such governmental authorities having jurisdiction of the Property as may be required under applicable laws to complete the Property. Borrower will duly perform and comply with, and cause to be duly performed and complied with, all of the terms and conditions of all Project Approvals obtained at any time.

**5.9** Laborers, Subcontractors, and Materialmen.

Borrower will furnish to Lender, upon reasonable request of Lender at any time, and from time to time, affidavits listing all laborers, subcontractors, materialmen, and any other Persons who might or could claim statutory or common law liens and are furnishing or have furnished labor or material to the Property or any part thereof on behalf of Borrower, together with affidavits, or other evidence satisfactory to Lender, showing that such parties have been paid all amounts then due for

labor and materials furnished to the Property. Following payment in full to each applicable party, Borrower will also use reasonable efforts to furnish to Lender, at any time and from time to time upon demand by Lender, lien waivers bearing a then current date and prepared on a form satisfactory to Lender from the contractors, subcontractors or materialmen as Lender may reasonably require.

**5.10**   Further Assurances.

Borrower will cooperate with, and will do such further acts and execute such further instruments and documents as Lender shall reasonably request, to preserve and protect Borrower Collateral and to carry out to its satisfaction the transactions contemplated by this Agreement and the other Loan Documents.

**5.11**   Loss of Priority.

If this Agreement or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien on or security interest in Borrower Collateral covered hereby or thereby, except as a result of a disposition of the applicable Borrower Collateral in a transaction permitted under this Agreement, then Borrower shall promptly repay all of the Obligations in full.

**5.12**   Appraisals.

Borrower hereby acknowledges and agrees that Lender shall have the right to obtain a new or updated Appraisal of the Property from time to time at Borrower's sole cost and expense; provided, however, that so long as no Event of Default has occurred, Borrower shall not be responsible to pay for more than one (l) Appraisal in any twelve (12) month period.

**5.13**   Sign and Publicity.

Lender reserves the right to publicize the making of the Loan.

**5.14**   Coverage.

Borrower shall furnish to Lender and maintain at all times, at Borrower's sole cost and expense, such policies of insurance in such amounts and in accordance with the standards set forth on **Exhibit D** attached hereto, with standard mortgagee's endorsements naming Lender as additional insured under the commercial general liability policy and umbrella limited liability policy and cause Lender to be named as a loss payee, as its interest may appear, for the remaining required policies, and shall also deliver to Lender such other insurance as Lender, from time to time, may reasonably require upon notice to Borrower in writing provided that such other insurance is (a) reasonable and customary for properties comparable to the Property and/or the construction of the renovations and is available at the commercially reasonable rates, or (b) is reasonably required by Lender by virtue of the renovations or the nature of the construction at the Property. Borrower also agrees to increase the amount of applicable insurance coverages upon the reasonable request of Lender after the construction of any renovations, buildings or other improvements on the Property.  The all-risk/special form property insurance shall provide for the loss proceeds to be payable to Lender or its assigns as mortgagee.  Certifications evidencing the originals of all such policies in form and content acceptable to Lender shall be deposited with Lender.  It is understood and agreed that the approval of any insurer by Lender shall not be deemed or construed to be any representation, warranty or determination by Lender as to the form or legal sufficiency of any insurance contract, or the solvency of any insurance company, or the sufficiency of the amounts carried for the protection of Borrower or

any other person, and Borrower assumes the full risk, responsibility and liability, if any, with respect to such matters. If Borrower fails to secure and maintain insurance as required hereunder, Lender shall have the immediate right (without waiver of any other rights Lender may have upon an Event of Default under this Agreement) to secure same in the name and for the account of Borrower, in which event Borrower shall pay the costs thereof by Lender within ten (10) days of written demand from Lender and with interest thereon at the Default Rate from the date of disbursement by Lender until paid in full, and all such amounts shall be deemed secured by the lien of the security documents; provided, however, Lender has agreed to accept the Borrower's insurance coverage limits and deductibles in place as of the Closing Date, subject to the requirement to bring such coverage into compliance with this Section 5.14 in accordance with Section 5.7 hereof, although such coverage does not comply with the terms hereof.

# ARTICLE VI
# NEGATIVE COVENANTS

Borrower covenants and agrees that, so long as any credit hereunder shall be available and until termination of this Agreement and payment in full of the Obligations, Borrower will not do any of the following:

**6.1** Indebtedness.

Borrower shall not create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except:

(a)     Indebtedness evidenced by this Agreement, the other Loan Documents, and

(b)     Endorsement of instruments or other payment items for deposit; and

(c)     Unsecured trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices and not in connection with the borrowing of money and which amounts are for sums not yet delinquent; provided, however, in no event shall any such trade payables outstanding exceed $250,000.00 in the aggregate at any time.

**6.2** Liens.

Borrower  shall not create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of Borrower Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

**6.3** Restrictions on Fundamental Changes.

(a)     Borrower shall not enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Stock.

(b)     Borrower shall not liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution).

(c)     Borrower shall not convey, pledge, hypothecate, sell, lease, license, assign, transfer, or otherwise dispose of, in one transaction or a series of transactions, all or any substantial part of its assets, other than Permitted Dispositions.

(d)      Borrower shall not convey, pledge, hypothecate, sell, lease, license, assign, transfer, or otherwise dispose of, in one transaction or a series of transactions, direct or indirect interest in the membership interests, partnership interests, shares or other ownership interests of Borrower, in any manner or way, whether voluntarily or involuntarily.

**6.4** Disposal of Assets.

Other than Permitted Dispositions, Borrower shall not convey, sell, lease, license, assign, transfer, or otherwise dispose of any of Borrower's assets without the prior written consent of Lender, to be granted or withheld in Lender's sole discretion.

**6.5** Name Change.

Borrower shall not change its name, federal employer identification number, organizational identification number, state of organization or organizational identity; provided, however, that Borrower may change its name upon at least thirty (30) days' prior written notice to Lender of such change and so long as, at the time of such written notification, Borrower provides any financing statements necessary to perfect and continue perfected Lender's Liens.

**6.6** Nature of Business.

Borrower shall not make any change in the principal nature of its or their business.

**6.7** Prepayments and Amendments.

Except in connection with a Restricted Payment or other payment not prohibited by Section 6.9, Borrower shall not optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of Borrower, other than the Obligations in accordance with this Agreement.

**6.8** Change of Control.

Cause, permit, or suffer, directly or indirectly, any change of Control (other than if caused by death or incapacity) without the prior written consent of Lender.

**6.9** Restricted Payments.

If an Event of Default exists, Borrower shall not make any Restricted Payment.

**6.10**      Accounting Methods.

Borrower shall not modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP) or enter into, modify, or terminate any agreement currently existing, or at any time hereafter entered into with any third party accounting firm or service bureau for the preparation or storage of Borrower's accounting records without said accounting firm or service bureau agreeing to provide Lender information regarding Borrower's financial condition.

**6.11**      Investments.

Borrower shall not directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment.

**6.12**    Transactions with Affiliates.

Borrower shall not sell, lease, assign, transfer, convey, license or otherwise dispose of any of Borrower's property to any Affiliate or (b) directly or indirectly enter into or permit to exist any other transaction with any Affiliate of Borrower except for transactions that (i) are in the ordinary course of Borrower's business, (ii) are upon fair and reasonable terms, (iii) are fully disclosed to Lender, and (iv) are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-Affiliate.   Borrower acknowledges and agrees that (i) any loans made to Borrower from any Affiliate of Borrower (including without limitation partners or members of Borrower); and (ii) any payments (including, without limitation, distributions) to any Affiliate of Borrower (including without limitation partners or members of Borrower) shall be subordinate to the payment in full of the Obligations and the performance of Borrower's obligations under the Loan Documents.

**6.13**    Change of Business.

Borrower shall not suspend or change a substantial portion of its or their business.

**6.14**    Use of Proceeds.

Borrower shall not use the proceeds of the Term Loan for any purpose other than those set forth in Section 2.9.

**6.15**    Borrower Collateral with Bailees.

Borrower shall not store any Borrower Collateral at any time now or hereafter with a bailee, warehouseman, or similar party, other than a custodian for the benefit of Lender.

**6.16**    [Removed].

**6.17**    Organizational Documents.

Borrower shall not amend its Organizational Documents without the prior consent of Lender not to be unreasonably withheld.   Notwithstanding the foregoing, Borrower may amend its Organization Documents to comply with Applicable Law and upon written notice to Lender.

**6.18**    Prescribed Laws.

Borrower will not, and will not permit any Person having a direct or indirect ownership interest in any Loan Party to, (i) use, directly or indirectly, the proceeds of the Loan in a manner that would violate any Prescribed Laws; (ii) become a Prohibited Person; (iii) knowingly engage in or conspire to engage in any dealings or transactions that evade or avoid, or have the purpose of evading or avoiding, or attempt to violate any Prescribed Laws, or be otherwise associated with or engaged in business with any Prohibited Person; (iv) fail to comply fully with all applicable orders, rules, regulations and recommendations of OFAC; and (v) fail to comply fully with the Prescribed Laws.

Borrower will cooperate with Lender, and will cause any Person having a direct or indirect ownership interest in Borrower to cooperate with Lender, in providing to Lender such additional information and documentation on Borrower's and such Person's legal or beneficial ownership and sources of funds as Lender deems necessary or prudent to enable Lender to comply with the Prescribed Laws as now exist or hereafter are amended. From time to time upon the written request

of Lender, Borrower shall deliver to Lender a schedule of the name, legal domicile address and jurisdiction of organization, if applicable, for each such Person.

**6.19**   RESERVED.

**6.20**   Leasing Restrictions.

Without the prior written consent of Lender, not to be unreasonably withheld or delayed, Borrower and Borrower's agents shall not enter into any Lease that includes any non-market terms and conditions including, without limitation, below market rents, it being understood that Borrower, and Borrower's agents may enter into any Lease without Lender's consent but upon prior written notice to Lender and a reasonable period of time, not to exceed ten (10) days, for Lender to review any such lease, provided such Lease is an arm's length transaction, at market rents and does not contain any non-market terms and conditions.  Borrower will not enter into any residential Lease.

**6.21**   Defaults Under Leases.

If applicable, Borrower will not suffer or permit any material breach or default to occur in any of Borrower's obligations under any Lease nor suffer or permit the same to terminate by reason of any failure of Borrower to meet any requirement of any Lease including those with respect to any time limitation within which any of Borrower's work is to be done or the space is to be available for occupancy by the lessee.  Borrower shall notify Lender promptly in writing in the event a Tenant commits a material default under a Lease.

**6.22**   Management Contracts.

Borrower shall not enter into, modify, amend, terminate or cancel any management contracts for the Property or agreements with agents or brokers, without the prior written approval of Lender not to be unreasonably withheld or delayed.

**6.23**   Alterations.

Without the prior written consent of Lender, Borrower shall not make any material alterations to the Property.

**6.24**   Mechanics' Liens and Contest Thereof.

Borrower will not suffer or permit any mechanics' lien claims to be filed or otherwise asserted against the Property, and will promptly discharge the same in case of the filing of any claims for lien or proceedings for the enforcement thereof, provided, however, that Borrower shall have the right to contest in good faith and with reasonable diligence the validity of any such lien or claim (provided that Borrower posts a statutory lien bond which removes such lien from title to the Property within thirty-five (35) days of written notice by Lender to Borrower of the existence of the lien).

## ARTICLE VII
## CREATION OF SECURITY INTEREST

**7.1** Grant of Security Interest.

Borrower hereby grants to Lender, for the benefit of Lender, a continuing security interest in all of Borrower's right, title, and interest in all currently existing and hereafter acquired or arising

Borrower Collateral in order to secure prompt repayment of any and all of the Obligations in accordance with the terms and conditions of the Loan Documents and in order to secure prompt performance by Borrower of each of its covenants and duties under the Loan Documents. Lender's Liens in and to Borrower Collateral shall attach to all Borrower Collateral without further act on the part of Lender or Borrower. Anything contained in this Agreement or any other Loan Document to the contrary notwithstanding, Borrower has no authority, express or implied, to dispose of any item or portion of Borrower Collateral except for replacements thereof in the ordinary course of business.

**7.2** Negotiable Collateral.

In the event that any Borrower Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, and if and to the extent that Lender determines that perfection or priority of Lender's security interest is dependent on or enhanced by possession, Borrower, promptly upon the request of Lender, shall endorse and deliver physical possession of such Negotiable Collateral and all agreements and documents related thereto to Lender.

**7.3** Collection of Accounts, General Intangibles, and Negotiable Collateral.

At any time after the occurrence and during the continuation of an Event of Default, Lender or Lender's designee may, after providing any notice to Borrower required hereunder, if any, and upon expiration of cure or grace period, if any, (a) notify Account Debtors of Borrower that Borrower's Accounts, chattel paper, or General Intangibles have been assigned to Lender or that Lender has a security interest therein, (b) cause a servicer to take possession of, and collect, Borrower's Accounts, or (c) collect Borrower's Accounts, chattel paper, or General Intangibles directly and charge the reasonable collection costs and expenses to the balance of the Term Loan. Borrower agrees that it will hold in trust for Lender, as Lender's trustee, any of its Collections that it receives and immediately will deliver such Collections to Lender in their original form as received by Borrower.

**7.4** Filing of Financing Statements; Delivery of Additional Documentation Required.

Borrower authorizes Lender to file any financing statement necessary or desirable to effectuate the transactions contemplated by the Loan Documents, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of Borrower where permitted by applicable law. Borrower hereby ratifies the filing of any financing statement filed without the signature of Borrower prior to the date hereof. If Borrower acquires any commercial tort claims after the date hereof, Borrower shall promptly (but in any event within ten (10) Business Days after such acquisition) deliver to Lender a written description of such commercial tort claim and shall deliver a written agreement, in form and substance satisfactory to Lender, pursuant to which Borrower shall grant a perfected security interest in all of its right, title and interest in and to such commercial tort claim to Lender, as security for the Obligations (a "**Commercial Tort Claim Assignment**"). At any time upon the reasonable request of Lender, Borrower shall execute or deliver to Lender any and all fixture filings, security agreements, pledges, assignments, Commercial Tort Claims, endorsements of certificates of title, and all other documents (collectively, the **"Additional Documents"**) that Lender may reasonably request in its reasonable discretion, in form and substance satisfactory to Lender, to create, perfect, and continue perfected or to better perfect Lender's Liens in Borrower Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Lender in any owned Real Property acquired after the Closing Date, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents. To the maximum extent permitted by applicable law, Borrower

39

authorizes Lender to execute any such Additional Documents in Borrower's name and authorizes Lender to file such executed Additional Documents in any appropriate filing office. In addition, on such periodic basis as Lender shall reasonably require, Borrower shall (i) provide Lender with a report of all new material patentable, copyrightable, or trademarkable materials acquired or generated by Borrower during the prior period, (ii) cause all material patents, copyrights, and trademarks acquired or generated by Borrower that are not already the subject of a registration with the appropriate filing office (or an application therefor diligently prosecuted) to be registered with such appropriate filing office in a manner sufficient to impart constructive notice of Borrower's ownership thereof, and (iii) cause to be prepared, executed, and delivered to Lender supplemental schedules to the applicable Loan Documents to identify such patents, copyrights, and trademarks as being subject to the security interests created thereunder; provided, however, that Borrower shall not register with the U.S. Copyright Office any unregistered copyrights (whether in existence on the Closing Date or thereafter acquired, arising, or developed) unless (i) Borrower provides Lender with written notice of its intent to register such copyrights not less than 30 days prior to the date of the proposed registration, and (ii) prior to such registration, the applicable Person executes and delivers to Lender a copyright security agreement in form and substance reasonably satisfactory to Lender, supplemental schedules to any existing copyright security agreement, or such other documentation as Lender reasonably deems necessary in order to perfect and continue perfected Lender's Liens on such copyrights following such registration

**7.5** Power of Attorney.

To the extent permitted by Applicable Law, Borrower hereby irrevocably makes, constitutes, and appoints Lender (and any of Lender's officers, employees, or agents designated by Lender) as Borrower's true and lawful attorney, with power to (a) if Borrower refuses to, or fails timely to execute and deliver any of the documents described in Section 7.4 or in Section 7.7, sign the name of Borrower on any of the documents described in Section 7.4 or in Section 7.7, (b) at any time that an Event of Default has occurred and is continuing, sign Borrower's name on any invoice or bill of lading relating to Borrower Collateral, drafts against Account Debtors, or notices to Account Debtors, (c) send requests (or make telephone inquiry) for verification of Borrower's Accounts, (d) endorse Borrower's name on any of its payment items (including all of its Collections) that may come into Lender's possession, (e) at any time that an Event of Default has occurred and is continuing, make, settle, and adjust all claims under Borrower's policies of insurance and make all determinations and decisions with respect to such policies of insurance, and (f) at any time that an Event of Default has occurred and is continuing, settle and adjust disputes and claims respecting Borrower's Accounts, chattel paper, or General Intangibles directly with Account Debtors, for amounts and upon terms that Lender determines to be reasonable, in Lender's discretion, and Lender may cause to be executed and delivered any documents and releases that Lender determines to be necessary. The appointment of Lender as Borrower's attorney, and each and every one of its rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully and finally repaid and performed and Lender's obligations to extend credit hereunder are terminated.

**7.6** Right to Inspect and Verify.

Lender (through any of its officers, employees, or agents) shall have the right, at Lender's sole expense, from time to time hereafter upon reasonable notice to Borrower (i) to inspect the Books and make copies or abstracts thereof, during normal business hours, (ii) from time to time, to communicate directly with any and all Account Debtors to verify the existence and terms thereof, and (iii) from time to time, to check, test, and appraise Borrower Collateral, or any portion thereof, in

order to verify Borrower's financial condition or the amount, quality, value, condition of, or any other matter relating to, Borrower Collateral; provided, however, if a discrepancy exists in excess of five percent (5%) in the aggregate between the items reported in the books of account and records of Borrower and the actual amount of said items as determined in connection with any such audit, then the cost of said audit shall be borne by the Borrower.  Borrower shall permit any designated representative of Lender to visit and inspect any of the properties of Borrower to inspect and to discuss its finances and properties and Borrower Collateral, upon reasonable notice and at such reasonable times during normal business hours and as often as may be reasonably requested

**7.7** Control Agreements.

To the extent permitted by Applicable Law, Borrower agrees that it will take any or all reasonable steps in order for Lender to obtain control in accordance with Sections 8-106, 9-104, 9-105, 9-106, and 9-107 of the Code with respect to all of its or their Securities Accounts, Deposit Accounts, electronic chattel paper, Investment Property, and letter-of-credit rights. Upon the occurrence and during the continuance of a Event of Default, Lender may notify any bank or securities intermediary to liquidate the applicable Deposit Account or Securities Account or any related Investment Property maintained or held thereby and remit the proceeds thereof to an account designated by Lender.

**ARTICLE VIII**
**EVENTS OF DEFAULT**

**8.1** Events of Default.

Any one or more of the following events, following any applicable notice requirements and/or cure period, if any, shall constitute an event of default (each, an "**Event of Default**") under this Agreement:

(a)     If Borrower fails to pay when due and payable, or when declared due and payable in accordance with this Agreement, all or any portion of the Obligations (whether principal, interest (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts), fees and charges due Lender, reimbursement of Lender Expenses, or other amounts constituting Obligations) within ten (10) days that such payment is due without need for further Lender notice (provided no such grace period shall be applicable to the Maturity Date, shall be deemed to be an extension of the due date for any such payment, or shall be applicable in the case of a default under Sections 8.1(c), 8.1(d), 8.1(f), or 8.1(g) hereunder); provided, however, if funds from the Tax and Insurance Reserve or Tax and Insurance Impound are used to satisfy all amounts due under Section 2.14 after any applicable Event of Default, such payment in full shall be deemed to cure such Event of Default;

(b)     If Borrower fails to (a) perform, keep, or observe any covenant or other provision contained in any Section of this Agreement (other than a Section that is expressly dealt with elsewhere in this Section 8.1) and such failure continues for thirty (30) days after notice from Lender but up to an additional one hundred eighty (180) days if reasonably necessary and Borrower is expeditiously seeking a cure, or (c) perform, keep, or observe any covenant or other provision contained in Sections 5.1, 5.2, 5.3 or 5.4, or Article VI of this Agreement or any comparable provision contained in any of the other Loan Documents;

41

(c)      If all or a substantial part of the assets of Borrower are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any receiver, trustee, custodian or assignee for the benefit of creditors;

(d)      If a Bankruptcy Proceeding is commenced by any Loan Party;

(e)      If a Bankruptcy Proceeding is commenced against any Loan Party which is not discharged, stayed or dismissed within ninety (90) days of the date of the filing thereof, and any of the following events occur: (a) such Loan Party consents to the institution of such Bankruptcy Proceeding against it; (b) the petition commencing the Bankruptcy Proceeding is not timely controverted, provided, however, that, during the pendency of such period, Lender shall be relieved of its obligations to extend credit hereunder; (c) the petition commencing the Bankruptcy Proceeding is not dismissed within ninety (90) calendar days of the date of the filing thereof, provided, however, that, during the pendency of such period, Lender shall be relieved of its obligation to extend credit hereunder; (d) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of any Loan Party, or (e) an order for relief shall have been entered therein;

(f)      Borrower shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall consent to the appointment of a receiver or trustee or liquidator of all of its property or the major part thereof;

(g)      If any Loan Party is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs;

(h)      If a notice of Lien, levy, or assessment is filed of record with respect to any Loan Party's assets by any Governmental Authority, or if any taxes or debts owing at any time hereafter to any one or more of such Governmental Authority becomes a Lien, whether choate or otherwise, upon any Loan Party's assets and the same is not paid before such payment is delinquent;

(i)      Judgment or other claim in an amount in excess of $50,000.00 becomes a Lien or encumbrance upon any material portion of any Loan Party's assets or any Borrower Collateral, except for judgments and claims disclosed to Lender, in writing, prior to the date hereof or bonded by Borrower and such statutory lien bond is in form and substance, including the amount of any such bond, reasonably satisfactory to Lender and the Title Company and removes such Lien from title to the Property within thirty (30) days of any such amount becoming a Lien;

(j)      If there is a default with respect to any agreement to which any Loan Party is a party, the termination of which is reasonably likely to result in a Material Adverse Effect, and such default (a) occurs at the final maturity of the obligations thereunder, or (b) results in a right by the other party thereto, irrespective of whether exercised, to accelerate the maturity of such Loan Party's obligations thereunder, to terminate such agreement or to refuse to renew such agreement in accordance with an automatic renewal right therein;

(k)      If Borrower makes any payment on account of Indebtedness, except for payments under the Loan Documents and payments otherwise expressly permitted under this Agreement;

(l)      Any warranty, representation, statement, or Record made to Lender by any Loan Party, or any officer, employee, agent, or director of any Loan Party, is untrue or incorrect or becomes untrue or incorrect in any material respect as of the date when made or deemed made;

(m)     If this Agreement or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien on or security interest in Borrower Collateral covered hereby or thereby, except as a result of a disposition of the applicable Borrower Collateral in a transaction permitted under this Agreement;;

(n)     Any material provision of any Loan Document shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by any Loan Party, or a proceeding shall be commenced by any Loan Party or by any Governmental Authority having jurisdiction over any Loan Party seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny that any Loan Party has any liability or obligation purported to be created under any Loan Document;

(o)     If any event of default as defined in any of the other Loan Documents occurs and is not cured within the applicable notice and/or cure period, if any;

(p)     **[Removed]**.

(q)     Any material default by Borrower, as lessor, under the terms of any Lease following the expiration of any applicable notice and cure period; or

(r)     If any warranty, representation, statement, report or certificate made now or hereafter by any Loan Party is untrue or incorrect in any material respect at the time made or delivered.

## ARTICLE IX
## LENDER'S RIGHTS AND REMEDIES.

**9.1** Rights and Remedies.

Upon the occurrence of an Event of Default and subject to any applicable notice requirements and/or cure periods, if any, Lender (at its election but without notice of its election and without demand) may do any one or more of the following, all of which are authorized by Borrower:

(a)     Declare all or any portion of the Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable without presentment, demand, protest, or notice of any kind, all of which are expressly waived by Borrower;

(b)     Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of Lender, but without affecting any of Lender's Liens in Borrower Collateral and without affecting the Obligations;

(c)     Make such payments and do such acts as Lender considers necessary or reasonable to protect its security interests in Borrower Collateral. Borrower agrees to assemble Borrower Collateral if Lender so requires, and to make Borrower Collateral available to Lender at a place that Lender may designate which is reasonably convenient to both parties. Borrower authorizes Lender to enter the premises where Borrower Collateral is located, to take and maintain possession of Borrower Collateral, or any part of it, and to pay, purchase, contest, or compromise any Lien that in Lender's sole determination, appears to conflict with the priority of Lender's Liens in and to Borrower Collateral and to pay all expenses incurred in connection therewith and to charge to the balance of the Loan. Subject to any Leases in effect with respect to any of Borrower's owned or leased premises, Borrower hereby grants to Lender a license to enter into possession of such premises and to

43

occupy the same, without charge, in order to exercise any of Lender's rights or remedies provided herein, at law, in equity, or otherwise;

(d)     Without constituting an acceptance of any collateral in full or partial satisfaction of an obligation (within the meaning of the Code), set off and apply to the Obligations any and all (i) balances and deposits of Borrower held by Lender, or (ii) Indebtedness at any time owing to or for the credit or the account of Borrower held by Lender;

(e)     Terminate any commitment to lend hereunder;

(f)     Require Borrower to pay interest on the principal balance of the Loan at a rate per annum equal to the Default Rate; and

(g)     Lender shall have all other rights and remedies available at law or in equity or pursuant to any other Loan Document including, without limitation, the power of sale or judicial foreclosure as set forth in the Security Instrument and/or the Pledge Agreement.

The rights and remedies of Lender under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it. In the event of an Event of Default which is not cured within any applicable cure period, Borrower agrees to cooperate with Lender to assemble and to liquidate Borrower Collateral.

## ARTICLE X
## MISCELLANEOUS

**10.1**     Notices.

Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three (3) days after mailing with a conforming copy also sent by first class mail; or (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service, each to the address as set forth below or to such other address as the respective parties may hereafter designate in writing:

> If to Lender:
>
> > Kairos Credit Strategies Operating Partnership
> > 30242 Esperanza
> > Rancho Santa Margarita, CA 92688
> > Attn:  General Counsel
>
> With a copy (which shall not constitute Notice) to:
>
> > Akerman LLP
> > 50 N. Laura Street, Suite 3100
> > Jacksonville, FL 32202

Attention:  Christopher McCranie
Telephone: 904.598.8636
Email: christopher.mccranie@akerman.com

If to Borrower:

The Friars National Association, Inc.
57 East 55th Street
New York, NY 10022
Attention:  [----]
Telephone:  [----]
Email:  [----]

With a copy (which shall not constitute Notice) to:

Baratta, Baratta & Aidala LLP
546 Fifth Avenue
New York, NY 10036
Attention:  Joseph A. Baratta
Telephone:  212.750.9700
Email:  jabaratta@barattalaw.com

**10.2**    Survival of Agreement; Successors and Assigns.

(a)    All covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Note is outstanding and unpaid or such longer period if expressly set forth in this Agreement.

(b)    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party.  All covenants, promises and agreements by or on behalf of Borrower that are contained in this Agreement shall bind and inure to the benefit of the respective successors and assigns of Lender.  No other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with this Agreement or any of the other Loan Documents.  Lender shall not have any obligation to any Person not a party to this Agreement or the other Loan Documents.  Lender may in its sole discretion assign, pledge, hypothecate, transfer or participate all or any portion or interest it has in the Loan, this Agreement or the Loan Documents without Borrower's consent.  Borrower agrees to cooperate with Lender's efforts to do any of the foregoing and to execute all documents reasonably required by Lender in connection therewith which do not materially adversely affect Borrower's rights under the Loan Documents.

**10.3**    Expenses of Lender; Indemnification.

**(a)    BORROWER WILL PAY ALL REASONABLE OUT-OF-POCKET COSTS AND EXPENSES INCURRED BY LENDER IN CONNECTION WITH THE PREPARATION, DEVELOPMENT AND EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.**

**(b)     BORROWER AGREES TO INDEMNIFY LENDER AND ITS RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS AGAINST, AND TO HOLD LENDER AND EACH SUCH PERSON HARMLESS FROM, ANY AND ALL REASONABLE OUT-OF-POCKET LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES, INCLUDING REASONABLE COUNSEL FEES AND EXPENSES, INCURRED BY OR ASSERTED AGAINST LENDER OR ANY SUCH PERSON ARISING OUT OF, IN ANY WAY CONNECTED WITH, OR AS A RESULT OF (I) THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS,  (II) THE BREACH OF ANY REPRESENTATION OR WARRANTY OR (III) ANY CLAIM, LITIGATION, INVESTIGATION OR PROCEEDINGS RELATING TO ANY OF THE FOREGOING, WHETHER OR NOT LENDER OR ANY SUCH PERSON IS A PARTY THERETO; PROVIDED, HOWEVER, THAT SUCH INDEMNITY SHALL NOT, AS TO LENDER, APPLY TO ANY SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES TO THE EXTENT THAT THEY RESULT FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF LENDER OR ANY OF ITS AFFILIATES OR ANY OF THEIR EMPLOYEES, OFFICERS, DIRECTORS, AGENTS, OR CONSULTANTS.**

**(c)     THE PROVISIONS OF THIS <u>SECTION 10.3</u> SHALL REMAIN OPERATIVE AND IN FULL FORCE AND EFFECT REGARDLESS OF THE EXPIRATION OF THE TERM OF THIS AGREEMENT, THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY, THE REPAYMENT OF THE LOAN, THE INVALIDITY OR UNENFORCEABILITY OF ANY TERM OR PROVISION OF THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS, OR ANY INVESTIGATION MADE BY OR ON BEHALF OF LENDER.  ALL AMOUNTS DUE UNDER THIS <u>SECTION 10.3</u> SHALL BE PAYABLE ON WRITTEN DEMAND THEREFOR.**

**10.4**     Applicable Law.

Irrespective of the place of execution and/or delivery, this Agreement, the Note and the other Loan Documents shall be governed and construed by and interpreted in accordance with the laws of the State of New York, without regard to conflict of law provisions thereof.

**10.5**     No Waiver of Rights by Lender; Waiver of Jury Trial, etc.

(a)     Neither any failure nor any delay on the part of Lender in exercising any right, power or privilege hereunder or under the Loan Documents shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any other right, power or privilege.  Except as prohibited by law, each party hereto hereby waives any right it may have to claim or recover in any litigation referred to in this Section any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.  Each party hereto (i) certifies that neither any representative, agent or attorney of Lender has represented, expressly or otherwise, that Lender would not, in the event of litigation, seek to enforce the foregoing waivers and (ii) acknowledges that it has been induced to enter into this Agreement or the Loan Documents, as applicable, by, among other things, the mutual waivers and certifications herein.

