UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KAIROS CREDIT STRATEGIES OPERATING
PARTNERSHIP, LP,

                  Plaintiff,

    -v-

THE FRIARS NATIONAL ASSOCIATION, INC., et
al.,

                  Defendants.

23 Civ. 02960 (AS) (RFT)

**REPORT AND RECOMMENDATION**

**TO THE HONORABLE ARUN SUBRAMANIAN, UNITED STATES DISTRICT JUDGE:**

By Order of Reference dated January 31, 2024 (ECF 128), this matter was referred to a

Magistrate Judge to issue a report and recommendation concerning the amount, if any, that

should be awarded to Plaintiff Kairos Credit Strategies Operating Partnership, LP from the

proceeds of the anticipated sale by a receiver of certain properties owned by Defendant Friars

National Association, Inc. ("Friars Club") following a default by Friars Club on a loan and

mortgage secured by those properties. Having reviewed the submissions of Plaintiff and Friars

Club, I respectfully recommend that Your Honor issue an order stating that Friars Club owes

Plaintiff the amount set forth in the conclusion below.[1]

---

[1]     This report and recommendation does not address the arguments by Friars Club in its
response to Plaintiff's submission in support of the amount Plaintiff claims it is owed that the
decision granting a summary judgment of foreclosure was erroneous or that the judgment was
infirm or improper (*see* ECF 147, Friars Club's Response); such arguments are outside the scope
of my referral.

**FACTUAL BACKGROUND**

Friars Club defaulted on a series of loans made to it between 2018 and 2023. (*See* ECF 119, Summary Judgment Order at 5.) On August 28, 2018, Friars Club received a $2 million loan from 57 East 55th Street Funding Associates ("Funding Associates") and as security, Friars Club granted Funding Associates an interest in certain real and personal property located at 57 East 55th Street (collectively, "the Property"). (*See* ECF 90, Declaration of Raymond Hu in Support of Plaintiff's Summary Judgment Motion ("Hu SJ Decl.") Ex. 4, Mortgage and Security Agreement Dated 10/3/2018.) From 2018 through 2019 Friars Club received additional loans totaling $4 million from Funding Associates, all of which were secured by the Property. (*See* ECF 90, Hu SJ Decl. Exs. 5-12, Funding Associates Notes.)

In February 2020, Funding Associates assigned the loans to Titan Capital ID, LLC ("Titan") (*see id.* Ex. 13, Assignment of Mortgage Dated 2/21/2020), which provided Friars Club with an additional $3 million loan (for a total loan of $9 million) secured by the Property (*see id.* Ex. 24, Consolidated, Extended, Amended and Restated Mortgage Note Dated 2/21/2020).

On June 25, 2021, Titan assigned the $9 million loan to Plaintiff. (*See id.* Ex. 28, Consolidated, Extended, Amended and Restated Term Loan and Security Agreement Dated 6/25/2021 ("2021 Consolidated Loan Agreement") Schedule 10.26; *id.* Ex. 32, Consolidated, Extended, Amended and Restated Mortgage, Assignment of Rents, Security Agreement and Financing Statement Dated 6/25/2021 ("2021 Consolidated Mortgage Note").) Plaintiff provided Friars Club with an additional $4 million loan secured by the Property, for a total principal amount of $13 million. (*See id.* Ex. 31, Consolidated, Extended, Amended and Restated Promissory Note Dated 6/25/2021 ("2021 Consolidated Promissory Note").)

On March 1, 2023, Friars Club failed to make its required monthly payment on the loan to Plaintiff. (*See* ECF 90, Hu SJ Decl. ¶ 57; *see also* ECF 119, Summary Judgment Order at 4.) Plaintiff states that Friars Club's date of default was March 11, 2023. (*See* ECF 140, First Supplemental Declaration of Raymond Hu ("Hu First Supp. Decl.") ¶ 6; *see also* ECF 90, Hu SJ Decl. Ex. 28, 2021 Consolidated Loan Agreement § 8.1 (providing that a default occurs if a payment due is not made within ten days of the due date).) On March 13, 2023, Plaintiff sent a notice of default to Friars Club, demanding that Friars Club cure. (*See* ECF 90, Hu SJ Decl. ¶ 57; *see also id.* Ex. 36, Notice of Default at 2.) The notice of default was returned as unclaimed. (*See id*. ¶ 57.) On March 30, 2023, counsel for Plaintiff sent a letter to Friars Club notifying Friars Club that "all of the Obligations under the Loan are hereby accelerated and immediately due and payable as a result of certain Events of Default, which are continuing." (*Id.* Ex. 37, Letter.) Friars Club failed to cure its default. (*See id.* ¶ 58.)

## PROCEDURAL BACKGROUND

On April 7, 2023, Plaintiff commenced this action against Friars Club, seeking to foreclose on the Property. (*See* ECF 1, Compl. ¶¶ 16-20.) Plaintiff named as defendants various entities that might have claims on the Property, including: City of New York Department of Environmental Control, New York State Department of Labor, New York State Tax Department, and New York City Finance Administration (together, the "New York Defendants"), the Hotel, Restaurant & Club Employees and Bartenders Union, Local 6 ("Union"), and Club Employees Pension Fund ("Fund"). (*See id*. ¶¶ 4-7.)

On April 12, 2023, Plaintiff moved for emergency appointment of a receiver (*see* ECF 26), which motion the Court granted (*see* ECF 67, Order Appointing Receiver).

On May 18, 2023, Union and Fund filed an answer and cross-claims against Friars Club. (*See* ECF 64, Answer and Cross Claims of Union and Fund.) Union and Fund alleged that Friars Club and any successors or assigns are bound to a collective bargaining agreement and that Friars Club must make adherence to the collective bargaining agreement a condition of any transfer of the Property. (*See id.* ¶¶ 23-25.) Union and Fund also alleged that Friars Club owes them $153,430.60. (*See id.* ¶¶ 31, 34.)

On October 18, 2023, Plaintiff moved for summary judgment against Friars Club, Union, and Fund. (*See* ECF 88, Mot. for Summary Judgment.) On December 12, 2023, Your Honor dismissed the New York Defendants from the case and granted Plaintiff's motion for summary judgment to foreclose on the Property. (*See* ECF 119, Summary Judgment Order at 7-8.) Your Honor directed Plaintiff to meet and confer with all other interested parties and to file a proposed judgment (*see id.*), which proposed order (ECF 121) Your Honor entered on January 31, 2024. (*See* ECF 127, Judgment.) On May 20, 2024, Plaintiff filed a Proposed Amended Judgment, clarifying that the original summary judgment of foreclosure was granted as against Friars Club in addition to Union and Fund. (*See* ECF 139, Proposed Amended Judgment.) Your Honor entered that proposed order on May 29, 2024. (*See* ECF 144, Amended Judgment.)