**(b)     BORROWER AND LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM OR ACTION IN ANY WAY, INVOLVING OR ARISING, DIRECTLY OR INDIRECTLY, OUT OF, RELATED**

**TO, OR CONNECTED WITH ANY LOAN DOCUMENT OR THE RELATIONSHIP ESTABLISHED THEREUNDER.**

**10.6** Acknowledgments.

Borrower acknowledges that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement, the Note and the other Loan Documents;

(b) Lender does not have any fiduciary relationship with Borrower and the relationship between Lender, on one hand, and Borrower, on the other hand, is solely that of debtor and creditor; and

(c) no joint venture exists between Borrower and Lender.

**10.7** Marshalling of Assets; Jurisdiction.

TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER. WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A "PROCEEDING"), BORROWER IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE CITY OF NEW YORK, COUNTY OF NEW YORK AND STATE OF NEW YORK, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. BORROWER FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY NEW YORK STATE OR UNITED STATES COURT SITTING IN THE CITY OF NEW YORK AND COUNTY OF NEW YORK MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, WITH A CONFORMING COPY BY FIRST CLASS MAIL DIRECTED TO BORROWER AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT OF SAID CERTIFIED MAILING; EXCEPT THAT IF BORROWER SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

**10.8** Modification of Agreement.

No modification, amendment or waiver of any provision of this Agreement or any other Loan Document shall in any event be effective unless the same shall be in writing and signed by Lender and Borrower, following such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in the same, similar or other circumstance.

**Notwithstanding anything to the contrary, no email correspondence of Lender shall in any event be interpreted as a modification, amendment, or waiver of any provision of this Agreement or any other Loan Document.**

**10.9**     Prohibition on Transfers in Violation of ERISA.

In addition to the prohibitions set forth above, Borrower shall not assign, sell, pledge, encumber, transfer, hypothecate or otherwise dispose of its interest or rights in this Agreement or in the Property, or attempt to do any of the foregoing or suffer any of the foregoing, nor shall any party owning a direct or indirect interest in Borrower assign, sell, pledge, mortgage, encumber, transfer, hypothecate or otherwise dispose of any of its rights or interest (direct or indirect) in Borrower, attempt to do any of the foregoing or suffer any of the foregoing, if such action would cause the Loan, or the exercise of any of Lender's rights in connection therewith, to constitute a prohibited transaction under ERISA or the Internal Revenue Code or otherwise result in Lender being deemed in violation of any applicable provision of ERISA.  Borrower agrees to indemnify and hold Lender free and harmless from and against all losses, costs (including attorneys' fees and expenses), taxes, damages (including consequential damages) and expenses Lender may suffer by reason of the investigation, defense and settlement of claims and in obtaining any prohibited transaction exemption under ERISA necessary or desirable in Lender's sole judgment or by reason of a breach of the foregoing prohibitions.  The foregoing indemnification shall be a recourse obligation of Borrower and shall survive repayment of the Note, notwithstanding any limitations on recourse contained herein or in any of the Loan Documents.

**10.10**     Reinstatement; Certain Payments.

If a claim is ever made upon Lender for repayment or recovery of any amount or amounts received by Lender in payment or on account of any of the obligations under this Agreement, Lender shall give prompt notice of such claim to Borrower, and if Lender repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of its property, or (ii) any settlement or compromise of any such claim effected by Lender with any such claimant, entered into after consultation with Borrower, then and in such event Borrower agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Borrower notwithstanding the cancellation of the Note or other instrument evidencing the obligations under this Agreement or the termination of this Agreement, and Borrower shall be and remain liable to Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Lender.

**10.11**     Right of Setoff.

In addition to any rights and remedies of Lender provided by law, Lender is hereby authorized, following an Event of Default, to the fullest extent permitted by law, subject to any notice requirements or rights to cure provided under this Agreement, if any, to set off and apply any monies held by Lender to or for the credit or the account of Borrower against any and all of the obligations of Borrower now and hereafter existing under this Agreement, the Note or the other Loan Documents held by Lender, irrespective of whether or not Lender shall have made any demand under this Agreement, the Note or the other Loan Documents and although such obligations may be in any currency, direct or indirect, absolute or contingent, matured or unmatured. Lender agrees to promptly notify Borrower after any such setoff and application made by Lender, but the failure to give such notice shall not affect the validity of such setoff and application. The rights of Lender under this Section are in addition to other rights and remedies which Lender may have.

**10.12**   Lender's Consent.

Wherever in this Agreement or the other Loan Documents there is a requirement for Lender's consent and/or a document to be provided or an action taken "to the satisfaction of Lender", it is understood by such phrase that, except as expressly modified herein, Lender shall exercise its consent, right or judgment in its sole and absolute discretion.

**10.13**   Time of the Essence.

Borrower agrees that time is of the essence under this Agreement.

**10.14**   Severability.

In case any one or more of the provisions contained in this Agreement, in the Note or in the Loan Documents should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**10.15**   Counterparts.

This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

**10.16**   Entire Agreement; Cumulative Remedies.

(a)   This Agreement, the Note and the other Loan Documents constitute the entire agreement among the parties hereto and thereto as to the subject matter hereof and thereof and supersede any previous agreement, oral or written, as to such subject matter.

(b)   The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

**10.17**   Captions and Headings.

The captions and headings of various Articles, Sections, and subsections of this Agreement and Exhibits and Schedules pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

**10.18**   Recitals, Exhibits, and Schedules.

The Preambles and all other Recitals set forth herein are made a part hereof by this reference. The Exhibits and Schedules hereto shall constitute an integral part of this Agreement.

**10.19**   Number and Gender; Definitions Include Amendments.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Person or Persons referred to may require. Definitions contained in this Agreement which identify documents, including, but not limited to, the Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments, modifications, and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Lender.

Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

**10.20**   Waiver of Damages.

In no event shall Lender be liable to Borrower for punitive, exemplary or consequential damages, including, without limitation, lost profits, whatever the nature of a breach of its obligations under this Agreement or any of the Loan Documents, and Borrower for itself and its successors and assigns waives all claims for punitive, exemplary or consequential damages.

**10.21**   Claims Against Lender.

Lender shall not be in default under this Agreement, or under any other Loan Documents, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender and Lender does not remedy or cure the default, if any there be, within (30) days after notice from Borrower but up to an additional one hundred and eighty (180) days if reasonably necessary and Lender is expeditiously seeking a cure.  Borrower waives any claim, set-off or defense against Lender arising by reason of any alleged default by Lender as to which Borrower does not give such notice timely as aforesaid.  Borrower acknowledges that such waiver is or may be essential to Lender's ability to enforce its remedies without delay and that such waiver therefore constitutes a substantial part of the bargain between Lender and Borrower with regard to the Loan. No Tenant is intended to have any rights as a third-party beneficiary of the provisions of this Section 10.21.

**10.22**   Cross Default and Cross Collateral.

In furtherance of prior provisions hereof, Borrower agrees and acknowledges that the occurrence of an Event of Default under the terms of this Agreement shall constitute an Event of Default under the Note, the Security Instrument, and the other Loan Documents and under the documents evidencing any other loan now existing or hereafter made by Lender to Borrower whether or not such loan is secured by all or any portion of the Property. The security interests, liens and other rights and interests in and relative to any of Borrower Collateral now or hereafter granted to Lender by Borrower by or in any instrument or agreement, including but not limited to this Agreement and the other Loan Documents shall serve as security for any and all liabilities of Borrower to Lender, including but not limited to the liabilities described in this Agreement, the Note, the Security Instrument, and the other Loan Documents and, for the repayment thereof, Lender may resort to any security held by it in such order and manner as it may elect.

**10.23**   Joint and Several.

The promises and agreements herein shall be construed to be and are hereby declared to be the joint and several promises and agreements of each and every Borrower and shall be fully binding upon and enforceable against each and every Borrower. Lender may at its option enforce this Loan Agreement against one or all of Borrowers. Lender shall not be required to resort to enforcement against all Borrowers and the failure to proceed against or join any Borrower shall not affect the liability of the other Borrowers or their joint and several liability if enforcement is sought against more than one Borrower.

**10.24**   NO ORAL AGREEMENTS.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF**

**PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**10.25**  Sale of Mortgage and Securitization.

Lender shall have the right (a) to sell, assign, pledge or otherwise transfer the Loan or any portion thereof or interest therein to any Person, (b) to sell participation interests in the Loan to any Person, (c) to cause the Loan to be split into two or more separate loans, (d) to cause the Loan to be split into senior and one or more junior or mezzanine loans in whatever proportion Lender deems appropriate (which loans may be secured by mortgages and/or a pledge of direct or indirect partnership or membership interests in Borrower), (e) to  create one or more senior and subordinate notes (i.e., an A/B or A/B/C structure) or multiple components of such note or notes, and thereafter to sell, assign, participate, syndicate or securitize all or any part of any variant of the Loan or (f) to securitize the Loan or any portion thereof or interest therein in one or more private or public single asset or pooled loan securitizations.  (The transactions referred to in clauses (a) through (e) are referred to as a "**Secondary Market Transaction**" and the transactions referred to in clause (f) are referred to as a "**Securitization**".)  Borrower further agrees that Lender may disseminate to any such actual or potential purchaser, assignee or participant all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to: (i) the Property and its operation; (ii) any party connected with the Loan (including, without limitation, the Borrower, any partner, shareholder, joint venturer, manager or member of Borrower, any constituent partner, shareholder, joint venturer, manager or member of Borrower, or any indemnitor); and/or (iii) any lending relationship other than the Loan which Lender may have with any party connected with the Loan (collectively, the "**Loan Information**").  The Loan Information shall only be provided to any such Person for use by it and its financial and legal advisors, shall not be further disseminated for any purpose unless required by law, regulation or court process and shall be subject to industry standard provisions of confidentiality for any such disseminated information.  In the event of any such sale, assignment or participation, Lender and the parties to such transaction shall share in the rights and obligations of Lender as set forth in the Loan Documents only as and to the extent they agree among themselves.  In connection with any such sale, assignment or participation, Borrower further agrees that the Loan Documents shall be sufficient evidence of the obligations of Borrower to each purchaser, assignee, or participant, and upon written request by Lender, Borrower shall, at Lender's expense as to Borrower's attorneys' actual and reasonable fees and costs to review, enter into such amendments or modifications to the Loan Documents as may be reasonably required in order to evidence any such sale, assignment or participation, provided that the same does not increase Borrower's obligations or impair Borrower's rights under the Loan Documents.  The indemnity obligations of Borrower under the Loan Documents shall also apply with respect to any purchaser, assignee or participant.  Anything in this Agreement to the contrary notwithstanding, and without the need to comply with any of the formal or procedural requirements of this Agreement, including this <u>Section 10.25</u>, any lender may at any time and from time to time pledge and assign all or any portion of its rights under all or any of the Loan Documents to a Federal Reserve Bank; provided that no such pledge or assignment shall release such lender from its obligations thereunder.  Lender shall be liable for all costs and expenses incurred by Borrower in connection with any Secondary Market Transaction or Securitization; <u>provided</u>, <u>however</u>, that, Borrower shall not be liable for Lender's costs incurred in connection with the same.

**10.26**   Lost Notes.

In connection with any lost note affidavit, or any missing original promissory note(s) as set forth in Schedule 10.26 annexed hereto (the "**Lost Note(s)**"), Borrower:  (i) agrees to waive, release and relinquish all rights and remedies accorded by applicable law as against Lender; (ii) shall have no defenses to the enforcement of the Note, the Lost Note(s) or the Security Instrument; and (iii) shall have no right of offset or claim against Lender.  Borrower hereby waives any and all defenses with regards to the Lost Note(s) in any action of Lender to enforce the Note or any of the other Loan Documents, including without limitation the defense of lack of standing.  Borrower waives any requirement that Lender: (A) produce, deliver, display, endorse, exhibit, or otherwise demonstrate possession of any of the Lost Note(s); or (B) deliver any bond, security, indemnity, or other documentation for the Lost Note(s).  Borrower hereby agrees to release and indemnify Lender, assume liability for, and agrees to pay, protect, defend and save Lender harmless from and against, any and all liabilities, obligations, losses, damages, out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and costs), causes of action, suits, claims, demands and judgments of any nature or description whatsoever that may at any time be imposed upon, incurred by or awarded against Lender as a result of any Lost Note(s), lost note affidavit, or other document in the chain of notes and mortgages consolidated pursuant to the Note or the Security Instrument.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Borrower and Lender have caused this Agreement to be duly executed by their duly authorized officers, all of the day and year first above written.

LENDER:

**KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP,**
a Delaware limited partnership

By: Kairos Credit Strategies REIT, Inc.
a Delaware corporation
Its: General Partner

By: _Jonathan A. Needell_
Name: Jonathan A. Needell
Title: President and CIO

BORROWER:

**THE FRIARS NATIONAL ASSOCIATION, INC.,**
a New York not-for-profit corporation

By: _____

Name: Arthur Aidala
Title: President

## EXHIBIT A

### Legal Description of Land

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, CITY OF NEW YORK AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF 55TH STREET DISTANT 156 FEET 6 INCHES EASTERLY FROM THE NORTHEASTERLY CORNER OF SAID STREET AND MADISON AVENUE;

RUNNING THENCE NORTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK;

THENCE EASTERLY ALONG THE CENTER LINE OF THE BLOCK 33 FEET;

THENCE SOUTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH ANOTHER PARTY WALL 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF 55TH STREET;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF 55TH STREET, 33 FEET TO THE POINT OR PLACE OF BEGINNING.

**THE** policy to be issued under this report will insure the title to such buildings and improvements erected on the premises, which by law constitute real property**.**

**FOR CONVEYANCING ONLY: TOGETHER** with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

# EXHIBIT B

Within 30 days of the Closing Date:

- KeyBank signoff of KYC and Cash Management Agreement
- Finalization and signoff of Insurance Certificates Acord 25/28
- Inspection of Fire Sprinkler System
- Inspection of Fire Alarm System

Within 60 days of closing:

- Insurance renewal to be reviewed and approved by Lender
-

Within 90 days of closing:

- Clearing of Department of Buildings Violations
-

| | | |
|---|---|---|
| DOB Violation Display for 122918E9027/641957 | 12/29/2018 | Elevator |
| DOB Violation Display for 052019EVCAT501221 | 05/20/2019 | Elevator – Failure to perform Category 5 inspection |
| DOB Violation Display for 120319E9027/663620 | 12/03/2019 | Elevator |
| DOB Violation Display for 121020E9027/695160 | 12/10/2020 | Elevator |
| OATH/ECB Violation | 08/12/1993 | WORK W/O A PERMIT ALTERATION AND REWIRING OF ELECTRICAL WORK 4th and 6th FLOOR STOP ALLWORK<br><br>REMEDY OBTAIN PERMIT |

Within 180 days of closing:

Clearing of Department of Building Permits no longer needed.

## **<u>EXHIBIT C</u>**

[RESERVED]

**EXHIBIT D**

**EXHIBIT D**

**PROPERTY INSURANCE REQUIREMENTS**
**(06/2020)**

Mortgage Property Insurance Requirements

Required Coverage.  The borrower shall be required to maintain the following insurance cover with respect to the property at all times during the term of the loan:

- Property – (*Acord 28*)  — All-Risk/Special Form including wind/hail, full insurable value  on a Replacement Cost basis, Agreed Amount (waive co-insurance). Building Limit, Personal Property, Deductible (maximum $25,000; the deductible may not be a per location amount but an aggregate amount for one event).  Shall not contain a coinsurance clause or the coinsurance clause shall be offset by an Agreed Amount provision.  If an Agreed Amount provision is used, the Agreed Amount must be no less than the estimated Replacement Cost.
- Business Income/Loss of Rents coverage for not less than 12 months gross income plus a minimum 180 day Extended Period of Indemnity.  Deductible not to exceed 72 hours.
- Wind (including Named Storm) — Included for the replacement cost with a 2% deductible but no greater than a 5% TIV maximum deductible. Limits shall be equal to those covered under the Special Form policy.  Joint Loss Agreement included if covered under a separate policy.  If covered under a blanket policy, limits shall be no less than the greater of  the largest TIV for properties covered by the blanket limit or 40% of the aggregate TIV of all properties within at risk counties within the state covered by the Blanket Limit.
- Flood — required if property is located in a Special Hazard Flood Area or other area with a high degree of flood risk. Coverage required as follows:
  - The maximum available from NFIP with a deductible acceptable to Lender. Proof of NFIP insurance must be provided before funding.  Acceptable evidence may consist of a flood insurance dec page or a copy of the flood insurance application, and, if just an application, Kairos Investment Management Company requires a copy of the cancelled check, application stamped payment received or prepaid by the insurance company or agent, or a letter from the insurance company or agent stating that the policy has been issued or prepayment has been received for flood insurance.
  - Excess Flood coverage is required with limit acceptable to Lender and a deductible no greater than the maximum available from NFIP.
  - Joint Loss Agreement included if covered under a separate policy.
- Terrorism — Coverage for Foreign & Domestic Acts, included for the total insurable value with a maximum deductible of $25,000.

*The following coverages may be required. Confirmation to follow once third-party reports are received:*

- Law and Ordinance Endorsement – if the ability to rebuild the property is restricted for any reason a Law & Ordinance endorsement to the hazard insurance policy is required providing coverage for loss to the undamaged portion of the building.  The hazard insurance policy must be in the following amounts (Coverage A, B & C)
  - Coverage A— Loss to the undamaged portion of property must be equal to replacement cost of the improvements without deduction for depreciation.
  - Coverage B — Demolition and debris removal in an amount not less than 10% of the replacement cost of the improvements.
  - Coverage C — Increased cost of construction in an amount not less than 10% of the replacement cost of the improvements.

- o If Coverages B and C are a combined limit, then coverage must equal at least 20% of the replacement cost of the improvements.
- Earthquake — required if the property is located in an area with a high degree of seismic risk (Seismic Zone 3 or 4) and if the PML (SEL) exceeds 20%. Limits must be equal to 150% of the replacement cost multiplied by the PML (SEL). Coverage must include business income/loss of rents as required above. Maximum 5% deductible allowed.  Joint loss agreement included if covered under a separate policy.
- Sinkhole/Earth Movement – required.
- Equipment Breakdown / Boiler & Machinery Coverage — required to cover steam boilers, steam pipes, steam engines, steam turbines or other pressure-fired vessels in operation on the Property. Coverage must be in amounts acceptable to the lender with limits no less than the Replacement Cost of the property(Joint Loss Agreement included if covered under a separate policy).
- Blanket Policies – If coverage is written on a blanket policy, the blanket policy limits, including any sublimits are adequate for the applicable risks and meet the following minimum requirements: (a) the limit is a Per Occurrence, and reinstates after each loss without an Annual Aggregate (b) the Special form limit must be no less than the greater of the following: i) the largest individual TIV for properties covered by the Blanket Insurance Policy limit, or ii) the aggregate TIV of the property, and adjacent properties sharing a boundary with the property, any properties separated from the Property by a street, alley, or public space, and any other properties within 100 feet of the Property and covered by the same blanket limit.
- General Liability *(Acord 25)* — $1MM per occurrence, $1MM Damage to Rented Premises 2MM Aggregate, $2MM Products Completed Operations Aggregate, $10k Medical Payments with no greater than a $25k deductible/SIR.  Policy must cover all Buildings, Common Areas and Elements, Commercial Spaces, Public Ways (roads, driveways, alleys, walks, paths, and other similar areas) and Habitational Spaces.  Policy shall pay for the cost of defending any covered claim arising out of or in connection with the ownership, use, possession, leasing, operation, maintenance, or condition of the property.  Policy shall cover contractual liability.  Defense limits shall be in addition to the limits above.  If the policy covers multiple locations, the Each Occurrence and General Aggregate Limits must apply on a per location basis, with no aggregate cap. Policy must include Terrorism coverage.
- Umbrella Liability – Limits as determined by Lender.  Suggested limits $10MM General Aggregate, $10MM Each Occurrence.  Policy shall schedule the General Liability, Auto Liability,, and Employers Liability as Underlying.  Policy shall follow form of the underlying policies.  Policy must include Terrorism coverage.
- Pollution Liability – if applicable, required in amounts and with deductibles acceptable to Lender.
- Workers Compensation — Per statutory requirements.
- Employers Liability and/or Crime/Fidelity/Cybersecurity – if applicable, required in amounts and with deductibles acceptable to Lender.  Employers Liability, if required, includes waiver of subrogation.
- Owned, Hired and Non-Owned Auto liability — if applicable, required in an amount equal to no less than $1,000,000 CSL or such greater amount as Lender shall require.
- Liquor Liability — if applicable, required in an amount equal to no less than $1,000,000 plus umbrella/excess liability limits.

Certificate Holder — Kairos Investment Management Company its successors and/or assigns as their interests may appear — named as certificate holder, mortgagee/loss payee and additional insured. Mortgagee endorsement — must be per ISO Form CP1218 or its equivalent. A copy of the form to be used must be submitted and approved prior to closing.

Additional Requirements:

1. Thirty (30) days' written notice of material change, non-renewal or cancellation, except 10 days' notice for non-payment of premium.  Replacement certificates shall be sent to Lender as policies are renewed, replaced, or modified.
2. Borrower must be included as a Named Insured on all policies.
3. Lender may, from time to time, require additional coverage to maintain levels consistent with those purchased by borrowers of a similar size, and with similar property types, or due to a change in the exposures presented by the Borrower or the occupants of the Property.
4. Confirmation if coverage is provided by a blanket policy.  If so, Kairos Investment Management Company requires a schedule of locations and values of all other properties covered under the policy.
5. Any insurance placed by a Property Manager relative to the Collateral shall name Kairos Credit Strategies Operating Partnership, LP as an Additional Insured, and should be in compliance with these requirements.   Any Property Manager must also comply with the Workers Compensation, Employers Liability, Auto Liability, Umbrella and Other Insurance requirements as advised by Lender.
6. The Property, General Liability and Umbrella policies must contain permission to waive rights of subrogation.
7. All carriers must have an "A-IX" by AM Best or "A-" by S&P or "A3" by Moody's and be authorized to do business in the State where Property is located. Surplus lines carriers are to be avoided; if the insurance is through a surplus lines carrier, the borrower should demonstrate that they were declined by at least two regular authorized carriers.
8. Paid receipt for the annual premiums for all required policies.  If any balance is due, an invoice is required, and this amount will be collected at closing.  An escrow account will be established under the Loan to pay the premium at renewal.  PREMIUMS MAY NOT BE FINANCED WITH EITHER A PREMIUM FINANCING COMPANY OR PAID IN INSTALLMENTS TO INSURANCE CARRIERS.
9. Certificates shall be issued on Acord 25 and 28 forms and include the following:
   a. Borrower as named insured.
   b.  Kairos Credit Strategies Operating Partnership, LP its successors and/or assigns as their interests may appear – named as certificate holder, mortgagee/loss payee and additional insured.
   c. Collateral location address noted
   d. Current policy term
   e. Policy number and loan number
   f. Insured values
   g. If a blanket policy, copy of Statement of Values
   h. All coverages to include a waiver of subrogation and be primary and non-contributory to the insurance carried by Kairos Credit Strategies Partnership, LP or its affiliates
   i. Additional Insured Endorsements shall be issued on a CG 2018 or equivalent.
   j. Lenders Loss Payable / Mortgagee Endorsement CP1218 or equivalent required

**Exhibit E**

Tenant Direction Letter

[_____ ___, 202__

[Tenant address information]

RE:    Your Lease Agreement dated _____ ___, 202___ (the "**Lease**") for the real property located at _____

To Whom It May Concern:

There is a change in the address for payment of rent under your Lease.  Going forward, Landlord instructs and authorizes you to disregard all previous instruction relating to the payment of rent and all other sums due under the Lease (collectively, the "**Rent**") and requests that you deliver any and all Rent payments to the following address:

Kairos Credit Strategies Operating Partnership, LP
30242 Esperanza
Rancho Santa Margarita, CA 92688
Attn: General Counsel
Reference: 48 East 63rd Street Account

If you make your payment via ACH, the account information is as follows:

Bank Name: KeyBank Real Estate Capital
ABA #: 041-001-039
Acct #: 359951013036
Acct Name: KCM Payment Clearing
Ref: Loan #: _____

Aside from the aforementioned two changes, all terms of your Lease shall remain the same. If you have any questions regarding these changes, please do not hesitate to contact the undersigned per your Lease.

Thank you for your cooperation.

[Signature Page Follows]

Best regards,

**THE FRIARS NATIONAL ASSOCIATION, INC.** ., a
New York not-for-profit corporation


By: _____
     Arthur Aidala, President

Schedule 3.13

Permitted Liens

None.

Schedule 5.4(a)

Location of Borrower Collateral

57 E. 55th Street
New York, NY 10022

Schedule 5.4(b)

Location of Chief Executive Offices

57 E. 55th Street
New York, NY 10022

Schedule 10.26

Schedule of Mortgages, Assignments and Agreements Related to Lost Notes

Mortgage Number 1 of 7:
Mortgagor:        Friars National Association, Inc.
Mortgagee:        57 East 55th Street Funding Associates
Amount:           $2,000,000.00
Dated:            08/28/2018
Recorded:         09/06/2018
CRFN:             2018000298267

Mortgage Number 2 of 7:
Mortgagor:        The Friars National Association, Inc.
Mortgagee:        57 East 55th Street 2nd Funding Associates
Amount:           $1,000,000.00
Dated:            10/03/2018
Recorded:         10/15/2018
CRFN:             2018000340879

Mortgage Number 3 of 7:
Mortgagor:        The Friars National Association, Inc.
Mortgagee:        57 East 55th Street 3rd Funding Associates
Amount:           $1,000,000.00
Dated:            01/08/2019
Recorded:         01/15/2019
CRFN:             2019000016736

Mortgage Number 4 of 7:
Mortgagor:        The Friars National Association, Inc.
Mortgagee:        57 East 55th Street 4th Funding Associates
Amount:           $1,000,000.00
Dated:            06/06/2019
Recorded:         06/24/2019
CRFN:             2019000198078

Agreement:
#4a
Type:             Omnibus Modification
Mortgagor:        The Friars National Association, Inc.
Mortgagees:       57 East 55th Street Funding Associates,
57 East 55th Street 2nd Funding Associates,
57 East 55th Street 3rd Funding Associates
and 57 East 55th Street 4th Funding Associates
Dated:            09/25/2019
Recorded:         10/10/2019
CRFN:             2019000330237
(Note: The above mortgage #s 1 - 4 were consolidated, extended and modified to form a single lien
in the amount of $5,000,000.00)

Assignment:
#4b
Type:          Assignment of Mortgage
Assignors:     57 East 55th Street Funding Associates,
57 East 55th Street 2nd Funding Associates,
57 East 55th Street 3rd Funding Associates
and 57 East 55th Street 4th Funding Associates
Assignee:      Titan Capital ID, LLC
Dated:         02/21/2020
Recorded:      03/04/2020
CRFN:          2020000082523

    (Note: Assigns the above mortgages #s 1 - 4, as consolidated by the referenced Omnibus Modification)

Mortgage Number 5 of 7:
Mortgagor:     The Friars National Association, Inc.
Mortgagee:     57 East 55th Street 5th Funding Associates
Amount:        $1,000,000.00
Dated:         09/25/2019
Recorded:      10/10/2019
CRFN:          2019000330235

Assignment:
#5a
Type:          Assignment of Mortgage
Assignors:     57 East 55th Street 5th Funding Associates
Assignee:      Titan Capital ID, LLC
Dated:         02/21/2020
Recorded:      03/04/2020
CRFN:          2020000082526

(Note: Assigns the above mortgage # 5)

Mortgage Number 6 of 7:
Mortgagor:     The Friars National Association, Inc.
Mortgagee:     Titan Capital ID, LLC
Amount:        $3,000,000.00
Dated:         02/21/2020
Recorded:      03/04/2020
CRFN:          2020000082527

Mortgage Number 7 of 7:
Mortgagor:     The Friars National Association, Inc.
Mortgagee:     Titan Capital ID, LLC
Amount:        $9,000,000.00
Dated:         02/21/2020
Recorded:      03/04/2020
CRFN:          2020000082528

# EXHIBIT E – GAP NOTE

## GAP PROMISSORY NOTE

$4,000,000.00                                     New York City, New York County, NY

June 25, 2021

**FOR VALUE RECEIVED**, **THE FRIARS NATIONAL ASSOCIATION, INC.,** a New York not-for-profit corporation, having its principal place of business at 57 East 55th Street, New York, NY 10022, as maker (together with its successors and assigns, if any, as permitted, "**Borrower**"), hereby unconditionally promises to pay to the order of **KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP**, a Delaware limited partnership, having its principal place of business at 30242 Esperanza, Rancho Santa Margarita, CA 92688, as payee (together with its successors and permitted assigns, "**Lender**"), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of FOUR MILLION AND NO/100 Dollars ($4,000,000.00) in lawful money of the United States of America together with interest on the unpaid balance thereof at the rate (the "**Interest Rate**") provided in that certain Consolidated, Extended, Amended and Restated Term Loan and Security Agreement dated of even date herewith by and between Lender and Borrower (as amended, restated or modified from time to time, the "**Loan Agreement**"), computed from the date hereof, until the Maturity Date as defined in the Loan Agreement (the "**Maturity Date**"); provided, however, that from and after: (a) the Maturity Date, whether upon stated maturity, acceleration or otherwise; or (b) the date on which the Interest Rate is increased to the Default Rate (as hereinafter defined) as provided herein or under the terms of the Loan Agreement, such additional interest shall be computed at the Default Rate. As used herein, the term "**Default Rate**" shall mean the Default Rate as defined in the Loan Agreement.

## ARTICLE 1- PAYMENT TERMS

Interest on the outstanding principal balance shall accrue from the date hereof to the Maturity Date at the Interest Rate. Commencing on August 1, 2021 and continuing on each Payment Date as defined in the Loan Agreement (each, a "**Payment Date**"), through and including the Maturity Date, Borrower shall make each payment as required by the Loan Agreement, which payments shall be applied to unpaid principal, interest, and other costs and fees as more specifically provided in the Loan Agreement.

All payments and other amounts due under this Gap Promissory Note (this "**Note**") and the other Loan Documents shall be made without any setoff, defense or irrespective of, and without deduction for, counterclaims.

Interest on the outstanding principal balance shall be calculated as provided in the Loan Agreement.

Borrower shall pay to Lender on the Maturity Date the outstanding principal balance, all accrued and unpaid interest thereon, and all other amounts due under this Note, the Gap Mortgage (defined below) and the other Loan Documents.

## ARTICLE 2- SECURITY

This Note is secured by, inter alia, that certain Gap Mortgage made by Borrower to Lender of even date herewith (the "**Gap Mortgage**"), on the parcel of property situated in New York City, New York County, New York, bounded and described as set forth in Exhibit A attached to the

Gap Mortgage and made a part thereof. All of the terms, covenants, and conditions contained in the Gap Mortgage and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.