Your Honor referred this matter to Magistrate Judge Jennifer Willis for a report and recommendation "detailing the amounts owed to [Plaintiff] under the Loan Documents" (ECF 128, Order of Reference), and on February 1, 2024, the matter was reassigned to me. On February 9, 2024, I set a briefing schedule, directing Plaintiff to file proposed findings of fact and conclusions of law by no later than February 23, 2024 as to the amount owed to Plaintiff by Friars Club; and directing Defendants to file any responses to Plaintiff's submissions by March 8,

2024. (*See* ECF 129, Scheduling Order.) Plaintiff duly filed its proposed findings of facts and

conclusions of law ("Proposed Findings") (ECF 130), along with the Declaration of Raymond Hu

in Support of Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Hu Decl.") (ECF 131)

and the Declaration of Mark Lichtenstein ("Lichtenstein Decl.") (ECF 132).

Plaintiff sought to recover $16,711,321.71 as of February 23, 2024 (the date of the

Proposed Findings), plus $6,232.24 in accrued interest for every day between February 23, 2024

and the date a final judgment is entered. (*See* ECF 130, Proposed Findings ¶ 15.) The

$16,711,321.71 included: (1) the unpaid principal balance of $13 million; (2) Property Protective

Advances, as defined by Sections 9 and 10.3 of the 2021 Consolidated Loan Agreement, which

includes taxes and insurance payments, costs and fees of the Court-appointed receiver,

attorneys' fees, and miscellaneous expenses to ensure protection and preservation of Plaintiff's

interest in the Property, consisting of $1,046,156.92 in insurance, taxes, and receiver fees,

$287,459.78 in legal fees and costs in connection with this foreclosure action, $23,610.15 in

legal fees for a loan modification that was not executed, and $13,600.00 in property inspection

costs, for a total of $1,370,826.85; (3) accumulated interest on the unpaid principal balance and

on the Property Protective Advances between the date of default (March 11, 2023) and

February 23, 2024, in the amount of $2,203,008.52; (4) Late Charges, as defined by Section 2.6

of the 2021 Consolidated Loan Agreement, in the amount of $127,702.16; and (5) Special

Servicing Fees, as defined by Section 2.10 of the 2021 Consolidated Loan Agreement, in the

amount of $141,960.00, less a credit to Friars Club of $132,175.82. (*See* ECF 131, Hu Decl. Ex. A,

Calculation of Amounts Due at 1.) Plaintiff subsequently withdrew its claim for Late Charges.

(*See* ECF 145, Second Declaration of Mark S. Lichtenstein ¶ 3.)

On March 8, 2024, Union and Fund filed proposed findings of fact and conclusions of law. (*See* ECF 133, Union and Fund Proposed Findings). They did not contest Plaintiff's support for the amount owed to Plaintiff by Friars Club. (*See id*. at second introductory paragraph.) Instead, Union and Fund asked to preserve the rights of the former Friars Club employees. (*See id.*)[2]  Friars Club did not submit a response to Plaintiff's Proposed Findings by the March 8 deadline.

On May 17, 2024, I directed Plaintiff to make a supplemental submission by May 22, 2024 on certain aspects of the calculation of the amount owed to Plaintiff by Friars Club (*see* ECF 137, Order), and I gave Defendants until May 31, 2024 to file a response (*see* ECF 141, Order). On May 22, 2024, Plaintiff filed a supplemental submission (ECF 140), which provided more information on Plaintiff's calculation of and support for the amount owed to it by Friars Club. After reviewing the supplemental submission, I concluded that Plaintiff had addressed some but not all of my outstanding questions, and so on May 28, 2024, I issued an order requiring Plaintiff, by May 29, 2024, to provide more information on the claimed Late Fees and giving Defendants until May 31, 2024 to respond. (*See* ECF 142, Order.) On May 29, 2024, Plaintiff made a submission withdrawing its request that Late Fees be included in determining the amount owed to it by Friars Club. (*See* ECF 145, Second Declaration of Mark S. Lichtenstein ¶ 3.)

---

[2]     This report and recommendation does not address the positions taken by Defendants Union and Fund in their submission, since that submission does not relate to the amount Plaintiff is owed as a result of Friars Club's default and thus falls outside the scope of my referral.

On May 30, 2024, Friars Club submitted a response to Plaintiff's May 22, 2024 submission in support of the amount Plaintiff claimed is owed to it by Friars Club. (*See* ECF 147, Friars Club's Response ¶¶ 3, 6.)

After reviewing the supplemental submission and Friars Club's response, I concluded that Plaintiff had provided support for some but not all its calculations. On June 3, 2024, I issued an order requiring Plaintiff, by June 4, 2024, to submit additional information on its claimed Property Protective Advances and giving Defendants until June 5, 2024 to file a response. (*See* ECF 148, Order.) On June 4, 2024, Plaintiff filed a second supplemental submission that provided more information regarding Plaintiff's calculation of and support for the amount owed to it by Friars Club. (*See* ECF 149, Second Supplemental Declaration of Raymond Hu Dated 6/4/2024 ("Hu Second Supp. Decl.").) None of the Defendants filed a response by the deadline.

<u>DISCUSSION</u>

I.    **Legal Standard**

A.    <u>Amount Owed Under the Terms of the Defaulted Mortgage</u>

Pursuant to Section 1321 of the New York Real Property Actions and Proceedings Law, after a court has granted summary judgment in favor of a plaintiff based on an undisputed showing of default on a mortgage, the "trial court has the authority to compute the amount owed or appoint a referee to do the same." *U.S. Bank Tr., N.A. v. Dingman*, No. 16-CV-1384 (CS), 2016 WL 6902480, at *4 (S.D.N.Y. Nov. 22, 2016) ("Although section 1321 contemplates a situation where the defendant fails to answer or the right of the plaintiff is admitted, because the Court granted summary judgment in favor of Plaintiff based on an undisputed showing of

default on the mortgage, the procedural posture of the case now is as if the right of Plaintiff has been admitted."). An evidentiary hearing on the amount owed is not required, "so long as there is a basis for the damages awarded"; "[d]etailed affidavits and other documentary evidence can provide this basis." *Onewest Bank, N.A. v. Cole*, No. 14-CV-3078 (FB) (RER), 2015 WL 4429014, at *3 (E.D.N.Y. July 17, 2015). The amount owed should be determined based on "the terms of the Notes and Mortgages." *E. Sav. Bank, FSB v. Rabito*, No. 11-CV-2501 (KAM) (VVP), 2014 WL 4804872, at *1 (E.D.N.Y. Sept. 10, 2014) (quoting *Builders Bank v. Rockaway Equities, LLC,* No. 08-CV-3575 (MDG), 2011 WL 4458851, at *5 (E.D.N.Y. Sept.23, 2011) (internal quotation marks omitted)), report and recommendation adopted, 2014 WL 4804901 (Sept. 26, 2014).