Any capitalized term used in this Note and not defined herein shall have the meaning given to such term in the Loan Agreement and/or the Gap Mortgage, as applicable.

## ARTICLE 3- DEFAULT AND ACCELERATION

It is expressly agreed that all amounts due under this Note and the Gap Mortgage shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or before the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default (as defined in the Loan Agreement and/or the Gap Mortgage) and in addition, Lender shall be entitled to receive interest on the entire unpaid principal sum at the Default Rate. This Article 3, however, shall not be construed as an agreement or privilege to extend the Maturity Date, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

## ARTICLE 4 - SAVINGS CLAUSE

This Note and the Gap Mortgage are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by this Note and as provided for herein or in the other Loan Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of this Note (the "**Maximum Legal Rate**"). If, by the terms of this Note or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the loan until payment in full so that the rate or amount of interest on account of the loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the loan for so long as the loan is outstanding.

## ARTICLE 5- NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged, or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge, or termination is sought.

## ARTICLE 6- WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the debt evidence by this Note (the "**Debt**") do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and

notice of protest and non payment, and all other notices of any kind. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment, or waiver of any provision of this Note, the Gap Mortgage, or the other Loan Documents made by agreement between Lender or any other person shall release, modify, amend, waive, extend, change, discharge, terminate, or affect the liability of Borrower, and any other person who may become liable for the payment of all or any part of the Debt, under this Note, the Gap Mortgage, or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Gap Mortgage, or the other Loan Documents. If Borrower is a partnership, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership, and the term Borrower, as used herein, shall include any alternate or successor partnership, but any predecessor partnership and their partners shall not thereby be released from any liability. If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term Borrower as used herein, shall include any alternate or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. If Borrower is a limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the members comprising the limited liability company, and the term Borrower as used herein, shall include any alternate or successor limited liability company, but any predecessor limited liability company and their members shall not thereby be released from any liability. If Borrower consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

EXCEPT AS PROHIBITED BY LAW OR AS MAY BE PERMITTED PURSUANT TO THE LOAN AGREEMENT, BORROWER HEREBY EXPRESSLY AND UNCONDITIONALLY, WILLINGLY, KNOWINGLY AND VOLUNTARILY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY OR ON BEHALF OF LENDER ON THIS NOTE, ANY AND EVERY RIGHT BORROWER MAY HAVE TO (I) INJUNCTIVE RELIEF, (II) INTERPOSE ANY COUNTERCLAIM THEREIN (OTHER THAN COMPULSORY COUNTERCLAIMS), AND (III) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING. NOTHING HEREIN CONTAINED SHALL PREVENT OR PROHIBIT BORROWER FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION AGAINST LENDER WITH RESPECT TO ANY ASSERTED CLAIM.

EXCEPT AS PROHIBITED BY LAW, BORROWER HEREBY WILLINGLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.  THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR LENDER TO ACCEPT THIS NOTE AND MAKE THE LOAN.

BORROWER AND ANY SUBSEQUENT ENDORSER, GUARANTOR OR OTHER ACCOMMODATION BORROWER WAIVE ALL RIGHT TO TRIAL BY JURY, EXCEPT AS EXPRESSLY PROHIBITED BY LAW, IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS NOTE OR UNDER ANY AGREEMENT, INSTRUMENT OR OTHER DOCUMENT CONTEMPLATED HEREBY OR RELATED HERETO AND IN ANY ACTION DIRECTLY OR INDIRECTLY RELATED TO OR CONNECTED WITH THE OBLIGATIONS PROVIDED FOR HEREIN, OR ANY CONDUCT RELATING TO THE ADMINISTRATION OR ENFORCEMENT OF SUCH OBLIGATIONS OR ARISING FROM THE DEBTOR/CREDITOR RELATIONSHIP OF THE PARTIES HERETO. BORROWER ACKNOWLEDGES THAT THIS WAIVER MAY DEPRIVE IT OF AN IMPORTANT RIGHT AND THAT SUCH WAIVER HAS WILLINGLY, KNOWINGLY AND VOLUNTARILY BEEN AGREED TO BY BORROWER.

## ARTICLE 7- TRANSFER

Lender shall have the absolute right to sell and/or assign this Note and the Gap Mortgage and the other Loan Documents, in whole or in part, and/or to enter into one or more participation agreements concerning this Note and the Gap Mortgage. If Lender gives written notice of any such sale(s), assignment(s) and/or participation(s) to Borrower, Borrower shall make, or cause to be made, payments to such subsequent holder(s) or participant(s), as the case may be.  Lender may deliver, without notice, all the collateral mortgaged, granted, pledged or assigned pursuant to the Gap Mortgage and other Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law with respect thereto, and, provided transferee assumes the obligations under the Loan Documents, Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8- GOVERNING LAW

THIS NOTE WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, OR THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE, AND THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE

**STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

**BORROWER IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE CITY, COUNTY AND STATE OF NEW YORK, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.  NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. BORROWER FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY NEW YORK STATE OR UNITED STATES COURT SITTING IN THE CITY AND COUNTY OF NEW YORK MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED WITH A CONFIRMING COPY BY FIRST CLASS MAIL TO BORROWER AT THE ADDRESS INDICATED ABOVE, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF BORROWER SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.**

### ARTICLE 9- NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.1 of the Loan Agreement.

{Signature Page Follows}

**IN WITNESS WHEREOF**, Borrower has duly executed this Gap Promissory Note as of the day and year first above written.

BORROWER:

**THE FRIARS NATIONAL ASSOCIATION, INC**, a New York not-for-profit corporation

By: _____

Name: Arthur Aidala

Title: President

# EXHIBIT F – GAP MORTGAGE

| NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER | |
|---|---|
| This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document. |  2021062900751003002E7418 |

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 8 |
|---|---|---|
| **Document ID: 2021062900751003** | Document Date: 06-25-2021 | Preparation Date: 06-29-2021 |
| Document Type: MORTGAGE | | |
| Document Page Count: 7 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| FIRST AMERICAN TITLE INSURANCE COMPANY<br>666 THIRD AVENUE<br>1060172B<br>NEW YORK, NY 10017<br>212-850-0675<br>CBLISTEIN@FIRSTAM.COM | AKERMAN LLP<br>ATTENTION: CHRISTOPHER MCCRANIE, ESQ.<br>50 NORTH LAURA STREET, SUITE 3100<br>JACKSONVILLE, FL 32202 |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1291 | 127 | Entire Lot | 57 EAST 55TH STREET |
| | Property Type: | COMMERCIAL REAL ESTATE | | |

### CROSS REFERENCE DATA

CRFN_____ _or_ DocumentID_____ _or_ _____ Year_____ Reel____ Page_____ _or_ File Number_____

### PARTIES

| MORTGAGOR/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| THE FRIARS NATIONAL ASSOCIATION, INC.<br>57 EAST 55TH STREET<br>NEW YORK, NY 10022 | KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP<br>30242 ESPERANZA<br>RANCHO SANTA MARGARITA, CA 92688 |

### FEES AND TAXES

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 4,000,000.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 4,000,000.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 20,000.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 45,000.00 | | $ | 0.00 |
| Spec (Additional): | $ | 10,000.00 | **RECORDED OR FILED IN THE OFFICE** | | |
| TASF: | $ | 0.00 | **OF THE CITY REGISTER OF THE** | | |
| MTA: | $ | 12,000.00 | **CITY OF NEW YORK** | | |
| NYCTA: | $ | 25,000.00 | Recorded/Filed      07-07-2021 10:58 | | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | | |
| TOTAL: | $ | 112,000.00 | **2021000256896** | | |
| Recording Fee: | $ | 72.00 | | | |
| Affidavit Fee: | $ | 0.00 | *City Register Official Signature* | | |

1060172B

First American Title
Insurance Company
666 Third Avenue   5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

## GAP MORTGAGE

by

### THE FRIARS NATIONAL ASSOCIATION, INC

as mortgagor

(Mortgagor)

in favor of

### KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP

as mortgagee

(Lender)

County: New York

Block: 1291

Lot: 127

Premises: 57 East 55th Street, New York, NY  10022

Dated: June 25, 2021

---

Record and Return to:

Christopher J. McCranie, Esq.
Akerman LLP
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202

## GAP MORTGAGE

THIS GAP MORTGAGE ("**Mortgage**") made as of June 25, 2021, by **THE FRIARS NATIONAL ASSOCIATION, INC.**, a New York not-for-profit corporation, as maker, having its principal place of business at 57 East 55th Street, New York, NY 10022, as mortgagor ("**Mortgagor**") in favor of **KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP**, a Delaware limited partnership, having its principal place of business at 30242 Esperanza, Rancho Santa Margarita, CA 92688, as mortgagee ("**Lender**").

To secure the payment of an indebtedness in the sum of FOUR MILLION AND NO/100 Dollars ($4,000,000.00) lawful money of the United States of America, to be paid with interest thereon, according to that certain Gap Promissory Note bearing even date herewith made by Mortgagor in fabor of Lender (the "**Gap Note**"), the Mortgagor hereby mortgages to the Lender, and grants the Lender a security interest in, all right, title and interest of the Mortgagor now owned, or hereafter acquired, in and to the following property, rights and interests (such property, rights and interests being hereinafter collectively referred to as the "**Mortgaged Property**"):

a. all that certain lot, piece or parcel of land more particularly described in <u>Exhibit A</u> attached hereto and by this reference made a part hereof (the "**Premises**");

b. all buildings and improvements now or hereafter located on the Premises (hereinafter referred to as the "**Improvements**");

c. all the estate, right, title, claim, or demand of any nature whatsoever of Mortgagor, either in law or in equity, in possession or expectancy, in and to the Premises and/or the Mortgaged Property or any part thereof;

d. all easements, rights-of-way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights, and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating, or pertaining to the Premises and/or the Mortgaged Property (including, without limitation, any and all development rights, air rights or similar or comparable rights of any nature whatsoever now or hereafter appurtenant to the Premises and/or the Mortgaged Property now or hereafter transferred to the Premises) and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Premises to the center line thereof;

e. all machinery, apparatus, equipment, fittings, fixtures, and other real and personal property of every kind and nature whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Premises and/or the Mortgaged Property, or appurtenances thereto, and usable in connection with the present or future operation and occupancy of the Premises and/or the Mortgaged Property and all building equipment, materials and supplies of any nature whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Premises and/or the Mortgaged Property (hereinafter collectively referred to as the "**Equipment**"), and the right, title and interest of Mortgagor in and to any of the Equipment which may be subject to any security agreements (as defined in the Uniform Commercial Code of the State of New York), superior in lien to the lien of the Mortgage;

f.  all awards of payments, including interest thereon, and the right to receive the same, which may be made with respect to the Premises and/or the Mortgaged Property, whether from the exercise of the right of eminent domain (including any transfer made in lieu of the exercise of said right), or for any other injury to or decrease in the value of the Mortgaged Property;

g.  all leases, reciprocal easement and operating agreements and other agreements affecting the use or occupancy of the Premises and/or the Mortgaged Property now or hereafter entered into (hereinafter referred to as the "**Leases**") and the right to receive and apply the rents, issues, and profits of the Premises and/or the Mortgaged Property (hereinafter referred to as the "**Rents**") to the payment of the Indebtedness;

h.  all proceeds of and any unearned premiums on any insurance policies covering the Premises and/or the Mortgaged Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Premises and/or the Mortgaged Property;

i.  the right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding bought with respect to the Premises and/or the Mortgaged Property and to commence any action or proceeding to protect the interest of Lender in the Mortgaged Property;

j.  All media rights, memorabilia, collectibles, art, furnishings, furniture and any other valuables of Mortgagor, whether or not located at, or relating to, the Premises; and

k.  All intangible personal property now or hereafter owned by the Mortgagor, whether or not related to the Premises or the Improvements, including, but not limited to, the following: all rights of Mortgagor in, to, under, by virtue of, arising from or growing out of any and all present or future contracts, contract rights, drafts, acceptances, instruments, deposit accounts, all accounts (as defined in the UCC), accounts receivable, letter-of-credit rights or letters of credit, rights to payment for money or funds advanced or sold, chattel paper, including but not limited to, rights to payment evidenced by chattel paper, investment property, commercial tort claims, insurance policies, permits, licenses, trade names, plans, specifications, appraisals, reports, paid fees, choses-in-action, subdivision restrictions or declarations, general intangibles, and other obligations of any kind whatsoever now or hereafter dealing with, affecting or concerning Mortgagor, and whether or not dealing with, affecting or concerning the Premises, the Improvements or the Equipment or any portion thereof or interest therein including, without limitation, the following: (1) all contracts, plans, specifications and permits for or related to the Premises or its development or the construction or refurbishing of the Improvements; (2) all agreements for the provision of utilities or services (including any reservation of capacity for utilities or services) to the Premises or Improvements; (3) all payment, performance or other bonds; (4) all contracts, option agreements, right of first refusal agreements and other agreements now existing or hereafter made for the sale by Mortgagor of all or any of Mortgagor's personal property or for the sale of all or any portion of the Premises or the Improvements, including any deposits paid by any purchasers (howsoever such deposits may be held) and any proceeds of such contracts and agreements, including any purchase-money notes and mortgages made by such purchasers; and (5) any declaration of condominium, restrictions, covenants, easements,

other declarations or similar documents now or hereafter recorded against the title to all or any portion of the Premises;

l.  All other tangible and intangible personal property and interests in personal property of Mortgagor of any kind or description now held by Lender or at any time hereafter transferred or delivered to, or coming into the possession, custody, or control of, Lender, or any agent or affiliate of Lender, whether expressly as collateral security or for any other purpose (whether for safekeeping, custody, collection or otherwise), and all dividends and distributions on or other rights in connection with any such property; and

m.  Any and all products and proceeds (including insurance proceeds and proceeds of proceeds) of any or all of the foregoing and all property that is within the definition of proceeds as it is defined in the UCC (defined below), including without limitation, whatever is received upon the use, lease, sale, exchange, collection, loss, destruction, any other utilization, or any disposition of any of the Mortgaged Property (defined above), whether cash or non-cash, and any other type or item of property, and all substitutions, additions, accessions, replacements, products, and renewals of, to, or for such property and all insurance therefor; and all supporting evidence and documents relating to any of the above-described tangible and intangible personal property of the Mortgagor, including, without limitation, records, computer programs, disks, tapes, microfilm, microfiche, and related electronic data processing media, and all rights of the custodian of such items to retrieve the same from third parties, including but not limited to all of Mortgagor's right, title and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media, written applications, credit information, account cards, payment records, correspondence, delivery and installation certificates, invoice copies, delivery receipts, notes and other evidences of indebtedness, insurance certificates and the like, together with all books of account, ledgers, and cabinets in which the same are reflected or maintained. For the avoidance of doubt, the inclusion of "proceeds" as collateral does not authorize Mortgagor to sell, dispose of, or otherwise use the collateral in any manner not specifically authorized by this Mortgage or the other Loan Documents.

Capitalized terms not otherwise defined herein shall have the meaning set forth in the Gap Note or Loan Agreement (defined below), as applicable.

TO HAVE AND TO HOLD the above granted and described Mortgaged Property unto and to the proper use and benefit of Lender, and the successors and assigns of Lender, forever.

AND the Mortgagor covenants with the Lender as follows:

1. The Mortgagor will pay the indebtedness, as hereinbefore provided.

2. Mortgagor shall obtain, maintain and keep in full force and effect during the term of this Mortgage, or cause Mortgagor's lessees to obtain, maintain and keep adequate insurance coverage, with all premiums paid thereon and without notice or demand, with respect to its properties and business against loss or damage of the kinds and in the amounts as set forth in that certain Consolidated, Extended, Amended and Restated Term Loan and Security Agreement dated of even date herewith by and between Lender and Mortgagor (as amended, restated or modified from time to time, the **"Loan Agreement"**).

3. That no building on the Premises shall be altered, removed, or demolished without the consent of the Lender.

4. That Mortgagor shall be in default under this Mortgage upon the occurrence of any default or breach by Mortgagor of the terms, conditions, representations, warranties, and covenants of this Mortgage or the Gap Note, and/or upon the occurrence of an Event of Default in accordance with the terms of the Loan Agreement or any of the other Loan Documents (as used herein, each a "**Default**" or an "**Event of Default**"), and upon such an Event of Default, Lender shall have the remedies and be entitled to the rights described in the Loan Agreement.

5. That the holder of this Mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver.

6. That the Mortgagor will pay all taxes, assessments, utilities, and water rates and all other applicable fees and costs as further provided in the Loan Agreement.

7. That the Mortgagor within seven (7) days upon request will furnish a written statement duly acknowledged of the amount due on this Mortgage and whether any offsets or defenses exist against the mortgage debt.

8. That all notices, demands, consents, requests or other communications (each, a "**Notice**") that are permitted or required to be given by any party to the other hereunder shall be in writing and given in the manner specified in Section 10.1 of the Loan Agreement.

9. That the Mortgagor warrants the title to said Premises and the Mortgaged Property.

10. That the Mortgagor will, in compliance with Section 13 of the Lien Law, receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvements and will apply the same first to the payment of the cost of the improvements before using any part of the total of the same for any other purpose.

11. CHECK THE APPROPRIATE BOX:

(   ) The within mortgage covers real property principally improved, or to be improved, by one or more structures containing in the aggregate not more than six residential dwelling units, each having their own separate cooking facilities.

(X) The within mortgage does not cover real property improved as described above.

This Mortgage may not be waived, changed, or discharged orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, change, or discharge is sought. If there be more than one Mortgagor, the covenants and warranties and obligations hereof shall be joint and several. The covenants of this Mortgage shall run with the land and bind the Mortgagor, the heirs, distributees, legal representatives, successors, and assigns of the Mortgagor and all subsequent owners, encumbrancers, tenants, and subtenants of the Premises, and shall inure to the benefit of the Lender, the successors and assigns of the Lender, and all subsequent holders of this Mortgage. As used herein the singular shall include the plural as the context requires.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, this Gap Mortgage has been duly executed by the Mortgagor effective as of the date set forth above.

MORTGAGOR:

**THE FRIARS NATIONAL ASSOCIATION, INC.**, a New York not-for-profit corporation

By: _____

Name: Arthur Aidala

Title: President

STATE OF NEW YORK)

 KINGS            ) ss:

COUNTY OF ~~NEW YORK~~)

On the 24th day of June in the year 2021 before me, the undersigned, personally appeared ARTHUR AIDALA, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

Notary Public

[NOTARIAL STAMP/SEAL]

WILLIAM R. SANTO
Notary Public, State of New York
No. ▮▮▮▮▮▮
Qualified in Kings County
Commission Expires Febuary 8, 2023

## EXHIBIT A

## THE PREMISES

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, CITY OF NEW YORK AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF 55TH STREET DISTANT 156 FEET 6 INCHES EASTERLY FROM THE NORTHEASTERLY CORNER OF SAID STREET AND MADISON AVENUE;

RUNNING THENCE NORTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK;

THENCE EASTERLY ALONG THE CENTER LINE OF THE BLOCK 33 FEET;

THENCE SOUTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH ANOTHER PARTY WALL 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF 55TH STREET;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF 55TH STREET, 33 FEET TO THE POINT OR PLACE OF BEGINNING.

County: New York

Block: 1291

Lot: 127

# EXHIBIT G – NOTE

**THIS CONSOLIDATED, EXTENDED, AMENDED AND RESTATED PROMISSORY NOTE (THIS "NOTE") CONSOLIDATES, EXTENDS, AMENDS AND RESTATES THAT CERTAIN CONSOLIDATED, EXTENDED, AMENDED AND RESTATED MORTGAGE NOTE MADE BY THE MAKER NAMED BELOW TO TITAN CAPITAL ID, LLC, A DELAWARE LIMITED LIABILITY COMPANY ("EXISTING LENDER"), DATED FEBRUARY 21, 2020, EVIDENCING THE PRINCIPAL AMOUNT OF $9,000,000.00 (THE "EXISTING NOTE") AND THAT CERTAIN GAP PROMISSORY NOTE DATED AS OF THE DATE HEREOF EXECUTED BY BORROWER IN FAVOR OF LENDER IN THE ORIGINAL PRINCIPAL AMOUNT OF $4,000,000 (THE "GAP NOTE").   THIS NOTE IS MADE BY THE BORROWER NAMED BELOW TO THE LENDER NAMED BELOW TO EVIDENCE THE ENTIRE PRINCIPAL AMOUNT OF $13,000,000.00 OF THE CONSOLIDATED PRINCIPAL INDEBTEDNESS HERETOFORE EVIDENCED BY THE EXISTING NOTE AND THE GAP NOTE.  THIS NOTE DOES NOT CREATE OR EVIDENCE ANY NEW OR FURTHER PRINCIPAL INDEBTEDNESS OTHER THAN THE PRINCIPAL INDEBTEDNESS EVIDENCED BY THE EXISTING NOTE AND THE GAP NOTE.**

**CONSOLIDATED, EXTENDED, AMENDED AND RESTATED**
**PROMISSORY NOTE**

$13,000,000.00                                                                     New York, New York
                                                                                            June 25, 2021

FOR VALUE RECEIVED **The Friars National Association, Inc.**, a New York not-for-profit corporation ("**Borrower**"), and having its principal place of business at 57 E 55th Street, New York, NY 10022 hereby unconditionally promises to pay to the order of **KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP**, a Delaware limited partnership, as lender, having an address at 30242 Esperanza, Rancho Santa Margarita, CA 92688 (together with its successors and assigns, "**Lender**"), or at such other place as the Lender or holder hereof may from time to time designate in writing, the maximum principal sum of up to THIRTEEN MILLION AND NO/100 Dollars ($13,000,000.00) (the "**Loan**"), or so much thereof as is advanced pursuant to that certain Consolidated, Extended, Amended and Restated Term Loan and Security Agreement, dated the date hereof, between Borrower and Lender (as the same may be amended, modified, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), in lawful money of the United States of America, with interest thereon to be computed from the date of this Consolidated, Extended, Amended and Restated Promissory Note (as the same may be amended, supplemented, restated, replaced or otherwise modified from time to time, this "**Note**") at the Interest Rate, and to be paid in accordance with the terms of this Note and the Loan Agreement.  All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

**ARTICLE 1:  PAYMENT TERMS**

Borrower agrees to pay the principal sum of this Note, interest on the unpaid principal sum of this Note and all other amounts due under the Loan Agreement and other Loan Documents including, without limitation, costs and expenses, including, without limitation, Enforcement Costs, without relief from valuation and appraisement laws at the rates and at the times specified in the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon and all other amounts due under the Loan Agreement and other Loan Documents shall be due and payable, in all events, on the Maturity Date.

## ARTICLE 2:  DEFAULT AND ACCELERATION

The Indebtedness shall, upon any required notice hereunder or under the Loan Agreement, if any, and subject to any cure period hereunder or under the Loan Agreement, if any, become immediately due and payable at the option of Lender, if any payment required in this Note is not paid (a) in accordance with the terms of the Loan Agreement, or (b) on the happening of any other Event of Default.

## ARTICLE 3:  LOAN DOCUMENTS

This Note is secured by the Security Instrument and the other Loan Documents.  All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.  In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4:  SAVINGS CLAUSE

Notwithstanding anything to the contrary contained herein, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the maximum rate of interest permitted by applicable law from time to time (the "**Maximum Legal Rate**"), (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender.

## ARTICLE 5:  NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6:  WAIVERS

Subject to the terms of the Loan Agreement, Borrower and all others who may become liable for the payment of all or any part of the Indebtedness do hereby jointly and severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment, any Excused Delay and all other notices of any kind.  No release of any security for the Obligations or extension of time for payment, of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Obligations, under this Note, the Loan Agreement or the other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the

partnership or limited liability company, and the term "Borrower", as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability.  If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders or members comprising, or the officers and directors relating to, the corporation, and the term "Borrower" as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. Nothing in the foregoing two sentences shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, as applicable, which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.

 EXCEPT AS PROHIBITED BY LAW OR AS MAY BE PERMITTED PURSUANT TO THE LOAN AGREEMENT, BORROWER HEREBY EXPRESSLY AND UNCONDITIONALLY, WILLINGLY, KNOWINGLY AND VOLUNTARILY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY OR ON BEHALF OF LENDER ON THIS NOTE, ANY AND EVERY RIGHT BORROWER MAY HAVE TO (I) INJUNCTIVE RELIEF, (II) INTERPOSE ANY COUNTERCLAIM THEREIN (OTHER THAN COMPULSORY COUNTERCLAIMS), AND (III) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING. NOTHING HEREIN CONTAINED SHALL PREVENT OR PROHIBIT BORROWER FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION AGAINST LENDER WITH RESPECT TO ANY ASSERTED CLAIM.

EXCEPT AS PROHIBITED BY LAW, BORROWER HEREBY WILLINGLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.  THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR LENDER TO ACCEPT THIS NOTE AND MAKE THE LOAN.

BORROWER AND ANY SUBSEQUENT ENDORSER, GUARANTOR OR OTHER ACCOMMODATION BORROWER WAIVE ALL RIGHT TO TRIAL BY JURY, EXCEPT AS EXPRESSLY PROHIBITED BY LAW, IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS NOTE OR UNDER ANY AGREEMENT, INSTRUMENT OR OTHER DOCUMENT CONTEMPLATED HEREBY OR RELATED HERETO AND IN ANY ACTION DIRECTLY OR INDIRECTLY RELATED TO OR CONNECTED WITH THE OBLIGATIONS PROVIDED FOR HEREIN, OR ANY CONDUCT RELATING TO THE ADMINISTRATION OR ENFORCEMENT OF SUCH OBLIGATIONS OR ARISING FROM THE DEBTOR/CREDITOR RELATIONSHIP OF THE PARTIES HERETO. BORROWER ACKNOWLEDGES THAT THIS WAIVER MAY DEPRIVE IT OF AN IMPORTANT RIGHT AND THAT SUCH WAIVER HAS WILLINGLY, KNOWINGLY AND VOLUNTARILY BEEN AGREED TO BY BORROWER.

### ARTICLE 7:  TRANSFER

Lender shall have the absolute right to sell and/or assign this Note and the Security Instrument, in whole or in part, and/or to enter into one or more participation agreements concerning this Note and the Security Instrument in accordance with the terms of the Loan Documents. If Lender gives written notice

of any such sale(s), assignment(s) and/or participation(s) to Borrower, Borrower shall make, or cause to be made, payments to such subsequent holder(s) or participant(s), as the case may be.  Lender may deliver, without notice, all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law with respect thereto, and, provided transferee assumes the obligations under the Loan Documents, Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

### ARTICLE 8:  GOVERNING LAW

**THIS NOTE WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, OR THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE, AND THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

**BORROWER IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE CITY, COUNTY AND STATE OF NEW YORK, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.  NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. BORROWER FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY NEW YORK STATE OR UNITED STATES COURT SITTING IN THE CITY AND COUNTY OF**

**NEW YORK MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED WITH A CONFIRMING COPY BY FIRST CLASS MAIL TO BORROWER AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF BORROWER SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.**

### ARTICLE 9: NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.1 of the Loan Agreement.

### ARTICLE 10:  PRIOR NOTES

This Note is being executed and delivered as a restatement of the outstanding indebtedness evidenced by those certain notes secured by the mortgages and other instruments referenced on **Schedule "A"** annexed hereto (collectively, the "**Prior Notes**"), including without limitation that certain Gap Promissory Note dated the date hereof made by the Borrower in favor of and to the order of the Lender in the original principal amount of $4,000,000.00 (the "**Gap Note**"). This Note shall not constitute a cancellation or novation with respect to the indebtedness evidenced by the Prior Notes and/or the Gap Note and as hereafter evidenced by this Note and shall continue to be secured by, inter alia, the Security Instrument and the prior mortgages referenced on **Schedule "A"**, without interruption in the lien or priority thereof. Subject to the foregoing, this Note consolidates, amends, restates and supersedes the Prior Notes, including the Existing Note, and the Gap Note in their entirety.

The indebtedness evidenced by this Note constitutes the sum of a total restatement of the indebtedness evidenced by the Prior Notes (including without limitation the Existing Note and the Gap Note).

Section 10.26 of the Loan Agreement is incorporated herein by reference for the express benefit of Lender.

*[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]*

5

**BORROWER:**
**THE FRIARS NATIONAL ASSOCIATION, INC.**, a New
York not-for-profit corporation

By:_____

Name: Arthur Aidala
Title: President

**Schedule A**

Schedule of Prior Mortgages, Assignments and Agreements

Mortgage Number 1 of 8:
Mortgagor:       Friars National Association, Inc.
Mortgagee:       57 East 55th Street Funding Associates
Amount:          $2,000,000.00
Dated:           08/28/2018
Recorded:        09/06/2018
CRFN:            2018000298267

Mortgage Number 2 of 8:
Mortgagor:       The Friars National Association, Inc.
Mortgagee:       57 East 55th Street 2nd Funding Associates
Amount:          $1,000,000.00
Dated:           10/03/2018
Recorded:        10/15/2018
CRFN:            2018000340879

Mortgage Number 3 of 8:
Mortgagor:       The Friars National Association, Inc.
Mortgagee:       57 East 55th Street 3rd Funding Associates
Amount:          $1,000,000.00
Dated:           01/08/2019
Recorded:        01/15/2019
CRFN:            2019000016736

Mortgage Number 4 of 8:
Mortgagor:       The Friars National Association, Inc.
Mortgagee:       57 East 55th Street 4th Funding Associates
Amount:          $1,000,000.00
Dated:           06/06/2019
Recorded:        06/24/2019
CRFN:            2019000198078

Agreement #4a:
Type:            Omnibus Modification
Mortgagor:       The Friars National Association, Inc.
Mortgagees:      57 East 55th Street Funding Associates,
                 57 East 55th Street 2nd Funding Associates,
                 57 East 55th Street 3rd Funding Associates
                 and 57  East 55th Street 4th Funding Associates
Dated:           09/25/2019
Recorded:        10/10/2019
CRFN:            2019000330237
(Note: The above mortgage #s 1 - 4 were consolidated, extended and modified to form a single lien in the amount of $5,000,000.00)

A-1

Assignment #4b:
Type:        Assignment of Mortgage
Assignors:   57 East 55th Street Funding Associates,
             57 East 55th Street 2nd Funding Associates,
             57 East 55th Street 3rd Funding Associates
             and 57  East 55th Street 4th Funding Associates
Assignee:    Titan Capital ID, LLC
Dated:       02/21/2020
Recorded:    03/04/2020
CRFN:        2020000082523
(Note: Assigns the above mortgages #s 1 - 4, as consolidated by the referenced Omnibus Modification)

Mortgage Number 5 of 8:
Mortgagor:   The Friars National Association, Inc.
Mortgagee:   57 East 55th Street 5th Funding Associates
Amount:      $1,000,000.00
Dated:       09/25/2019
Recorded:    10/10/2019
CRFN:        2019000330235

Assignment #5a:
Type:        Assignment of Mortgage
Assignors:   57 East 55th Street 5th Funding Associates
Assignee:    Titan Capital ID, LLC
Dated:       02/21/2020
Recorded:    03/04/2020
CRFN:        2020000082526
(Note: Assigns the above mortgage # 5)

Mortgage Number 6 of 8:
Mortgagor:   The Friars National Association, Inc.
Mortgagee:   Titan Capital ID, LLC
Amount:      $3,000,000.00
Dated:       02/21/2020
Recorded:    03/04/2020
CRFN:        2020000082527

Mortgage Number 7 of 8:
Mortgagor:   The Friars National Association, Inc.
Mortgagee:   Titan Capital ID, LLC
Amount:      $9,000,000.00
Dated:       02/21/2020
Recorded:    03/04/2020
CRFN:        2020000082528

Assignment #7a:
Type:        Assignment of Mortgage
Assignor:    Titan Capital ID, LLC
Assignee:    Kairos Credit Strategies Operating Partnership, LP
Dated:       of even date with this Note
Recorded:    date of recording of the Mortgage
CRFN:        to be obtained upon recording in conjunction with the Mortgage
(Note: Assigns the above mortgage # 7)

2

Mortgage Number 8 of 8:
Mortgagor:          The Friars National Association, Inc.
Mortgagee:         Kairos Credit Strategies Operating Partnership, LP
Amount:             $4,000,000.00
Dated:                of even date with this Note
Recorded:          date of recording of the Mortgage
CRFN:                to be obtained upon recording in conjunction with the Mortgage
(Note: Gap Mortgage to be recorded prior to and in conjunction with the Mortgage)

# EXHIBIT H – MORTGAGE



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City
Register will rely on the information provided
by you on this page for purposes of indexing
this instrument. The information on this page
will control for indexing purposes in the event
of any conflict with the rest of the document.