B.    <u>Attorneys' Fees and Costs</u>

In assessing an application for attorneys' fees, courts award counsel the "presumptively reasonable fee," which is calculated by multiplying the reasonable hourly rate by the number of hours that were reasonably expended to litigate the action. *See Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009); *see also Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011).[3] In considering the reasonableness of the hourly rate, the Court's analysis is guided by the prevailing market rate for similar services. *See Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984). The Court also considers factors including the attorneys' experience, reputation, and

---

[3]    Plaintiff does not invoke Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure in connection with its request for attorneys' fees, which provides that a motion for attorneys' fees must "be filed no later than 14 days after the entry of judgment." Judgment has not yet been entered. Rule 54(d)(2)(B) "generally governs the timing of a motion for attorney's fees," but it "only explicitly sets a deadline by which a motion for attorney's fees must be filed; it does not prohibit the filing of such a motion before the entry of judgment." *Beata Music LLC v. Danelli,* No. 18-CV-6354 (JGK), 2022 WL 1471031, at *1 n.2 (S.D.N.Y. May 10, 2022). Accordingly, the request for attorneys' fees and costs is not premature.

ability; the time, labor, and skill required; the novelty and complexity of the legal issues posed;

awards in similar cases; and degree of success. *See Agudath Israel of America, et al. v. Hochul*,

No. 22-38, 2023 WL 2637344, at *2 n.2 (2d Cir. Mar. 27, 2023). Fee awards typically include

those reasonable out-of-pocket costs incurred by the attorney, including for items such as

"shipping, filing fees, process servers, and litigation support." *HSBC Bank USA, N.A. v. PAKS*

*Holdings, LLC*, No. 19-10193 (PGG) (JLC), 2021 WL 667661, at *8 (S.D.N.Y. Feb. 22, 2021)

(internal quotation marks and citation omitted).

## II.    Analysis

### A.    Amount Owed to Plaintiff Under the Terms of the Defaulted Mortgage

I compute the amount owed to Plaintiff by Friars Club based on the documentary

evidence submitted by Plaintiff. No Defendant has challenged my authority to perform this

computation or suggested that an evidentiary hearing is warranted.[4]

#### 1.    Unpaid Principal Balance

The principal amount of the loan originally was $13 million. (*See* ECF 90, Hu SJ Decl. Ex.

28, 2021 Consolidated Loan Agreement at 1.) Payments were applied first to accrued and

unpaid interest and then to the principal balance (*see id.* § 2.4 (b)), and no payments were ever

---

[4]    At the outset, I note that Plaintiff has been granted a judgment of foreclosure, which is
an equitable remedy. *See Westnau Land Corp.* v. *U.S. Small Bus. Admin.*, 1 F.3d 112, 115 (2d Cir.
1993) (recognizing that under New York law, "a creditor is required to elect between the
remedies of an action for money damages on a debt or an equitable action to foreclose a
mortgage that secures the debt"). Because my computation of damages is in connection with a
judgment of foreclosure, that computation does not run afoul of the Seventh Amendment right
to a trial by jury. *See Pereira v. Farace*, 413 F.3d 330, 337 (2d Cir. 2005) (explaining that the
Seventh Amendment "preserv[es] the right to a jury trial only in suits at common law" (internal
quotation marks and citation omitted)).

applied to the principal. Accordingly, the unpaid principal balance remains $13 million. (*See id*. ¶ 92.)

2.    Property Protective Advances

Plaintiff seeks $1,370,826.85 in Property Protective Advances, consisting of $1,046,156.92 in insurance, taxes, and receiver fees, $287,459.78 in legal fees and costs in connection with this foreclosure action, $23,610.15 in legal fees for a loan modification that was not executed, and $13,600.00 in property inspection costs. (*See* ECF 131, Hu Decl. Ex. A, Calculation of Amounts Due at 1.)[5] Courts in this Circuit have allowed plaintiffs in foreclosure actions to recover property protective advances when the plaintiffs submit sufficient documentation to prove the accuracy of the claimed cost of such advances. *See E. Sav. Bank, FSB,* 2022 WL 18858919, at *5 (collecting cases).

Section 9.1 of the 2021 Consolidated Loan Agreement and Section 9 of the 2021 Consolidated Mortgage Note set out Plaintiff's rights and remedies upon a default by Friars Club. (*See* ECF 90, Hu SJ Decl. Ex. 28, 2021 Consolidated Loan Agreement § 9.1; *id.* Ex. 32, 2021 Consolidated Mortgage Note § 9.) Plaintiff is authorized to "make such payments and do such acts as [Plaintiff] considers necessary or reasonable to protect its security interests," including initiating a foreclosure action, selling the Property, paying attorneys' fees and costs, paying

---

[5]    Plaintiff seeks Property Protective Advances for the period ending February 23, 2024 (the date of its initial submission in support of the amounts owed); it has not supplemented its submission with proof of later advances and has not sought leave to do so in the future, other than stating in a footnote to the declaration supporting its claimed attorney fees that Plaintiff reserves its right to seek legal fees and costs incurred after submission of that declaration. (*See* ECF 132, Lichtenstein Decl. ¶ 10 n.1.) I limit my analysis of Property Protective Advances to the period ending February 23, 2024.

servicer fees and costs, and paying insurance premiums and interest on the unpaid principal

balance on the note. (ECF 90, Hu SJ Decl. Ex. 28, 2021 Consolidated Loan Agreement § 9.1(c));

*id.* Ex. 32, 2021 Consolidated Mortgage Note § 9.) The 2021 Consolidated Mortgage Note

specifically outlines Friars Club's obligation to indemnify Plaintiff for "all enforcement costs,

costs, advances, charges and expenses, including attorneys' fees and costs and any servicer fees

and costs, disbursements and costs of abstracts of title, documentary stamp and intangible

personal property taxes" that Plaintiff incurred in connection with the "Note, this Mortgage,

and the other Loan Documents or in the enforcement of [Plaintiff]'s rights hereunder." (*Id.* Ex.

32, 2021 Consolidated Mortgage Note § 9.)

   a.   *Insurance, Taxes, Property Inspections, and Receiver Fees*

   Plaintiff asserts that, as of February 23, 2024, it had paid $1,046,156.92, "primarily . . .

to pay insurance premiums, real property taxes, the costs and fees of the Court-appointed

Receiver[,] repairs and maintenance." (ECF 131, Hu Decl. ¶ 13.) Friars Club argues that the

evidence provided by Plaintiff in support of these amounts either fails to substantiate the

amounts or is not competent evidence. (*See* ECF 147, Friars Club's Response ¶¶ 3-5, 9-12.) I

disagree.