2021062900751004002EB4AD

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 30 |
|---|---|---|

**Document ID:** 2021062900751004    Document Date: 06-25-2021    Preparation Date: 07-07-2021
**Document Type:** AGREEMENT
**Document Page Count:** 28

| PRESENTER: | RETURN TO: |
|---|---|
| FIRST AMERICAN TITLE INSURANCE COMPANY<br>666 THIRD AVENUE<br>1060172B<br>NEW YORK, NY 10017<br>212-850-0675<br>CBLISTEIN@FIRSTAM.COM | AKERMAN LLP<br>ATTENTION: CHRISTOPHER MCCRANIE, ESQ.<br>50 NORTH LAURA STREET, SUITE 3100<br>JACKSONVILLE, FL 32202 |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1291 | 127 | Entire Lot | 57 EAST 55TH STREET |

    **Property Type:** COMMERCIAL REAL ESTATE

**CROSS REFERENCE DATA**

**CRFN:**  2018000298267
  ☒ Additional Cross References on Continuation Page

**PARTIES**

| PARTY 1: | PARTY 2: |
|---|---|
| THE FRIARS NATIONAL ASSOCIATION, INC.<br>57 EAST 55TH STREET<br>NEW YORK, NY 10022 | KAIROS CREDIT STRATEGIES OPERATING<br>PARTNERSHIP, LP<br>30242 ESPERANZA<br>RANCHO SANTA MARGARITA, CA 92688 |

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 13,000,000.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | 255 | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 177.00 | | | |
| Affidavit Fee: | $ | 8.00 | | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**

Recorded/Filed    07-07-2021 10:59
City Register File No.(CRFN):
    **2021000256897**

*Annette M Hill*

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2021062900751004002CB62D

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | PAGE 2 OF 30 |
|---|---|

**Document ID: 2021062900751004**  Document Date: 06-25-2021  Preparation Date: 07-07-2021
Document Type: AGREEMENT

**CROSS REFERENCE DATA**
**CRFN:** 2018000340879
**CRFN:** 2019000016736
**CRFN:** 2019000198078
**CRFN:** 2019000330235
**CRFN:** 2020000082527
**Document ID:** 2021062900751003

1060172B

**Prepared by & Return to:**
Christopher J. McCranie, Esq.
Akerman LLP
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202

First American Title
Insurance Company
666 Third Avenue   5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

CONSOLIDATED, EXTENDED, AMENDED AND RESTATED
MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT
AND FINANCING STATEMENT

by

**THE FRIARS NATIONAL ASSOCIATION, INC**,
a New York not-for-profit corporation, as Mortgagor

in favor of

**KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP,**
a Delaware limited partnership, as Lender

Dated as of June 25, 2021

Relating to that certain loan from Lender to the Borrower (defined below) in the original principal amount of:
$13,000,000.00

Location of Premises:

County: New York
Block: 1291
Lot: 127
Address: 57 East 55th Street, New York, NY 10022

THIS DOCUMENT SERVES AS A FIXTURE FILING UNDER THE UNIFORM COMMERCIAL
CODE - SECURED TRANSACTIONS AS ADOPTED BY THE STATE OF NEW YORK.

## CONSOLIDATED, EXTENDED, AMENDED AND RESTATED MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FINANCING STATEMENT

THIS AMENDED AND RESTATED MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FINANCING STATEMENT (this "**Mortgage**"), is dated effective as of the 25th day of June, 2021 (the "**Effective Date**"), and is made by **THE FRIARS NATIONAL ASSOCIATION, INC.**, a New York not-for-profit corporation, having a mailing address at 57 East 55th Street, New York, NY 10022 (the "**Mortgagor**" or the "**Borrower**"), in favor of **KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP**, a Delaware limited partnership, having a mailing address at 30242 Esperanza, Rancho Santa Margarita, CA 92688 (the "**Lender**").

### RECITALS:

A.    Lender has made a loan to Mortgagor described in the Loan Agreement defined below, in the original principal amount of THIRTEEN MILLION AND NO/100 Dollars ($13,000,000.00) (the "**Loan**"), as evidenced by and more particularly described in that certain Consolidated, Extended, Amended and Restated Promissory Note dated of even date herewith, executed by the Borrower in favor of Lender, in the original principal amount of THIRTEEN MILLION AND NO/100 Dollars ($13,000,000.00) (the "**Note**") and that certain Consolidated, Extended, Amended and Restated Term Loan and Security Agreement dated of even date herewith by and between Lender and Borrower (as amended, restated or modified from time to time, the "**Loan Agreement**").

B.    The term "**Loan Documents**" shall have the meaning as set forth in the Loan Agreement.

C.    This Mortgage consolidates, extends, amends, and restates the prior mortgages and other instruments listed on **Exhibit "C"** attached hereto (collectively, the "**Prior Mortgages**").

D.    Borrower hereby assumes all of the obligations and agreements of all the prior notes (herein, collectively, the "**Prior Notes**") secured by the Prior Mortgages. Borrower also hereby assumes all of the obligations in all agreements, whether or not listed in **Exhibit "C"**, which consolidate, modify, or extend such Prior Notes and Prior Mortgages.

E.    The Borrower agrees that the obligations under the Prior Notes (and under all other agreements which consolidated, modified or extended the obligations under the Prior Notes) shall be and are hereby consolidated. To that end, Borrower has concurrently herewith executed and delivered to Lender that certain Consolidated, Extended, Amended and Restated Promissory Note (herein, the "**Note**") which consolidates, extends amends and restates in their entirety the terms and provisions of the Prior Notes.

F.    Borrower agrees that the rights and obligations under the Prior Mortgages (and under all other agreements which consolidated, modified or extended rights and obligations under the Prior Mortgages) shall be and are hereby consolidated and that Lender's rights in the Mortgaged Property (defined below) shall be and are hereby combined and consolidated so that Lender has one real estate security interest under this Mortgage securing the Note evidencing Borrower's indebtedness to Lender in the amount of $13,000,000.00, together with interest thereon. Borrower and Lender agree that the terms of the Prior Mortgages are hereby amended and restated in their entirety to be the terms which are set out in this Mortgage. As consolidated, extended, amended and restated hereby, the terms and provisions of the Prior Mortgages shall remain in full force and effect and are hereby ratified and confirmed by Borrower in all respects, subject to the terms and provisions of this Mortgage. For purposes of the Prior Mortgages and this Mortgage, Borrower's address stated above and Lender's address stated above shall be the addresses of Borrower and Lender, respectively, unless and until modified in accordance with the terms of this Mortgage or the Loan Agreement.

G.    The Mortgaged Property (as defined herein) is the same premises conveyed to Mortgagor by deed recorded on 06/11/1957 in(as) Liber 5005 Cp 410.

{1354406.1 }    58281765

**NOW, THEREFORE,** to secure the payment and performance of Borrower of all of their obligations (the "**Obligations**") now existing or hereafter arising under the Loan, the Note, and any of the other Loan Documents, and in order to charge the properties, interests and rights hereinafter described with such payment and performance and for and in consideration of the sum of TEN and NO/100 DOLLARS ($10.00) and other good and valuable consideration, **MORTGAGOR DOES BY THESE PRESENTS HEREBY MORTGAGE, GRANT, BARGAIN, TRANSFER, ALIEN, REMISE, ASSIGN, HYPOTHECATE, DEPOSIT, PLEDGE, SET OVER, CONFIRM, CONVEY AND WARRANT UNTO LENDER, ITS SUCCESSORS AND ASSIGNS,** a first priority security interest in all of Mortgagor's estate, right, title, and interest now owned or hereafter acquired in and to each of the following (all of such real, personal and mixed property herein described, whether affixed or annexed or not, and all rights hereby conveyed and mortgaged are intended so to be and are to be deemed included in the term the "**Mortgaged Property**" as used herein):

(a)     All of all those certain pieces, parcels or tracts of land, of which Mortgagor is now seized and possessed and in actual possession, situate in New York County, New York, more particularly described on **Exhibit A** attached hereto and incorporated herein (the "**Land**"), to have and to hold the same, together with all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages, timber, crops, oil, gas, and mineral rights, projections, appurtenances, water rights (including riparian and littoral rights), streets, ways, alleys, strips and gores of land now or hereafter in any way belonging to, adjoining, appurtenant to, crossing, or pertaining to the Land;

(b)     All buildings, betterments, structures, improvements, build-outs, mobile homes and fixtures of any nature now or hereafter constructed or located, in whole or in part, on the Land, regardless of whether physically affixed thereto or now or hereafter severed or capable of severance from the Land (collectively, the "**Improvements**");

(c)     All tangible property (collectively, the "**Equipment**") now or hereafter owned by Mortgagor and whether or not located at, affixed to, placed upon or used in connection with the Land or the Improvements. The Equipment includes, without limitation, the following: (1) all machinery, equipment, appliances, fixtures, conduits and systems for generating or distributing air, water, heat, air conditioning, electricity, light, fuel or refrigeration, or for ventilating or sanitary purposes, or for the exclusion of vermin or insects, or for the removal of dust, refuse, sewage or garbage, or for fire prevention or extinguishing; (2) all elevators, escalators, lifts and dumbwaiters; (3) all motors, engines, generators, compressors, pumps, lift stations, tanks, boilers, water heaters, furnaces and incinerators; (4) all furniture, furnishings, fixtures, appliances, installations, partitions, projection systems, shelving, cabinets, lockers, vaults and wall safes; (5) all carpets, carpeting, rugs, underpadding, linoleum, tiles, mirrors, wall coverings, windows, storm doors, awnings, canopies, shades, screens, blinds, draperies and related hardware, chandeliers and light fixtures; (6) all plumbing, sinks, basins, toilets, faucets, pipes, sprinklers, disposals, laundry appliances and equipment, and kitchen appliances and equipment; (7) all alarm, safety, electronic, telephone, music, entertainment and communications equipment and systems; (8) all janitorial, maintenance, cleaning, window washing, vacuuming, landscaping, pool and recreational equipment and supplies; (9) all storage tanks (including, without limitation, underground storage tanks) together with pipes, lines and other equipment associated therewith; and (10) any other items of property, wherever kept or stored, if acquired by Mortgagor with the intent of incorporating them in or using them in connection with the Land or the Improvements;

(d)     All rights of Mortgagor in and to all awards or payments, including interest thereon and the right to receive the same, growing out of or resulting from any exercise of the power of eminent domain (including the taking of all or any part of the Land or the Improvements), or any alteration of the grade of any street upon which the Land abuts, or any other injury to, taking of, or decrease in the value of the Land or the Improvements or any part thereof;

(e)     All rights of Mortgagor in and to any hazard, casualty, liability, or other insurance policy carried for the benefit of Mortgagor or Lender with respect to the Improvements or the Equipment, including without limitation any unearned premiums and all insurance proceeds or sums

payable in lieu of or as compensation for any loss of or damage to all or any portion of the Improvements or the Equipment;

(f)     All rights of Mortgagor in and to all supplies and building materials delivered to or located upon the Land or elsewhere and used or usable in connection with the construction or refurbishing of the Improvements or the Equipment;

(g)     All intangible personal property now or hereafter owned by the Mortgagor, whether or not related to the Land or the Improvements, including, but not limited to, the following: all rights of Mortgagor in, to, under, by virtue of, arising from or growing out of any and all present or future contracts, contract rights, drafts, acceptances, instruments, deposit accounts, all accounts (as defined in the UCC), accounts receivable, letter-of-credit rights or letters of credit, rights to payment for money or funds advanced or sold, chattel paper, including but not limited to, rights to payment evidenced by chattel paper, investment property, commercial tort claims, insurance policies, permits, licenses, trade names, plans, specifications, appraisals, reports, paid fees, choses-in-action, subdivision restrictions or declarations, general intangibles, and other obligations of any kind whatsoever now or hereafter dealing with, affecting or concerning Mortgagor, and whether or not dealing with, affecting or concerning the Land, the Improvements or the Equipment or any portion thereof or interest therein including, without limitation, the following: (1) all contracts, plans, specifications and permits for or related to the Land or its development or the construction or refurbishing of the Improvements; (2) all agreements for the provision of utilities or services (including any reservation of capacity for utilities or services) to the Land or Improvements; (3) all payment, performance or other bonds; (4) all contracts, option agreements, right of first refusal agreements and other agreements now existing or hereafter made for the sale by Mortgagor of all or any of Mortgagor's personal property or for the sale of all or any portion of the Land or the Improvements, including any deposits paid by any purchasers (howsoever such deposits may be held) and any proceeds of such contracts and agreements, including any purchase-money notes and mortgages made by such purchasers; and (5) any declaration of condominium, restrictions, covenants, easements, other declarations or similar documents now or hereafter recorded against the title to all or any portion of the Land;

(h)     All of Mortgagor's right, title, interest, estate, claim, or demand, either at law or in equity, in and to all architectural, engineering, land management, forestry, mitigation and similar plans, specifications, drawings, renderings, profiles, studies, shop drawings, reports, plats, permits, surveys and the like, and all sewer taps, permits and allocations, agreements for utilities, bonds and sureties, relating to the Land or the Improvements or appurtenant facilities erected or to be erected upon or about the Land;

(i)     All rents, income, issues and profits of the Land, the Improvements and other property subject to this Mortgage (collectively, the "**Rents**"), and all leases, subleases, tenancies, licenses, franchises and occupancy agreements of any nature whatsoever now or hereafter affecting the Land or the Improvements (collectively, the "**Leases**"), together with all guaranties of the Leases and all security deposits and prepaid rents under the Leases;

(j)     All licenses, permits, authorizations or agreements and any other consents, approvals, and rights relating to the Land, whether presently held or hereafter acquired ("**Licenses and Permits**");

(k)     All other tangible and intangible personal property and interests in personal property of Mortgagor of any kind or description now held by Lender or at any time hereafter transferred or delivered to, or coming into the possession, custody, or control of, Lender, or any agent or affiliate of Lender, whether expressly as collateral security or for any other purpose (whether for safekeeping, custody, collection or otherwise), and all dividends and distributions on or other rights in connection with any such property;

(l)     All media rights, memorabilia, collectibles, art, furnishings, furniture and any other valuables of Borrower, whether or not located at, or relating to, the Land; and

(m)     Any and all products and proceeds (including insurance proceeds and proceeds of proceeds) of any or all of the foregoing and all property that is within the definition of proceeds as it is defined in the UCC (defined below), including without limitation, whatever is received upon the use, lease, sale, exchange, collection, loss, destruction, any other utilization, or any disposition of any of the Mortgaged Property (defined above), whether cash or non-cash, and any other type or item of property, and all substitutions, additions, accessions, replacements, products, and renewals of, to, or for such property and all insurance therefor; and all supporting evidence and documents relating to any of the above-described tangible and intangible personal property of the Mortgagor, including, without limitation, records, computer programs, disks, tapes, microfilm, microfiche, and related electronic data processing media, and all rights of the custodian of such items to retrieve the same from third parties, including but not limited to all of Mortgagor's right, title and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media, written applications, credit information, account cards, payment records, correspondence, delivery and installation certificates, invoice copies, delivery receipts, notes and other evidences of indebtedness, insurance certificates and the like, together with all books of account, ledgers, and cabinets in which the same are reflected or maintained. For the avoidance of doubt, the inclusion of "proceeds" as collateral does not authorize Mortgagor to sell, dispose of, or otherwise use the collateral in any manner not specifically authorized by this Mortgage or the other Loan Documents.

This Mortgage constitutes a security agreement within the meaning of, and shall create a security interest under, the Uniform Commercial Code – Secured Transactions as adopted by the State of New York, as in effect from time to time, or under the Uniform Commercial Code in force from time to time, in any other state to the extent the same is applicable law (collectively, the "UCC") with respect to the fixtures and other personal property included in the Mortgaged Property and all proceeds and products thereof, and all supporting obligations ancillary to or arising in any way in connection therewith (collectively, the "Personal Property"). A portable document format or PDF file format, carbon, photographic or other reproduction of this Mortgage or of any financing statement shall be sufficient as a financing statement. Mortgagor's principal place of business, and Lender's address are set forth in Section 10.1 of the Loan Agreement. Mortgagor shall execute and deliver to Lender, in form and substance satisfactory to Lender, such financing statements, continuation statements and such further assurances as Lender may from time to time consider reasonably necessary to create, perfect, preserve and maintain in full force and effect Lender's lien upon the Personal Property. Lender, at the expense of Mortgagor, may cause such statements and assurances to be recorded and re-recorded, filed and re-filed, in the name of Mortgagor, and Mortgagor hereby constitutes and irrevocably appoints Lender its true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, and empowers such attorney or attorneys in the name of Mortgagor, but at the option of such attorney-in-fact, to execute and file any and all financing statements. In addition to the foregoing, Mortgagor hereby authorizes Lender at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements with or without signature of Mortgagor as authorized by applicable law, as applicable to the Mortgaged Property. For purposes of such filings, Mortgagor agrees to furnish any information requested by Lender promptly upon request of Lender. Mortgagor also ratifies its authorization for Lender to have filed any such initial financing statements, amendments thereto or continuation statements if filed prior to the date of this Mortgage. Mortgagor hereby irrevocably constitutes and appoints Lender and any officer or agent of Lender, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Mortgagor or in Mortgagor's own name to execute in Mortgagor's name any such documents and to otherwise carry out the purposes of this Section, to the extent that Mortgagor's authorization above is not sufficient. To the extent permitted by law, Mortgagor hereby ratifies all acts such attorneys-in-fact shall lawfully do, have done in the past or cause to be done in the future by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

The parties intend that this Mortgage shall continue in full force and effect until satisfied by a written satisfaction or release executed and delivered by Lender to Mortgagor or otherwise recorded in the applicable,

official public records after payment in full of all Obligations, or as otherwise may be provided in the Loan Agreement. The lien of this Mortgage shall secure all Obligations as more fully set forth herein together with any future advances or other extensions of credit in connection with the Loan.

Mortgagor specifically agrees as follows:

1.      Recitals; Defined Terms. The parties agree that the foregoing Recitals are true and correct and incorporated herein by this reference. All capitalized terms not otherwise defined in this Mortgage shall have the meaning ascribed to such terms in the Loan Documents, as applicable. Further, as used herein, the term "Lender" shall include any servicer of the Loan, as appointed by Lender in its discretion, if applicable, together with its agents, nominees or designees (collectively, the **"Servicer"**).

2.      Compliance with the Note and this Mortgage and Warranty of Title. Mortgagor shall comply with all provisions hereof, of the Note, and of all of the other Loan Documents, and will promptly pay to Lender the principal with interest thereon and all other sums required to be paid by Mortgagor under the Note, this Mortgage, and of all of the other Loan Documents. Mortgagor covenants and warrants that: (a) Mortgagor is indefeasibly seized of the Mortgaged Property; (b) the Mortgaged Property is not subject to any liens or encumbrances, other than, with respect solely to the Land, liens for ad valorem taxes which are not yet due and payable, all of which are superior to the lien of this Mortgage; (c) Mortgagor has lawful authority to convey, mortgage and encumber the Mortgaged Property; (d) Mortgagor will defend title to the Mortgaged Property against the claims of all persons whomsoever; and (e) Mortgagor will provide such further assurances as may be necessary, convenient, or otherwise required to perfect Lender's first priority lien in the Mortgaged Property created, or intended to be created, by this Mortgage.

3.      Payment of Taxes and Liens.

(a)      Mortgagor shall pay promptly, when due, and shall promptly deliver to Lender receipts therefor, all taxes, assessments, rates, dues, charges, fees, impositions, obligations and encumbrances of every kind whatsoever now or hereafter imposed, levied or assessed upon or against the Mortgaged Property or any part thereof, or upon or against this Mortgage or the Obligations or other sums secured hereby, or upon or against the interest of Lender in the Mortgaged Property, as well as all income taxes, assessments and other governmental charges levied or imposed by any taxing authority upon or against Mortgagor, the Mortgaged Property or any part thereof and any charge which, if unpaid, would become a lien or charge upon the Mortgaged Property.

(b)      Mortgagor shall not permit any mortgage (other than this Mortgage), mechanics', laborer's, materialmen's, statutory or other lien to be created or to remain a lien upon any of the Mortgaged Property.

(c)      Mortgagor shall promptly pay all yearly taxes, assessments, insurance premiums, and other similar charges against or otherwise related to the Mortgaged Property as they become due (before any interest attaches or any penalty is incurred), and shall deliver written proof of such payment to Lender within thirty (30) days after the due date. If Mortgagor shall fail to pay any such taxes, assessments, insurance premiums, or other similar charges as required pursuant to the terms of this Mortgage, upon demand by Lender, Mortgagor shall deliver to Lender such monies as are required to pay such taxes, assessments, insurance premiums, and other similar charges, and Lender may require that Mortgagor make monthly deposits with Lender for such taxes, assessments, insurance premiums, or other similar charges due on the Mortgaged Property (as based on prior tax years) in an amount equal to the total amount of such taxes, assessments, insurance premiums, or other similar charges due on the Mortgaged Property, divided by the number of months to elapse before one month prior to the date when such taxes, assessments, insurance premiums, or other similar charges will become delinquent. Such deposits: (i) shall be used, subject to the provisions of this Section, for the payment of the taxes, assessments, insurance premiums, or other similar charges on the Mortgaged Property next due and payable when they become due; (ii) may be commingled with other funds of Lender, and Lender shall not be required to establish a separate account for such deposits, and (iii) may be applied by Lender to any amounts owed to Lender under the Loan in the Event of Default under this Mortgage or the other Loan Documents. All

such deposits shall be applied by Lender, provided no Event of Default has occurred and is continuing, to the payment of taxes, assessments, insurance premiums, or other similar charges due on the Mortgaged Property. Following an Event of Default, Lender may apply such deposits to the payment of the amounts owed to Lender under the Note and the other Loan Documents, in whatever order Lender elects in Lender's sole discretion. Payments shall be made in the fiscal year designated by Lender, provided sufficient funds are available and such taxes, assessments, insurance premiums, or other similar charges are not delinquent. If the sums so deposited are insufficient to pay any such amounts for any period when the same shall become due and payable, Mortgagor shall on demand deposit such additional funds as may be necessary to pay such amounts in full. If the sums so deposited exceed the amount required to pay taxes, assessments, insurance premiums, or other similar charges for any year, the excess shall be credited to a subsequent deposit for such purposes.

4.      Insurance. Mortgagor shall obtain, maintain and keep in full force and effect during the term of this Mortgage, or cause Mortgagor's lessees to obtain, maintain and keep adequate insurance coverage, with all premiums paid thereon and without notice or demand, with respect to its properties and business against loss or damage of the kinds and in the amounts as set forth in the Loan Agreement.

5.      Condemnation and Insurance Proceeds.

(a)      (i) All awards of damages and all other compensation payable directly or indirectly by reason of a condemnation or proposed condemnation (or transfer in lieu thereof) for public or private use affecting the Mortgaged Property; (ii) all other claims and awards for damages to or decrease in value of the Mortgaged Property; (iii) all proceeds of any insurance policies payable by reason of loss sustained to the Mortgaged Property; and (iv) all interest which may accrue on any of the foregoing, are all absolutely and irrevocably assigned to and shall be paid to Lender. At the absolute discretion of Lender, whether or not its security is or may be impaired, but subject to applicable law if any, and without regard to any requirement contained in any other Section hereof, Lender may apply all or any of the proceeds it receives to its expenses in settling, prosecuting or defending any such claim and apply the balance to the Obligations in any order, and release all or any part of the proceeds to Mortgagor upon any conditions Lender may impose. Lender may commence, appear in, defend or prosecute any assigned claim or action, and may adjust, compromise, settle and collect all claims and awards assigned to Lender; provided however, that in no event shall Lender be responsible for any failure to collect any claim or award, regardless of the cause of the failure.

(b)      Notwithstanding Section 5(a) above or any other provision in this Mortgage or any other Loan Documents executed in connection with the Loan evidenced by the Note and this Mortgage, absent the existence of a Default, Lender shall permit insurance or condemnation proceeds held/received by Lender to be used for repair or restoration but, to the extent that said proceeds exceed five percent (5%) of the Loan Amount at the time received by Lender, may condition such application upon reasonable conditions, including, without limitation: (i) the deposit with Lender of such additional funds which Lender determines are needed to pay all costs of the repair or restoration (including, without limitation, taxes, financing charges, insurance and rent during the repair period); (ii) the establishment of an arrangement for lien releases and disbursement of funds acceptable to Lender, (iii) the delivery to Lender of plans and specifications for the work, a contract for the work signed by a contractor acceptable to Lender, and a cost breakdown for the work, all of which shall be acceptable to Lender; (iv) the delivery to Lender of a completion guaranty for the repair/restoration work executed by the guarantors of the Obligations in form satisfactory to Lender; and (v) the delivery to Lender of evidence acceptable to Lender (aa) that after completion of the work the income from the Mortgaged Property will be sufficient to pay all expenses and debt service for the Mortgaged Property; (bb) that no Default will exist following the completion of repair/restoration, including without limitation a Default with regard to the any debt yield covenants, if any, set forth in the Loan Documents; (cc) that upon completion of the work, the size, capacity and total value of the Mortgaged Property will be at least as great as it was before the damage or condemnation occurred; and (dd) that there has been no material adverse change in the financial condition or credit of Mortgagor or any guarantor of the Obligations since the date of this Mortgage; (ee) that the repair/restoration work can reasonably be expected to be completed prior to the maturity date of the Note, and (ff) of the satisfaction of any additional conditions that Lender may reasonably establish to protect its security. Mortgagor hereby

acknowledges that the conditions described above are reasonable, and, if such conditions have not been satisfied within one hundred eighty (180) days of receipt by Lender of such insurance or condemnation proceeds, then Lender may apply such insurance or condemnation proceeds to pay the Obligations in such order and amounts as Lender in its sole discretion may choose. Furthermore, notwithstanding anything to contrary contained herein, in the event any such insurance or condemnation proceeds are received by Lender in the twelve (12) month period immediately prior to the Maturity Date, then Lender shall have no obligation to disburse any insurance or condemnation proceeds to Mortgagor, and Lender may apply such insurance or condemnation proceeds to pay the Obligations in such order and amounts as Lender in its sole discretion may choose.

6.       Care and Use of the Mortgaged Property. Mortgagor shall not cut or remove any material amount of timber, sever, remove or grant any rights in any oil, gas, minerals, lime rock, phosphate, soil or other materials or remove or demolish any building or other property forming a part of the Mortgaged Property without the prior written consent of Lender in Lender's sole discretion. Mortgagor shall not permit, commit or suffer any waste, impairment or deterioration of the Mortgaged Property or any part thereof, and shall keep the same and improvements thereon in good condition and repair. Mortgagor shall notify Lender in writing within five (5) days of any damage or impairment of the Mortgaged Property. Mortgagor shall comply with all laws and regulations applicable to the Mortgaged Property, including, without limitation, all zoning, environmental, land use and toxic or hazardous waste disposal laws. Mortgagor covenants and warrants that all applicable zoning laws, ordinances and regulations affecting the Mortgaged Property permit Mortgagor's current or intended use and occupancy thereof.

7.       Lender's Right to Make Certain Payments. In the event Mortgagor (a) fails to complete, or pay in full for, any construction of improvements to the Mortgaged Property, (b) pay or discharge the taxes, assessments, levies, liabilities, obligations (including obligations under any leases) or encumbrances affecting the Mortgaged Property, (c) fails to keep the Mortgaged Property insured or to deliver the policies, premiums paid, (d) fails to repair the Mortgaged Property as herein agreed, or (e) Mortgagor otherwise defaults in any covenant herein or in any other document evidencing or securing the Obligations, then upon providing Mortgagor with written notice and a ten (10) day period to cure the default, Lender may at its option, without waiving or curing any default by Mortgagor, expend funds to complete or pay for such improvements, pay or discharge the taxes, assessments, levies, liabilities, and to pay off or cure any default under, obligations and encumbrances or any part thereof, procure and pay for such insurance or make and pay for such repairs and take such action to preserve the value of the Mortgaged Property and otherwise perform any action required to be performed by Mortgagor. Lender shall have no obligation on its part to determine the validity or necessity of any payments thereof and any such payment shall not waive or affect any option, lien, equity or right of Lender under or by virtue of this Mortgage. The full amount of each and every such payment shall be immediately due and payable, whether or not there be notice, demand, attempt to collect or suit pending, and shall bear interest at the Default Rate (defined below) from the date thereof until paid, and together with such interest, shall be secured by the lien of this Mortgage and any other instrument securing the Obligations. Nothing herein contained shall be construed as requiring Lender to advance or expend monies for any of the purposes mentioned in this Section. No such payments shall be deemed to waive or cure any default hereunder.

8.       Cash Management Account. Any Cash Management Account(s) will be governed and controlled by the terms of the Loan Agreement and any separate Cash Management Agreement.