   Plaintiff avers that it advanced $134,923.48 to pay real estate taxes; $815,245.44 to pay

receivership fees, utilities bills, and "Life Safety Issues"; $72,377.15 to pay insurance fees; and

$13,600 for property inspections. (*See* ECF 131, Hu Decl. Ex. A, Calculation of Amounts Due at 4;

*id*. Ex. C, Invoices for Property Protective Advances.) Plaintiff's initial submission contained

supporting documentation, including invoices, letters from counsel, and receipts,

demonstrating the general accuracy of these amounts, except the property inspections. (*See,*

11

*e.g.,* ECF 131, Hu Decl. Ex. C, Invoices for Property Protective Advances.)[6] In his supplemental

declaration, Mr. Hu declared under penalty of perjury that he is "personally familiar with the

Protective Advances made by the Plaintiff at the request of the Court-appointed Receiver" and

that the documentation attached as Exhibit C to his original declaration and attached as

Exhibits A and B to his second supplemental declaration support such advances. (ECF 149, Hu

Second Supp. Decl. ¶¶ 4-7, 12.) This is sufficient to substantiate the amounts claimed. *See, e.g.,*

*E. Sav. Bank,* 2014 WL 4804872, at *6 (finding that a plaintiff had submitted substantial

documentation demonstrating the accuracy of the claimed amount due for protective advances

by including an escrow advance schedule detailing payments made along with checks and

invoices demonstrating proof of such payments). Specifically:

- Plaintiff claims $134,923.48 for real estate taxes; $134,924.18 is supported by a June 14, 2023 letter from Key Bank Real Estate Capital seeking a wire transfer of $44,871.70 for payment of real estate taxes and a December 13, 2023 letter from Key Bank Real Estate Capital seeking a wire transfer of $90,052.48 for payment of real estate taxes. (*See* ECF 131, Hu Decl. Ex. C at 3, 56.)

---

[6]      The materials attached as Exhibit C to the Hu Declaration include: Letters from Akerman LLP to Trigild IVL Group, LLC, the Court-appointed receiver, copying Steven Biolsi (Friars Club's counsel), which summarize the protective services needed between May 2023 and December 2023 and confirm payment was made (*see* ECF 131*,* Hu Decl. Ex. C at 1-2, 4-7,27-29, 33-35); invoices from the New York City Department of Environmental Protection (*see id.* at 36-37); invoices from Consolidated Edison Company of New York (*see id.* at 20-25, 38-39); invoices from Allstate Sprinkler LLC for fire protection services (*see id.* at 40-46); invoices from PBF Solutions LLC for plumbing and other repair services (*see id.* at 47-49); invoices from Trigild IVL Group, LLC for receiver services (*see id.* at 8-9, 12-13); and letters from Key Bank Real Estate seeking payment for real estate taxes and property insurance (*see id.* at 3, 27-32, 56).

- Plaintiff claims $815,245.44 for receivership fees, utilities bills, and "Life Safety Issues"; $815,215.74 is supported by (a) invoices totaling $355,138.55 (*see id.* at 4-26); (b) invoices totaling $347,866.25 (*see id.* at 33-52); and (c) invoices totaling $112,210.34 (*see* ECF 149, Hu Second Supp. Decl., Ex. A at 3; *id.* Ex. B. at 1-11).

- Plaintiff claims $72,377.15 for insurance fees; that amount is supported by a letter from Key Bank Real Estate Capital seeking payment of insurance premiums to renew the property, liability, and excess insurance policies for the property. (*See* ECF 131, Hu Decl. Ex. C at 27-32.)

- Plaintiff seeks $13,600 for property inspections. Plaintiff states that the individuals who performed the property inspections were employed by Plaintiff's internal special servicing team and provides documents supporting the costs of the inspections. (*See* ECF 140, Hu First Supp. Decl. ¶¶ 19, 22 & Ex. C, Documents Supporting Inspection Costs.) There does not appear to be any prohibition in any of the loan documents from using in-house personnel to perform property inspections. Accordingly, I believe that Plaintiff has also adequately supported a cost of $13,600 for property inspections. Based on the foregoing, I conclude that Plaintiff has supported its claim that it is owed

**$1,036,116.37** for payments for insurance, taxes, property inspections and receiver fees.[7]

---

[7]    This amount (not $1,046,156.92 as stated by Plaintiff in paragraph 13 of the Hu Declaration (ECF 131), which appears to be a typo or reflect an error in addition) is the sum of the amounts Plaintiff indicated it spent on insurance, taxes, property inspections, and receiver fees.

*b.    Servicing Fees*

The Loan Agreement provides that Friars Club shall pay Plaintiff "along with accrued and payable interest then due a servicing fee equal to $920 per month." (ECF 90, Hu SJ Decl. Ex. 28, 2021 Consolidated Loan Agreement § 2.10(b).) The 2021 Consolidated Loan Agreement also states that if there is a default by Friars Club and the loan is "transferred to a special workout person," known as a "Special Servicer," then Plaintiff shall be "entitled to collect a one-time fee for their services equal to $130,000.00 at the time the Loan is transferred in addition to the Servicing Fee payable monthly." (*Id.* § 2.10(c).)

Friars Club has failed to pay the $920 monthly service fee since March 1, 2023, and so Plaintiff is entitled to $11,960 for the thirteen monthly servicing fees for the period from March 1, 2023 through February 23, 2024. (*See* ECF 131, Hu Decl. Ex. A, Calculation of Amounts Due at 6.)

With regard to the $130,000 fee for the Special Servicer, Plaintiff indicates in its supplemental submission that, "as is common in the commercial real estate lending sector," after beginning this foreclosure action, it "transferred the servicing of the Loan to its internal Special Servicing team . . . ." (ECF 140, Hu First Supp. Decl. ¶ 22.) Plaintiff points out that "there is no prohibition, in the Loan Agreement or elsewhere, to the Plaintiff transferring the Distressed Loan to its internal Special Servicing specialists to handle all the issues inherent in administering a non-performing loan secured by deteriorating collateral" and that the fee of $130,000, "which represents 1% of the initial principal loan amount, is proportionate to the size of the Loan" and compensates Plaintiff for additional work associated with managing a property

securing a loan in default, including involvement in "the day-to-day operations of the property."
(*Id.* ¶¶ 23, 24.)

Under the circumstances, I recommend allowing Plaintiff to recover the $130,000
Special Servicer fee, and therefore to recover a total of **$141,960** in servicing fees.

> c.    *Legal Fees and Costs in Connection with Draft Loan Modification*
>        *Documents*

Plaintiff seeks reimbursement of legal fees and costs Plaintiff incurred in connection
with the preparation of loan modification documents requested by Friars Club, in the amount
of $23,610.15. (*See* ECF 131, Hu Decl. ¶ 14.) Plaintiff acknowledges that the loan modification
was never consummated. (*See id.*) In my order requesting additional support for certain aspects
of Plaintiff's itemization of amounts owed due to Friars' Club's default, I noted that Plaintiff did
not cite to any specific provisions in the 2021 Consolidated Loan Agreement, 2021 Consolidated
Mortgage Note or other loan documents indicating Plaintiff is entitled to reimbursement for
these expenses. (*See* ECF 137, Order.)