9.       Payment of Expenses. Mortgagor shall pay all enforcement costs, costs, advances, charges and expenses, including attorneys' fees and costs and any servicer fees and costs, disbursements and cost of abstracts of title, documentary stamp and intangible personal property taxes (and any penalties or interest with respect thereto) incurred in connection with the Note, this Mortgage, or the other Loan Documents, or the enforcement thereof or paid at any time by Lender due to the failure on the part of Mortgagor to promptly and fully perform, comply with and abide by each and every stipulation, agreement, condition and covenant of the Note, this Mortgage, and the other Loan Documents or in the enforcement of Lender's rights hereunder. The full amount of such costs, charges and expenses shall be immediately due and payable, whether or not there be notice, demand, attempt to collect or suit pending, and shall bear interest at the Default Rate from the date thereof until

paid, and together with such interest, shall be secured by the lien of this Mortgage and any other instrument securing the Obligations. Nothing herein contained shall be construed as requiring Lender to advance or expend monies for any of the purposes mentioned in this Section. No such payments shall be deemed to waive or cure any default hereunder. No such action which Lender shall take or fail to take in connection with the Note or the Loan Documents, or any of them, or any security for the payment of the Obligations or other undertakings of the Mortgagor, nor any course of dealing with the Mortgagor or any other person, shall reduce or release the Obligations or in any way to afford Mortgagor any recourse against Lender.

10.     Documentary Stamp Tax and Intangible Tax. Contemporaneously herewith, Mortgagor has executed and delivered to Lender the Note. The Note evidences a debt obligation owed by Mortgagor to Lender in the Principal Amount. Mortgagor shall pay any and all required documentary stamp taxes and intangible personal property taxes due in connection with the Note, this Mortgage, and the other Loan Documents. If for any reason whatsoever the State of New York or County of Manhattan (or any other state, local, or federal jurisdiction or governmental or quasi-governmental body, board, department, or agency) should assess additional documentary stamp taxes, intangible taxes, penalties, interest, or other charges with respect to such existing indebtedness evidenced by the Note, or with respect to any documentary stamp or intangible tax due in connection with this Mortgage or any of the Loan Documents, Mortgagor covenants and agrees with Lender that upon the demand of Lender, Mortgagor shall immediately pay all such additional documentary stamp taxes, intangible taxes, penalties, interest, or other charges. Mortgagor's covenant in the preceding sentence shall survive any termination, release, or satisfaction of this Mortgage and will be secured by the lien of this Mortgage.

11.     No Transfer or Further Encumbrance. Except as set forth in the Loan Agreement, Mortgagor shall not sell, convey, transfer or further encumber any interest in or any part of the Mortgaged Property without the prior written consent of Lender, and any such sale, conveyance, transfer or encumbrance made without Lender's prior written consent may, at Lender's option, be declared null and void by Lender. If any person should, without the prior written consent of Lender, which consent may be given or withheld in Lender's sole and absolute discretion, obtain an interest in all or any part of the Mortgaged Property pursuant to the execution or enforcement of any lien, security interest or other right, whether superior, equal or subordinate to this Mortgage or the lien hereof, such event shall be deemed to be a transfer by Mortgagor and an Event of Default hereunder.

12.     After-Acquired Property. The lien of this Mortgage will automatically attach, without further act, to all after acquired property of whatever kind located in or on, or attached to, or used or intended to be used in connection with or in the operation of the Mortgaged Property.

13.     Additional Documents; Further Assurances. At any time and from time to time, upon Lender's reasonable request, Mortgagor shall make, execute and deliver or cause to be made, executed and delivered to Lender and, where appropriate, shall cause to be recorded or filed and from time to time thereafter to be re-recorded or re-filed at such time and in such offices and places as shall be deemed desirable by Lender any and all such further deeds, conveyances, mortgages, security agreements, financing statements, assignments of leases, certifications, affidavits, instruments, or other documents as Lender may consider necessary or desirable in order to better assure, mortgage, pledge, assign and confirm unto Lender all and singular the Mortgaged Property and the title thereto, and/or to effectuate, complete, enlarge or perfect, or to continue and preserve the obligations of Mortgagor under the Note and this Mortgage, and the lien of this Mortgage as a first and prior lien upon all of the Mortgaged Property, whether now owned or hereafter acquired by Mortgagor. Upon any failure by Mortgagor to do so, Lender may make, execute, record, file, re-record, or re-file any and all such mortgages, instruments, certificates and documents for and in the name of Mortgagor, and Mortgagor hereby irrevocably appoints Lender as agent and attorney-in-fact of Mortgagor to do so.

14.     Reappraisals. Notwithstanding any term or provision hereof to the contrary, if at any time and for any reason Lender in its sole discretion determines that the value of the Mortgaged Property may have declined, within sixty (60) days from Lender's written request to Mortgagor therefor, Mortgagor shall provide to Lender, at Mortgagor's sole cost and expense (or reimburse Lender for Lender's costs and expenses of obtaining), a current appraisal of the Mortgaged Property to be ordered by Lender from an appraiser designated by Lender and in form and content as required by Lender. Notwithstanding the foregoing, for so long as no Event

of Default has occurred hereunder, Lender shall not be permitted to require appraisals hereunder more frequently than annually unless required more frequently by Lender's regulations or requirements or any applicable laws. Any such costs or expenses incurred or paid in connection with this Section shall be immediately due and payable by Mortgagor, whether or not there be notice, demand, attempt to collect or suit pending, and such amount due shall bear interest from the date incurred until the date paid by Mortgagor at the Default Rate. All such costs or expenses incurred or paid by Lender, together with such interest, shall be secured by the lien of this Mortgage. Mortgagor shall cooperate fully with any such appraiser and provide all such documents and information as such appraiser may request in connection with such appraiser's performance and preparation of such appraisal. Mortgagor's failure to promptly and fully comply with Lender's requirements under this Section shall, without further notice, constitute an Event of Default under this Mortgage.

15. Inspection of the Mortgaged Property. Notwithstanding any term or provision hereof to the contrary, and irrespective of a default by Mortgagor hereunder, Lender shall have the right to inspect the Mortgaged Property in accordance with the Loan Agreement (each inspection, an "**Inspection**") at Mortgagor's sole cost and expense. Prior to each Inspection, Lender shall provide reasonable notice to Mortgagor of Lender's intent to perform an Inspection.

16. Warranties and Representations of Mortgagor. As material inducements to Lender to make the Loan, Mortgagor hereby warrants and represents to Lender as follows:

(a) Validity of Loan Documents. That Mortgagor is the sole and lawful owner of the Mortgaged Property and that the Loan Documents are in all respects legal, valid and binding according to their terms and grant to Lender a direct, valid and enforceable first priority lien and security interest in the Mortgaged Property. Borrower

(b) Conflicting Transactions of Mortgagor. That the consummation of the transactions hereby contemplated and the performance of Mortgagor's obligations under and by virtue of the Loan Documents will not result, to the best of Mortgagor's knowledge, in any breach of, or constitute a default under any mortgage, security deed, deed of trust, lease, bank loan or credit agreement, corporate charter or bylaws, as applicable, or other instrument to which Mortgagor is a party or by which Mortgagor may be bound or affected.

(c) Pending Litigation. That there are no actions, suits or proceedings pending or, to the knowledge of Mortgagor, threatened against or affecting Mortgagor which affects any of the Mortgaged Property, or involving the validity or enforceability of any of the Loan Documents or the priority of the lien thereof, at law or in equity, or before or by any governmental authority, except actions, suits and proceedings which are fully covered by insurance and which, if adversely determined, would not substantially impair Mortgagor's ability to perform each and every one of its respective obligations under and by virtue of the Loan Documents; and that to Mortgagor's knowledge, Mortgagor is not in default with respect to any order, writ, injunction, decree or demand of any court or any governmental authority.

(d) Violations of Governmental Law, Ordinances or Regulations. That Mortgagor has no knowledge of any violation or notice of violations of any federal or state law or municipal ordinance or order or requirement of, or agreement with, the county or city or any municipal department or other governmental authority having jurisdiction affecting the Mortgaged Property, which violations in any way relate to or affect the Mortgaged Property, except as disclosed in the Title Report issued by the Title Company (as defined in the Loan Agreement).

(e) Condition of Mortgaged Property. That the Mortgaged Property is not now damaged or impaired as a result of any fire, explosion, accident, flood, windstorm, land movement, earthquake, discharge or other casualty other than deferred maintenance as expressly disclosed in a property maintenance report to Lender prior to the Closing Date and certified to Lender, all in form and substance acceptable to Lender in Lender's sole discretion.

(f)     Accuracy of Information. That Lender's commitment to make the Loan, is based on the accuracy of Mortgagor's representations and statements. None of the Loan Documents furnished to Lender contains any untrue statement of a material fact or omits to state a fact material to Lender's decision to make the Loan.

(g)     Continuation and Investigation. That the warranties and representations contained herein shall be and remain true and correct so long as any of Mortgagor's or any guarantor's obligations hereunder have not been satisfied, or so long as part of the Loan shall remain outstanding. All representations, warranties, covenants and agreements made herein or in any certificate or other document delivered to Lender by or on behalf of Mortgagor pursuant to or in connection with any of the Loan Documents shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

(h)     Prior Notes and Prior Mortgages. Borrower has the right to consolidate, modify and extend the Prior Notes and Prior Mortgages, and Borrower also covenants and warrants that there are no offsets, counterclaims or defenses against the indebtedness now unpaid or against the Prior Notes, Prior Notes, the Note, or this Mortgage.

17.     Environmental Condition of Property. In connection with the environmental condition of the Mortgaged Property and other related matters, Mortgagor has made certain representations, warranties and covenants to Lender and has agreed to indemnify, defend, and hold Lender harmless all as more particularly set forth in that certain Environmental Indemnity Agreement of even date herewith executed by Mortgagor, Lender, and Guarantor, and the same is incorporated herein by reference.

18.     Leases. Mortgagor agrees as follows with respect to all Leases:

(a)     Mortgagor does hereby absolutely and unconditionally assign to Lender, all of Mortgagor's right, title and interest in all current and future Leases and Rents, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Such assignment shall not be construed to bind Lender to the performance of any of the covenants or provisions contained in any Lease or otherwise impose any obligation upon Lender. Nevertheless, subject to the terms of the Cash Management Agreement and this paragraph, Lender grants to Mortgagor a revocable license to operate and manage the Mortgaged Property and to collect the Rents subject to the requirements of this Mortgage. Upon and during an Event of Default, with required notice, if any, and right to cure, if any, each as provided in the Assignment of Leases and Rents (as defined in the Loan Agreement), the license granted to Mortgagor herein shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents, whether or not Lender enters upon or takes control of the Mortgaged Property. Mortgagor hereby grants and assigns to Lender the right, at Lender's option, upon revocation of the license granted herein, to enter upon the Mortgaged Property in person, by agent or by court appointed receiver to collect the Rents. Any Rents collected after the revocation of such license may be applied toward payment of the Obligations in such priority and proportions as Lender in its sole discretion shall deem proper. Mortgagor shall not in any event collect or accept any Rents under any Lease more than one (1) month in advance without the prior written consent of Lender. If Mortgagor collects or receives any such Rents after the occurrence of any Event of Default, then: (i) Mortgagor shall hold such funds in trust for Lender; (ii) Mortgagor shall not commingle such funds with any other funds or assets; and (iii) Mortgagor shall remit such funds to Lender not later than one (1) business day after Mortgagor's receipt of the same.

(b)     Mortgagor shall not enter into or modify any Lease on or after the date hereof except in accordance with the terms and conditions of the Loan Agreement.

(c)     Mortgagor shall perform all of its material obligations under the Leases, all in accordance with the terms and conditions of the Loan Agreement.

(d)     Mortgagor covenants and represents that: (i) Mortgagor has title to, and full right to assign each Lease which is now in effect and the Rents, income and profits due or to become due thereunder; (ii) to Mortgagor's best knowledge, no other assignment of any interest in the Leases or the Rents has been made, except as set forth herein; (iii) to Mortgagor's best knowledge, there are no existing material defaults under the provisions of the Leases; and (iv) Mortgagor will not hereafter further assign, transfer, encumber or pledge the Leases (except for transfers or pledges in favor of Lender).

(e)     From and after the occurrence of any Event of Default hereunder, Lender shall be entitled, in addition to all other rights or remedies set forth herein, at its option and without notice to or the consent of Mortgagor, to enter and take possession of the Mortgaged Property and to manage and operate the same or to have a receiver appointed to do the same, to collect all or any Rents accruing therefrom or from the Leases, to let or re-let the Mortgaged Property or any part thereof, to cancel and modify Leases, to evict tenants, to bring or defend any suits in connection with the possession of the Mortgaged Property in its own name or Mortgagor's name, to make such repairs as Lender deems appropriate, and to perform such other acts in connection with the management and operation of the Mortgaged Property as Lender, in its sole discretion, may deem proper. Lender is specifically authorized, without limitation, to notify tenants under the Leases of: (i) the terms of this Mortgage; (ii) the occurrence of any Event of Default hereunder; and (iii) any other matters that Lender deems appropriate. Lender is further authorized to direct such tenants to make all payments directly to Lender or its nominee from and after the occurrence of any Event of Default hereunder. Lender's receipt of any Rents, issues or profits pursuant to this instrument, after the institution of foreclosure or sale proceedings under any mortgage, shall not cure such default or affect such proceedings or any sale pursuant thereto.

(f)     The net proceeds of any Rents collected by Lender hereunder, after reimbursement of expenses incurred by Lender under the terms of this instrument and any other amounts to be applied in accordance with the Loan Agreement, shall be applied in reduction of the Obligations secured hereby in such order as Lender, in its discretion, deems appropriate.

(g)     Lender shall not be deemed to be an agent, partner or joint venturer of Mortgagor or any other person, and nothing herein contained shall be construed to impose any liability upon Lender by reason of the provisions hereof.

19.     Events of Default. Mortgagor shall be in default under this Mortgage upon the occurrence of any default or breach by Mortgagor of the terms, conditions, representations, warranties, and covenants of this Mortgage and upon the occurrence of an Event of Default in accordance with the terms of the Loan Agreement or any of the other Loan Documents (as used herein, each a "**Default**" or an "**Event of Default**").

20.     Acceleration. If an Event of Default shall have occurred, Lender may declare all amounts due under the Note and any interest accrued thereon, and all other sums secured hereby, and all other amounts due under the Loan Documents, to be due and payable immediately. Upon such declaration all principal and interest and other sums shall immediately be due and payable without demand or notice, which such notice is expressly waived by Mortgagor.

21.     Remedies After Default.

(a)     If an Event of Default shall have occurred, Lender may exercise any or all of the following rights, remedies and recourses:

(i)     To the extent permitted by applicable law, Lender may enter upon all or any part of the Mortgaged Property and take exclusive possession thereof and of all books, records and accounts relating thereto. If Mortgagor remains in possession of all or any part of the Mortgaged Property after an Event of Default and without Lender's prior written consent thereto, Lender may invoke any and all legal remedies to dispossess Mortgagor, including without limitation one or more actions for forcible entry and detainer, trespass to try title and writ of restitution. Nothing contained in the foregoing sentence shall, however, be construed to impose any greater obligation or any prerequisites

to acquiring possession of the Mortgaged Property after an Event of Default than would have existed in the absence of such sentence.

(ii)    To the extent permitted by applicable law, Lender may, as attorney-in-fact or agent of Mortgagor, or in its own name as Lender or by the appointment of a receiver in accordance with applicable law, hold, lease, manage, operate or otherwise use or permit the use of all or any portion of the Mortgaged Property and conduct the business, if any, thereof, either by itself or by other persons, firms, entities or agents, in such manner, for such time and upon such other terms as Lender may deem to be prudent and reasonable under the circumstances (making such repairs, alterations, additions and improvements thereto and taking any and all other action with reference thereto, from time to time, as Lender shall deem necessary or desirable) and to exercise the powers described herein. Lender may apply all Rents and other amounts collected by Lender in connection therewith in accordance with the provisions hereof. Such remedies may be exercised cumulatively and concurrently, and in this respect each of Lender shall be entitled to avail itself of the benefits and rights stated herein.

(iii)    Lender may institute a proceeding, judicial or otherwise, for the complete foreclosure of this Mortgage to the fullest extent permitted by law; or institute a proceeding or proceedings, judicial or otherwise, for the partial foreclosure of this Mortgage, as permitted by applicable law for the portion of the Obligations then due and payable, with this Mortgage then continuing unimpaired and without loss of priority so as to secure the balance of the Obligations.

(iv)    To the extent permitted by applicable law, Lender may sell or offer for sale the Mortgaged Property and/or Personal Property, in such portions, order and parcels as Lender may determine, with or without having first taken possession of same, to the highest bidder for cash in lawful money of the United States at public or private auction or sale in accordance with applicable law, or the UCC, and in the event of a sale, by foreclosure, public or private sale, or otherwise, of less than all of the Mortgaged Property and/or Personal Property, this Mortgage shall continue as a lien and security interest on the remaining portion of the Mortgaged Property and/or Personal Property. Lender may postpone any sale by public announcement at the time and place noticed for the sale, or by any private notice allowed by applicable law. If the Mortgaged Property consists of several lots, parcels or items of property, Lender may, in its sole discretion and to the extent permitted by applicable law: (A) designate the order in which such lots, parcels or items shall be offered for sale or sales, or (B) elect to sell such lots, parcels or items through a single sale, or through two (2) or more successive sales or in any other manner that Lender deems in its best interest, it being expressly understood and agreed that the right of sale arising out of any Event of Default shall not be exhausted by any one or more sales. Should Lender desire that more than one sale or other disposition of the Mortgaged Property and/or Personal Property or any portion thereof be conducted simultaneously, or successively, on the same day, or at such different days or times and in such order as Lender may deem to be in its best interests, no such sale shall terminate or otherwise affect the lien and security interest of this Mortgage on any part of the Mortgaged Property and/or Personal Property not sold until all the Obligations have been fully satisfied and this Mortgage shall have been satisfied. Mortgagor shall pay the expenses of any sale of the Mortgaged Property and/or Personal Property whether one or more, and of any judicial proceedings wherein the same may be made, including reasonable compensation of Lender, its agents and counsel, and shall pay all expenses, liabilities and advances made or incurred by Lender in connection with such sale or sales, together with interest at the Default Rate on all such advances made by Lender. Upon any sale hereunder, Lender may, at Lender's election, execute and deliver to the purchaser or purchasers a deed or deeds or bill of sale or bills of sale, as applicable, conveying the property so sold, but without any covenant or warranty whatsoever, express or implied, whereupon such purchaser or purchasers shall be let into immediate possession; and the recitals in any such deed or deeds or bill of sale or bills of sale, as applicable of facts, such as default, the giving of notice of default and notice of sale, and other facts affecting the regularity or validity of such sale or disposition, shall be conclusive proof of the truth of such facts; and any such deed or deeds or bill of sale or bills of sale, as applicable shall be conclusive against all persons as to such facts recited therein.

(v)     Lender may exercise any or all of its rights and remedies under the UCC or other applicable law as well as all other rights and remedies possessed by Lender, all of which shall be cumulative. Lender is hereby authorized and empowered to enter the Mortgaged Property or other place where any Personal Property may be located without legal process, and to take possession of such Personal Property without notice or demand, which hereby are waived to the maximum extent permitted by the laws of the State of New York. Upon demand by Lender, Mortgagor shall make such Personal Property available to Lender at a place reasonably convenient to Lender. Lender may sell at one or more public or private sales and for such price as Lender may deem commercially reasonable, any and all of such Personal Property, and any other security or property held by Lender and Lender may be the purchaser of any or all of such Personal Property.

(b)     Prior to, upon or at any time after, commencement of foreclosure of the lien, security title and security interest provided for herein or any legal proceedings pursuant hereto, Lender may make application to a court of competent jurisdiction for appointment of a receiver of the Mortgaged Property. Such application may be made as a matter of strict right and without notice to Mortgagor (unless notice is required by applicable law and such right of notice may not be waived) or regard to the adequacy of the Mortgaged Property or insolvency of Mortgagor or any person who may be legally or equitably liable to pay the Obligations and without giving bond to Mortgagor (unless bond is required by applicable law and such right of bond may not be waived, in which case, such bond shall be in the minimum amount required by applicable law), and Mortgagor does hereby irrevocably consent to such appointment. Any such receiver shall have all the usual powers and duties of receivers in similar cases, including the full power to rent, maintain and otherwise operate the Mortgaged Property all upon such terms as may be approved by the court, and shall apply the Rents in accordance with the provisions of this Mortgage.

(c)     Lender shall have all rights, remedies and recourses granted in this Mortgage, in any other applicable Loan Documents, and available at law or equity (including specifically those granted by the UCC in effect and applicable to the Mortgaged Property) including, without limitation, the right to judicially or non-judicially foreclose, to bring a strict foreclosure action, or to bring an action in any court of competent jurisdiction to foreclose this instrument as a realty mortgage if permitted by applicable law, and, except as limited by applicable law, the same (i) shall be cumulative and concurrent; (ii) may be pursued separately, successively or concurrently against Mortgagor or against all or any portion of the Mortgaged Property, in the sole discretion of Lender; (iii) may be exercised as often as occasion therefor shall arise, it being agreed by Mortgagor that the exercise or failure to exercise any of same shall in no event be construed as a waiver or release thereof or of any other right, remedy or recourse; and (iv) are intended to be, and shall be nonexclusive.

(d)     Lender shall be entitled to receive all reasonable costs and expenses of the sale or repossession of the Mortgaged Property including any receiver's fee or commission, if any, title and abstracting charges, reasonable attorneys' fees and auctioneer's fees, inspection costs, third party costs for any environmental assessments, property condition reports, valuations of any real or personal property, and all other costs and expenses incurred in exercising or preparing to exercise its remedies hereunder, whether incurred at pretrial, trial, on appeal, at sale, or in bankruptcy or in any administrative or collection proceeding.

(e)     Mortgagor shall not be relieved of any obligation it has granted under this Mortgage, or any other applicable Loan Documents, to Lender by reason of (i) the release, regardless of consideration, of any of the Mortgaged Property or any other collateral held pursuant to the applicable Loan Documents or the addition of any other property to the Mortgaged Property or other such collateral; (ii) any agreement or stipulation between any subsequent owner of all or any portion of the Mortgaged Property and Lender; or (iii) any other acts or occurrence, save and except the full payment and performance of all of the Obligations due to Lender under this Mortgage, the Note, and any other applicable Loan Documents.

(f)     To the fullest extent permitted by law, Lender may release, regardless of consideration, any part of the Mortgaged Property without, as to the remainder, in any way impairing, affecting, subordinating or releasing the lien or security interest created in or evidenced by this Mortgage or its status as a first and prior lien and security interest in and to the Mortgaged Property. For payment of the Obligations, to the fullest extent

permitted by applicable law, Lender may resort to any other security therefor held by Lender in such order and manner as Lender may elect, and such resort may be taken concurrently or successively and in one or several consolidated or independent judicial actions or lawfully taken non-judicial proceedings, or both.

(g)  To the extent permitted by applicable law, in case Lender shall have proceeded to invoke any right, remedy or recourse permitted under this Mortgage, the Note, or any other applicable Loan Documents and shall thereafter elect to discontinue or abandon the same for any reason, Lender shall have the unqualified right so to do and, in such an event, Mortgagor and Lender shall be restored to their former positions with respect to this Mortgage, the Note, or any other applicable Loan Documents, the Mortgaged Property and otherwise, and the rights, remedies, recourses and powers of Lender shall continue as if same had never been invoked.

(h)  To the extent permitted by applicable law, all proceeds received from the sale or other dispositions of the Mortgaged Property, including but not limited to, the Rents and other income generated by the holding, leasing, operating or other use of the Mortgaged Property, pursuant to this Mortgage shall be applied by Lender (or the receiver, if one is appointed), as applicable, to the extent that funds are so available therefrom, in accordance with the following priorities:

(i)  FIRST: to the reasonable costs and expenses of the sale or possession of the Mortgaged Property including any receiver's fee or commission, if any, title and abstracting charges, attorneys' fees and an auctioneer's fee if such expense has been incurred;

(ii)  SECOND: to the satisfaction of the Obligations; and

(iii)  THIRD: to the payment to whomsoever shall be entitled thereto under applicable law, if the person who made the sale knows who is entitled thereto. Otherwise, the surplus shall be paid to the clerk of the superior, district or circuit court (or other court having jurisdiction).

(i)  If Lender shall be ordered, in connection with any bankruptcy, insolvency or reorganization of Mortgagor, to restore or repay to or for the account of Mortgagor or any of its creditors any amount theretofore received hereunder, the amount for such restoration or repayment shall be deemed to be an Obligation so as to place Lender in the position it would have been in had such amount never been received by any party hereto.

(j)  If an Event of Default shall occur, Mortgagor will use its best efforts to cooperate with Lender and promptly do all things reasonably required of it toward obtaining all necessary authority and permission from any governmental authority or otherwise to accomplish any disposition, abandonment or change in use of the Mortgaged Property (or any portion thereof) as Lender may request in connection with the exercise of its rights and powers hereunder and under this Mortgage, the Note, or any other applicable Loan Documents. Without limiting the generality of the foregoing, following an Event of Default and reasonable advance notice to Mortgagor, Mortgagor agrees to relocate operations located on the Mortgaged Property to a location off of the Mortgaged Property or to a specific location on the Mortgaged Property as directed by Lender to accommodate the disposition, abandonment, change in use or foreclosure by Lender of any portion thereof, provided that such relocation does not materially violate any legal requirement applicable to Mortgagor or the Mortgaged Property.

22.  No Waiver. No delay or omission of Lender or of any holder of this Mortgage to exercise any right, power or remedy accruing upon any Event of Default shall exhaust or impair any such right, power or remedy or be construed as a waiver of any such Event of Default or constitute acquiescence therein.

23.  Non-Exclusive Remedies. No right, power or remedy conferred upon or reserved to Lender by this Mortgage or by any of the other Loan Documents is exclusive of any other right, power or remedy, but each and every such right, power and remedy shall be cumulative and concurrent and shall be in addition to any other right, power or remedy given hereunder, or now or hereafter existing at law, in equity or by statute.

24.     Application of Payments. Notwithstanding anything to the contrary herein, any partial payment made by Mortgagor or any payment made by Mortgagor after the occurrence of an Event of Default may be applied against the Obligations hereby secured in such manner as Lender, in its sole discretion, may determine.

25.     Successors and Assigns Bound. Whenever one of the parties hereto is named or referred to herein, the heirs, personal representatives, successors and assigns of such party shall be included and all covenants and agreements contained in this Mortgage, by or on behalf of Mortgagor or Lender, shall bind and inure to the benefit of their respective heirs, personal representatives, successors and assigns.

26.     Invalid or Unenforceable. In the event that any of the covenants, agreements, terms or provisions contained in this Mortgage and the Note shall be invalid, illegal or unenforceable in any respect, the validity of the remaining covenants, agreements, terms or provisions contained herein and in the Note shall be in no way affected, prejudiced or disturbed thereby.

27.     Future Advances. This Mortgage is given to secure not only existing Obligations, but also such future advances, whether such advances are obligatory or are to be made at the option of Lender, or otherwise, as are made under the Loan within twenty (20) years from the date hereof, to the same extent as if such future advances were made on the date of the execution of this Mortgage. The total amount of indebtedness that may be so secured may decrease or increase from time to time, but the total unpaid balance so secured at one time shall not exceed two (2) times the face amount of the Note, plus interest thereon, and any disbursements made for the payment of taxes, levies or insurance on the Mortgaged Property, with interest on such disbursements at the Default Rate as hereinafter defined. Each such additional loan shall be evidenced by a note or other evidence of indebtedness and shall be automatically secured by this Mortgage without the necessity of the note or other evidence of indebtedness identifying such additional loan as part of the indebtedness secured by this Mortgage. Nothing herein contained shall imply any obligation on the part of Lender to make any such additional loan(s).

28.     Obligation of Mortgagor. Mortgagor shall pay the cost of releasing or satisfying this Mortgage of record.

29.     Default Rate. The "**Default Rate**" shall be the default rate as set forth in the Loan Agreement; provided, however, at no time shall any interest or charges in the nature of interest be taken, exacted, received or collected which would exceed the maximum rate permitted by law.

30.     Facilities For Handicapped. All improvements now or hereafter included in the Mortgaged Property shall comply with all legal requirements regarding access and facilities for handicapped or disabled persons, including, without limitation, and to the extent applicable, the following: (a) the Federal Architectural Barriers Act of 1988 (42 U.S.C. Section 4151, et. seq.); (b) The Fair Housing Amendment Act of 1988 (42 U.S.C. Section 3601, et. seq.); (c) The Americans With Disabilities Act of 1990 (42 U.S.C. Section 12101 et. seq.); and (d) The Rehabilitation Act of 1973 (29 U.S.C. Section 794).

31.     Indemnification. Mortgagor will protect, indemnify and save harmless Lender, its officers, directors, agents, employees, affiliates and any respective servicers from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation, reasonable attorneys' fees and expenses) imposed upon, incurred by or asserted against Lender or any of such persons by reason of (a) ownership of any interest in the Mortgaged Property or any part thereof; (b) any accident, injury to or death of person or loss of or damage to property occurring on or about the Mortgaged Property or any part thereof or the adjoining sidewalks, curbs, vaults and vault space, if any, streets or ways; (c) any use, disuse or condition of the Mortgaged Property or any part thereof, or the adjoining sidewalks, curbs, vaults and vault space, if any, or any streets or ways; (d) any failure on the part of Mortgagor to perform or comply with any of the terms hereof or any inaccuracy in any representation or warranty made by Mortgagor herein; (e) any necessity to defend any of the right, title or interest conveyed by this Mortgage; (f) the performance of any labor or services or the furnishing of any materials or other property in respect to the Mortgaged Property or any part thereof; or (g) any subsidence or erosion of any part of the surface of the Mortgaged Property, including any shoreline or any bank of any river, stream, creek, lake, ocean or other water

source. If any action, suit or proceeding is brought against Lender, or any of its officers, directors, agents or employees, for any reason, Mortgagor, upon the request of such party, will, at Mortgagor's expense, cause such action, suit or proceeding to be resisted and defended by counsel satisfactory to Lender or such person. Any amounts payable to an indemnified party under this Section which are not paid within ten (10) days after written demand therefor shall bear interest at the Default Rate (as defined above) from the date of such demand, and such amounts, together with such interest, shall be indebtedness secured by this Mortgage. The obligations of Mortgagor under this Section shall survive any defeasance of this Mortgage or repayment of the Obligations or any satisfaction of this Mortgage.

32.     Notices. All notices, demands, consents, requests or other communications (each, a "Notice") that are permitted or required to be given by any party to the other hereunder shall be in writing and given in the manner specified in Section 10.1 of the Loan Agreement.