In its supplemental filing, Plaintiff points to Section 10.3(a) of the 2021 Consolidated
Loan Agreement to support its claim for these legal fees and costs. The provision states: the
"**BORROWER WILL PAY ALL REASONABLE OUT-OF-POCKET COSTS AND EXPENSES INCURRED
BY LENDER IN CONNECTION WITH THE PREPARATION, DEVELOPMENT AND EXECUTION OF
THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS**." (ECF 140, Hu First Supp. Decl. ¶ 20;
ECF 90, Hu SJ Decl. Ex. 28, 2021 Consolidated Loan Agreement §10.3(a) (bolding and all caps in
original).) Plaintiff argues that the "expenses incurred by the Plaintiff as a result of the
Borrower's request to enter into a loan modification due to an impending default are therefore

covered and payable to the Plaintiff pursuant to the Loan Agreement." (ECF 140, Hu First Supp. Decl. ¶ 20.) I disagree. The cited provision of the 2021 Consolidated Loan Agreement refers to the costs and expenses incurred in connection with the "preparation, development and execution of this Agreement and the other Loan Documents." (ECF 90, Hu SJ Decl. Ex. 28, 2021 Consolidated Loan Agreement § 10.3(a).) Loan Documents are defined as: "collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases and Rents, . . . and all other documents, certificates and instruments executed in connection therewith and delivered to Lender in connection with the Loan and any prior loan documents assigned to Lender in connection with this Loan, as all of the forgoing shall be consolidated, extended, amended or restated from time to time." (*See id.* at 9.) The provision makes no mention of draft Loan Documents; the sophisticated counsel who drafted the Loan Documents could have included an allowance for fees and costs for unconsummated renegotiations of loan documents, had they wished to do so. Under the circumstances, I respectfully recommend that Plaintiff be denied recovery of legal fees and costs incurred in connection with draft loan modification documents.

> **d.    Legal Fees and Costs for this Foreclosure Action**

Plaintiff seeks $283,567.50 for legal fees and $3,892.28 for costs incurred between March 16, 2023 and February 9, 2024. (*See* ECF 132, Lichtenstein Decl. ¶ 10.)[8] Plaintiff submitted its attorneys' billing records. (*See* ECF 131, Hu Decl. Ex. D, Invoice of Outstanding Legal Fees and Costs.) Plaintiff's counsel submitted an attorney declaration testifying to the hours worked on this matter and the fees charged and received to date as well as attorney

---

[8]    The reference to $283,576.50 in legal fees (*see* ECF 132, Lichtenstein Decl. ¶ 10 introductory paragraph) appears to be a typo.

billing records. (*See* ECF 132, Lichtenstein Decl.) Based on my analysis below, I conclude that Plaintiff is entitled to **$264,079.04** for legal fees and costs in connection with this foreclosure action.

Various provisions within the loan documents make clear that Plaintiff is entitled to reasonable attorneys' fees and costs for enforcing its rights. (*See* ECF 90, Hu SJ Decl. Ex. 32, 2021 Consolidated Mortgage Note § 9; *id.* Ex. 28, 2021 Consolidated Loan Agreement §§ 1.1, 9.1(c), 10.3.) These provisions support an award of attorneys' fees and costs to Plaintiff, provided the fees and costs are reasonable. *See Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 95 (2d Cir. 2013) (upholding a professional fee provision in a loan contract).

Nine partners worked on this foreclosure action during the relevant period; their hourly billing rates range from $614.71 to $1105, and they spent 267.4 hours on this matter. The partner who spent the most time on this case (over 188.9 hours) had an hourly billing rate of $629.49. (*See* ECF 132, Lichtenstein Decl. ¶ 10.) Two associates worked on this matter during the relevant period; their hourly billing rates ranged from $391.86 to $625, and they spent 189.8 hours on this matter. The associate who spent the most time on this case (185.1 hours) had an hourly billing rate of $391.86. (*See id.*) Three paralegals worked on this matter during the relevant period; their hourly billing rates ranged from $340 to $445.66, and they spent 95.6 hours on this matter. The paralegal who spent the most time on this case (94.3 hours) had an hourly billing rate of $445.66. (*See id.*)

Friars Club challenges the hours spent by Plaintiff's counsel on this matter, arguing that the "issues in this action were simple," so that anything more than 100 hours of work would be excessive. (ECF 147, Friars Club's Response ¶¶ 17-18.) Friars Club goes on to argue that

Plaintiff's counsel wasted time hunting for assets when there was no need to do so because there has never been a dispute that the value of the Property is more than sufficient to cover Friars Club's obligations. (*See id.* ¶ 17.) Friars Club also contends that Plaintiff improperly seeks to recover fees for interfering with a contract between SiriusXM and Friars Club in a manner that affirmatively harmed Friars Club. (*See id*.)

i.    Number of Hours Expended

Having reviewed the billing records (*see* ECF 132, Litchtenstein Decl. Ex. 1, Plaintiff's Counsel's Invoices), I believe the time spent by attorneys and paralegals working on this highly contested matter was reasonable. The time entries are clear and substantive, and they show that Plaintiff's counsel spent an appropriate amount of time litigating this action, including by filing the complaint, filing an emergency motion for an appointment of a receiver (which motion was granted), drafting and responding to discovery requests, preparing for and taking depositions, and briefing the motion for summary judgment (which motion was granted). I also conclude that all these litigation efforts were reasonable undertakings. *See, e.g., Wilmington Tr., N.A. v. Winta Asset Mgmt., LLC*, No. 20-CV-5309 (JGK) (VF), 2023 WL 9603893, at *10 (S.D.N.Y. Dec. 21, 2023) (finding that the plaintiff's lawyers spent an appropriate amount of time litigating the action, including seeking the appointment of a receiver and filing motions for summary judgment), report and recommendation adopted, 2024 WL 1700032 (April 18, 2024).

Friars Club fails to provide any reasoned support for its contention that anything more than 100 hours of work would be excessive. Friars Club cites *DLJ Mortgage Capital, Inc. v. Act Lending Corp*., in which this Court, after having reviewed counsel's billing records, found that the approximately 70 hours spent on that matter was reasonable. (*See* ECF 147, Friars Club's

Response ¶ 18 (citing *DLJ Mortgage Cap*., No. 07-CV-10318 (JFK) (THK), 2008 WL 5517589, at *8

(S.D.N.Y. Dec. 1, 2008), report and recommendation adopted, 2009 WL 111571 (Jan. 14,

2009)).) But Friars Club provides no comparison of the necessary work in this matter and the

work performed in *DLJ Mortgage Capital*. Notably, *DLJ Mortgage Capital* was decided in the

context of a default judgment – not, as was the case here, a vigorously litigated matter in which

Plaintiff filed an emergency motion to appoint a receiver (*see* ECF 26, Mot. to Appoint

Temporary Receiver), engaged in months-long discovery (*see* ECF 74, Joint Status Letter), and

briefed a summary judgment motion (*see* ECF 88, Mot. for Summary Judgment).