33.     Waivers by Mortgagor. To the fullest extent permitted by applicable law except as otherwise provided in the Loan Agreement, this Mortgage, the Note, and any other applicable Loan Documents, Mortgagor hereby irrevocably and unconditionally WAIVES and RELEASES (a) all benefits that might accrue to Mortgagor by virtue of any present or future law exempting the Mortgaged Property from attachment, levy or sale on execution or providing for any appraisement, valuation, homestead exemption, stay of execution, exemption from civil process, redemption or extension of time for payment; (b) all notices of any demand, presentment, Default, Event of Default, intent to accelerate or acceleration or the election by Lender, as applicable, to exercise or the actual exercise of any right, remedy or recourse provided for under this Mortgage, the Note, or any other applicable Loan Documents; (c) any right to a marshalling of assets or a sale in inverse order of alienation; (d) any restrictions or conditions upon the exercise by Lender of the remedies set forth herein; (e) rights of redemption; and (f) any Excused Delay (as hereinafter defined). As used herein, an "Excused Delay" means a delay caused by an Act of God, state of emergency or public health emergency declared by federal, state or local governmental authorities, pandemic (specifically including the COVID-19 pandemic), epidemic, endemic or outbreak, government mandated shutdown, quarantine or travel ban, war, acts of terrorism, order of government or civil or military authorities, impossibility or frustration of purpose. Lender shall have no duties or responsibilities except those expressly set forth in this Mortgage and the other Loan Documents. Neither Lender nor any of its officers, directors, employees or agents shall be liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross negligence or willful misconduct. No provision of this Mortgage shall operate to place any obligation or liability for the control, care, management or repair of the Mortgaged Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Mortgaged Property by the tenants or any other Person, or for any dangerous or defective condition of the Mortgaged Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. NOTHING HEREIN CONTAINED SHALL BE CONSTRUED AS CONSTITUTING LENDER A "MORTGAGEE IN POSSESSION".

EXCEPT AS PROHIBITED BY LAW, MORTGAGOR HEREBY WILLINGLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. MORTGAGOR CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.     THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR LENDER TO ACCEPT THIS AGREEMENT AND MAKE THE LOAN.

34.     WAIVER OF JURY TRIAL. MORTGAGOR AND ANY SUBSEQUENT ENDORSER, GUARANTOR OR OTHER ACCOMMODATION BORROWER WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS MORTGAGE OR UNDER ANY AGREEMENT, INSTRUMENT OR OTHER DOCUMENT CONTEMPLATED HEREBY OR RELATED HERETO AND IN ANY ACTION DIRECTLY OR

INDIRECTLY RELATED TO OR CONNECTED WITH THE OBLIGATIONS PROVIDED FOR HEREIN, OR ANY CONDUCT RELATING TO THE ADMINISTRATION OR ENFORCEMENT OF SUCH OBLIGATIONS OR ARISING FROM THE DEBTOR/CREDITOR RELATIONSHIP OF THE PARTIES HERETO. MORTGAGOR ACKNOWLEDGES THAT THIS WAIVER MAY DEPRIVE IT OF AN IMPORTANT RIGHT AND THAT SUCH WAIVER HAS WILLINGLY, KNOWINGLY AND VOLUNTARILY BEEN AGREED TO BY MORTGAGOR.

35.     Section Headings. The section headings contained in this Mortgage are for the purposes of identification only and shall not be considered in construing this Mortgage.

36.     Authority. The individual or individuals executing this Mortgage hereby represent and warrant that they are empowered and duly authorized to so execute this Mortgage on behalf of the party or parties they represent.

37.     COMMERCIAL LOAN AND MORTGAGE. MORTGAGOR ACKNOWLEDGES AND AGREES THAT THE LOAN IS STRICTLY A COMMERCIAL LOAN, THIS MORTGAGE IS STRICTLY A COMMERCIAL MORTGAGE, AND THE TRANSACTIONS CONTEMPLATED BY THIS MORTGAGE AND THE LOAN DOCUMENTS ARE STRICTLY COMMERCIAL TRANSACTIONS.

38.     State Specific Provisions. This Mortgage is subject to the terms and provisions relating to the particular laws of the State of New York as set forth in Exhibit "B" attached hereto which is hereby incorporated by reference as though fully set forth herein. In the event of any conflict between the terms and conditions contained in the body of this Mortgage and the terms and provisions set forth in Exhibit "B" the terms and provision set forth in Exhibit "B" shall govern and control.

39.     Lost Notes. Section 10.26 of the Loan Agreement is incorporated herein by reference for the express benefit of Lender.

40.     Not a Novation. This Mortgage does not constitute, nor shall it be construed to constitute a novation. Lender shall continue to have the same rights and remedies to proceed against the Mortgaged Property or collect the indebtedness in the same manner as permitted under the Loan Documents, and Lender shall continue to have a first priority lien and encumbrance on the Mortgaged Property.

*[Signature pages follow]*

IN WITNESS WHEREOF, the undersigned has executed this Mortgage effective as of the Effective Date written above.

MORTGAGOR:

**THE FRIARS NATIONAL ASSOCIATION, INC.**, a
New York not-for-profit corporation

By: _____

Name: Arthur Aidala
Its: President

*{NOTARY PAGE FOLLOWS}*

STATE OF New York

COUNTY OF New York        ) ss:

On the _16_ day of June in the year 2021 before me, the undersigned, personally appeared ARTHUR AIDALA, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

**NANCY H SCHAAFF**
Notary Public, State of New York
No. 01SC6265547
Qualified in Kings County
Commission Expires July 09, 20 24

Mortgagor's Notary Page to
Amended and Restated Mortgage, Assignment of Rents, Security Agreement and Financing Statement

LENDER:

**KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP,**
a Delaware limited partnership


By: Kairos Credit Strategies REIT, Inc.
a Delaware corporation
Its: General Partner


By: _____
Name: Jonathan A. Needell
Title: President and CIO


*{Notary Page Follows}*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**Acknowledgment**

State of     CALIFORNIA   )
County of    ORANGE       )

On __JUNE 17__, 2021 before me, __CATHERINE N. BUI__, Notary Public, personally appeared Jonathan A. Needell, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                    *Notary Public*

CATHERINE N. BUI
Notary Public - California
Orange County
Commission # 2278538
My Comm. Expires Mar 12, 2023

*Place Notary Seal Above*

Notary Page to Lender's Signature Page to
Amended and Restated Mortgage, Assignment of Rents, Security Agreement and Financing Statement

**Exhibit A**

Legal Description of the Land

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, CITY OF NEW YORK AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF 55TH STREET DISTANT 156 FEET 6 INCHES EASTERLY FROM THE NORTHEASTERLY CORNER OF SAID STREET AND MADISON AVENUE;

RUNNING THENCE NORTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK;

THENCE EASTERLY ALONG THE CENTER LINE OF THE BLOCK 33 FEET;

THENCE SOUTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH ANOTHER PARTY WALL 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF 55TH STREET;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF 55TH STREET, 33 FEET TO THE POINT OR PLACE OF BEGINNING.

County: New York

Block: 1291

Lot: 127

**Exhibit B**

## NEW YORK STATE SPECIFIC PROVISIONS

**NEW YORK PROVISIONS.** Notwithstanding anything to the contrary elsewhere in this Mortgage:

(a)    **MAXIMUM PRINCIPAL SUM.** Notwithstanding anything contained herein to the contrary, the maximum amount of principal indebtedness secured by this Mortgage at execution or which under any contingency may become secured hereby at any time is $13,000,000.00 plus all amounts extended by Mortgagee, after default by Mortgagor hereunder, to enforce, defend and/or maintain the lien of this Mortgage or to protect the Property, or the value thereof, including without limitation, all amounts in respect of insurance premiums, legal fees and all real estate taxes, charges or assessments imposed by law upon the Property, or any other amount, cost or charge to which Mortgagee may become subrogated upon payment as a result of Mortgagor's failure to pay as required by the terms of the Mortgage plus all accrued but unpaid interest on the obligations secured hereby.

(b)    **Trust Fund for Advances.** In compliance with Section 13 of the Lien Law of the State of New York, the Mortgagor will receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the "cost of improvement" (as such quoted term is defined in the New York Lien Law), and will apply the same first to the payment of such costs before using any part of the total of the same for any other purpose and, will comply with Section 13 of the New York Lien Law. Mortgagor will indemnify and hold Mortgagee harmless against any loss or liability, cost or expense, including, without limitation, any judgments, attorney's fees, costs of appeal bonds and printing costs, arising out of or relating to any proceeding instituted by any claimant alleging a violation by Mortgagor of any applicable lien law including, without limitation, any section of Article 3-A of the New York Lien Law.

(c)    **New York Real Property Law Article 4-A.** If this Mortgage shall be deemed to constitute a "mortgage investment" as defined by New York Real Property Law Section 125, then this Mortgage shall and hereby does (i) confer upon the Mortgagee the powers and (ii) impose upon the Mortgagee the duties of trustees set forth in New York Real Property Law Section 126.

(d)    **Statement in Accordance with Section 253.1-a.(a) of the New York Tax Law.** This Mortgage does not cover real property principally improved or to be improved by one or more structures containing in the aggregate not more than six (6) residential dwelling units, each having separate cooking facilities.

(e)    **Statement in Accordance with Section 274-a of the New York Real Property Law.** The Mortgagee shall, within fifteen (15) days after written request, provide the Mortgagor with the statement required by Section 274-a of the New York Real Property Law.

(f)    **Section 291-f of New York Real Property Law.** Mortgagee shall have all of the rights set forth in Section 291-f of the Real Property Law of New York. For purposes of Section 291-f of the New York Real Property Law, all existing non-residential tenants and every non-residential tenant or subtenant who after the recording of this Mortgage, enters into a Lease upon the premises of any of the Property or who acquires by instrument of assignment or by operation of law a leasehold estate upon the Property is hereby notified that Mortgagor shall not, without obtaining Mortgagee's prior consent in each instance, cancel, abridge or otherwise modify any Leases or accept prepayments for more than thirty (30) days of installments of rent to become due with respect to any Lease thereof having an unexpired term on the date of this Mortgage of five (5) years or more, except as expressly permitted under the Loan Agreement, and that any

58281765

such cancellation, abridgement, modification or prepayment made by any such tenant or subtenant without either being expressly permitted under this Mortgage or receiving Mortgagee's prior consent shall be voidable by Mortgagee at its option.

(g)     **Sections 254, 271, 272 and 291-f of New York Real Property Law.** All covenants of the Mortgagor herein contained shall be construed as affording to Mortgagee rights additional to and not exclusive of the rights conferred under the provisions of Sections 254, 271, 272 and 291-f of the Real Property Law of New York.

(h)     **Real Property Law.** In the event of any conflict, inconsistency or ambiguity between (i) the provisions of the Note, this Mortgage or the other Loan Documents and (ii) the provisions of subsection 4 of Section 254 of the Real Property Law of New York covering the insurance of buildings against loss by fire, the provisions of the Note, this Mortgage and the other Loan Documents shall control.

(i)     **RPAPL.** If an Event of Default shall occur and be continuing, Mortgagee may commence an action to foreclose the Mortgage pursuant to Articles 13 of the New York Real Property Actions and Proceedings Law (the "**RPAPL**"). In such case, Mortgagee may commence a civil action to foreclose this Mortgage pursuant to Article 13 of the RPAPL to satisfy the Note and all other amounts secured hereby.

(j)     **Certain Waivers.** Mortgagor hereby waives and releases all benefit that might accrue to Mortgagor by virtue of any present or future law exempting the Property, or any part of the proceeds arising from any sale thereof, from attachment, levy or sale on execution, or providing for any stay of execution, exemption from civil process or extension of time for payment, or any right of marshalling in the event of any sale hereunder of the Property, and, unless specifically required herein, all notices of Mortgagor's default or of Mortgagee's election to exercise, or Mortgagee's actual exercise of any option under this Mortgage or any other Loan Documents. Mortgagor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Mortgagee from bringing any action against Mortgagor, including a claim for deficiency to the extent Mortgagee is otherwise entitled to a claim for deficiency, before or after Mortgagee's commencement or completion of any foreclosure action or any other action to exercise its remedies hereunder or otherwise available at a law or in equity.

(k)     **Application of Insurance Proceeds.** In no event shall the provisions of Section 254 of the Real Property Law of the State of New York with respect to the application of insurance proceeds apply to this Mortgage.

(l)     **Assignment.** Upon the repayment of this Mortgage, Mortgagee shall cooperate with Mortgagor in effecting an assignment, without representation or warranty (except that Mortgagee shall represent that it has not assigned or encumbered this Mortgage or the other Loan Documents), and without recourse to Mortgagee, of this Mortgage, provided all Mortgagees' actual, out of pocket costs and reasonable attorneys' fees are paid by Mortgagor, and Mortgagee shall have no liability to Mortgagor for the loss of the Note or any original document evidencing and securing the Loan, but shall provide Mortgagor with a lost document affidavit describing the circumstances thereof and such other instruments as may be reasonably requested to effectuate such assignment (which shall not include any indemnification agreements).

Exhibit C

Schedule of Prior Mortgages, Assignments and Agreements

Mortgage Number 1 of 4:

| | |
|---|---|
| Mortgagor: | Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street Funding Associates |
| Amount: | $2,000,000.00 |
| Dated: | 08/28/2018 |
| Recorded: | 09/06/2018 |
| CRFN: | 2018000298267 |

Mortgage Number 2 of 4:

| | |
|---|---|
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street 2nd Funding Associates |
| Amount: | $1,000,000.00 |
| Dated: | 10/03/2018 |
| Recorded: | 10/15/2018 |
| CRFN: | 2018000340879 |

Mortgage Number 3 of 4:

| | |
|---|---|
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street 3rd Funding Associates |
| Amount: | $1,000,000.00 |
| Dated: | 01/08/2019 |
| Recorded: | 01/15/2019 |
| CRFN: | 2019000016736 |

Mortgage Number 4 of 4:

| | |
|---|---|
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagee: | 57 East 55th Street 4th Funding Associates |
| Amount: | $1,000,000.00 |
| Dated: | 06/06/2019 |
| Recorded: | 06/24/2019 |
| CRFN: | 2019000198078 |

Agreement #4a:

| | |
|---|---|
| Type: | Omnibus Modification |
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagees: | 57 East 55th Street Funding Associates, |
| | 57 East 55th Street 2nd Funding Associates, |
| | 57 East 55th Street 3rd Funding Associates |
| | and 57  East 55th Street 4th Funding Associates |
| Dated: | 09/25/2019 |
| Recorded: | 10/10/2019 |
| CRFN: | 2019000330237 |

(Note: The above mortgage #s 1 - 4 were consolidated, extended and modified to form a single lien in the amount of $5,000,000.00)

58281765

Assignment #4b:
Type:          Assignment of Mortgage
Assignors:     57 East 55th Street Funding Associates,
               57 East 55th Street 2nd Funding Associates,
               57 East 55th Street 3rd Funding Associates
               and 57  East 55th Street 4th Funding Associates
Assignee:      Titan Capital ID, LLC
Dated:         02/21/2020
Recorded:      03/04/2020
CRFN:          2020000082523
(Note: Assigns the above mortgages #s 1 - 4, as consolidated by the referenced Omnibus Modification)
               ⓪

Mortgage Number 5 of ?:
Mortgagor:     The Friars National Association, Inc.
Mortgagee:     57 East 55th Street 5th Funding Associates
Amount:        $1,000,000.00
Dated:         09/25/2019
Recorded:      10/10/2019
CRFN:          2019000330235

Assignment #5a:
Type:          Assignment of Mortgage
Assignors:     57 East 55th Street 5th Funding Associates
Assignee:      Titan Capital ID, LLC
Dated:         02/21/2020
Recorded:      03/04/2020
CRFN:          2020000082526
(Note: Assigns the above mortgage # 5)
               ⓞ

Mortgage Number 6 of ?:
Mortgagor:     The Friars National Association, Inc.
Mortgagee:     Titan Capital ID, LLC
Amount:        $3,000,000.00
Dated:         02/21/2020
Recorded:      03/04/2020
CRFN:          2020000082527

Mortgage Number 7 of 8: Agreement ⓐ
Mortgagor:     The Friars National Association, Inc.
Mortgagee:     Titan Capital ID, LLC
Amount:        $9,000,000.00
Dated:         02/21/2020
Recorded:      03/04/2020
CRFN:          2020000082528   Consolidates, Modifies and extends mortgages 1-6 ⓞ
Assignment #8a:
Type:          Assignment of Mortgage
Assignor:      Titan Capital ID, LLC
Assignee:      Kairos Credit Strategies Operating Partnership, LP
Dated:         of even date with this Mortgage
Recorded:      date of recording of this Mortgage
CRFN:          to be obtained upon recording in conjunction with this Mortgage
(Note: Assigns the above mortgage # 7)

C-2

58281765

Mortgage Number 7 of 7:

| | |
|---|---|
| Mortgagor: | The Friars National Association, Inc. |
| Mortgagee: | Kairos Credit Strategies Operating Partnership, LP |
| Amount: | $4,000,000.00 |
| Dated: | of even date with this Mortgage |
| Recorded: | date of recording of this Mortgage |
| CRFN: | to be obtained upon recording in conjunction with this Mortgage |

(Note: Gap Mortgage to be recorded prior to and in conjunction with this Mortgage)

C-3

58281765

# EXHIBIT I – ASSIGNMENT OF LEASES



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City
Register will rely on the information provided
by you on this page for purposes of indexing
this instrument. The information on this page
will control for indexing purposes in the event
of any conflict with the rest of the document.

2021062900751005001E8490

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 15 |
|---|---|

**Document ID:** 2021062900751005     Document Date: 06-25-2021     Preparation Date: 06-29-2021
**Document Type:** ASSIGNMENT OF LEASES AND RENTS
**Document Page Count:** 13

**PRESENTER:**
FIRST AMERICAN TITLE INSURANCE COMPANY
666 THIRD AVENUE
1060172B
NEW YORK, NY 10017
212-850-0675
CBLISTEIN@FIRSTAM.COM

**RETURN TO:**
AKERMAN LLP
ATTENTION: CHRISTOPHER MCCRANIE, ESQ.
50 NORTH LAURA STREET, SUITE 3100
JACKSONVILLE, FL 32202

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1291 | 127 | Entire Lot | 57 EAST 55TH STREET |

Property Type: COMMERCIAL REAL ESTATE

**CROSS REFERENCE DATA**

**CRFN:** 2018000298267
☒ Additional Cross References on Continuation Page

**PARTIES**

**ASSIGNOR:**
THE FRIARS NATIONAL ASSOCIATION, INC.
57 EAST 55TH STREET
NEW YORK, NY 10022

**ASSIGNEE:**
KAIROS CREDIT STRATEGIES OPERATING
PARTNERSHIP, LP
30242 ESPERANZA
RANCHO SANTA MARGARITA, CA 92688

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 13,000,000.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | 255 | | $ | 0.00 |
| TAXES:  County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | | |
| MTA: | $ | 0.00 | **OF THE CITY REGISTER OF THE** | | |
| NYCTA: | $ | 0.00 | **CITY OF NEW YORK** | | |
| Additional MRT: | $ | 0.00 | Recorded/Filed | 07-07-2021 10:59 | |
| TOTAL: | $ | 0.00 | City Register File No.(CRFN): | | |
| Recording Fee: | $ | 102.00 | | **2021000256898** | |
| Affidavit Fee: | $ | 8.00 | | | |

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2021062900751005001C8610

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | PAGE 2 OF 15 |
|---|---|

**Document ID:** 2021062900751005          Document Date: 06-25-2021          Preparation Date: 06-29-2021
Document Type: ASSIGNMENT OF LEASES AND RENTS

---

**CROSS REFERENCE DATA**
**CRFN:** 2018000340879
**CRFN:** 2019000016736
**CRFN:** 2019000198078
**CRFN:** 2019000330235
**CRFN:** 2020000082527
**Document ID:** 2021062900751003



First American Title
Insurance Company
666 Third Avenue  5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

**RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:**

Akerman LLP
50 N. Laura Street, Suite 3100
Jacksonville, Florida 32202
Attn: Christopher J. McCranie

DOCUMENT TITLE:      ASSIGNMENT OF LEASES AND RENTS

ASSIGNOR:              THE FRIARS NATIONAL ASSOCIATION, INC. a New York
                       not-for-profit corporation, as assignor

ASSIGNEE:              KAIROS CREDIT STRATEGIES OPERATING
                       PARTNERSHIP, LP, a Delaware limited partnership, as
                       assignee

LOCATION:              57 E. 55TH STREET, NEW YORK, NY 10022

COUNTY:                New York, New York

BLOCK:                 1291

LOT:                   127

{1354184.1 }
58281859

## ASSIGNMENT OF LEASES AND RENTS

This **ASSIGNMENT OF LEASES AND RENTS** (this "<u>Assignment</u>") dated as of June 25, 2021 (the "<u>Effective Date</u>"), is made by **THE FRIARS NATIONAL ASSOCIATION, INC.**, a New York not-for-profit corporation ("<u>Assignor</u>" or "<u>Borrower</u>"), with its principal address at 57 East 55th Street, New York, NY  10022, in favor of **KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP**, a Delaware limited partnership ("<u>Assignee</u>"), the address of which is 30242 Esperanza, Rancho Santa Margarita, CA 92688.

### WITNESSETH:

**WHEREAS**, pursuant to the terms of that certain Consolidated, Extended, Amended and Restated Term Loan and Security Agreement dated as of the date hereof (as modified, amended and/or supplemented from time to time, the "<u>Loan Agreement</u>"), by and between Assignor, as borrower, and Assignee, as lender, Assignor has obtained a loan in the original principal amount of up to THIRTEEN MILLION AND NO/100 Dollars ($13,000,000.00) (the "<u>Loan</u>") from Assignee; and

**WHEREAS**, the Loan is evidenced by, among other things, that certain Consolidated, Extended, Amended and Restated Promissory Note dated as of the date hereof (as modified, amended and/or supplemented from time to time, the "<u>Note</u>"), made by Assignor and payable to Assignee, in the original principal amount of the Loan; and

**WHEREAS**, the Loan is secured by, among other things, a first priority lien on Assignor's property evidenced by, among other things, (i) that certain Consolidated, Extended, Amended and Restated Mortgage, Assignment of Rents, Security Agreement and Financing Statement dated as of the date hereof (as modified, amended and/or supplemented from time to time, the "<u>Security Instrument</u>") given by Assignor in favor of Assignee, encumbering, among other things, certain real property situated in the County of New York, State of New York, and more particularly therein and described on <u>Exhibit A</u> attached hereto (the "<u>Property</u>"), and (ii) by such other documents and instruments identified in the Loan Agreement as "Loan Documents" executed and delivered by Assignor and/or its Affiliates (the Loan Agreement, the Note, the Security Instrument, and such other documents and instruments, as the same may from time to time be amended, consolidated, renewed or replaced, being collectively referred to herein as, the "<u>Loan Documents</u>"); and

**WHEREAS**, any capitalized terms not otherwise defined herein shall have the meanings ascribed to such term in the Loan Agreement; and

**NOW, THEREFORE**, in consideration of the making of the loan evidenced by the Note by Assignee to Assignor, and as an additional source of payment of such loan, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby irrevocably, absolutely and unconditionally transfer, sell, assign, pledge and convey to Assignee, and Assignee's successors and assigns, all of the right, title and interest of Assignor in and to:

(a)     any and all leases, licenses, rental agreements, concessions and occupancy agreements of whatever form now or hereafter affecting all or any part of the Property and any and all guarantees, extensions, renewals, replacements and modifications thereof (collectively, as modified, amended and/or supplemented from time to time, the "Leases"); and

(b)     all deposits (whether for security or otherwise), rents, issues, profits, revenues, royalties, accounts, rights, benefits and income of every nature of and from the Property, including, without limitation, minimum rents, additional rents, termination payments, forfeited security deposits, liquidated damages following default and all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability due to destruction or damage to the Property, together with the immediate and continuing right to collect and receive the same, whether now due or hereafter becoming due, and together with all rights and claims of any kind that Assignor may have against any Tenant (collectively, the "Rents").

**TO HAVE AND TO HOLD** the same unto Assignee, and Assignee's successors and assigns.

**IT IS AGREED** that, notwithstanding that this instrument is a present, absolute and executed assignment of the Rents and of the Leases and a present, absolute and executed grant of the powers herein granted to Assignee, Assignor is hereby permitted, at the sufferance of Assignee and at Assignee's discretion, and is hereby granted a license by Assignee, to retain possession of and act as landlord under the Leases and to collect and retain the Rents unless and until there shall exist an Event of Default under the terms of any of the Loan Documents. Upon the occurrence and during the continuance of such Event of Default and after any required written notice hereunder or the Loan Agreement, if any, and lapse of cure period hereunder or the Loan Agreement, if any, the aforementioned license granted to Assignor shall automatically terminate without notice to Assignor, and Assignee may thereafter, without taking possession of the Property, take possession of the Leases and collect the Rents. Further, from and after such termination, Assignor shall be the agent of Assignee in collection of the Rents, and any Rents so collected by Assignor shall be held in trust by Assignor for the sole and exclusive benefit of Assignee, and Assignor shall, within one (1) business day after receipt of any Rents, pay the same to Assignee to be applied by Assignee as hereinafter set forth. Furthermore, during the continuance of such Event of Default and termination of the aforementioned license, Assignee shall have the right and authority, without further notice whatsoever to Assignor and without regard to the adequacy of the security therefor, to: (a) make application to a court of competent jurisdiction for appointment of a receiver for all or any part of the Property, as particularly set forth in the Security Instrument, (b) manage and operate the Property, with full power to employ agents to manage the same; (c) demand, collect, receive and sue for the Rents, including without limitation those past due and unpaid; and (d) do all acts relating to such management of the Property, including, but not limited to, negotiation of new Leases, making adjustments of existing Leases, contracting and paying for repairs and replacements to the Improvements and to the fixtures, equipment and personal property located in the Improvements or used in any way in the operation, use and occupancy of the Property as in the reasonable judgment and discretion of Assignee may be necessary to maintain the same in a tenantable condition, purchasing and paying for such additional furniture and equipment as in the sole judgment of Assignee may be necessary to maintain a proper rental income from the Property, employing necessary managers and other employees, purchasing fuel, providing utilities and paying for all other expenses incurred in the operation of the Property,

maintaining adequate insurance coverage over hazards customarily insured against and paying the premiums therefor. Assignee may apply the Rents received by Assignor from the Property, after deducting the reasonable costs of collection thereof, including, without limitation, reasonable attorneys' fees and a reasonable management fee for any management agent so employed, against amounts expended for repairs, upkeep, maintenance, service, fuel, utilities, taxes, assessments, insurance premiums and such other expenses as Assignee incurs in connection with the operation of the Property and against interest, principal, required escrow deposits and other sums which have or which may become due, from time to time, under the terms of the Loan Documents, in such order or priority as to any of the items so mentioned as Assignee, in Assignee's sole subjective discretion, may determine. The exercise by Assignee of the rights granted Assignee in this paragraph, and the collection of, the Rents and the application thereof as provided herein, shall not be considered a waiver by Assignee of any Event of Default under the Loan Documents or prevent foreclosure of any liens on the Property nor shall such exercise make Assignee liable under any of the Leases, Assignee hereby expressly reserving all of Assignee's rights and privileges under the Security Instrument and the other Loan Documents as fully as though this Assignment had not been entered into. Without limitation, Assignee shall have no rights under this paragraph unless an Event of Default exists.

Without limiting the rights granted hereinabove, in the event Assignor shall fail to make any payment or to perform any act required under the terms hereof and such failure shall not be cured after any required notice hereunder, if any, and within any applicable grace or cure period, if any, then Assignee may, but shall not be obligated to, without prior notice to or demand on Assignor, and without releasing Assignor from any obligation hereof, make or perform the same in such manner and to such extent as Assignee may deem necessary to protect the security hereof, including specifically, without limitation, appearing in and defending any action or proceeding purporting to affect the security hereof or the rights or powers of Assignee, performing or discharging any obligation, covenant or agreement of Assignor under any of the Leases, and, in exercising any of such powers, paying all necessary costs and expenses, employing counsel and incurring and paying reasonable attorneys' fees. Any sum advanced or paid by Assignee for any such purpose, including, without limitation, reasonable attorneys' fees, together with interest thereon at the Default Interest Rate (as defined in the Note) (if such sums are not paid by Assignor within ten (10) days of written notice from Assignee) from the date paid or advanced by Assignee until repaid by Assignor, shall immediately be due and payable to Assignee by Assignor on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

**IT IS FURTHER AGREED** that this Assignment is made upon the following terms, covenants and conditions:

1.      This Assignment shall not operate to place responsibility for the control, care, management or repair of the Property upon Assignee, nor for the performance of any of the terms and conditions of any of the Leases, nor shall this Assignment operate to make Assignee responsible or liable for any waste committed on the Property by the Tenants or any other party or for any dangerous or defective condition of the Property or for any negligence in the management, upkeep, repair or control of the Property unless and until Assignee takes actual possession of the Property. Assignee shall not be liable for any loss sustained by Assignor resulting from Assignee's failure to let the Property or from any other act or omission of Assignee in managing the Property

in the absence of Assignee's gross negligence or willful misconduct. Assignor shall and does hereby indemnify and hold Assignee harmless from and against any and all liability, loss, claim, demand or damage incurred by reason of this Assignment, including, without limitation, claims or demands for security deposits from Tenants of space in the Improvements deposited with Assignor, and from and against any and all claims and demands whatsoever which may be asserted against Assignee by reason of any alleged obligations or undertakings on Assignee's part to perform or discharge any of the terms, covenants or agreements contained in any of the Leases. Should Assignee incur any liability by reason of this Assignment or in defense of any claim or demand for loss or damage as provided above, the amount thereof, including, without limitation, reasonable costs, expenses and reasonable attorneys' fees, together with interest thereof at the Default Interest Rate from the date paid or incurred by Assignee until repaid by Assignor, shall be immediately due and payable to Assignee by Assignor upon demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. Notwithstanding the foregoing, Assignor shall have no obligation to indemnify Assignee for any matter that arises out of Assignee's gross negligence or willful misconduct.

      2.     This Assignment shall not be construed as making Assignee a mortgagee in possession.

      3.     Assignee is obligated to account to Assignor only for such Rents as are actually collected or received by Assignee.

      4.     Assignor hereby further presently and absolutely assigns to Assignee subject to the terms and provisions of this Assignment: (a) any award or other payment which Assignor may hereafter become entitled to receive with respect to any of the Leases as a result of or pursuant to any bankruptcy, insolvency or reorganization or similar proceedings involving the Tenants under such Leases; and (b) any and all payments made by or on behalf of any Tenant of any part of the Property in lieu of Rent. Assignor hereby irrevocably appoints Assignee as Assignee's attorney-in-fact to, during the continuance of an Event of Default by Assignor hereunder or under any of the other Loan Documents which has not been cured within any applicable grace or cure period, appear in any such proceeding and to collect any such award or payment, which power of attorney is coupled with an interest by virtue of this Assignment and is irrevocable so long as any sums are outstanding under the loan evidenced by the Note; provided, however, that Assignee may not exercise any rights under this paragraph unless and Event of Default has occurred and is continuing.