Nor does Friars Club substantiate its accusation that Plaintiff's counsel wasted time on

asset searches. Friars Club's assertion that the Property has sufficient equity to cover Friars

Club's obligations is not a guarantee, and so I cannot conclude that the limited time spent by

Plaintiff's counsel looking for assets was unwarranted.

Friars Club's argument that Plaintiff cannot recover for work done to interfere with a

contract between Friars Club and SiriusXM, because "legal fees for the willful harm inflicted by

[Plaintiff's] attorney or the receiver" (ECF 147, Friars Club's Response ¶ 17) is similarly

unavailing. The Loan Documents authorize Plaintiff to "make such payments and do such acts

as [Plaintiff] *considers necessary or reasonable* to protect its security interests." (ECF 90, Hu SJ

Decl. Ex. 28, 2021 Consolidated Loan Agreement § 9.1(c)); *id.* Ex. 32, 2021 Consolidated

Mortgage Note § 9 (emphasis supplied).) The decisions about what costs to incur to protect

Plaintiff's security interest are left to Plaintiff. Under the circumstances, Friars Club has not

persuaded me that the limited work done by Plaintiff's counsel relating to the SiriusXM contract

was unnecessary or inappropriate.

ii.    Hourly Rates

Having reviewed Plaintiff's declaration in support of the claimed attorneys' fees (ECF 132, Lichtenstein Decl.), I conclude that the hourly rates for the partners and associates who worked on the matter were reasonable, based on the rates for similar services, *see Blum*, 465 U.S. at 895 n.11 (1984), as well as the attorneys' experience and their degree of success, *see Agudath Israel*, 2023 WL 2637344. The hourly rates, which range from $614.71 to $1105 for partners and from $391.86 to $625 for associates, are comparable to rates approved in similar commercial matters. *See, e.g., UMB Bank, Nat'l Ass'n v. Bluestone Coke, LLC*, No. 20-CV-2043, 2021 WL 3292519, at *6 (S.D.N.Y. Aug. 2, 2021) (approving partners' hourly rates of up to $1,030 in a complex bankruptcy and commercial litigation involving sophisticated commercial actors); *Tabatznik v. Turner*, No. 14-CV-8135 (JFK), 2016 WL 1267792, at *11-12 (S.D.N.Y. Mar. 30, 2016) (applying a per hour partner rate of $650 and associate rate of $425 in an action to enforce a promissory note). The lead partner on the matter has had over 30 years of experience handling foreclosure actions and the lead associate on the matter had three years of experience. (*See* ECF 132, Lichtenstein Decl. ¶¶ 11, 21.) Moreover, Plaintiff was successful in almost all aspects of the suit.

However, I believe that Plaintiff's requested hourly rates for paralegals (ranging from $340 to $445.66) are unduly high. Courts in this District typically award hourly rates for paralegals and other administrative professionals of between $100 and $200. *See 1979 Fam. Tr. Licensor, LLC v. Darji*, No. 19-CV-4389 (VEC), 2020 WL 9596279, at *1 (S.D.N.Y. Sept. 30, 2020) (noting that courts in this District typically approve paralegal hourly rates between $100 and $200); *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16-CV-6392 (JPO), 2021 WL 1198930, at *5

(S.D.N.Y. Mar. 30, 2021) (noting that courts in this District "have been loath" to award billing rates "in excess of $200" for "support staff"). Accordingly, I respectfully recommend that the hourly rate for paralegals be reduced to $200.

Based on the foregoing analysis, I respectfully recommend that the requested attorneys' fees be granted, except that the paralegal hourly rate be reduced to $200, resulting in attorneys' fees in the amount of **$260,186.76**.[9]

iii.    Costs

Plaintiff also requests $3,892.28 in costs: $402 for the filing fee in this action, $869.91 for the foreclosure search, $908.10 for service of court documents, and $1,712.27 for miscellaneous fees such as for postage and deposition transcripts. (*See* ECF 132, Lichtenstein Decl. Ex. 1, Plaintiff's Counsel's Invoices.) These are the types of costs that may be recovered. *See HSBC Bank USA*, 2021 WL 667661, at *8. Plaintiff's counsel has documented its costs. (*See* ECF 132, Lichtenstein Decl. Ex.1.) This record is sufficient to support the request for reimbursement. *See HSBC Bank USA*, 2021 WL 667661, at *8 (finding that sworn testimony and billing records documenting litigation costs were sufficient to support the request for reimbursement). I therefore respectfully recommend that Plaintiff be allowed to recover **$3,892.28** in costs in connection with this foreclosure action.

*****

---

[9]    The legal fees at Plaintiff's proposed rates come to $283,567.50. I deduct from that amount $23,380.74 to reflect the lower paralegal hourly rate of $200 per hour. This deduction is the combined total of ($245.66 per hour x 94.3 hours = $23,165.74), ($195 per hour x .6 hours = $117) and ($140 per hour x .7 hours = $98).

Based on the analysis above, I conclude that Plaintiff is entitled to recover **$1,442,155.41** in Property Protective Advances, which amount reflects the sum of **$1,036,116.37** in insurance, taxes, property inspections, and receiver fees, **$141,960** in servicing fees, and **$264,079.04** in attorneys' fees and costs in connection with this foreclosure action.

### 3.    Accumulated Interest

The 2021 Consolidated Loan Agreement provides that the outstanding principal balance shall bear interest at the Interest Rate (9.25% annually). (*See* ECF 90, Hu SJ Decl. Ex. 28, 2021 Consolidated Loan Agreement § 2.4.) In the event of default, Plaintiff may elect to accrue interest at the "Default Rate," defined as "the lesser of (i) sixteen percent (16%) per annum or (ii) the highest rate of interest permitted under the laws of the state of New York." (*Id.*) In New York, the maximum legal rate is 16%. N.Y. Gen. Oblig. Law § 5-501; *see also* N.Y. Banking Law § 14-a. Accordingly, the Default Rate is 16%.

According to the 2021 Consolidated Loan Agreement, the "Borrower shall pay interest in arrears on the principal balance of the Loan from time to time outstanding at a per annum rate equal to the Interest Rate (or the Default Rate at any time at which an Event of Default shall exist)." (ECF 90, Hu SJ Decl. Ex. 28, 2021 Consolidated Loan Agreement § 2.4(a).) The method for calculating interest on the principal balance is set out in the 2021 Consolidated Loan Agreement, which provides, as relevant here, that interest shall be "computed on the basis of the actual days elapsed on the assumption that each month contains thirty (30) days and each year contains three hundred sixty (360) days . . . ." (*Id.* § 1.1 at 7). Following a default, Friars Club shall pay Plaintiff interest at the "Default Rate on the entire unpaid principal sum and any other amounts due at such time under this Agreement and the other Loan Documents." (*Id.* §

2.8.) Upon Plaintiff's payment of Property Protective Advances, "the full amount of each and every such payment shall be immediately due and payable, whether or not there be notice, demand, attempt to collect or suit pending, and shall bear interest at the Default Rate (defined below) from the date thereof . . . ." (ECF 90, Hu SJ Decl. Ex. 32, 2021 Consolidated Mortgage Note § 7.)