      5.     Assignor represents, warrants and covenants to and for the benefit of Assignee: (a) that Assignor now is (or with respect to any Leases not yet in existence, will be immediately upon the execution thereof) the absolute owner of the landlord's interest in the Leases, with full right and title to assign the same and the Rents due or to become due thereunder; (b) that, other than this Assignment, there are no outstanding assignments of the Leases or Rents; (c) that no Rents have been anticipated, discounted, released, waived, compromised or otherwise discharged except for prepayment of rent of not more than one (1) month prior to the accrual thereof; (d) to Assignor's knowledge, that there are no defaults now existing under any of the Leases by the landlord or Tenant, and there exists no state of facts which, with the giving of notice or lapse of time or both, would constitute a default under any of the Leases by the landlord or Tenant, except as disclosed

in writing to Assignee; (e) that Assignor, to the best of its knowledge, has and shall duly and punctually observe and perform all covenants, conditions and agreements in the Leases on the part of the landlord to be observed and performed thereunder subject to good faith contest rights; and (f) to the best of Assignor's knowledge the Leases are in full force and effect and are the valid and binding obligations of Assignor, and, to the knowledge of Assignor, are the valid and binding obligations of the Tenants thereto.

6.    Assignor covenants and agrees that Assignor shall not, without the prior written consent of Assignee which consent shall not be unreasonably withheld or delayed: (a) exclusive of security deposits, accept any payment of Rent or installments of Rent for more than one (1) month in advance; (b) cancel or terminate any Lease (other than for non-payment of Rent or other material breach thereof) or amend or modify any Lease in violation of the Loan Documents; (c) knowingly take or omit to take any action right or option which would permit the Tenant under any Lease to cancel or terminate said Lease; (d) anticipate, discount, release, waive, compromise or otherwise discharge any Rents payable or other obligations under the Leases other than in the ordinary course of business; (e) further pledge, transfer, mortgage or otherwise encumber or assign the Leases or future payments of Rents or incur any indebtedness, liability or other obligation to any Tenant under the Leases; or (f) permit any Lease to become subordinate to any lien other than the lien of the Security Instrument; provided, however, that Assignor may take any of the actions described in subsection (b) or (d) above so long as no Event of Default has occurred and so long as such actions are taken by Assignor in the ordinary course of business and are consistent with sound customary leasing and management practices for similar properties.

7.    Assignor covenants and agrees that Assignor shall, at Assignor's sole cost and expense, appear in and defend any action or proceeding arising under, growing out of, or in any manner connected with the Leases or the obligations, duties or liabilities of the landlord or Tenant thereunder, and shall pay on demand all reasonable costs and expenses, including, without limitation, reasonable attorneys' fees, which Assignee may incur in connection with Assignee's appearance, voluntary or otherwise, in any such action or proceeding, together with interest thereon at the Default Rate from the date incurred by Assignee until repaid by Assignor if such sums are not paid within thirty (30) days of written demand.

8.    At any time after an Event of Default and after any required written notice hereunder or the Loan Agreement, if any, Assignee may, at Assignee's option, notify any Tenants or other parties of the existence of this Assignment. Assignor does hereby specifically authorize, instruct and direct each and every present and future Tenant of the whole or any part of the Property to pay all unpaid and future Rents to Assignee upon receipt of demand from Assignee to so pay the same and Assignor hereby agrees that each such present and future Tenant may rely upon such written demand from Assignee to so pay said Rents without any inquiry into whether there exists an Event of Default hereunder or under the other Loan Documents or whether Assignee is otherwise entitled to said Rents. Assignor hereby waives any right, claim or demand which Assignor may now or hereafter have against any present or future Tenant by reason of such payment of Rents to Assignee, and any such payment shall discharge such Tenant's obligation to make such payment to Assignor.

9.    Assignee may take or release any security for the indebtedness evidenced by the Note, may release any party primarily or secondarily liable for the indebtedness evidenced by the

Note, may grant extensions, renewals or indulgences with respect to the indebtedness evidenced by the Note and may apply any other security therefor held by Assignor to the satisfaction of any indebtedness evidenced by the Note without prejudice to any of Assignor's rights hereunder.

10.     The acceptance of this Assignment and the collection of the Rents in the event Assignor's license is terminated, as referred to above, shall be without prejudice to Assignee. The rights and remedies of Assignee hereunder and at law are cumulative and concurrent, may be pursued separately, successively or together and may be exercised as often as occasion therefor shall arise, it being agreed by Assignor that the exercise of any one or more of the rights provided for herein shall not be construed as a waiver of any of the other rights or remedies of Assignee, at law or in equity or otherwise, so long as any obligation under the Loan Documents remains unsatisfied.

11.     All rights of Assignee hereunder shall inure to the benefit of Assignee's successors and assigns (without implying Assignor's consent to any transfer of any of the Property in violation of the Loan Agreement or any of the other Loan Documents); and all obligations of Assignor shall bind Assignor's successors and assigns and any subsequent owner or owners of the Property. All rights of Assignee in, to and under this Assignment shall pass to and may be exercised by any assignee of such rights of Assignee. Assignor hereby agrees that if Assignee gives written notice to Assignor of an assignment of said rights, upon such notice the liability of Assignor to the assignee of the Assignee shall be immediate and absolute. Assignor will not set up any claim against Assignee or any intervening assignee as a defense, counterclaim or setoff to any action brought by Assignee or any intervening assignee for any amounts due hereunder or for possession of or the exercise of rights with respect to the Leases or the Rents.

12.     It shall be an Event of Default, subject to any notice and cure periods hereunder or under the other Loan Documents, if any, (a) if any material representation or warranty made herein by Assignor is determined by Assignee to have been false or misleading in any material respect at the time made, or (b) upon any failure by Assignor to comply with the provisions of Section 6 above, or (c) upon any failure by Assignor in the performance or observance of any other covenant or condition hereof and, to the extent such failure described in this subsection (c) is susceptible of being cured, the continuance of such failure for thirty (30) days after written notice thereof from Assignee to Assignor; provided, however, that if such default described in this subsection (c) is susceptible of cure but such cure cannot be accomplished with reasonable diligence within said period of time, and if Assignor commences to cure such default promptly after receipt of notice thereof from Assignee, and thereafter prosecutes the curing of such default with reasonable diligence, such period of time shall be extended for such period of time as may be necessary to cure such default with reasonable diligence, but not to exceed an additional ninety (90) days. Any such default not so cured shall be a default or an Event of Default, as applicable, under each of the other Loan Documents, entitling Assignee to exercise any or all rights and remedies available to Assignee under the terms hereof or of any or all of the other Loan Documents, and any Event of Default or default under any other Loan Document (by Assignor) which is not cured within any applicable grace or cure period shall be deemed an Event of Default hereunder subject to no grace or cure period, entitling Assignee to exercise any or all rights provided for herein.

13.     Failure by Assignee to exercise any right which Assignee may have hereunder shall not be deemed a waiver thereof unless so agreed in writing by Assignee, and the waiver by Assignee of any default hereunder shall not constitute a continuing waiver or a waiver of any other default or of the same default on any future occasion.  No collection by Assignee of any Rents pursuant to this Assignment shall constitute or result in a waiver of any default then existing hereunder or under any of the other Loan Documents.

14.     If any provision under this Assignment or the application thereof to any entity, person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Assignment and the application of the provisions hereof to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the fullest extent permitted by law.

15.     This Assignment may not be amended, modified or otherwise changed except by a written instrument duly executed by Assignor and Assignee.

16.     This Assignment shall be in full force and effect continuously from the date hereof to and until the Security Instrument shall be released of record, and the release of the Security Instrument shall, for all purposes, automatically terminate this Assignment and render this Assignment null and void and of no effect whatsoever.

17.     All notices, demands, requests or other communications to be sent by one party to the other hereunder or required by law shall be given and become effective as provided in the Loan Agreement.

18.     **IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS ASSIGNMENT AND THE LOAN, AS A WHOLE, AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICT OF LAWS), AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.**

19.     This Assignment may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.  Any signature page of this Assignment may be detached from any counterpart of this Assignment without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Assignment identical in form hereto but having attached to it one or more additional signature pages.

20.     In addition to, but not in lieu of, any other rights hereunder, Assignee shall have the right to institute suit and obtain a protective or mandatory injunction against Assignor to prevent a breach or default, or to reinforce the observance, of the agreements, covenants, terms and conditions contained herein, as well as the right to damages occasioned by any breach or default by Assignor.

21. This Assignment shall continue and remain in full force and effect during any period of foreclosure with respect to the Property.

22. Assignor hereby covenants and agrees that Assignee shall be entitled to all of the rights, remedies and benefits available by statute, at law, in equity or as a matter of practice for the enforcement and perfection of the intents and purposes hereof. Assignee shall, as a matter of absolute right, be entitled, upon application to a court of applicable jurisdiction, and without notice to Assignor, to the appointment of a receiver to obtain and secure the rights of Assignee hereunder and the benefits intended to be provided to Assignee hereunder.

23. In connection with any action arising from or in connection with this Assignment, the prevailing party shall be entitled to an award of its costs and expenses, including attorneys' fees (including but not limited to appellate fees and fees for all paralegals, legal assistants and other paraprofessionals) and disbursements, incurred or paid before and at trial or any other proceeding which may be instituted, at any tribunal level, and whether or not suit or any other proceeding is instituted.

24. ASSIGNOR, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE IN WHICH THE PROPERTY IS LOCATED OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS ASSIGNMENT OR ANY OTHER OF THE LOAN DOCUMENTS, (ii) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION OVER THE COUNTY IN WHICH THE LAND IS LOCATED, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND (iv) AGREES THAT ASSIGNOR WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM WITH RESPECT TO THIS ASSIGNMENT (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF ASSIGNEE TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM). ASSIGNOR FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO THE ASSIGNOR AT THE ADDRESS FOR NOTICES DESCRIBED IN SECTION 10.1 OF THE LOAN AGREEMENT, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

25. EACH OF ASSIGNOR AND ASSIGNEE HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS ASSIGNMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS ASSIGNMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS

RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR
HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR
OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH
CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT
TRIAL WITHOUT A JURY. ANY PARTY TO THIS ASSIGNMENT MAY FILE AN
ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS
WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER
OF THEIR RIGHT TO TRIAL BY JURY.

26.    This Assignment shall not be construed more strictly against one party than against
the other merely by virtue of the fact that this Assignment may have been physically prepared by
one of the parties, or such party's counsel, it being agreed that all parties and their respective
counsel have mutually participated in the negotiation and preparation of this Assignment.

27.    All rights and remedies granted to Assignee under the Loan Documents shall be in
addition to and cumulative of all rights and remedies granted to Assignee hereunder.

28.    **ASSIGNOR ACKNOWLEDGES AND AGREES THAT THE LOAN IS
STRICTLY A COMMERCIAL LOAN AND THE TRANSACTIONS CONTEMPLATED
BY THIS ASSIGNMENT AND THE LOAN DOCUMENTS ARE STRICTLY
COMMERCIAL TRANSACTIONS, AND ASSIGNOR WAIVES AND RENOUNCES ALL
HOMESTEAD EXEMPTION RIGHTS AND SIMILAR RIGHTS AS TO THE
OBLIGATIONS UNDER THIS ASSIGNMENT AND THE LOAN DOCUMENTS OR ANY
RENEWAL OR EXTENSION THEREOF.**

**[SIGNATURE FOLLOWS ON NEXT PAGE]**

**IN WITNESS WHEREOF**, Assignor has executed this Assignment under seal as of the day and year first above written.

**ASSIGNOR:**

**THE FRIARS NATIONAL ASSOCIATION, INC**, a
New York not-for-profit corporation

By: _____

Name: Arthur Aidala
Its: President

*(Notary Page Follows)*

STATE OF New York )
                            ) ss:
COUNTY OF New York )


On the 16 day of June in the year 2021 before me, the undersigned, personally appeared ARTHUR AIDALA, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


Notary Public

NANCY H SCHAAFF
Notary Public, State of New York
No. 01SC6265547
Qualified in Kings County
Commission Expires July 09, 2023


Assignor's Notary Page to Amended and Restated Assignment of Leases and Rents

## EXHIBIT A

## DESCRIPTION OF PROPERTY

### Legal Description

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, CITY OF NEW YORK AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF 55TH STREET DISTANT 156 FEET 6 INCHES EASTERLY FROM THE NORTHEASTERLY CORNER OF SAID STREET AND MADISON AVENUE;

RUNNING THENCE NORTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK;

THENCE EASTERLY ALONG THE CENTER LINE OF THE BLOCK 33 FEET;

THENCE SOUTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH ANOTHER PARTY WALL 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF 55TH STREET;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF 55TH STREET, 33 FEET TO THE POINT OR PLACE OF BEGINNING.


County: New York

Block: 1291

Lot: 127

# EXHIBIT J – CASH MANAGEMENT AGREEMENT

Loan No.:[_____]

## CASH MANAGEMENT AGREEMENT

**THIS CASH MANAGEMENT AGREEMENT** (this "**Agreement**") is made as of June 25, 2021, by and among **THE FRIARS NATIONAL ASSOCIATION, INC., a New York not-for-profit corporation**, having an address of 57 East 55th Street, New York, New York 10022 ("**Borrower**"), **KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP**, a Delaware limited partnership, as lender, having an address at 30242 Esperanza, Rancho Santa Margarita, CA 92688 (together with its successors and assigns, "**Lender**"), and **KEYBANK NATIONAL ASSOCIATION**, a national banking association, having an address at 11501 Outlook Street, Suite 300, Overland Park, Kansas 66211, acting in its capacity as a depository bank ("**Agent**").

## RECITALS

The following recitals are a material part of this Agreement:

A.     Pursuant to that certain Loan Agreement (the "**Loan Agreement**"), dated the date hereof, between Borrower and Lender, Lender has made a loan (the "**Loan**") to Borrower in the principal amount of **$13,000,000.00**, which Loan is evidenced by that certain Promissory Note, dated as of the date hereof made by Borrower in favor of Lender (the "**Note**"), and secured by, among other things, one or more mortgages, deeds of trust or deeds to secure debt dated as of the date hereof (individually and collectively, the "**Security Instrument**"), made by Borrower for the benefit of Lender, covering that certain property known as the Friars Club and having a physical address of 57 E. 55th Street, New York, NY 10022.  The Security Instrument, the Note, the Loan Agreement, this Agreement and all other documents and instruments evidencing or securing the Loan or now or hereafter executed by Borrower or others in connection with or related to the Loan, together with all amendments, modifications, substitutions or replacements thereof, are sometimes herein collectively referred to as the "**Loan Documents**" or individually as a "**Loan Document**".  Any capitalized term defined in any other Loan Document and not otherwise defined herein shall have the same meaning when used in this Agreement.

B.     Pursuant to the Loan Agreement and the Security Instrument, Borrower has granted to Lender a security interest in all of Borrower's right, title and interest in, to and under the Rents and has assigned and conveyed to Lender all of Borrower's right, title and interest in, to and under the Rents due and to become due to Borrower.

C.     In order to fulfill all of its obligations under the Loan Agreement, Borrower has agreed that during a Cash Management Period all Rents and other revenues from the Property will be deposited on each Business Day into the Cash Management Account (hereinafter defined) and shall be applied as hereinafter set forth.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I:  DEFINITIONS

**Section 1.1**     **General**.  As used herein, the following terms shall have the following definitions:

"**Agent**": as defined in the preamble hereof, together with its successors and assigns.

"**Agent Subaccount**":  as defined in Section 2.1(b) hereof.

"**Agreement**":  as defined in the preamble hereof.

"**Borrower**":  as defined in the preamble hereof, together with its successors and permitted assigns.

"**Cash Management Account**":  as defined in Section 2.1(b) hereof.

"**Collateral**":  as defined in Section 5.1(a) hereof.

"**Debt Service Subaccount**": as defined in Section 2.1(b) hereof.

"**Excess Cash Flow**":  as defined in Section 3.4 hereof.

"**Excess Cash Flow Subaccount**":  as defined in Section 2.1(b) hereof.

"**Interest Reserve Subaccount**":  as defined in Section 2.1(b) hereof.

 "**Lender**":  as defined in the preamble hereof, together with its successors and assigns; it being agreed that Servicer may act for and on behalf of Lender under this Agreement.

"**Loan**":  as defined in the Recitals hereto.

"**Loan Agreement**":  as defined in the Recitals hereto.

"**Loan Documents**":  as defined in the Recitals hereto.

"**Note**":  as defined in the Recitals hereto.

"**Obligations**":  as defined in Section 5.1(a) hereof.

"**Security Instrument**":  as defined in the Recitals hereto.

"**Subaccount**":  as defined in Section 2.1(b) hereof.

"**Tax and Insurance Escrow Subaccount**":  as defined in Section 2.1(b) hereof.

"**UCC**":  as defined in Section 5.1(a) hereof.

## ARTICLE II:  THE ACCOUNTS

**Section 2.1**     **Establishment of the Cash Management Account**.  (a) [RESERVED].

(b)     Upon Agent's receipt of a Trigger Notice, Agent shall establish an Eligible Account with Agent (the "**Cash Management Account**") into which Borrower shall deposit, or cause to be deposited, during a Cash Management Period, all sums required to be deposited into the Cash Management Account, which Cash Management Account shall be maintained for the remainder of the term of the Loan.   The following subaccounts (each a "**Subaccount**") of the Cash Management Account shall be maintained on a ledger entry basis:

(i)     A Subaccount into which amounts are to be deposited with Lender pursuant to Section 2.14 of the Loan Agreement (the "**Tax and Insurance Escrow Subaccount**").

(ii)     A Subaccount into which amounts are to be deposited in accordance with Section 2.17(e)(iv) of the Loan Agreement (the "**Agent Subaccount**").

(iii)     A Subaccount into which debt service payments required pursuant to Section 2.17(e)(v) of the Loan Agreement are to be deposited with Lender (the "**Debt Service Subaccount**").

(iv)     A Subaccount into which amounts are to be deposited in accordance with Section 2.17(e)(vi) of the Loan Agreement (the "**Servicer Subaccount**").

(v)     [RESERVED].

(vi)     A Subaccount into which amounts are to be deposited with Lender pursuant to Section 2.12 of the Loan Agreement (the "**Interest Reserve Subaccount**").

(vii)     A Subaccount into which all Excess Cash Flow is to be deposited with Lender during a Cash Management Period in accordance with Section 2.16 of the Loan Agreement (the "**Excess Cash Flow Subaccount**").

**Section 2.2     Account Name**.   The Cash Management Account shall be entitled "Borrower Cash Management Account FBO Lender". In the event Lender transfers or assigns the Loan, Agent, at Lender's request, shall change the name of the Cash Management Account to the name of the transferee or assignee.   In the event Lender retains a Servicer to service the Loan, Agent, at Lender's request, shall change the name of the Cash Management Account to the name of Servicer, as agent for Lender.

**Section 2.3     Eligible Account**.   Borrower and Agent shall maintain the Cash Management Account as an Eligible Account.   The Cash Management Account shall be and shall be treated as a "securities account" as such term is defined in Section 8-501(a) of the UCC and control of the Cash Management Account shall be vested in Lender in accordance with Section 9-104 of the UCC.   Agent hereby agrees that each item of property (whether investment property, financial asset, securities, instrument, cash or other property) credited to the Cash Management Account shall be treated as a "financial asset" within the meaning of Section 8 102(a)(9) of the UCC.   Agent shall, subject to the terms of this Agreement, treat Lender as entitled to exercise the rights that comprise any financial asset credited to the Cash Management Account.   All securities or other property underlying any financial assets credited to the Cash Management Account shall be registered in the name of Agent, endorsed to Agent or in blank, or credited to another securities

3

account maintained in the name of Agent, and in no case will any financial asset credited to the Cash Management Account be registered in the name of Borrower, payable to the order of Borrower or specially endorsed to Borrower.

**Section 2.4    Permitted Investments**.  Sums on deposit in the Cash Management Account shall not be invested except in Permitted Investments.  Account balances shall be invested in investments suitable for investment of escrows and reserves established under mortgage loans included in a Securitization in which some or all of the Securities are rated "AAA" (or the equivalent) by the Rating Agencies as directed by Lender.  Absent express investment direction from Lender, account balances shall be uninvested and maintained as cash.  Interest accruing on the Cash Management Account shall be periodically added to the principal amount of the Cash Management Account and shall be held, disbursed and applied in accordance with the provisions of this Agreement.  Notwithstanding any actual losses sustained on a liquidation of a Permitted Investment the proceeds of such Permitted Investment shall be deposited into the Cash Management Account by Borrower no later than three (3) Business Days following such liquidation.  Borrower shall be responsible for payment of any federal, state or local income or other tax applicable to income paid or credited to Borrower from Permitted Investments.  The Cash Management Account shall be assigned the federal tax identification number of Borrower, which number is [---].

## ARTICLE III:  DEPOSITS

**Section 3.1**    [RESERVED].

**Section 3.2    Additional Deposits**.  Borrower shall make such deposits into the Cash Management Account as may be required by the Loan Agreement.

**Section 3.3**    [RESERVED].

**Section 3.4    Application of Cash Management Account Funds to Subaccounts**. Provided no Event of Default is then continuing, during a Cash Management Period, Agent shall apply all funds on deposit in the Cash Management Account to the following Subaccounts in the following amounts and order of priority as per Lender's or its designee's written instructions:

(a)    First, funds, if any, sufficient to pay the monthly installment of (or such other amount required to replenish) the Tax and Insurance Reserve pursuant to the terms and provisions of Section 2.14 of the Loan Agreement, which amounts shall be deposited in the Tax and Insurance Escrow Subaccount;

(b)    Then, funds sufficient to pay the fees and expenses of the Agent then due and payable, which amount shall be deposited into the Agent Subaccount;

(c)    Then, funds sufficient to pay the next required monthly payment of interest and/or principal in accordance with the Note, subject to application of any amounts remaining in the Interest Reserve Account, shall be disbursed to Lender;

(d)     Then, funds sufficient to pay any and all reasonable Lender Expenses and Servicing Fee as of the date of disbursement, which amount shall be deposited into the Servicer Subaccount;

(e)     Then, funds sufficient to replenish the Interest Reserve to an amount as required by Lender, in Lender's reasonable discretion, which amounts shall be deposited into the Interest Reserve Subaccount;

(f)     Then, funds sufficient to pay any interest accruing at the Default Rate (less amounts already paid pursuant to clause (d) above), late payment charges and any other amounts due under the Loan Documents, if any, which amounts shall be deposited into the Debt Service Subaccount;

(g)     Lastly, any funds remaining in the in the Cash Management Account after deposits for items (a) through (f) above (the "**Excess Cash Flow**"), if any, shall be disbursed directly into the Excess Cash Flow Subaccount until the earlier of (A) repayment of the Loan or (B) end of any applicable Cash Management Period, after which any such amount remaining in the Excess Cash Flow Subaccount shall be returned to Borrower.

## ARTICLE IV:  DISBURSEMENTS

**Section 4.1      Withdrawals**.  Provided no Event of Default shall have occurred and be continuing on each Payment Date during a Cash Management Period, Agent shall withdraw all funds on deposit in the Cash Management Account and in the Subaccounts and disburse such funds as follows:

(a)     Disbursements from Tax and Insurance Escrow Subaccount.  Agent shall disburse funds on deposit in the Tax and Insurance Escrow Subaccount to Lender for the payment of Taxes and Insurance Premiums in accordance with Section 2.14 of the Loan Agreement.

(b)     Disbursements from Agent Subaccount.  Agent shall disburse funds on deposit in the Agent Subaccount and apply such amounts to Agent's fees and expenses.

(c)     Disbursements from Debt Service Subaccount.  Agent shall disburse funds on deposit in the Debt Service Subaccount to Lender for the payments set forth in Section 2.4 of the Loan Agreement.

(d)     Disbursements from Servicer Subaccount.  Agent shall disburse funds on deposit in the Servicer Subaccount and apply such amounts to Lender Expenses and Servicing Fee.

(e)     Disbursements from the Replacement Impound Subaccount.  Agent shall disburse funds on deposit in the Interest Reserve Subaccount to Lender for the purposes set forth in Section 2.12 of the Loan Agreement.

(f)     Disbursements from the Excess Cash Flow Subaccount. Funds in the Excess Cash Flow Subaccount shall be held until the earlier of (A) repayment of the Loan or (B) end of any applicable Cash Management Period, after which any such amount remaining in the Excess Cash Flow Subaccount shall be returned to Borrower.

**Section 4.2** **Sole Dominion and Control of Cash Management Account and Subaccounts**.  Borrower and Agent acknowledge and agree that the Cash Management Account and any and all Subaccounts are subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, including Agent, subject to the terms hereof.  Borrower shall not have the right of withdrawal with respect to the Cash Management Account.  Agent shall have the right and agrees to comply with the instructions of Lender with respect to the Cash Management Account without the further consent of Borrower.  Agent shall comply with all "entitlement orders" (as defined in Section 8-102(a)(8) of the UCC) and instructions originated by Lender without further consent by Borrower or any other person.  Regardless of any provision of any other agreement, for purposes of the Uniform Commercial Code, New York shall be deemed the jurisdiction of the Agent, as securities intermediary.

## ARTICLE V:  PLEDGE OF ACCOUNTS

**Section 5.1** **Security for Obligations**.  (a)  To secure the full and punctual payment and performance of all obligations of Borrower now or hereafter existing with respect to the Loan, whether for principal, interest, fees, expenses or otherwise, and all obligations of Borrower now or hereafter existing under the Loan Agreement, the Note, the Security Instrument, this Agreement and all other Loan Documents (all such obligations, collectively, the "**Obligations**"), Borrower hereby grants to Lender a first priority continuing security interest in and to the following property of Borrower, whether now owned or existing or hereafter acquired or arising and regardless of where located (all of the same, collectively, the "**Collateral**"):

> (i)     the Cash Management Account and all cash, checks, drafts, certificates, and instruments, if any, from time to time deposited or held in the Cash Management Account from time to time including all deposits or wire transfers made to the Cash Management Account;

> (ii)    any and all amounts invested in Permitted Investments;

> (iii)   all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and

> (iv)    to the extent not covered by clauses (i), (ii) or (iii) above, all "proceeds" (as defined under the Uniform Commercial Code as in effect in the state in which the Cash Management Account is located (the "**UCC**")) of any or all of the foregoing.

> (b)     Lender, its authorized agents or designees, including Agent, shall have with respect to the Collateral, in addition to the rights and remedies herein set forth, all of the rights and remedies available to a secured party under the UCC, as if such rights and remedies were fully set forth herein.

**Section 5.2** **Certain Rights of Lender**.  Upon the occurrence and during the continuance of an Event of Default, Lender shall promptly notify Agent in writing of the occurrence of such event and, without notice from Agent or Lender, (a) Borrower shall have no

further right in respect of (including the right to instruct Lender or Agent to transfer from) the Cash Management Account or Subaccount, (b) Lender may direct Agent to liquidate and transfer any amounts then invested in Permitted Investments to the Cash Management Account or reinvest such amounts in other Permitted Investments as Lender may reasonably determine is necessary to perfect or protect any security interest granted or purported to be granted hereby or to enable Agent, as agent for Lender, or Lender, to exercise and enforce Lender's rights and remedies hereunder with respect to any Collateral and (c) Lender may apply any funds in the Cash Management Account to any Obligations in such order of priority as Lender may determine in its sole discretion.

Section 5.3 **Further Assurances**. Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower shall promptly execute and deliver all instruments and documents, and take all further action, that may be necessary or desirable, or that Agent or Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby (including any security interest in and to any Permitted Investments) or to enable Agent or Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

Section 5.4 **Termination of Agreement**. This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until payment in full of the Obligations. Upon payment and performance in full of the Obligations, this Agreement shall terminate and Borrower shall be entitled to the prompt return, at its expense, of such of the Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof, and Lender shall authorize the release to Borrower of all funds remaining on deposit under this Agreement, including any amounts invested in the Permitted Investments, and Agent or Lender shall execute such instruments and documents as may be reasonably requested by Borrower to permit such release of funds and evidence such termination and the release of the lien hereof.

## ARTICLE VI: RIGHTS AND DUTIES OF LENDER AND AGENT

Section 6.1 **Reasonable Care**. Beyond the exercise of reasonable care in the custody thereof or as otherwise expressly provided herein, neither Agent nor Lender shall have any duty as to any Collateral in its possession or control as agent therefor or bailee thereof or any income thereon or the preservation of rights against any person or otherwise with respect thereto. Agent and Lender each shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which Agent or Lender accords its own property, it being understood that Lender shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in value thereof, by reason of the act or omission of Agent or Lender, its Affiliates, agents, employees or bailees, except to the extent that such loss or damage results from Agent's or Lender's gross negligence or willful misconduct, provided that nothing in this Article VI shall be deemed to relieve Agent from the duties and standard of care which, as a commercial bank, it generally owes to depositors. Neither Lender nor Agent shall have any liability for any loss resulting from the investment of funds in Permitted Investments in accordance with the terms and conditions of this Agreement.

**Section 6.2    Indemnity**.  Agent, in its capacity as agent hereunder, shall be responsible for the performance only of such duties as are specifically set forth herein, and no duty shall be implied from any provision hereof.  Agent shall not be under any obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own monies.  Borrower shall indemnify and hold Agent and Lender, their respective employees and officers harmless from and against any loss, cost or damage (including reasonable attorneys' fees and disbursements) incurred by Agent or Lender in connection with the transactions contemplated hereby, except to the extent that such loss or damage results from Agent's or Lender's gross negligence or willful misconduct.

**Section 6.3    Reliance**.  Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper, document or signature reasonably believed by it to be genuine, and it may be assumed that any person purporting to act on behalf of Borrower giving any of the foregoing in connection with the provisions hereof has been duly authorized to do so.  Agent may consult with counsel, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder and in good faith in accordance therewith.  Agent shall not be liable to Borrower for any act or omission done or omitted to be done by Agent in reliance upon any instruction, direction or certification received by Agent and without gross negligence or willful or reckless misconduct.

**Section 6.4    Resignation or Termination of Agent**.  (a) Agent shall have the right to resign as Agent hereunder upon thirty (30) days' prior written notice to Borrower and Lender, and in the event of such resignation, Lender shall appoint a successor agent which must be an Eligible Institution.  No such resignation by Agent shall become effective until a successor agent shall have accepted such appointment and executed an instrument by which it shall have assumed all of the rights and obligations of Agent hereunder.  If no such successor agent is appointed within sixty (60) days after receipt of the resigning Agent's notice of resignation, the resigning Agent may petition a court of competent jurisdiction for the appointment of a successor agent.