Friars Club argues that judgment was only recently entered and that the original judgment was not an effective judgment against Friars Club. (*See* ECF 147, Friars Club's Response ¶ 21.) It goes on to conclude that Plaintiff's "efforts seeking to compound interest on top of interest is an improper calculation." (*Id*.) But Friars Club has not identified which amounts it contends reflect improper compound interest; nor does it explain or provide any authority to support it position that the amendment of the judgment on May 29, 2024 is relevant to the question of what interest amounts are appropriately awarded to Plaintiff. I therefore do not believe that this argument affects the calculation of interest owed to Plaintiff.

Under the terms of the 2021 Consolidated Loan Agreement and 2021 Consolidated Mortgage Note, the accumulated interest as of June 10, 2024 (the date of this report and recommendation) may be calculated by taking the sum of the following amounts:[10]

- The product of (a) the Interest Rate (9.25% per year) divided by 360 days per year, which is the daily Interest Rate, (b) the number of days in February 2023 (assumed to be 30 under the 2021 Consolidated Loan Agreement) (*see* ECF 90, Hu SJ Decl. Ex. 28, 2021

---

[10]     Reports and recommendations issued in this District typically calculate interest as of the date of their issuance and typically also include a recommendation that the Clerk of Court bring those calculations forward to the date that judgment is entered. *See, e.g., Wells Fargo Bank v. 5615 N. LLC,* No. 20-CV-2048 (VSB) (KHP) 2023 WL 7394340, at *5 (S.D.N.Y. May 4, 2023).

Consolidated Loan Agreement § 1.1 at 7), and (c) the unpaid principal amount of $13 million. This product, which reflects the accumulated unpaid interest for February 2023 that had been due on March 1, 2023, accrued at a non-default annual interest rate of 9.25%, is **$100,208.33**.[11]

- The product of (a) the Interest Rate (9.25% per year) divided by 360 days per year, (b) 11 (the number of days in March before the Default Rate began to apply), and (c) the unpaid principal amount of $13 million; plus the product of (a) the Default Rate (16% per year) divided by 360 days per year, (b) 19, which is the number of days in March 2023 for which the Default Rate applied, given the assumption in the 2021 Consolidated Loan Agreement that there are 30 days in a month (*see id.*); and (c) the unpaid principal amount of $13 million. This amount, which reflects the accumulated unpaid interest for March 2023 that came due on April 1, 2023, is **$146,520.83**.[12]

- The product of (a) the Default Rate (16% per year) divided by 360 days per year, which is the daily Default Rate, (b) the number of days since April 1, 2023, which as of June 10, 2024, was 430 days calculated in the matter set forth in the 2021 Consolidated Loan Agreement (*see id.*),[13] and (c) the unpaid principal amount of $13 million. This product,

---

[11]    Plaintiff calculated this amount to be $93,527.78 using 28 days in February, which was the actual number of days in February 2023. (*See* ECF 140, Hu First Supp. Decl. ¶ 10 n.1.)

[12]    Plaintiff calculated this amount to be $154,736.11 using a 31-day month for March. (*See* ECF 140, Hu First Supp. Decl. ¶ 11 n.2.)

[13]    From April 1, 2023 to June 10, 2024, there are 14 months and 10 days. Each month is assumed to be 30 days long under the 2021 Consolidated Loan Agreement, and so 14 months are assumed to be 420 days. This results in a total of 430 days.

which reflects accumulated interest from April 1, 2023 to June 10, 2024, accrued at the Default Rate, is **$2,484,444.44**.[14]

- Interest at the Default Rate through June 10, 2024 on six Property Protective Advances made between June 28, 2023 and February 9, 2024, which advances amounted to $1,022,516.77 (*see* ECF 149, Hu Second Supp. Decl. ¶ 11). I perform this calculation based on the assumption in the 2021 Consolidated Loan Agreement that there are thirty days in each month, by adding the interest accrued on each Property Protective Advance from the date each such advance was made:

  o the interest on the first Property Protective Advance is the product of (a) the Default Rate (16% per year) divided by 360 days per year, which is the daily Default Rate, (b) the number of days since interest began to accrue on that advance, June 28, 2023 (the day after payment was made), which as of June 10, 2024 is assumed to be 342 days,[15] and (c) the unpaid June 2023 protective advance payment amount of $44,872, which comes to $6,820.54;

  o the interest on the second Property Protective Advance is the product of (a) the Default Rate (16% per year) divided by 360 days per year, which is the daily Default Rate, (b) the number of days since interest began to accrue on that advance, August 12, 2023 (the day after payment was made), which as of June

---

[14]    Plaintiff calculated the accumulated interest as of February 23, 2024 (the date of its proposed findings of fact and conclusions of law) as $2,203,008.52. (*See* ECF 130, Proposed Findings at 7.)

[15]    From June 29, 2023 to June 10, 2024, there are 11 months and 12 days. Each month is assumed to be 30 days long under the 2021 Consolidated Loan Agreement, and so 11 months are assumed to be 330 days. This results in a total of 342 days.

10, 2024 is assumed to be 300 days,[16] and (c) the unpaid August 2023 protective advance payment amount of $355,139, which comes to $47,351.87;

o   the interest on the third Property Protective Advance is the product of (a) the Default Rate (16% per year) divided by 360 days per year, which is the daily Default Rate, (b) the number of days since interest began to accrue on that advance, September 29, 2023 (the day after payment was made), which as of June 10, 2024 is assumed to be 253 days,[17] and (c) the unpaid September 2023 protective advance payment amount of $72,377, which comes to $8,138.39;

o   the interest on the fourth Property Protective Advance is product of (a) the Default Rate (16% per year) divided by 360 days per year, which is the daily Default Rate, (b) the number of days since interest began to accrue on that advance, November 14, 2023 (the day after payment was made), which as of June 10, 2024 is assumed to be 208 days,[18] and (c) the unpaid November 2023 protective advance payment amount of $347,867, which comes to $32,158.37;

o   the interest on the fifth Property Protective Advance is the product of (a) the Default Rate (16% per year) divided by 360 days per year, which is the daily

---

[16]    From August 11, 2023 to June 10, 2024, there are nine months and 30 days. Each month is assumed to be 30 days long under the 2021 Consolidated Loan Agreement § 1.1 at 7, and so nine months are assumed to be 270 days. This results in a total of 300 days.