(b)    In connection with any resignation by Agent, (i) the resigning Agent shall, at the sole cost of Borrower, (A) duly assign, transfer and deliver to the successor agent this Agreement and all cash and Permitted Investments held by it hereunder, (B) execute such financing statements and other instruments as may be necessary to assign to the successor agent the security interest in the Collateral existing in favor of the retiring Agent hereunder and to otherwise give effect to such succession and (C) take such other actions as may be reasonably required by Borrower or the successor agent in connection with the foregoing and (ii) the successor agent shall establish in its name, as secured party, cash collateral accounts, which shall become the Cash Management Account for purposes of this Agreement upon the succession of such agent.

(c)    Lender at its sole discretion shall have the right, upon thirty (30) days' notice to Borrower and Agent, to terminate this Agreement or Agent or to replace Agent with a successor agent that satisfies the requirements of an Eligible Institution or to have the Cash Management Account held by another Eligible Institution, provided that such successor agent shall become a party to, and perform the duties of Agent pursuant to the terms of, this Agreement or execute and deliver a replacement Cash Management Agreement having terms and provisions substantially similar to this Agreement.

**Section 6.5**     **Agent Appointed Attorney In Fact**.     Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney in fact, with full power of substitution, to execute, acknowledge and deliver any instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower with respect to the Collateral, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower, which Borrower could or might do or which Lender or Agent (as agent of Lender) may deem necessary or desirable to more fully vest in Lender and Agent (as agent of Lender), the rights and remedies provided for herein.  The foregoing powers of attorney are irrevocable and coupled with an interest; provided however, same shall not be exercised by Lender or Agent (as agent of Lender) unless Borrower fails to perform any agreement herein and such failure shall continue for five (5) Business Days after notice of such failure is given to Borrower. Any reasonable expenses of Lender and Agent in connection therewith shall be paid by Borrower.

**Section 6.6**     **Agent as Eligible Institution**.  If Agent is not an Eligible Institution or each of the Cash Management Account or Subaccounts are not Eligible Accounts, Agent shall promptly notify Lender thereof.

**Section 6.7**     **Offset Rights**.  Agent hereby waives any right of offset, banker's lien or similar rights against, or any assignment of, or security interest or other interest in, the Collateral.

## ARTICLE VII:  REMEDIES

**Section 7.1**     **Remedies**.  Upon the occurrence and during the continuance of an Event of Default, Lender or Agent, as agent for Lender, may:

(a)     without notice to Borrower, except as required by law, and at any time or from time to time, charge, set off and otherwise apply all or any part of the Collateral against the Obligations or any part thereof;

(b)     in its sole discretion, at any time and from time to time, exercise any and all rights and remedies available to it under this Agreement, or as a secured party under the UCC or under any applicable law; and

(c)     demand, collect, take possession of, receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Collateral (or any portion thereof) as Lender may determine in its sole discretion.

**Section 7.2**     **Waiver**.  Borrower hereby expressly waives, to the fullest extent permitted by law, presentment, demand, protest or any notice of any kind in connection with this Agreement or the Collateral.  Borrower acknowledges and agrees that ten (10) days' prior written notice of the time and place of any public sale of the Collateral or any other intended disposition thereof shall be reasonable and sufficient notice to Borrower within the meaning of the UCC.

## ARTICLE VIII:  PATRIOT ACT NOTICE AND COMPLIANCE

**Section 8.1**     **USA PATRIOT Act Notice**.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each borrower that opens an account.  What this

means: when the borrower opens an account, Lender or Agent will ask for the business name, business address, taxpayer identifying number and other information that will allow Lender or Agent, as applicable, to identify the borrower, such as organizational documents. For some businesses and organizations, Lender or Agent may also need to ask for identifying information and documentation relating to certain individuals associated with the business or organization. The term "borrower" as used in this <u>Section 8.1</u> shall include Borrower and its successors and permitted assigns.

      **Section 8.2**    <u>**Anti-Money Laundering and Economic Sanctions**</u>.  Borrower hereby represents and warrants that Borrower, any Guarantor, and any Affiliated Manager (each, a "**Borrower Party**"), each Person that Controls each Borrower Party and, to Borrower's knowledge, each and every other Person that is an Affiliate of any Borrower Party and their respective directors, officers, employees or agents and any Person that has an economic interest in any Borrower Party, in each case, has not, and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents, shall not: (i) itself be (or have been), be (or have been) owned or controlled by, or act for or on behalf of a Person or government that is the subject of, in each case, economic sanctions administered or enforced by the Office of Foreign Assets Control ("**OFAC**") of the Department of the Treasury, the Department of State, or other relevant sanctions authority ("**Sanctions**"); (ii) fail to be (or have been) in full compliance with the requirements of the Patriot Act or other applicable anti-money laundering laws and regulations and all Sanctions; (iii) fail to operate (or have operated) under policies, procedures and practices, if any, that are (A) in compliance with applicable anti-money laundering laws and regulations and Sanctions and (B) available to Lender for Lender's review and inspection during normal business hours and upon reasonable prior notice; (iv) be (or have been) in receipt of any notice from OFAC, the Secretary of State or the Attorney General of the United States or any other department, agency or office of the United States, in each case, claiming a violation or possible violation of applicable anti-money laundering laws and regulations and/or Sanctions; (v) be (or have been) the subject of Sanctions, including those listed as a Specially Designated National or as a "blocked" Person on any lists issued by OFAC and those owned or controlled by or acting for or on behalf of such Specially Designated National or "blocked" Person; (vi) be (or have been) a Person who has been determined by competent authority to be subject to any of the prohibitions contained in the Patriot Act; or (vii) be (or have been) owned or controlled by or be (or have been) acting for or on behalf of, in each case, any Person who has been determined to be subject to the prohibitions contained in the Patriot Act. Borrower covenants and agrees that in the event Borrower receives any notice that any Borrower Party (or any of their respective beneficial owners or Affiliates) became the subject of Sanctions or is indicted, arraigned, or custodially detained on charges involving Sanctions, money laundering or predicate crimes to money laundering, Borrower shall immediately notify Lender and Agent. It shall be an Event of Default if any Borrower Party or any other party to any Loan Document becomes the subject of Sanctions or is indicted, arraigned or custodially detained on charges involving Sanctions, money laundering or predicate crimes to money laundering. All capitalized words and phrases and all defined terms used in the Patriot Act are incorporated into this Section. As used herein, "**Patriot Act**" shall mean collectively (i) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same was restored and amended by Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act (USA FREEDOM Act) of 2015, (ii) all statutes, orders, rules and regulations of the United States

government and its various executive departments, agencies and offices related to applicable anti-money laundering laws, rules and regulations and (iii) any amendment, extension, replacement or other modification of any of the foregoing from time to time and any corresponding provisions of future laws.

## ARTICLE IX:  MISCELLANEOUS

**Section 9.1**    **Transfers and Other Liens**.  Except as otherwise expressly permitted by the Loan Documents, Borrower agrees that it shall not (a) sell or otherwise dispose of any of the Collateral or (b) create or permit to exist any Lien upon or with respect to all or any of the Collateral, except for the Lien granted to Agent, as agent for Lender, under this Agreement.

**Section 9.2**    **Lender's Right to Perform Borrower's Obligations; No Liability of Lender**.  If Borrower fails to perform any of the covenants or obligations contained herein, and such failure shall continue for a period five (5) Business Days after Borrower's receipt of written notice thereof from Lender, Lender may itself perform, or cause performance of, such covenants or obligations, and the reasonable expenses of Lender incurred in connection therewith shall be payable by Borrower to Lender.  Notwithstanding Lender's right to perform certain obligations of Borrower, it is acknowledged and agreed that Borrower retains control of the Property and operation thereof and notwithstanding anything contained herein or Agent's or Lender's exercise of any of its rights or remedies hereunder, under the Loan Documents or otherwise at law or in equity, neither Agent nor Lender shall be deemed to be a mortgagee in possession nor shall Lender be subject to any liability with respect to the Property or otherwise based upon any claim of lender liability.

**Section 9.3**    **No Waiver**.  The rights and remedies provided in this Agreement and the other Loan Documents are cumulative and may be exercised independently or concurrently, and are not exclusive of any other right or remedy provided at law or in equity.  No failure to exercise or delay by Agent or Lender in exercising any right or remedy hereunder or under the Loan Documents shall impair or prohibit the exercise of any such rights or remedies in the future or be deemed to constitute a waiver or limitation of any such right or remedy or acquiescence therein. Every right and remedy granted to Agent or Lender hereunder or by law may be exercised by Agent or Lender at any time and from time to time, and as often as Agent or Lender may deem it reasonably expedient.  Any and all of Agent's or Lender's rights with respect to the lien and security interest granted hereunder shall continue unimpaired, and Borrower shall be and remain obligated in accordance with the terms hereof, notwithstanding (a) any proceeding of Borrower under the Bankruptcy Code or any bankruptcy, insolvency or reorganization laws or statutes of any state, (b) the release or substitution of Collateral at any time, or of any rights or interests therein or (c) any delay, extension of time, renewal, compromise or other indulgence granted by the Agent or Lender in the event of any default, with respect to the Collateral or otherwise hereunder.  No delay or extension of time by Agent or Lender in exercising any power of sale, option or other right or remedy hereunder, and no notice or demand which may be given to or made upon Borrower by Agent or Lender, shall constitute a waiver thereof, or limit, impair or prejudice Agent's or Lender's right, without notice or demand, to take any action against Borrower or to exercise any other power of sale, option or any other right or remedy.  No waiver of any term or condition of this Agreement, whether by delay, omission or otherwise, shall be effective unless in writing and

11

signed by the party sought to be charged, and then such waiver shall be effective only in the specific instance and for the purpose for which given.

Section 9.4    **Expenses**.  (a) The Collateral shall secure, and Borrower shall pay to Agent and Lender or Agent's and Lender's counsel on demand, from time to time, all reasonable costs and expenses (including reasonable attorneys' fees and disbursements, and transfer, recording and filing fees, taxes and other charges) of, or incidental to, the creation or perfection of any lien or security interest granted or intended to be granted hereby, the custody, care, sale, transfer, administration, collection of or realization on the Collateral, or in any way relating to the enforcement, protection or preservation of the rights or remedies of Agent or Lender under this Agreement, the Loan Agreement, the Note, the Security Instrument, or the other Loan Documents. Such fees and charges shall be paid to Agent pursuant to Section 3.4(b) hereof and Agent shall be entitled to charge the Cash Management Account for such fees and charges.  Notwithstanding the foregoing, Agent shall have no right to charge, set off or otherwise apply any portion of the Collateral against any amounts owed Agent by Borrower or Lender other than Agent's right to collect fees and expenses owed to Agent in accordance with the terms and provisions of this Agreement.

(b)    Agent shall be entitled to charge the Cash Management Account for all items deposited in and credited to the Cash Management Account and subsequently returned unpaid or with respect to which Agent fails to reserve final settlement.  In the event of insufficient funds in the Cash Management Account, Lender shall repay Agent for such returned unpaid items to the extent that Lender received funds for such items.  If Lender repays such funds to Agent, Agent shall disburse funds hereafter received in the Cash Management Account to Lender within one (1) Business Day of the same day that such funds are available until such funds disbursed to Lender equal the amount returned to Agent by Lender pursuant to this Section 9.4(b), together with any applicable interest thereon.

Section 9.5    **Entire Agreement**.  This Agreement constitutes the entire and final agreement between the parties with respect to the subject matter hereof and may not be modified, supplemented, changed, terminated or otherwise varied, except by a writing duly signed by the party against whom enforcement thereof is sought, and then only to the extent expressly set forth in such writing.

Section 9.6    **Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective successors and permitted assigns.

Section 9.7    **Notices**.  All notices or other written communications hereunder shall be delivered in accordance with Section 10.6 of the Loan Agreement.  Any such notices of other written communications to Agent shall be addressed as follows:

KeyBank National Association
11501 Outlook Street, Suite 300
Overland Park, Kansas 66211
Facsimile No.: 877-379-1625
Attention:  Cash Management

12

**Section 9.8** **Captions**.  All captions in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

**Section 9.9** **Governing Law.**  The governing law and related provisions set forth in Section 10.4 of the Loan Agreement are hereby incorporated by reference as if fully set forth herein and shall be deemed fully applicable hereunder.

**Section 9.10** **Counterparts**.  This Agreement may be executed in any number of counterparts each of which shall be deemed an original and all of which, taken together, shall constitute this Agreement.

**Section 9.11** **Conflicts**.  In the event of any conflict between the provisions of this Agreement and the Loan Agreement, the provisions of the Loan Agreement shall control.

**Section 9.12** **Trial by Jury.  TO THE FULLEST EXTENT NOW OR HEREAFTER PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS AGREEMENT WAIVES AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS AGREEMENT.**

**Section 9.13** **Miscellaneous**.

(a)  If a court of competent jurisdiction adjudicates any one or more of this Agreement's provisions as invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any of this Agreement's other provisions, and this Agreement shall be construed as if it had never contained such invalid, illegal or unenforceable provision.

(b)  The following rules of construction shall be applicable for all purposes of this Agreement and all documents or instruments supplemental hereto, unless the context otherwise clearly requires:  (i) the terms "include," "including" and similar terms shall be construed as if followed by the phrase "without being limited to"; (ii) any pronoun used herein shall be deemed to cover all genders, and words importing the singular number shall mean and include the plural number, and vice versa; (iii) the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or"; (iv) the words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision or section of this Agreement; (v) an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by Lender; (vi) no inference in favor of or against any party shall be drawn from the fact that such party has drafted any portion hereof or any other Loan Document; and (vi) if Borrower consists of more than one person or entity, then the obligations and liabilities of each person or entity shall be joint and several and in such case, the term "Borrower" shall mean individually and collectively, jointly and severally, each Borrower.

(c)  Wherever Lender's judgment, consent, approval or discretion is required under this Agreement for any matter or thing or Lender shall have an option, election, or right of determination or any other power to decide any matter relating to the terms and conditions of this Agreement, including any right to determine that something is satisfactory or not ("**Decision**

13

**Power**"), such Decision Power shall be exercised in the sole and absolute discretion of Lender unless otherwise expressly stated to be reasonably exercised.  Such Decision Power and each other power granted to Lender upon this Agreement or any other Loan Document may be exercised by Lender or by any authorized agent of Lender (including any servicer or attorney-in-fact), and Borrower hereby expressly agrees to recognize the exercise of such Decision Power by such authorized agent.

**[NO FURTHER TEXT ON THIS PAGE]**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**BORROWER:**

**THE FRIARS NATIONAL ASSOCIATION, INC.,**
a New York not-for-profit corporation

By:_____

Name: Arthur Aidala
Title: President

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**LENDER:**

**KAIROS CREDIT STRATEGIES PARTNERSHIP, LP,**
a Delaware limited partnership

By: Kairos Credit Strategies REIT, Inc.
a Delaware corporation
its general partner

By: *Jonathan A. Needell*
Name: Jonathan A. Needell
Title: President & CIO

**AGENT:**

**KEYBANK NATIONAL ASSOCIATION,**
a national banking association

By:_____
Name:_____
Title:_____

## EXHIBIT A

### Price Schedule Single Account without Lockbox**

***ACCEPTANCE FEE***
    One-time fee payable upon execution of this Agreement  **$750.00**
***BUSINESS CHECKING SERVICES***
  *General*
    Monthly Maintenance (per account)
***Online Access - KTT***
  *Information Reporting*
    Current Day Report
    Previous Day Report
    Analysis Statement
    DDA Statement
  *Transaction Services*
    Return Item Reporting
***ACH***
  *ACH Received*
    Incoming Debit Item
    Incoming Credit Item
***WIRE TRANSFER***
    Incoming Wire Transfer
***KeyCorp - DACA Servicing***
    Cash Management Fee
***CASH MANAGEMENT PACKAGE PRICE***  **$450.00**
***RETURNED DEPOSITED ITEMS & CHECKS***
    Returned Check Fee  **$  33.00**
***\*\*All fees are subject to change at the discretion of KeyBank, National Association.***

### Price Schedule Single Account including Lockbox**

***ACCEPTANCE FEE***
    One-time fee payable upon execution of this Agreement  **$750.00**
***BUSINESS CHECKING SERVICES***
  *General*
    Monthly Maintenance (per account)
***Online Access - KTT***
  *Information Reporting*
    Current Day Report
    Previous Day Report
    Analysis Statement
    DDA Statement
  *Image Research Center*

2

                Deposit Image
        *Transaction Services*
                Return Item Reporting

***ACH***
        *ACH Received*
                Incoming Debit Item
                Incoming Credit Item

**WIRE TRANSFER**
                Incoming Wire Transfer

**WHOLESALE LOCKBOX**
        Setup and Maintenance
                Lockbox Set-up (one-time)
                PO Box Rental Fee (annual) (pass-through fee)
                Lockbox Maintenance (per account per month)
        Payment (Item) Processing
                Lockbox Item - Wholesale (per item)
        Check Clearing and Depositing
                Lockbox Deposit Item Clearing
        Optional Lockbox Services
                Lockbox Re-Association Without Staple (per item)
                Lockbox Item Photocopy (per item)
                Lockbox Additional Payee (per item)
        Data Entry Services
                Lockbox Data Entry (per keystroke)
        Imaging Services
                Lockbox Image - Check Scan (per check)

***KeyCorp - DACA Servicing***
        Cash Management Fee

***CASH MANAGEMENT PACKAGE PRICE***          **$625.00**

***RETURNED DEPOSITED ITEMS & CHECKS***
        Returned Check Fee          **$ 33.00**

***\*\*All fees are subject to change at the discretion of KeyBank, National Association.***

<u>**Price Schedule for Multiple Accounts with OR without Lockbox**</u>**\*\***

**ACCEPTANCE FEE**
                One-time fee, payable upon execution of this Agreement    **$750.00**

**BUSINESS CHECKING SERVICES**
        *General*
                Monthly Maintenance (per account)

***Online Access - KTT***
        *Information Reporting*
                Current Day Report
                Previous Day Report
                Analysis Statement
                DDA Statement

*Image Research Center*
    Deposit Image
*Transaction Services*
    Return Item Reporting

**ACH**

*ACH Received*
    Incoming Debit Item
    Incoming Credit Item

**WIRE TRANSFER**

    Incoming Wire Transfer

**WHOLESALE LOCKBOX**

Setup and Maintenance
    Lockbox Set-up (one-time)
    PO Box Rental Fee (annual) (pass-through fee)
    Lockbox Maintenance (per account per month)
Payment (Item) Processing
    Lockbox Item - Wholesale (per item)
Check Clearing and Depositing
    Lockbox Deposit Item Clearing
Optional Lockbox Services
    Lockbox Re-Association Without Staple (per item)
    Lockbox Item Photocopy (per item)
    Lockbox Additional Payee (per item)
Data Entry Services
    Lockbox Data Entry (per keystroke)
Imaging Services
    Lockbox Image - Check Scan (per check)

***KeyCorp - DACA Servicing***
    Cash Management Fee

***CASH MANAGEMENT PACKAGE PRICE***        **$625.00**
***RETURNED DEPOSITED ITEMS & CHECKS***
    Returned Check Fee        **$ 33.00**

***\*\*All fees are subject to change at the discretion of KeyBank, National Association.***

# EXHIBIT K – STATE UCC

First American Title
Insurance Company
666 Third Avenue   5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

09294

2021 JUN 29  PH 4:36

UNI-37
DRAWDOWN

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Christopher J. McCranie      (904) 598-8636

**B. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Christopher J. McCranie
Akerman LLP
50 North Laura Street, # 3100
Jacksonville, FL 32202

10/01/72B

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| The Friars National Association, Inc. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 57 E 55th Street | New York | NY | 10022 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | Not-For-Profit Corp | New York | 38388 ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | | | ☐ NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)** - Insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 30242 Esperanza | Rancho Santa Margarita | CA | 92688 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All assets of the Debtor, wherever located and whether now owned or hereafter acquired, including any proceeds thereof.

| 5. ALTERNATIVE DESIGNATION (if applicable): | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**
The Friars Club (M: 0386067)      FRIAR39538      Filed with New York Department of State

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**FILING NUMBER:  202106290234558**

# EXHIBIT L – CITY UCC

## NYC DEPARTMENT OF FINANCE
### OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2021062900751006001E84D4

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 4 |
|---|---|

| Document ID: 2021062900751006 | Document Date: 06-25-2021 | Preparation Date: 06-29-2021 |
|---|---|---|
| Document Type: INITIAL UCC1 | | FIXTURE FILING |
| Document Page Count: 3 | | |

**PRESENTER:**
FIRST AMERICAN TITLE INSURANCE COMPANY
666 THIRD AVENUE
1060172B
NEW YORK, NY 10017
212-850-0675
CBLISTEIN@FIRSTAM.COM

**RETURN TO:**
AKERMAN LLP
ATTENTION: CHRISTOPHER MCCRANIE, ESQ.
50 NORTH LAURA STREET, SUITE 3100
JACKSONVILLE, FL 32202

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1291 | 127 | Entire Lot | 57 EAST 55TH STREET |

Property Type: COMMERCIAL REAL ESTATE

### CROSS REFERENCE DATA

CRFN_____ or DocumentID_____ or _____ Year_____ Reel____ Page_____ or File Number_____

### PARTIES

**DEBTOR:**
THE FRIARS NATIONAL ASSOCIATION, INC.
57 E 55TH STREET
NEW YORK, NY 10022

**SECURED PARTY:**
KAIROS CREDIT STRATEGIES OPERATING
PARTNERSHIP, LP
30242 ESPERANZA
RANCHO SANTA MARGARITA, CA 92688

### FEES AND TAXES

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | | |
| TASF: | $ | 0.00 | **OF THE CITY REGISTER OF THE** | | |
| MTA: | $ | 0.00 | **CITY OF NEW YORK** | | |
| NYCTA: | $ | 0.00 | Recorded/Filed       07-07-2021 10:59 | | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | | |
| TOTAL: | $ | 0.00 | **2021000256899** | | |
| Recording Fee: | $ | 20.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

*Annette M Hill*

*City Register Official Signature*

**First American Title**
**Insurance Company**
666 Third Avenue   5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

## UCC FINANCING STATEMENT
FOLLOW  INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Christopher J. McCranie        (904) 598-8636

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Christopher J. McCranie
Akerman LLP
50 North Laura Street, # 3100
Jacksonville, FL 32202

1060172B

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| The Friars National Association, Inc. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 57 E 55th Street | New York | NY | 10022 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | Not-For-Profit Corp | New York | 38388 ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| KAIROS CREDIT STRATEGIES OPERATING PARTNERSHIP, LP | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 30242 Esperanza | Rancho Santa Margarita | CA | 92688 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All assets of Debtor including, without limitation, fixtures located on or about the property as further described in the attached Exhibit A.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.      Attach Addendum      [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

The Friars Club (M: 0386067)                    Filed with New York City Register

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# UCC FINANCING STATEMENT **ADDENDUM**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

9a. ORGANIZATION'S NAME

OR **The Friars National Association, Inc.**

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|
| | | |

10. MISCELLANEOUS:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

11a. ORGANIZATION'S NAME

| OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| Not Applicable | | | | | ☐ NONE |

12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)

12a. ORGANIZATION'S NAME

| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☑ fixture filing.

14. Description of real estate:

**See Exhibit "A" attached hereto.**

16. Additional collateral description:

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

17. Check only if applicable and check only one box.

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust  or ☐ Decedent's Estate

18. Check only if applicable and check only one box.

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years

☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

EXHIBIT "A"
## TO UNIFORM COMMERCIAL CODE-1 FINANCING STATEMENT
(Land)

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, CITY OF NEW YORK AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF 55TH STREET DISTANT 156 FEET 6 INCHES EASTERLY FROM THE NORTHEASTERLY CORNER OF SAID STREET AND MADISON AVENUE;

RUNNING THENCE NORTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK;

THENCE EASTERLY ALONG THE CENTER LINE OF THE BLOCK 33 FEET;

THENCE SOUTHERLY PARALLEL WITH MADISON AVENUE AND PART OF THE WAY THROUGH ANOTHER PARTY WALL 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF 55TH STREET;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF 55TH STREET, 33 FEET TO THE POINT OR PLACE OF BEGINNING.


County: New York

Block: 1291

Lot: 127

# EXHIBIT M – NOTICES OF DEFAULT



March 13, 2023

The Friars National Association, Inc.
57 East 55th Street
New York, NY 10022
c/o Arthur Aidala, Gregory Peck, Susan Cronin, Joseph A. Baratta
Delivered by email: aidalaesq@aidalalaw.com; greg@crescenthg.com; susan@crescenthotelgroup.com
With a copy to: jabaratta@barattalaw.com

## NOTICE OF DEFAULT

To Whom it May Concern,

This letter is formal notice that The Friars National Association, Inc. ("Borrower") is in default as set out in the Term Loan and Security Agreement dated June 25, 2021 by and between Borrower, and Kairos Credit Strategies Operating Partnership, LP ("Lender").

We have not yet received your payment which was due on March 1, 2023 resulting in an Event of Default on March 11, 2023. The current outstanding balance is $140,881.86.  Default Interest of 16% per year is effective from the date of Default.

For your ease of reference, Section 8.1(a) is set forth below:

*8.1 Events of Default.*

Any one or more of the following events, following any applicable notice requirements and/or cure period, if any, shall constitute an event of default (each, an "**Event of Default**") under this Agreement:

(a) If Borrower fails to pay when due and payable, or when declared due and payable in accordance with this Agreement, all or any portion of the Obligations (whether principal, interest (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts), fees and charges due Lender, reimbursement of Lender Expenses, or other amounts constituting Obligations) within ten (10) days that such payment is due without need for further Lender notice (provided no such grace period shall be applicable to the Maturity Date, shall be deemed to be an extension of the due date for any such payment, or shall be applicable in the case of a default under Sections 8.1(c), 8.1(d), 8.1(f), or 8.1(g) hereunder); provided, however, if funds from the Tax and Insurance Reserve or Tax and Insurance Impound are used to satisfy all amounts due under Section 2.14 after any applicable Event of Default, such payment in full shall be deemed to cure such Event of Default



You must cure this default immediately. Lender reserves the right to declare all or any portion of the Obligations immediately due and payable, and shall have all other rights and remedies available at law or in equity or pursuant to any other Loan Document including, without limitation, the power of sale or judicial foreclosure as set forth in the Security Instrument and/or the Pledge Agreement. You have the right to assert in the foreclosure proceeding the non-existence of a Default or any other defense to acceleration and foreclosure.

Please note that the foregoing does not (i) operate as a waiver of any default under the Loan Documents (as that term is defined in the Term Loan and Security Agreement), (ii) operate as a waiver of any right, remedy, power or privilege of Lender under the Loan Documents, (iii) prejudice or preclude any other or further exercise of any right or remedy of Lender provided by law or in equity, or (iv) in any way modify, change, impair, affect, diminish or release any liability you may have pursuant to the Loan Documents or any other liability or obligation that you may have.

Kairos Credit Strategies Operating Partnership, LP


By: Jonathan A Needell
Kairos Credit Strategies REIT, Inc
President & CIO

# akerman

Mark S. Lichtenstein

Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY  10020

D: 212 259 8707
T: 212 880 3800
F: 212 880 8965
DirF: 212 259 8578
mark.lichtenstein@akerman.com

March 30, 2023

*Via Federal Express and E-Mail:*
The Friars National Association, Inc.
57 East 55th Street,
New York, NY 10022

Baratta, Baratta & Aidala LLP
546 Fifth Avenue
New York, NY 10036
Attention: Joseph A. Baratta
Email: jabaratta@barattalaw.com

Aidala Bertuna & Kamins
546 5th Avenue, 6th Floor
New York, NY 10036
Attention: Arthur L. Aidala
Email: aidalaesq@aidalalaw.com

Crescent Hotel Group
Attention: Gregory Peck
Email: greg@crescenthg.com
Attention: Susan Cronin
Email: susan@crescenthotelgroup.com

> Re:    *Loan (the "Loan") evidenced by, among other things, a certain Consolidated, Extended, Amended and Restated Mortgage, Assignment of Rents, Security Agreement and Financing Statement dated on or about June 25, 2021 (the "Mortgage")*

Dear Borrower:

This firm represents Kairos Credit Strategies Operating Partnership, LP ("Lender") in connection with the Loan to the Friars National Association, Inc. ("Borrower"). Except as otherwise stated herein, all capitalized terms used in this letter have the same meaning as defined in the Mortgage.

The purpose of this correspondence is to advise you that all of the Obligations under the Loan are hereby accelerated and immediately due and payable as a result of certain Events of

March 30, 2023
Page 2

Default, which are continuing. As of March 30, 2023, the amount owed to Lender is $13,490,389.51 (the "Debt") comprised of $13,000,000.00 principal and $237,898.00 interest, $1,840.00 Servicing Fees, and $79,450.84 Tax and Insurance Reserve. The Debt includes late fees of $6,708.66 as a result of failure to make timely payment in accordance with the Loan Documents, along with $23,610.15 in attorneys' fees and costs incurred in negotiating and drafting unexecuted amendments to the Loan Documents, but excludes other attorneys' fees and costs of collection, and other costs and expenses previously incurred by, or which may be in the future incurred by Lender, including, but not limited to taxes and other costs and expenses as set forth in the Loan Documents. Lender shall expeditiously exercise all of its rights and remedies against Borrower under the Mortgage and the Loan Documents, including commencing a judicial foreclosure action and pursuing its rights under the Uniform Commercial Code.

Pursuant to section 21(a)(v) of the Mortgage and N.Y. U.C.C. Law § 9-609, Lender hereby demands that Mortgagor make all of the Personal Property available to Lender at a safe and secure place inside the premises located at 57 East 55th Street, New York, NY 10022 on or before April 6, 2023.

Any payments hereafter received by Lender shall be in partial payment of the Debt, and may be accepted and applied by Lender to the unpaid balances due and owing under the Loan Documents in any order of priority as determined by Lender in its sole discretion with a full reservation of rights, all in accordance with the Loan Documents. If partial payments are accepted, they shall be without waiver of or prejudice to any rights or remedies available under the Loan Documents and applicable law. Any delay or forbearance by Lender in the enforcement or pursuit of its rights and remedies shall not affect such rights or remedies commenced by Lender at a later date.

Notwithstanding any discussions that Lender may have with you or may have had with you regarding the Loan, you are advised that it expressly reserves all rights and remedies available to it under the Loan Documents and applicable law. No such discussions shall imply an agreement on the part of Lender to waive any of their rights and remedies or to forbear from taking any action authorized under the Loan Documents or applicable law, whether or not such discussions shall be continuing. Should Lender agree to consider any request to discuss matters further, you may be required to sign a pre-negotiation agreement setting forth the conditions under which your request would be considered.

Please govern yourself accordingly.

Sincerely,

*Mark Lichtenstein*

Mark S. Lichtenstein

cc:   Kairos Credit Strategies Operating Partnership, LP (via e-mail)

69553803;1