[17]    From September 28, 2023 to June 10, 2024, there are eight months and 13 days. Each month is assumed to be 30 days long under the 2021 Consolidated Loan Agreement § 1.1 at 7, and so eight months are assumed to be 240 days. This results in a total of 253 days.

[18]    From November 13, 2023 to June 10, 2024, there are six months and 28 days. Each month is assumed to be 30 days long under the 2021 Consolidated Loan Agreement § 1.1 at 7, and so six months are assumed to be 180 days. This results in a total of 208 days.

Default Rate, (b) the number of days since interest began to accrue on that advance, June 28, 2023 (the day after payment was made), which as of June 10, 2024 is assumed to be 173,[19] and (c) the unpaid December 2023 protective advance payment amount of $90,052, which comes to $6,924.00; and

o   the interest on the sixth Property Protective Advance is the product of (a) the Default Rate (16% per year) divided by 360 days per year, which is the daily Default Rate, (b) the number of days since interest began to accrue on that advance, February 10, 2024 (the day after payment was made), which as of June 10, 2024 is assumed to be 122 days,[20] and (c) the unpaid February 2024 protective advance payment amount of $112,210.34, which comes to $6,084.29.

This sum of the interest on six Property Protective Advances comes to **$107,477.46**,[21] and the sum of the interest on the unpaid principal amount plus the interest on six Property Protective Advances comes to **$2,838,651.06**, which accounts for accumulated interest through June 10, 2024.

---

[19]     From December 18, 2023 to June 10, 2024, there are five months and 23 days. Each month is assumed to be 30 days long under the 2021 Consolidated Loan Agreement § 1.1 at 7, and so five months are assumed to be 150 days. This results in a total of 173 days.

[20]     From February 9, 2024 to June 10, 2024, there are three months and 32 days. Each month is assumed to be 30 days long under the 2021 Consolidated Loan Agreement § 1.1 at 7, and so three months are assumed to be 90 days. This results in a total of 122 days.

[21]     Plaintiff calculated the interest on the six Property Protective Advances to be $59,632.79 as of February 23, 2024 (rather than June 10, 2024), using the actual number of days in each month for which the Property Protective Advances were owed. (*See* ECF 140, Hu First Supp. Decl. ¶ 15.)

The Court should also account for additional interest that will accumulate between the date of this report and recommendation and the date a final judgment is entered. The Clerk of Court should be directed to calculate the amount of this additional interest, add it to the amount of accumulated interest as of June 10, 2024, which is **$2,838,651.06**, and include in the final judgment that sum, which will be the total amount of accumulated interest as of the date of the final judgment. *See Wells Fargo Bank v. 5615 N. LLC*, No. 20-CV-2048 (VSB) (KHP), 2023 WL 7394340, at *5 (directing the Clerk of Court to calculate additional interest from date of the report and recommendation until date of the final judgment and include that amount in the final judgment). The Clerk of the Court may perform this calculation by finding the product of: (a) the number of days between June 10, 2024 and the date of the final judgment and (b) $6,232.22, which is the amount of daily interest at the Default Rate on the outstanding principal balance of $13 million and on the included Property Protective Advances (*see* ECF 130, Proposed Findings ¶ 15).[22]

B.  <u>Post-Judgment Interest</u>

Post-judgment interest is mandatory in federal civil actions. *See* 28 U.S.C. § 1961(a). Pursuant to 28 U.S.C. § 1961(a), "[I]nterest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as

---

[22]    The amount of daily interest on the outstanding principal balance at the Default Rate is calculated by taking the product of the outstanding principal balance ($13 million) and the Default Rate of 16% per year divided by 360 days per year. The amount of daily interest on the Property Protective Advances is calculated by taking the product of the amount of six included Property Protective Advances as of June 10, 2024 ($1,022,516.77) and the Default Rate of 16% per year divided by 360 days per year. The daily interest on the outstanding principal balance and six included Property Protective Advances is the sum of these two figures, which amounts to $6,232.22.

published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." *Id.* Accordingly, Plaintiff's post-judgment interest should be granted and calculated based on the weekly average one-year constant maturity Treasury yield for the week preceding the date on which judgment is entered. *See Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008) (holding that post-judgment interest is mandatory and calculated pursuant to federal statute); *Builders Bank v. N. Funding, LLC*, No. 08-CV-3575 (MDG), 2012 WL 4928854, at *1 (E.D.N.Y. Oct. 16, 2012) (awarding post-judgment interest at the federal rate in an action for judgment of foreclosure and sale).

<u>CONCLUSION</u>

For the foregoing reasons, I respectfully recommend:

(1)    That the final judgment of foreclosure to be entered in favor of Plaintiff direct payment to Plaintiff in the amount of **$17,148,630.65**, plus an additional amount to be calculated by the Clerk of Court in accordance with point (2), below.[23] The **$17,148,630.65** is the sum of the following amounts, less the $132,175.82 credit to Friars Club:

    (a)  The unpaid principal balance of **$13,000,000**;

    (b)  Property Protective Advances of **$1,442,155.41**, which amount reflects the sum of $1,036,116.37 in insurance, taxes, property inspections, and receiver fees,

---

[23]    Notwithstanding that I recommend disallowing some of the amounts claimed by Plaintiff, this figure is higher than the $16,711,321.71 originally sought by Plaintiff (*see* ECF 131, Hu Decl. Ex. A, Calculation of Amounts Due at 1), primarily because Plaintiff performed its calculation as of February 23, 2024, while I accounted for interest to which Plaintiff is entitled that accrued between that date and the date of this report and recommendation; had I not done so, the interest that accrued during that period would have to be calculated by the Clerk of Court.

$141,960 in servicing fees, and $264,079.04 in attorneys' fees and costs in connection with this foreclosure action; and

(c)  Accumulated interest through June 10, 2024 on the unpaid principal balance and on Property Protective Advances, which accumulated interest totals **$2,838,651.06**.

(2)  That on the date of entry of a final judgment in this matter in favor of Plaintiff, the Clerk of Court be requested to calculate an amount to be added to the **$17,148,630.65** set forth in point (1) above, which additional amount accounts for (a) the interest that will have accrued on the unpaid principal balance and on six included Property Protective Advances between the date of this report and recommendation and the date of the final judgment, to be calculated by taking the product of the daily interest amount of $6,232.22 and the number of days between June 10, 2024 and the date of the final judgment; and

(3)  That the final judgment reflect that Plaintiff is entitled to post-judgment interest at a rate calculated based on the weekly average one-year constant maturity Treasury yield for the week preceding the date on which judgment is entered.

DATED:    June 10, 2024
          New York, New York

_____
**ROBYN F. TARNOFSKY**
United States Magistrate Judge

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO REPORT AND RECOMMENDATION**

The parties shall have fourteen days (including weekends and holidays) from service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure to this report and recommendation. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Subramanian.

THE FAILURE TO OBJECT WITHIN FOURTEEN DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).